# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Bureau of Consumer Financial
Protection and the Commonwealth
of Massachusetts *ex rel.* Maura
Healey, Attorney General,

    *Plaintiffs*,

          v.

Commonwealth Equity Group,
LLC (d/b/a Key Credit Repair);
Nikitas Tsoukales (a/k/a Nikitas
Tsoukalis),

    *Defendants*.

Case No.

## COMPLAINT

The Bureau of Consumer Financial Protection (Bureau) and the

Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney

General (the Commonwealth), bring this action against Commonwealth

Equity Group, LLC (d/b/a Key Credit Repair) (KCR) and Nikitas

Tsoukales (collectively, Defendants) for: (1) deceptive acts or practices

that violate §§ 1031 and 1036 of the Consumer Financial Protection Act

of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536, and § 2 of the Massachusetts

Consumer Protection Law, M.G.L. c. 93A, § 2 (MA-UDAP); (2) deceptive

and abusive telemarketing acts or practices that violate the

Telemarketing and Consumer Fraud and Abuse Prevention Act, 15

U.S.C. §§ 6101-6108, and the Telemarketing Sales Rule (TSR), 16

C.F.R. §§ 310.3 & 310.4; and (3) various acts or practices that violate

the Massachusetts Credit Services Organization Law, M.G.L. c. 93,

§§ 68A-E (MA-CSO). The Bureau and the Commonwealth allege as

follows.

## JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction over this action

because it concerns federal consumer-financial law, 12 U.S.C.

§ 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is

brought by an agency of the United States, 28 U.S.C. § 1345.

2.     This Court has supplemental jurisdiction over the

Commonwealth's state-law claims because they are so related to the

federal claims that they form part of the same case or controversy. 28

U.S.C. § 1367(a).

3.     Venue is proper in this district because Defendants are

located, reside, or do business in this district and because a substantial

part of the events or omissions giving rise to the claims occurred in this district. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b).

## PARTIES

4.     The Bureau is an independent agency of the United States. 12 U.S.C. § 5491. The Bureau is charged with enforcing "Federal consumer financial laws." 12 U.S.C. §§ 5563 and 5564. The Bureau has independent litigating authority, 12 U.S.C. §§ 5564(a)-(b), including the authority to enforce the TSR with respect to the offering or provision of a consumer-financial product or service under the CFPA, 15 U.S.C. § 6105(d).

5.     Maura Healey is the Attorney General of Massachusetts and its chief legal officer. Attorney General Healey is charged with, among other things, enforcing the MA-UDAP and other consumer-protection laws in the public interest. Indeed, the MA-UDAP created a statutory mandate for the Attorney General to investigate and prosecute any entity or person who "is using or is about to use any method, act, or practice declared by section two [of the MA-UDAP] to be unlawful." M.G.L. c. 93A, §§ 4, 6. Those actions "declared . . . to be unlawful by section two" of the MA-UDAP include "unfair methods of competition

and unfair or deceptive acts or practices in the conduct of any trade or commerce," M.G.L. c 93A, §§ 2, 4, while violations of §§ 68B to 68E of the MA-CSO automatically constitute violations of the MA-UDAP.

6.     KCR is a limited-liability company incorporated in Massachusetts in 2007. Its principal place of business is located at 686 Morton Street, Suite #2, Boston, Massachusetts. Through telemarketing and tele-sales, KCR offers and purports to provide credit-repair or credit-improvement services to consumers nationwide.

7.     KCR is a "covered person" under 12 U.S.C. § 5481(6)(A) because it offers or provides a consumer-financial product or service for use by consumers primarily for personal, family, or household purposes or that is delivered, offered, or provided in connection with such a product or service. The services offered or provided consist of financial-advisory services, including credit counseling and "collecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers, used or expected to be used in connection with any decision regarding the offering or provision of a consumer financial product or service." 12 U.S.C. § 5481(15)(A)(viii), (ix).

8.     Nikitas Tsoukales, sometimes known as Nikitas Tsoukalis, is KCR's president and sole owner. Tsoukales has managerial responsibility for KCR and arranges for KCR to provide credit-repair or credit-improvement services, including by directing KCR's day-to-day operations, finances, marketing, and sales practices.

9.     Tsoukales is a "covered person" under 12 U.S.C. § 5481(6)(A) because he offers or provides a consumer-financial product or service for use by consumers primarily for personal, family, or household purposes, or that is delivered, offered, or provided in connection with such a product or service. The services offered or provided consist of financial-advisory services, including credit counseling and "collecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers, used or expected to be used in connection with any decision regarding the offering or provision of a consumer financial product or service." 12 U.S.C. § 5481(15)(A)(viii), (ix).

10.     Tsoukales is also a "related person" under 12 U.S.C. § 5481(25) because he has managerial responsibility for KCR, and he materially participates in the conduct of KCR's affairs. As a related

person, Tsoukales is deemed a covered person under the CFPA. 12 U.S.C. § 5481(25).

11.    Defendants are "sellers" under the TSR as that term is defined by 16 C.F.R. § 310.2(dd) because, in connection with telemarketing transactions, they provide, offer to provide, or arrange for others to provide goods or services to customers in exchange for consideration.

12.    KCR is a "telemarketer" under the TSR as that term is defined by 16 C.F.R. § 310.2(ff) because, in connection with telemarketing, it initiates or receives telephone calls to or from customers.

13.    Tsoukales and KCR are each a "credit services organization" (CSO) under the MA-CSO because each is a person or entity that "sells, provides, performs, or who represents to sell, provide or perform for the payment of money or other valuable consideration" one or more of three types of services, which include "improving a buyer's credit record, history or rating" and "providing advice or assistance" in support thereof. M.G.L. c. 93, § 68A.

## FACTUAL ALLEGATIONS

14.     Tsoukales and KCR market and sell credit-repair services to consumers nationwide.

15.     KCR markets itself as providing services that will assist consumers in removing derogatory information from, or improving, the consumers' credit history, credit record, or credit scores or ratings.

16.     KCR conducts telemarketing through receiving inbound phone calls from consumers.

17.     Tsoukales created the scripts that KCR's telemarketers use in the sale of KCR's services, is responsible for the content of KCR's websites, and oversees nearly all aspects of KCR's marketing and advertising.

18.     Tsoukales also interacts directly with consumers and KCR's customers, and he has made representations to consumers related to KCR's credit-repair services before, during, and after their enrollment with the company.

19.     Since 2008, KCR has enrolled tens of thousands of consumers. From 2016 through 2019, KCR enrolled nearly 40,000 consumers nationwide.

20.   Since January 2011, KCR has collected at least $23,000,000 in fees from consumers.

21.   Since January 2011, KCR has enrolled roughly 12,616 Massachusetts consumers.

22.   KCR requires that consumers pay what it calls a "first work fee" of between $99.95 and $159.95 or more within five days of enrolling with the company.

23.   KCR then charges consumers monthly fees of $99.95 to $159.95 or more, depending on the service level the consumer chooses. KCR also adds an "expedited billing processing fee" of at least $6.50 to the monthly fees.

24.   KCR collects these fees from consumers before achieving the promised credit-repair results.

25.   As CSOs, Defendants are prohibited from charging any advance fees—namely, any fee charged before "full, complete and satisfactory performance" of the credit-repair services offered—unless two conditions are met. M.G.L. c. 93, § 68B. First, the CSO must obtain a surety bond in the amount of at least $10,000 issued by a company authorized to do business in Massachusetts. M.G.L. c. 93, § 68B(1).

Second, the CSO must establish a trust account at a "federally insured bank or savings and loan association located in [Massachusetts]." *Id.*

26.    While Defendants appear to maintain a $10,000 surety bond written by Western Surety Company, they do not have a trust account of any kind.

27.    Since at least 2017, KCR has made representations about its credit-repair services on its website, in online advertising, and in its customer agreements.

28.    For example, as of early March 2020, KCR's website included the following representations:

> a.    "our team of more than 60 credit experts help[s] each and every client individually" to "take the next steps towards credit freedom;" and

> b.    "[o]ur consultations are all done by our owner, Nik Tsoukales, and his team of certified credit consultants."

29.    KCR, however, has just a handful of Boston-based employees, only some of whom interact directly with consumers. The majority of KCR's sales and client interactions are conducted by contract telemarketers located in Central America who are

compensated almost entirely by commission, based on the number of clients they enroll in KCR's programs.

30.     In addition, in December 2018, KCR's website included the following representations:



31.     In many instances, however, KCR did not fix unlimited amounts of negative items on clients' credit files. And most clients did not see credit scores with an "average 90 point increase in 90 days."

32.    Another KCR advertisement published online in September 2018 stated:



33.    In many instances, however, consumers did not see removals on their credit reports within 45 days of enrolling with KCR.

34.    Other advertisements published on KCR's website from at least January 2018 to at least March 2019 represented that KCR would assist consumers in removing derogatory information from, or improving, the consumers' credit record, including:

      a.    "We dramatically increase credit scores to help consumers that are struggling to get approved;"

b.   "We help people whose low credit scores are holding

them back from the life they want;" and

c.   "Clean Up Unlimited Negative Records."

35.   In many instances, however, KCR did not dramatically

increase consumers' credit scores and did not clean up unlimited

negative records on behalf of consumers.

36.   KCR's representations have led consumers to believe that if

they paid for KCR's services, the company would help improve their

credit scores or remove derogatory information from their credit reports.

37.   In many instances, however, KCR failed to deliver the

promised results, and consumers did not see their credit scores

improved or negative items removed from their credit reports.

## COUNT I
### *Abusive Telemarketing Acts or Practices That Violate the TSR*

38.   The allegations in paragraphs 1 to 37 are incorporated here

by reference.

39.   It is an abusive telemarketing act or practice and a violation

of the TSR for any seller or telemarketer to request or receive payment

of any fee or consideration for goods or services represented to remove

derogatory information from, or improve, a person's credit history,

credit record, or credit rating, until:

> a.    the timeframe in which the seller has represented that
>
> all of the goods or services will be provided to that person
>
> has expired; and
>
> b.    the seller has provided the person with documentation
>
> in the form of a consumer report from a consumer-reporting
>
> agency demonstrating that the promised results have been
>
> achieved, such report having been issued more than six
>
> months after the results were achieved. 16 C.F.R.
>
> § 310.4(a)(2).

40.    Defendants have made representations to consumers that

their credit-repair services would remove derogatory information from,

or improve, the consumers' credit histories, credit reports, or credit

ratings.

41.     Defendants routinely requested and received payment of a fee or consideration for their credit-repair services before:

    a.     the timeframe in which they represented that all of their goods or services would be provided to the consumer expired; and

    b.     they provided the consumer with documentation in the form of a consumer report from a consumer-reporting agency demonstrating that the promised results were achieved, such report having been issued more than six months after the results were achieved.

42.     Therefore, Defendants have engaged in abusive telemarketing acts or practices that violated 16 C.F.R. § 310.4(a)(2).

## COUNT II
### *Deceptive Telemarketing Acts or Practices That Violate the TSR*

43.     The allegations in paragraphs 1 to 37 are incorporated here by reference.

44.     It is a deceptive telemarketing act or practice under the TSR for a seller or telemarketer to misrepresent any material aspect of the performance, efficacy, nature, or central characteristics of its services. 16 C.F.R. § 310.3(a)(2)(iii).

45.     In numerous instances, in connection with the offering or provision of credit-repair services, Defendants have represented, directly or indirectly, expressly or by implication, that KCR's actions would or likely would result in a substantial increase to consumers' credit scores.

46.     But, in numerous instances, KCRs actions did not result in a substantial increase to consumers' credit scores.

47.     In numerous instances, in connection with the offering or provision of credit-repair services, Defendants have represented, directly or indirectly, expressly or by implication, that KCR's actions would or likely would result in the removal of negative entries on consumers' credit reports.

48.     But, in numerous instances, KCRs actions did not result in the removal of negative entries on consumers' credit reports.

49.     These representations have been material and likely to mislead consumers acting reasonably under the circumstances.

50.     Because Defendants are sellers or telemarketers under the TSR, these misrepresentations about the performance, efficacy, nature,

or central characteristics of KCR's services violated the TSR. 16 C.F.R.

§ 310.3(a)(2)(iii).

## COUNT III
### *TSR Violations Constitute Violations of the CFPA*

51.    The allegations in paragraphs 1 to 37 are incorporated here

by reference.

52.    Under the CFPA, it is unlawful for any covered person or

service provider to commit any act or omission in violation of a "Federal

consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

53.    Any violation of the TSR that is committed by a person

subject to the CFPA shall be treated as a violation of a rule under

§ 1031 of the CFPA, 12 U.S.C. § 5531, regarding unfair, deceptive, or

abusive acts or practices. 15 U.S.C. § 6102(c)(2).

54.    Therefore, any violation of the TSR by a covered person is

also a violation of the CFPA.

55.    Because Defendants are covered persons and have

committed an act or omission in violation of the TSR, they also violated

the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT IV
### *Deceptive Acts or Practices That Violate the CFPA*

56.    The allegations in paragraphs 1 to 37 are incorporated here by reference.

57.    In numerous instances, in connection with the offering or provision of credit-repair services, Defendants have directly or indirectly, expressly or by implication, made material misrepresentations regarding the efficacy of KCR's credit-repair services by representing that KCR's actions would or likely would result in a substantial increase to consumers' credit scores.

58.    But, in numerous instances, KCR's actions did not result in a substantial increase to consumers' credit scores.

59.    In numerous instances, in connection with the offering or provision of credit-repair services, Defendants have directly or indirectly, expressly or by implication, made material misrepresentations regarding the efficacy of KCR's credit-repair services by representing that KCR's actions would or likely would result in the removal of material negative entries on consumers' credit reports.

60.    But in numerous instances, KCR's actions did not result in the removal of negative entries on consumers' credit reports.

61.     These representations regarding KCR's services were material and likely to mislead consumers acting reasonably under the circumstances.

62.     Therefore, Defendants' representations as described herein were false and misleading and constituted deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

## COUNT V
### *TSR and CFPA Violations*
### *Constitute Violations of the MA-UDAP*

63.     The allegations in paragraphs 1 to 37 are incorporated here by reference.

64.     Under the MA-UDAP, violations of federal consumer-protection laws such as the TSR and CFPA constitute violations of § 2 of the MA-UDAP, which prohibits unfair or deceptive acts or practices in the conduct of business in Massachusetts. 940 CMR 3.16; M.G.L. c. 93A, § 2.

65.     Therefore, any violation of the TSR or CFPA by a person or entity that conducts business in Massachusetts is also a violation of the MA-UDAP.

66.     Because Defendants committed acts or omissions that violated the TSR and CFPA, they also violated the MA-UDAP's ban on unfair or deceptive acts or practices.

## COUNT VI
### Defendants Operate in Open
### Violation of Numerous Requirements of the MA-CSO

67.     The allegations in paragraphs 1 to 37 are incorporated here by reference.

68.     As CSOs, in order to charge any advance fees, Defendants are required to maintain a $10,000 surety bond written by a company authorized to do business in Massachusetts and establish and maintain a trust account with a Massachusetts bank or savings and loan institution. M.G.L. c. 93, § 68B(1). Defendants have not met these requirements, yet they continually charge monthly service and other fees to consumers before fully and completely performing the promised credit-repair services, in violation of the MA-CSO.

69.     In addition, before execution of a contract and before the receipt of money or valuable consideration from a consumer, CSOs must disclose in writing "a complete and detailed description of the services to be performed by the [CSO] and the total cost to the buyer for such

services." M.G.L. c. 93, § 68C(5). And every CSO service agreement or contract must set forth "the terms and conditions of payment, *including the total of all payments to be made by the buyer*, whether to the [CSO] or to some other person." M.G.L. c. 93, § 68D(c) (emphasis added).

70.　Finally, before execution of a contract and before the receipt of money or valuable consideration from a consumer, CSOs are required to provide consumers with a written statement "asserting the buyer's right to proceed against the surety bond or trust account required under [§ 68B of the MA-CSO]" along with the name and business address of any such surety company and trust-account depository, together with the name of the trustee and the account number. M.G.L. c. 93, § 68C(6)-(7).

71.　Defendants' credit-service agreement (CSA)—their written contract with consumers—does not set forth the "total cost to the buyer" or "the total of all payments to be made by the buyer." Instead, KCR's CSAs are open-ended, highlighting that "the client understands that they are paying on a month to month basis." The CSA discloses only the first-work fee, to be paid within five days, and the monthly service fee plus "expedited billing processing fee," both of which are to be charged

"each subsequent month" after the first-work fee. These charges continue indefinitely until the consumer cancels the agreement in writing.

72.     Defendants' CSA also fails to alert the consumer to his or her right to proceed against the relevant surety bond or trust account and fails to disclose the contact and other information for those entities, as required by the MA-CSO.

73.     By failing to establish the required trust account and failing to disclose in writing the various required elements, as detailed above, Defendants violated §§ 68B(1), 68C(5)-(7) and 68D(c) of the MA-CSO. *See* M.G.L. c. 93, §§ 68A-E.

## COUNT VII
### *Untrue or Misleading Representations and Acts Intended to Defraud or Deceive Buyers in Violation of the MA-CSO*

74.     The allegations in paragraphs 1 to 37 are incorporated here by reference.

75.     The MA-CSO prohibits CSOs from making or using any "untrue or misleading representations in the offer or sale of [credit services] or from engag[ing], directly or indirectly, in any act, practice or

course of business intended to defraud or deceive a buyer in connection with the offer or sale of such services." M.G.L. c. 93, § 68B(4).

76.    In numerous instances, in connection with the offering or provision of credit-repair services, Defendants have directly or indirectly, expressly or by implication, made material misrepresentations regarding the efficacy of KCR's credit-repair services by representing that KCR's actions would or likely would result in a substantial increase to consumers' credit scores, often within a specified period.

77.    But, in numerous instances, KCR's actions did not result in a substantial increase, or any increase, to consumers' credit scores, and any increase often occurred outside the promised timeframe.

78.    In numerous instances, in connection with the offering or provision of credit-repair services, Defendants have directly or indirectly, expressly or by implication, made material misrepresentations regarding the efficacy of KCR's credit-repair services by representing that KCR's actions would or likely would result in the removal of material negative entries on consumers' credit reports, often within a specified period.

79.     But, in numerous instances, KCR's actions did not result in the removal of negative entries on consumers' credit reports, and to the extent that some portion of such negative entries were removed, this often occurred outside the promised timeframe.

80.     These representations regarding KCR's services were material and likely to deceive or mislead consumers acting reasonably under the circumstances.

81.     Therefore, Defendants' representations as described herein were "untrue or misleading" or "intended to defraud or deceive" consumers in violation of § 68B(4) of M.G.L. c. 93.

## COUNT VIII
### *Defendants' CSO Violations*
### *Constitute Violations of the MA-UDAP*

82.     The allegations in paragraphs 1 to 37 are incorporated here by reference.

83.     A violation of any section of the MA-CSO relating to the conduct of credit-services organizations in Massachusetts (*i.e.*, §§ 68B to 68D of M.G.L. c. 93) "shall [also] constitute a violation of" the MA-UDAP.

84.    Because Defendants violated the MA-CSO, as detailed in Counts VI and VII, they also violated the MA-UDAP's ban on unfair or deceptive acts or practices.

## COUNT IX
### *Unfair or Deceptive Acts or Practices That Violate the MA-UDAP*

85.    The allegations in paragraphs 1 to 37 are incorporated here by reference.

86.    In numerous instances, in connection with the offering or provision of credit-repair services, Defendants have directly or indirectly, expressly or by implication, made material misrepresentations regarding the efficacy of KCR's credit-repair services by representing that KCR's actions would or likely would result in a substantial increase to consumers' credit scores.

87.    But in numerous instances, KCR's actions did not result in a substantial increase to consumers' credit scores.

88.    In numerous instances, in connection with the offering or provision of credit-repair services, Defendants have directly or indirectly, expressly or by implication, made material misrepresentations regarding the efficacy of KCR's credit-repair

services by representing that KCR's actions would or likely would result in the removal of material negative entries on consumers' credit reports.

89.    But in numerous instances, KCR's actions did not result in the removal of negative entries on consumers' credit reports.

90.    These representations regarding KCR's services have been material and likely to mislead consumers acting reasonably under the circumstances.

91.    Therefore, Defendants' representations as described herein were false and misleading and constitute deceptive acts or practices that violated § 2 of the MA-UDAP.

## DEMAND FOR RELIEF

The Bureau and the Commonwealth request that the Court, as permitted by 12 U.S.C. § 5565, the MA-CSO, and the MA-UDAP:

     a.    impose appropriate injunctive relief against Defendants for their violations of the CFPA, the TSR, the MA-UDAP, and the MA-CSO;

     b.    grant additional injunctive relief as the Court may deem to be just and proper;

c.    award damages and other monetary relief against Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, the TSR, the MA-UDAP, and the MA-CSO, including rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement, or compensation for unjust enrichment;

d.    impose against Defendants civil money penalties; and

e.    award the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Thomas G. Ward
*Enforcement Director*
Jeffrey Paul Ehrlich
*Deputy Enforcement Director*
Kara K. Miller
*Assistant Litigation Deputy*

s/ Nelle Rohlich
Nelle Rohlich (WI Bar No. 1047522)
Benjamin Konop (OH Bar No. 0073458)
(202) 435-7280 (Rohlich)
(202) 435-7265 (Konop)
Nelle.Rohlich@cfpb.gov
Benjamin.Konop@cfpb.gov
1700 G Street, NW
Washington, D.C. 20552
*Attorneys for Plaintiff Bureau of*
*Consumer Financial Protection*

Commonwealth of Massachusetts
Maura Healey, Attorney General

s/ M. Claire Masinton
M. Claire Masinton
(MA Bar No. 646718)
(617) 963-2454
Claire.Masinton@mass.gov
Assistant Attorney General
Insurance & Financial Services
Division
One Ashburton Place, 18th Floor
Boston, MA 02108

*Attorney for Plaintiff the*
*Commonwealth of Massachusetts*