**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General,

Plaintiffs,

v.

COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALES a/k/a NIKITAS TSOUKALIS

Defendants.

No. 20-cv-10991

Judge Rya W. Zobel

Leave to File Granted 9/8/20

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

Timothy A. Hudson
Jordan E. Wilkow
Amie M. Bauer
Tabet DiVito & Rothstein LLC
209 S. LaSalle Street, Suite 700
Chicago, IL 60604
(312) 762-9450
thudson@tdrlawfirm.com
jwilkow@tdrlawfirm.com
abauer@tdrlawfirm.com

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ALLEGATIONS IN THE COMPLAINT ..........................................................................3

ARGUMENT.........................................................................................................3

I. COUNT I FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE .......................................................................................3

A. Plaintiffs' TSR Claims Should Be Dismissed Because The Credit Repair Organizations Act (Not The TSR) Controls The Conduct Alleged In The Complaint..........................................................3

B. Plaintiffs' TSR Claims Should Be Dismissed Because The TSR Is Unconstitutionally Vague......................................................5

1. The TSR's definition of "telemarketing" is void for vagueness under the Due Process Clause.......................................................5

a) The TSR fails to provide fair notice as to who is covered by the regulation .................................................7

b) The TSR is so standardless that it permits arbitrary or discriminatory enforcement............................8

2. The TSR's definition of "telemarketing" is void for vagueness under the First Amendment .........................................................9

C. Plaintiffs' TSR Claims Should Be Dismissed Because The TSR Places Unconstitutional Content-Based Constraints on Speech ................11

D. Plaintiffs' TSR Claims Should Be Dismissed Because The TSR Violates The Equal Protection Clause .....................................................14

E. Plaintiffs' TSR Claims Should Be Dismissed Because The FTC Exceeded Its Authority In Promulgating The TSR...................................15

F. Plaintiffs' TSR Claims Should Be Dismissed Because They Fail To Allege That Key Credit Is A Telemarketer Under The TSR .....................17

II. COUNT II FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED ..........................18

A. Count II Should Be Dismissed For The Reasons Set Forth In Section I Above....18

B. Count II Should Be Dismissed Because Plaintiffs' Fail To Allege That Key Credit Engaged In Deceptive Conduct ....18

III. COUNT III FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE ....23

IV. COUNT IV FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE ....23

V. COUNT V FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE ....23

VI. COUNT VI FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE ....23

VII. COUNT VII FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE ....26

VIII. COUNT VIII FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE ....26

IX. COUNT IX FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE ....27

X. THE CFPB SHOULD BE DISMISSED BECAUSE IT ACTED OUTSIDE ITS AUTHORITY IN BRINGING THIS ACTION....27

CONCLUSION....28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................17

*Barr v. American Association of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020)....................11, 12, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................17

*Board of Trustees of State University of New York v. Fox*,
492 U.S. 469 (1989)....................10

*Burson v. Freeman*,
504 U.S. 191 (1992)....................11, 12, 14

*Carey v. Brown*,
447 U.S. 455 (1980)....................14

*Consumer Financial Protection Bur. v. Gordon*,
819 F.3d 1179 (9th Cir. 2016)....................19

*Consumer Financial Protection Bureau v. Navient Corporation*,
No. 3:17-CV-101, 2017 WL 3380530....................19

*Consumer Financial Protection Bureau v. Prime Marketing Holdings, LLC*,
No. 16-0711-BRO, 2017 WL 2772313 (C.D. Cal. Jan. 19, 2017)....................19, 20

*Crosby Legacy Company, LLC v. TechnipFMC PLC*,
No. 18-10814-MLW, 2019 WL 5588993 (D. Mass. Sept. 13, 2019)....................20

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................5, 6, 9

*F.T.C. v. John Beck Amazing Profits, LLC*,
865 F. Supp. 2d 1052 (C.D. Cal. 2012)....................19, 20

*Hosseini v. Capital One*,
217 F. Supp. 3d 441 (D. Mass. 2016)....................24

*Jones v. Experian Information Solutions, Inc.*,
141 F. Supp. 3d 159 (D. Mass. 2015)....................20, 27

*Mass. Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976)....................14

*Massachusetts Association of Private Career Schools v. Healey*,
159 F. Supp. 3d 173 (D. Mass. 2016)....................9

*Morton v. Mancari*,
417 U.S. 535 (1974)....................4

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983)....................14

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)....................11, 12

*Seila Law LLC v. Consumer Financial Protection Bureau*,
140 S. Ct. 2183 (2020)....................2, 27

*Serafine v. Branaman*,
810 F.3d 354 (5th Cir. 2016)....................9, 10

*Texas v. E.P.A.*,
726 F.3d 180 (D.C. Cir. 2013)....................4

*United States v. Estate of Romani*,
523 U.S. 517 (1998)....................4

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982)....................9

**Statutes**

12 U.S.C. §§ 5531, 5536....................1, 19

15 U.S.C. § 1679.................... *passim*

15 U.S.C. §§ 6101-6108.................... *passim*

16 C.F.R. § 310.................... *passim*

M.G.L. c. 93 § 68....................1, 23, 24, 25, 26

M.G.L. c. 93A § 2....................1

Defendants Commonwealth Equity Group, LLC d/b/a Key Credit Repair and Nikitas Tsoukalis (together, "Key Credit") respectfully submit this Memorandum of Law in support of their motion to dismiss the complaint of the Bureau of Consumer Financial Protection ("CFPB") and the Commonwealth of Massachusetts (together, "Plaintiffs").

## INTRODUCTION

Plaintiffs have brought this nine-count complaint ("Complaint") against Key Credit, a credit repair services provider, for purported violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310, *et seq*. (promulgated pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAPA"), 15 U.S.C. §§ 6101-6108) (Counts I-II); the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536 (Counts III-IV); the Massachusetts Consumer Protection Law ("MA-UDAP"), M.G.L. c. 93A, § 2 (Counts V, VIII-IX); and the Massachusetts Credit Services Organization Law ("MA-CSO"), M.G.L. c. 93, §§ 68A-E (Counts VI-VII).

Although Plaintiffs manage to broaden their Complaint to assert no fewer than nine counts, it is predicated on only three claims. First, notwithstanding Congress's clear, specific, and unequivocal direction to the contrary, *see* 15 U.S.C. § 1679b(b), Plaintiffs contend that Key Credit was prohibited from requesting payment for its services until *six months after* the services were performed. Second, Plaintiffs contend that, because some of Key Credit's customers allegedly did not see an increase to their credit scores or removal of negative entries from their credit reports, Key Credit's alleged statements that its services "likely would result" in such outcomes were somehow false and materially misleading to its customers. And third, Plaintiffs misapprehend or misapply the MA-UDAP and the MA-CSO to contend that Key Credit was required to maintain a

trust account with a Massachusetts bank, and that it failed to make certain required disclosures in its services contracts.

As explained below, all of these claims fail, and all nine counts should be dismissed with prejudice for multiple independent reasons. To begin, Plaintiffs' claims under the TSR (Counts I and II and, by implication, Counts III and V) fail because: (1) the Credit Repair Organizations Act, 15 US.C. § 1679, *et seq*., controls the conduct alleged in the Complaint, not the TSR; (2) the TSR is unconstitutionally vague under both the Due Process Clause and the First Amendment; (3) the TSR places unconstitutional content-based constraints on speech in violation of the First Amendment; (4) the TSR violates the Equal Protection Clause; (5) the TSR constitutes an unlawful agency action in excess of the Federal Trade Commission's ("FTC") statutory authority to promulgate rules under the TCFAPA; (6) Plaintiffs fail to allege that Key Credit is a "telemarketer" or a "seller" under the TSR; and (7) Plaintiffs fail to allege that Key Credit engaged in any deceptive conduct. Moreover, Plaintiffs' failure to allege any deceptive conduct is also fatal to Counts IV, VII and IX.

Next, Plaintiffs' claims under the MA-CSO (Counts VI and VIII) fail because Plaintiffs do not and cannot allege that Key Credit charged any fee prior to full performance of services that Key Credit agreed to perform, and because Plaintiffs' allegations concerning purported disclosure violations are controverted by the plain language of Key Credit's services contract.

Finally, under the Supreme Court's recent decision in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2207 (2020), the CPFB's prosecution of this action is constitutionally defective, and the CFPB therefore should be dismissed from the litigation.

For all of these reasons, Plaintiffs' Complaint should be dismissed in its entirety with prejudice.

## ALLEGATIONS IN THE COMPLAINT

Key Credit markets and sells credit repair services to consumers nationwide. (Compl., ¶ 14.) Plaintiffs allege that Key Credit collects fees for its services "before achieving the promised credit repair results" and does not maintain a trust account. (*Id*. at ¶ 24, 26.) Plaintiffs also allege that Key Credit represented that its services "would or likely would result in a substantial increase to consumers' credit scores," but that "in numerous instances" its services did not result in a substantial increase to consumers' credit scores. (*Id*. at ¶¶ 45-46.) Similarly, Plaintiffs allege that Key Credit represented that its services "would or likely would result in the removal of negative entries on consumers' credit reports" but that "in numerous instances" that did not occur. (*Id*. at ¶¶ 47-48.) Plaintiffs contend that the foregoing alleged conduct violated the TSR, the CFPA, the MA-UDAP, and the MA-CSO. (*See id*. at Counts I-IX.)

## ARGUMENT

### I. COUNT I FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count I, Plaintiffs allege that Key Credit engaged in abusive telemarketing practices in violation of the TSR. Count I fails to state a claim and should be dismissed with prejudice.

#### A. Plaintiffs' TSR Claims Should Be Dismissed Because The Credit Repair Organizations Act (Not The TSR) Controls The Conduct Alleged In The Complaint.

As drafted (and as enforced by Plaintiffs here), the TSR directly conflicts with the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679 *et seq*. However, CROA controls the conduct alleged in the Complaint, and Plaintiffs' claims under the TSR should be dismissed.

The TSR purports to prohibit credit repair service providers from even *requesting* payment for their services until *six months after* their services were performed. *See* 16 C.F.R. § 310.4(a)(2). CROA, however, expressly addresses how credit repair service providers may charge fees: "[n]o

credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). Accordingly, Congress has determined that, once a service has been fully performed, credit repair organizations may properly collect fees for those completed services. *See id*. This act of Congress cannot be reconciled with Section 310.4(a)(2) of the TSR, and it is CROA that controls.

It is black letter law that "[a] valid statute always prevails over a conflicting regulation." *Texas v. E.P.A.*, 726 F.3d 180, 195 (D.C. Cir. 2013) (internal citations omitted). Moreover, it is the more specific and comprehensive statute that "represents Congress' detailed judgment" on the subject, and "a specific policy embodied in a later federal statute should control [the] construction of [an earlier] statute." *See United States v. Estate of Romani*, 523 U.S. 517, 530-32 (1998). Indeed, "regardless of the priority of enactment," where there is "no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974).

Here, it is self-evident that Congress intended CROA (*i.e.*, the "Credit Repair Organizations Act") to regulate the "credit repair organization" industry. It is a Congressionally enacted statute, it specifically and comprehensively addresses the credit repair industry, and it was enacted *after* the FTC promulgated the TSR in relevant part. *See* 15 U.S.C. § 1679 *et seq*.; *compare* 15 U.S.C. § 1679 (CROA effective September 30, 1996) *with* 60 Fed. Reg. 43842 (promulgating 16 C.F.R. 310.4(a)(2) August 23, 1995). Accordingly, under well-settled law, CROA (not the TSR) controls Key Credit's credit repair services.

Plaintiffs may argue that no conflict exists between the TSR and CROA because the TSR purports to apply only to "telemarketers." However, this purported limitation is entirely illusory.

As explained below, any credit repair service provider that receives a telephone call from a prospective client and discusses its services is a "telemarketer" under the TSR. One would be hard pressed to find any credit repair organization that does not fit that description. Indeed, Congress effectively compels the credit repair industry to engage in telephone consultations through CROA, which requires a credit repair organization to consult with prospective clients to determine whether their credit report contains inaccurate information *prior* to representing that it can be of assistance in removing the items in question. *See* 15 U.S.C. §§ 1679b(a)(3), 1679c.

As to credit repair organizations, CROA and the TSR occupy the same space, and they directly conflict. Accordingly, CROA controls the conduct alleged in Plaintiffs' Complaint (not the TSR) and Plaintiffs' claims under the TSR (Counts I-III and V) should be dismissed with prejudice.

**B. Plaintiffs' TSR Claims Should Be Dismissed Because The TSR Is Unconstitutionally Vague.**

1. <u>The TSR's definition of "telemarketing" is void for vagueness under the Due Process Clause.</u>

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This principle, referred to as the "void for vagueness" doctrine, "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id*. Accordingly, liability for a statutory or regulatory violation "fails to comply with due process" if the statute or regulation "fails to provide a person of ordinary intelligence fair notice of what is

prohibited," or is so "standardless" that it authorizes "arbitrary or discriminatory" enforcement. *See id*. (internal quotations omitted).

Here, the TSR's unworkably vague definition of "telemarketing" and, by implication, "telemarketer," is violative of due process under the void for vagueness doctrine. The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff). In relevant part, the TSR then defines "telemarketing" as "a plan, program or campaign which is conducted to induce the purchase of…services…by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg). Accordingly, a "telemarketer" under the TSR is a person who initiates or receives telephone calls from a customer "in connection with" a "plan, program or campaign which is conducted to induce the purchase of…services…by use of one or more telephones and which involves more than one interstate telephone call." *See id*.

Only "telemarketers" are subject to the TSR's requirements. And the TSR purports to make plain that not all service providers who sell services over the telephone are necessarily "telemarketers." Rather, only those service providers who initiate or receive calls "in connection with" a "plan, program, or campaign conducted to induce the purchase of its services" qualify as "telemarketers" under the TSR.[1]

[1] The TSR also provides for liability for "sellers" but the analysis set forth above is the same. A "seller" is "any person who, *in connection with a telemarketing transaction*, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). Accordingly, only those service providers who provide, offer to provide, or arrange for others to provide services to a customer "in connection with" a "plan, program, or campaign conducted to induce the purchase of…services…by use of one or more telephones and which involves more than one interstate telephone call" are "sellers" under the TSR. *See* 16 C.F.R. §§ 310.2(dd), 310.2(gg).

a) <u>The TSR fails to provide fair notice as to who is covered by the regulation.</u>

How is a service provider "of ordinary intelligence" to know: (1) whether it is initiating *or receiving* calls to or from prospective customers in the *absence* of a "plan, program, or campaign which is conducted to induce the purchase of services," (and thus not a telemarketer subject to the TSR); or (2) whether it is initiating or receiving calls to or from prospective customers "in *connection with*" such a "plan, program or campaign" (and thus a telemarketer subject to the TSR)?

The TSR does not define the terms "plan," "program," or "campaign." *See generally*, 16 C.F.R. § 310.2. But, for example, businesses that only *receive* calls related to the sale of their services must employ *some* means by which prospective customers are prompted to call them. *See* 16 C.F.R. 310.2(ff) (merely receiving calls sufficient to be deemed a "telemarketer"). Is the means by which these businesses encourage prospective customers to call (for example, online advertising or asking satisfied customers to refer others) sufficient to constitute a "plan, program or campaign which is conducted to induce the purchase of services?" If not, why not, and what *is* sufficient? If so, then virtually all businesses are "telemarketers" under the TSR because all businesses who receive sales calls necessarily employ some "plan, program, or campaign to induce the purchase of services." Indeed, without taking some action that could reasonably be construed as a "plan, program, or campaign conducted to induce the purchase of services," how else would a business encourage prospective customers to call?

The TSR purports to limit the definition of "telemarketer" to include, not *all* persons who use a telephone to conduct sales, but only those persons who do so "in connection with" a "plan program or campaign which is conducted to induce the purchase of services." But as explained above, the vagueness of this purported limitation renders it illusory because, ultimately, *all*

businesses using a telephone to conduct sales necessarily do so in connection with some sort of plan, program, or campaign to induce the purchase of its services.

Notably, the exemptions in Section 310.6 of the TSR suggest that the FTC may well have recognized this problem. Under Section 310.6, businesses who receive sales calls in response to advertising in any form are simply exempt from the TSR except for several disfavored types of businesses (including credit repair service providers). *See* 16 C.F.R. § 310.6(b)(5). This exemption does not cure the constitutional infirmity – to the contrary, it highlights it, and simply permits certain favored industries to avoid having to wrestle with whether, under the TSR's vague definition, they are telemarketers. (*See also infra* at 13-16.)

The TSR thus "fails to provide a person of ordinary intelligence [and did not provide Key Credit] fair notice" as to what constitutes "telemarketing" under the TSR, or the fact that *any* person engaged in sales that incorporate the use of telephones (involving more than one interstate call) is a "telemarketer" under the TSR. In practice, the TSR's vague, illusory rule creates a trap for the unwary, appearing to create space for persons to use a telephone for their sales without being deemed a telemarketer (an intuitively reasonable possibility), only to find – without notice – that there is in practice no way to avoid satisfying the vaguely delineated "telemarketer" criteria.

b) <u>The TSR is so standardless that it permits arbitrary or discriminatory enforcement.</u>

As noted above, statutes also violate the due process clause under the void for vagueness doctrine when they are so vague as to permit arbitrary or discriminatory enforcement. As evidenced by this very litigation, the TSR violates this principle as well.

The TSR's broad and vague definition of "telemarketer" permits the government "to decide in the first instance what constitutes [a 'plan, program, or campaign' for purposes of the Rule], then enforce the law as it sees fit." *See Serafine v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016).

"Such unfettered discretion is untenable." *Id*. Indeed, even if the CFPB "promised to limit the scope of its enforcement" to what it viewed to be the "really bad" telemarketers, it would be no answer. *See id*. Courts will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id*. (citing *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

For the first 13 years of its existence, the TSR simply was not enforced against credit services businesses. Instead, the credit services industry (quite reasonably) understood itself to be regulated by the Credit Repair Organizations Act, enacted by Congress one-year after the TSR promulgated the instant rule. (*Supra* at 3-5.) It is only recently that the CFPB has suddenly sought to hold credit repair services providers – arbitrarily and without notice –accountable to this vague and counter-intuitive regulation. For all of the foregoing reasons, the TSR is unconstitutionally vague in violation of the due process clause, and Plaintiffs' claims under the TSR should be dismissed with prejudice.

2. The TSR's definition of "telemarketing" is void for vagueness under the First Amendment.

"When speech is involved, rigorous adherence to [the vagueness doctrine's requirements] is necessary to ensure that ambiguity does not chill protected speech." *Fox Television*, 567 U.S. at 254; *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (where a regulation "threatens to inhibit the exercise of constitutionally protected rights ... [such as] the right of free speech or of association, a more stringent vagueness test should apply"); *Massachusetts Association of Private Career Schools v. Healey*, 159 F. Supp. 3d 173, 212 (D. Mass. 2016) ("[w]here a regulation's vagueness threatens to chill free speech, courts must use a more demanding standard"). Under the First Amendment, a law may be invalidated as vague and overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the

statute's plainly legitimate sweep." *Serafine*, 810 F.3d at 364 (citing *Stevens*, 559 U.S. at 473) (internal quotations omitted).

Here, speech uttered over a telephone "to induce the purchase of goods or services" is subject to the constraints and requirements of the TSR (and the TCFAPA), whereas other speech over a telephone is not.[2] *See* 16 C.F.R. § 310.2(gg); 15 U.S.C. § 6106(4). Because the description of the speech that is subject to the TSR's constraints is vague and overbroad, however, the TSR chills protected speech.

On its face, speech uttered "to induce the purchase of goods or services" includes far more than merely commercial speech (and certainly more than deceptive or abusive speech). For example, credit repair businesses like Key Credit who offer counsel and guidance over the telephone concerning best practices for obtaining and maintaining a good credit rating may well provide such guidance in the hope that a prospective customer will purchase their services. But there is no serious dispute that such counsel and guidance is fully protected speech. Commercial speech (more readily proscribable than fully protected speech) is "speech that proposes a commercial transaction," not simply all speech uttered "for a profit." *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989). Indeed, "[s]ome of our most valued forms of fully protected speech are uttered for a profit." *Id.* Yet while the TSR's definition of "telemarketing" no doubt covers the former, it also plainly covers the latter.

Consequently, to avoid falling within the reach of the TSR's overbroad definition of "telemarketing," (thereby becoming subject to its constraints and requirements), businesses must

---

[2] Relevant here, these constraints include a prohibition, applicable only to companies offering credit repair services, from requesting payment for services until six months *after* the services were performed. *See* 16 C.F.R. § 310.4(a)(2).

refrain from providing or discussing their services over the telephone if there is any possibility that the government will construe them to have done so (even in part) to induce the purchase of such services. For all of these reasons, the overbreadth of the TSR's applicable regulation chills protected speech and is therefore unconstitutionally vague under the First Amendment. Plaintiffs' TSR claims should be dismissed.

**C. Plaintiffs' TSR Claims Should Be Dismissed Because The TSR Places Unconstitutional Content-Based Constraints on Speech.**

Plaintiffs' TSR claims also should be dismissed for the independent reason that the TSR places impermissible content-based constraints on speech. Content-based restrictions on speech are presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Such restrictions are subject to strict scrutiny and therefore survive a court's review only if the government shows that "the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992); *see also Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020). "[A] law is content-based if a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Barr*, 140 S. Ct. at 2346 (internal quotations omitted). And "[t]hat description applies to a law that singles out specific subject matter for differential treatment." *Id*. (internal quotations omitted).

Although the TSR might appear to draw only a content-neutral distinction (*i.e.*, targeting speech through telemarketing without regard to the content of that speech), the TSR does not treat all telemarketing speech equally. To the contrary, the TSR "singles out specific subject matter for differential treatment." *Id*. For example, the TSR singles out telemarketing speech on the subject of improving an individual's credit rating for disfavored treatment. Indeed, a person who engages in *credit repair* telemarketing speech is prohibited from requesting payment for his or her services until six months *after* the services were performed, whereas telemarketing speech concerning any

other subject is not burdened with this constraint. *See* 16 C.F.R. § 310.4(a)(2); *see generally* 16 C.F.R. § 310.4. Thus, whether so mundane a practice as requesting a fee for a service after the service has been rendered is "abusive" under the TSR turns on whether the telemarketer discussed improving a person's credit rating. *Cf. Barr*, 140 S. Ct. at 2346. A telemarketer that says "here are ways you can improve your credit rating" is subject to the payment constraint, whereas a telemarketer that says "here are ways you can improve your insurance coverage" is not. "That is about as content-based as it gets." *Id*.

Because the TSR disfavors telemarketing speech on the subject of credit repair compared to telemarketing speech on other subjects, "the law is a content-based restriction on speech." *See id*. And because the TSR places content-based restrictions on speech, it is presumptively invalid. *See R.A.V.*, 505 U.S. at 382. In order to save the validity of the regulation (at least insofar as Section 310.4(a)(2)'s payment constraint is concerned), the government must show that precluding only telemarketers who engage in credit repair speech from requesting payment until *six months* after performance of their services is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *See Burson*, 504 U.S. at 198. The government cannot meet this heavy burden.

When Congress enacted the TCFAPA, it specifically identified the state interest at issue here. Congress authorized the FTC to promulgate rules (*i.e.*, the TSR) to protect consumers from "deceptive and other abusive telemarketing acts or practices." *See* 15 U.S.C. § 6101-6102. That may well be a compelling state interest, but there is no basis for the government to assert that preventing *only* telemarketers who provide credit repair services from requesting payment for their services until six months after performance is both "necessary" and "narrowly drawn" to serve that interest. Indeed, there is nothing inherently abusive about requesting payment for services one to

five months following performance. To the contrary, Congress itself has specifically found that it is entirely proper for credit repair service providers to be paid upon the full performance of any relevant services. *See* 15 U.S.C. § 1679b(b). Moreover, there are any number of alternative, more narrowly drawn means by which to protect consumers from deceptive or other abusive telemarketing practices. On its face, requesting a fee for services rendered within six months of performance is an arbitrary (much less narrowly drawn) proxy for "deception" or other "abuse."

Similarly, the TSR draws unconstitutional content-based distinctions concerning the speech uttered by specifically telemarketers who only "receive" calls. The TSR deems a person to be a "telemarketer" even if he or she merely *receives* telephone calls "in connection with" a "plan, program, or campaign which is conducted to induce the purchase of services." *See* 16 C.F.R. § 310.2(ff)-(gg). However, the TSR then exempts from its rules telemarketing calls received "in response to an advertisement through any medium" or "in response to a direct mail solicitation." *See* 16 C.F.R. § 310.6(b)(5)-(6). Because advertising in some form is an inextricable component of "receiving" purported telemarketing calls – how else would the potential customers be encouraged to call? – the inclusion of "receiving calls" in the TSR's definition of "telemarketer" is essentially rendered a nullity by the exemption in Section 310.6(b)(5)-(6). Although the TSR's rules concerning "receiving calls" might well have been constitutional were they evenly applied, the TSR instead exempts "receiving calls" from its reach *only* if the telemarketer is not engaged in telemarketing speech on a limited number of disfavored topics (such as improving an person's credit rating). *Compare* 16 C.F.R. § 310.2(ff)-(gg) *with* 16 C.F.R. § 310.6(b)(5)-(6).

Again, these content-based distinctions are presumptively invalid and survive only if burdening inbound telemarketing speech on the subject of improving an individual's credit (while exempting virtually all other inbound telemarketing speech from the TSR's reach) is "necessary

to serve a compelling state interest and that it is narrowly drawn to achieve that end." *See Burson*, 504 U.S. at 198. On its face, the TSR cannot meet this standard. Because the TSR draws content-based distinctions among telemarketing speech on different subjects, and because its distinctions cannot survive strict scrutiny, the TSR violates the First Amendment, and Plaintiffs' TSR claims should be dismissed.

### D. Plaintiffs' TSR Claims Should Be Dismissed Because The TSR Violates The Equal Protection Clause.

By discriminating against credit repair telemarketing speech and favoring virtually all other telemarketing speech as described above, the TSR violates the Equal Protection Clause. For this independent reason, Plaintiffs' TSR claims should be dismissed.

Equal protection analysis requires strict scrutiny of a government regulation when the regulation interferes with the exercise of a fundamental right or operates to the particular disadvantage of a suspect class. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). And rights protected by the First Amendment are fundamental rights. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983); *see also Barr*, 140 S. Ct. at 2354 ("the First Amendment is a kind of Equal Protection Clause for ideas") (internal quotation omitted). Specifically, "[w]hen government regulation discriminates among speech-related activities…the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown*, 447 U.S. 455, 461-62 (1980).

Here, for the reasons set forth above, the TSR discriminates against telemarketing speech on the subject of improving one's credit rating. Only credit repair telemarketing speech is subject to the TSR's debilitating payment constraint, and virtually all inbound telemarketing speech *other* than credit repair telemarketing speech is exempt from the TSR's requirements and constraints.

Because the government cannot establish that this content-based discrimination is necessary and "finely tailored" to serve its interest in protecting consumers from deceptive and other abusive telemarketing acts or practices, the TSR cannot survive strict scrutiny and violates the Equal Protection Clause. For this additional reason, Plaintiffs' TSR claims should be dismissed.

### E. Plaintiffs' TSR Claims Should Be Dismissed Because The FTC Exceeded Its Authority In Promulgating The TSR.

The TSR constitutes an unlawful agency action in excess of the FTC's statutory authority to promulgate rules under the TCFAPA. Under the TCFAPA, Congress authorized the FTC to promulgate rules to protect consumers from deceptive and other abusive telemarketing acts or practices. *See* 15 U.S.C. § 6101-6102. In the TCFAPA, Congress issued several directives to the FTC concerning the rules the FTC would promulgate and the conduct that Congress regarded as "abusive telemarketing acts or practices." *See* 15 U.S.C. § 6102(a)(3)(A)-(D). All of the conduct identified by Congress concerned *only* unsolicited calls initiated and made by a telemarketer to a consumer. *See id*. In response, the FTC issued the TSR. *See* 16 C.F.R. § 310.1. However, the FTC exceeded that directive and instead expanded the scope of its authority to define "telemarketer" as a person who initiates *or receives* telephone calls "in connection with" a "plan, program or campaign which is conducted to induce the purchase of goods or services." *See* 16 C.F.R. § 310.2(ff)-(gg).

Perhaps recognizing that broadening the definition of "telemarketer" to include even receiving calls was beyond the scope contemplated by Congress in the TCFAPA, the FTC attempted to walk away from the initiative to include "receiving" calls under its rules by enacting the exemptions contained in Section 310.6. (*See also supra* at 13-14.) While persons who receive telephone calls "in connection with" a "plan, program or campaign conducted to induce the purchase of goods or services" are telemarketers, under Section 310.6, persons who receive such

calls "in response to an advertisement through any medium" are *exempt* from the regulation. As explained above, this exemption swallows the rule because all persons who accept inbound calls necessarily employ *some* form of advertising. The exemptions in Section 310.6 therefore effectively obviate the inclusion of "receiving calls" in the definition of "telemarketer."

But the FTC did not stop there. Instead, it then carved out a limited number of disfavored service providers from the exemptions, leaving *them* subject to the TSR. Thus, rather than comply with its limited mandate of promulgating rules to address abusive and deceptive telemarketing practices, the FTC manufactured and selectively applied a prohibition on persons who received purported "inbound" calls to target disfavored industries like credit repair service providers like Key Credit. Indeed, notwithstanding that Congress separately enacted a statute (CROA) for the specific purpose of regulating at least one of those industries (including the manner in which credit repair service providers may collect their fees), the FTC strayed so far from Congress's directive as to create rules purporting to regulate the manner in which providers in these particular industries may collect fees. *See* 15 U.S.C. § 1679, *et seq.* (regulating the credit repair industry).

Far from protecting consumers from deceptive and abusive telemarketing practices, the TSR defines "telemarketer" so broadly as to capture virtually every business with a telephone, attempts to escape the dysfunction of its unworkably broad definition by exempting virtually every business that it covers, and then targets a limited number of disfavored, non-exempt business with arbitrary requirements such as a draconian payment collection regime that are decidedly unrelated to any purported telemarketing practice, abusive or otherwise. For all of these reasons, the FTC exceeded its authority in promulgating the TSR, and Plaintiffs' TSR claims should be dismissed.

### F. Plaintiffs' TSR Claims Should Be Dismissed Because They Fail To Allege That Key Credit Is A Telemarketer Under The TSR.

In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must describe the claim in sufficient detail to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim, and conclusory allegations "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009).

Here, Plaintiffs have failed to allege that Key Credit is a "telemarketer" or a "seller" under the TSR. To be a "telemarketer" under the TSR, a person must: (1) "initiate or receive telephone calls to or from a customer or donor"; (2) "in connection with" a "plan program or campaign which is conducted to induce the purchase of goods or services or a charitable contribution"; (3) "by use of one or more telephone calls"; and (4) "which involves more than one interstate telephone call." *See* 16 C.F.R. §§ 310.2(ff)-(gg). To be a "seller" under the TSR, a person must: (1) provide, offer to provide, or arrange for others to provide goods or services to the customer in exchange for consideration; (2) "in connection with" a "plan program or campaign which is conducted to induce the purchase of goods or services or a charitable contribution"; (3) "by use of one or more telephone calls"; and (4) "which involves more than one interstate telephone call." 16 C.F.R. §§ 310.2(dd), 310.2(gg).

Plaintiffs have failed to adequately allege these elements. Indeed, Plaintiffs' sole allegations as to whether Key Credit is a "telemarketer" or "seller" are merely conclusory, "threadbare recitals of the elements." Specifically, Plaintiffs allege merely:

- "[Key Credit] is a 'telemarketer' under the TSR as that term is defined by 16 C.F.R. § 310.2(ff) because, in connection with telemarketing, it initiates or receives telephone calls to or from customers." (Compl. ¶ 12.)

- "[Key Credit] is a 'seller' under the TSR as that term is defined by 16 C.F.R. § 310.2(dd) because, in connection with telemarketing transactions, they provide, offer to provide, or arrange for others to provide goods or services to customers in exchange for consideration." (*Id*. at ¶ 11.)

- "[Key Credit] conducts telemarketing through receiving inbound phone calls from consumers." (*Id*. at ¶ 16.)

These conclusory allegations are wholly inadequate. Nowhere do Plaintiffs specifically allege any "plan, program or campaign" that was "conducted to induce the purchase of goods or services." *See* 16 C.F.R. 310.2(gg). Because Plaintiffs have failed to allege that Key Credit is a telemarketer under the TSR, Plaintiffs' TSR claims should be dismissed.

## II. COUNT II FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED.

In Count II, Plaintiffs allege that Key Credit engaged in deceptive telemarketing practices in violation of the TSR. For the reasons that follow, Count II fails to state a claim and should be dismissed with prejudice.

### A. Count II Should Be Dismissed For The Reasons Set Forth In Section I Above.

For all of the reasons set forth in Section I above, Count II of the Complaint, which alleges "deceptive practices" under the TSR, should be dismissed with prejudice.

### B. Count II Should Be Dismissed Because Plaintiffs' Fail To Allege That Key Credit Engaged In Deceptive Conduct.

Under Section 310.3(a)(2)(iii) of the TSR, it is a deceptive telemarketing act or practice to "misrepresent, directly or by implication, in the sale of goods or services any ... material aspect of the performance, efficacy, nature, or central characteristics of goods and services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii). Under the CFPA, it is unlawful "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

While it appears that no Massachusetts court has construed Section 310.3 of the TSR, other federal courts have adopted the Federal Trade Commission Act's ("FTCA") definition of

"deceptive" when analyzing the TSR and the CFPA due to the similarity in the language of the statutes. *See Consumer Financial Protection Bur. v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016); *Consumer Financial Protection Bureau v. Prime Marketing Holdings, LLC*, No. 16-0711-BRO, 2017 WL 2772313, at *11 (C.D. Cal. Jan. 19, 2017); *Consumer Financial Protection Bureau v. Navient Corporation*, No. 3:17-CV-101, 2017 WL 3380530, at *23. Thus, to adequately plead deceptive conduct under the TSR (and the CFPA), Plaintiffs must establish that: (1) there was a representation; (2) that representation was likely to mislead consumers acting reasonably under the circumstances; and, (3) the representation was material. *Id*. To demonstrate that a representation was "likely to mislead consumers," Plaintiff must establish that (1) the representation was false, or, (2) Defendant lacked a reasonable basis for its claims. *Prime Marketing Holdings*, 2017 WL 2772313, at *11; *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012).

Notably, Massachusetts courts have construed the MA-UDAP – which Plaintiffs contend was violated by Key Credit on the basis of "deceptive practice" allegations that are identical to those that purport support Plaintiffs' deceptive practice claim under the TSR (*compare* Compl., Count II *with* Compl., Count IX) – and "have agreed that mere negligence cannot maintain a 93A claim; rather, the defendant must have committed some extreme or egregious fault." (internal quotations omitted) *Jones v. Experian Information Solutions, Inc.*, 141 F. Supp. 3d 159, 163-64 (D. Mass. 2015) (citing *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014).

In addition, Plaintiffs' "deception" claims (*i.e.*, Counts II, IV, VII, and IX) sound in fraud and must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Prime Marketing Holdings*, 2017 WL 2772313, at **5-6; *Crosby Legacy Company, LLC v. TechnipFMC PLC*, No. 18-10814-MLW, 2019 WL 5588993, at *6 (D. Mass. Sept. 13, 2019) ("a

plaintiff bringing a Chapter 93A claim must comply with Rule 9(b)"). Accordingly, Plaintiffs must specify (but fail to do so) the "time, place and content" of any allegedly deceptive representations that form the basis for these claims. *See Prime Marketing Holdings*, 2017 WL 2772313, at *7; *see also Crosby Legacy Company*, 2019 WL 5588993, at *6. Importantly, even under the less stringent pleading requirements of Federal Rule of Civil Procedure 8, Plaintiffs have failed to allege that Key Credit engaged in any deceptive conduct.

Count II identifies the two following allegedly deceptive statements:

- That Key Credit's "actions would or likely would result in a substantial increase to consumer's credit scores" (Compl., ¶ 45; *see also id*. at ¶¶ 57, 76, 86; and)
- That Key Credit's "actions would or likely would result in the removal of negative entries on consumers' credit reports. (*Id*. at ¶ 47; *see also id*. at ¶¶ 59, 78, 88.)

Counts IV, VII, and IX also rely on the same purportedly deceptive statements.

Whether analyzed under Rule 8 or Rule 9(b), Plaintiffs do not and cannot allege that either of these statements was false, or that Key Credit did not have a reasonable basis to make them. *See Prime Marketing Holdings*, 2017 WL 2772313, at *11 (to establish that a representation was "likely to mislead consumers," Plaintiff must allege that (1) the representation was false, or, (2) Defendant lacked a reasonable basis for its claims); *F.T.C. v. John Beck*, 865 F. Supp. 2d at 1067 (same). Indeed, Plaintiffs do not even allege in conclusory fashion that the statements are false or that Key Credit lacked a reasonable basis to make them. Rather, as to both statements, Plaintiffs allege only that "in numerous instances" Key Credit's services did not result in a "substantial increase" to customers' credit scores (*see* Compl., ¶¶ 58, 77, 87) or in the removal of negative entries on customers' credit reports (*see id.* at ¶¶ 48, 60, 79, 89.)

Plaintiffs' vague allegation that, for some unspecified number of unidentified Key Credit clients, Key Credit's actions did not result in a "substantial increase" to their credit scores is self-

evidently insufficient to allege that Key Credit's statement that its actions "would or likely would result" in such an increase was false or without a reasonable basis. Plainly, both statements can be true at the same time, and nothing about some unspecified number of clients not obtaining this result for unspecified reasons demonstrates that Key Credit was without a reasonable basis for stating that its actions would "likely" be successful. And it certainly does not make the statement false. The same is true of Key Credit's alleged statement regarding the removal of negative entries on clients' credit reports.

The Complaint also identifies several other allegedly deceptive statements , none of which are included in Counts II, IV, VII, and IX. In any event, like the statements identified in Counts II, IV, VII, and IX, the following allegedly deceptive statements are not actionable as a matter of law:

- that Key Credit will "fix an unlimited amounts of negative items in [a client's] credit file with all three of the major credit agencies, for one flat fee," (Compl. at ¶ 30);
- that Key Credit's clients see an "average 90 point increase in 90 days," (*id.*);
- that Key Credit's "clients start seeing removals in as little as 45 days," (*id*. at ¶ 32);
- "[w]e dramatically increase credit scores to help consumers that are struggling to get approved," (*id*. at ¶ 34);
- "[w]e help people whose low credit scores are holding them back from the life they want," (*id*.);
- "We Clean Up Unlimited Negative Records," (*id*.);
- "our team of more than 60 credit experts help[s] each and every client individually" to "take the next steps towards credit freedom," (*id*., ¶ 28); and
- "our consultations are all done by our owner, Nik Tsoukales, and his team of certified credit consultants," (*id*.).

With respect to the first six statements above, Plaintiffs' sole allegation purportedly demonstrating that each statement is either false or was made without a reasonable basis is that "in

many instances" Key Credit clients did not experience the outcome described. (*See id*. at ¶¶ 31, 33, 35, 37.) Even if true, this allegation is plainly insufficient to demonstrate the statements' falsity or that Key Credit lacked a reasonable basis to make it. The statements, moreover, are not promised outcomes, and in fact Key Credit's Credit Services Agreement ("CSA") explicitly states that Key Credit makes no "express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (*See* CSA at 2, a true and correct copy of which is attached hereto as **Exhibit A**.)

With respect to the last two statements above, Plaintiffs' allege only that Key Credit "has just a handful of Boston-based employees, only some of whom interact directly with consumers," and that "[t]he majority of [Key Credit's] sales and client interactions are conducted by contract telemarketers located in Central America who are compensated almost entirely by commission, based on the number of clients they enroll in [Key Credit's] programs." (*See* Compl. at ¶ 29.) Again, even if true, these allegations are plainly insufficient to demonstrate the statements' falsity or that Key Credit lacked a reasonable basis to make it. Plaintiffs do not and cannot allege that Key Credit's team does not consist of individuals who are thoroughly trained, certified credit repair experts, or that Nik Tsoukales and his team do not perform all consultations, helping each client individually. (*See id*. at ¶ 28.) Nor can Plaintiffs allege that Key Credit did not have a reasonable basis for making these statements.

In sum, Plaintiffs do not and cannot state a claim for deceptive practices under any pleading standard, and *a fortiori*, they certainly do not satisfy Rule 9(b)'s heightened pleading standard. For these additional reasons, Count II should be dismissed with prejudice.

## III. COUNT III FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count III, Plaintiffs claim that Key Credit violated the CFPA because "any violation of the TSR by a covered person is also a violation of the CFPA." (Compl., ¶ 54.) For all of the reasons set forth in Sections I and II above, Plaintiffs have failed to allege any violation of the TSR, and Count III should be dismissed with prejudice.

## IV. COUNT IV FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count IV, Plaintiffs claim that Key Credit violated the CFPA by engaging in the same alleged deceptive conduct that Plaintiffs identified in Count II. (*See id*. at ¶¶ 57-60.) For all of the reasons set forth in Section II(B) above, Plaintiffs do not and cannot allege that Key Credit engaged in any deceptive act or practice, and Count IV should be dismissed with prejudice.

## V. COUNT V FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count V, Plaintiffs claim that Key Credit violated the MA-UDAP because, "[u]nder the MA-UDAP, violations of federal consumer protection laws such as the TSR and CFPA constitute violations of § 2 of the MA-UDAP." (*See id*. at ¶ 64.) For all of the reasons set forth in Sections I-IV above, Plaintiffs have failed to allege any violation of the TSR or the CFPA, and Count V should be dismissed with prejudice.

## VI. COUNT VI FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count VI, Plaintiffs claim that Key Credit violated Section 68B(1), Section 68C(6)-(7), and Section 68D(c) of the Massachusetts Credit Services Organization Law ("MA-CSO"), M.G.L. c. 93 §§ 68A-E. (Compl., ¶¶ 68-70.) All of these claims are without merit and are controverted by the plain language of Key Credit's written CSA. *See Hosseini v. Capital One*, 217 F. Supp. 3d 441, 444 n.2 (D. Mass. 2016) ("[w]here a conflict exists between a plaintiff's allegations and the

documents attached to the complaint, the documents ... trump the complaint's allegations") (citing *Schatz v. Republican State Leadership Comm.*, 661 F.3d 50, 55 n.3 (1st Cir. 2012).

First, Section 68B(1) of the MA-CSO provides that if (and only if) a credit services organization "charge(s) or receive(s) any money or other valuable consideration prior to full, complete and satisfactory performance of the services the credit services organization has agreed to perform for the buyer," then the credit services organization must obtain "a surety bond in an amount not less than ten thousand dollars issued by a surety company authorized to do business in the commonwealth" and establish "a trust account at a federally insured bank or savings and loan association located in the commonwealth." M.G.L. c. 93 § 68B. Plaintiffs allege that Key Credit is subject to these requirements and has failed to meet them. (Compl., ¶ 68.)

Plaintiff misconstrue Section 68B. Plaintiffs allege that the surety bond and trust account requirements are triggered if a credit repair service provider "charg[es] any advance fees – namely, any fee charged before 'full, complete and satisfactory performance' of the credit repair services *offered*." (*See* Compl., ¶ 25 (emphasis added).) That is incorrect, and Plaintiffs' allegation that Key Credit did so is immaterial. The surety bond and trust account are required only if fees are charged *before* full performance of the services that the credit services provider "agreed to perform." *See* M.G.L. c. 93 § 68B. Here, Plaintiffs do not and cannot allege that Key Credit charged any fee "prior to full, complete and satisfactory performance of the services [that Key Credit] has agreed to perform for [any given] buyer." Indeed, Key Credit's CSA explicitly states that its customers will not be charged any advance fees whatsoever. (*See* Ex. A (CSA) at 2-4.) Consequently, Plaintiffs fail to allege that Section 68B's surety bond and trust account requirements apply to Key Credit, and these claims should be dismissed with prejudice.

Second, Section 68C(6)-(7) requires certain disclosures regarding the surety bond and trust account required under Section 68B. *See* M.G.L. c. 93 § 68C(6)-(7). For the reasons set forth above, Plaintiffs have failed to allege that the surety bond and trust account requirements apply to Key Credit, and they have therefore failed as well to allege that Section 68C(6)-(7)'s related disclosure requirement applies to Key Credit. This claim too should be dismissed with prejudice.

Finally, Plaintiffs allege that Key Credit has violated Sections 68C(5) and 68D(c) of the MA-CSO, which provide for certain disclosure requirements concerning credit repair services providers' services contracts. *See* M.G.L. c. 93 §§ 68C(5), 68D(c). Again, Plaintiffs' allegations are controverted by the plain language of Key Credit's services contracts, and these claims should therefore be dismissed with prejudice.

For example, Section 68C(5) of the MA-CSO state that credit services organizations must disclose in writing "a complete and detailed description of the services to be performed by the credit services organization and the total cost to the buyer for such services." (Compl., ¶ 69; M.G.L. c. 93 § 68C(5).) Section 68D(c) of the MA-CSO provides that the services agreements of credit services organizations are required to include "the terms and conditions of payment, including the total of all payments to be made by the buyer." (Compl., ¶ 69; M.G.L. c. 93 § 68D(c).) Here, Plaintiffs allege that Key Credit's CSA "does not set forth the 'total cost to the buyer' or 'the total of all payments to be made by the buyer.'" (Compl., ¶ 71.) However, the plain language of the CSA, contradicts Plaintiffs' allegation. (Ex. A at 3-4.)

As is clear on the face of the CSA, Key Credit's clients may cancel the contract at any time without any cancellation fees or additional charges. (*Id.*) Key Credit requires no more than a one-month commitment with no advance fees, and no obligation to renew. (*See id.* at 2-4.) With respect to that on-month, Key Credit performs the services identified in the CSA for which the

client subsequently pays the specifically identified "first work fee" of $189.95, plus a processing fee and applicable tax. (*See id*. at 2, 4.) If the client elects to continue working with Key Credit, Key Credit will then perform additional identified services over the course of the next 30 days, following which the client will be charged a fee of $139.95, plus a processing fee and tax, for services rendered. (*See id* at 3, 4.) At any given point, these specifically identified fees, identify the total cost of the services, and the total of all payments "to be made by the buyer." *See* M.G.L. c. 93 §§ 68C(5), 68D(c). No further payments are "to be made by the buyer" – to the contrary, the client can cancel Key Credit's services at any time. To the extent Key Credit is retained to perform any additional services for an additional fee, that is the client's choice.

Accordingly, Plaintiffs' allegations in Count VI are controverted by the plain language of the CSA, and should be dismissed with prejudice.

## VII. COUNT VII FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count VII, Plaintiffs claim that Key Credit violated the MA-CSO by engaging in the same alleged deceptive conduct that Plaintiffs identified in Count II. (*See id*. at ¶¶ 76-79.) For all of the reasons set forth in Section II(B) above, Plaintiffs do not and cannot allege that Key Credit engaged in any deceptive act or practice, and Count VII should be dismissed with prejudice.

## VIII. COUNT VIII FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count VIII, Plaintiffs claim that Key Credit violated the MA-UDAP because "[a] violation of any section of the MA-CSO relating to the conduct of credit services organizations in Massachusetts…shall also constitute a violation of the MA-UDAP." (Compl., ¶ 83.) For all of the reasons set forth in Section VI above, Plaintiffs have failed to allege any violation of the MA-CSO, and Count VIII should be dismissed with prejudice.

## IX. COUNT IX FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count IX, Plaintiffs claim that Key Credit violated the MA-UDAP by engaging in the same alleged deceptive conduct that Plaintiffs identified in Count II. (*See id.* at ¶¶ 86-89.) Under Massachusetts law, "mere negligence cannot maintain a 93A claim; rather, the defendant must have committed some extreme or egregious fault." *Jones v. Experian Information Solutions, Inc.*, 141 F. Supp. 3d 159, 163-64 (D. Mass. 2015) (internal quotations omitted) (citing *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014). For all of the reasons set forth in Section II(B) above, Plaintiffs do not and cannot allege that Key Credit engaged in any deceptive act or practice, and certainly do not and cannot allege that Key Credit committed "some extreme or egregious fault." *See id*. Count IX should be dismissed with prejudice.

## X. THE CFPB SHOULD BE DISMISSED BECAUSE IT ACTED OUTSIDE ITS AUTHORITY IN BRINGING THIS ACTION.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2207 (2020), the United States Supreme Court recently confirmed that "the CFPB's leadership by a single independent Director violate[d] the separation of powers." Although the Court found that the unconstitutional statutory provision insulating the CFPB from removal at will was severable from the other statutory provisions that define the CFPB's authority, it recognized that actions taken by the CFPB prior to the severing of the unconstitutional provision were "constitutional[ly] defect[ive]." *See id*. at 2208.

Here, the CFPB initiated this action when its director was not removable at will and before the unconstitutional removal protection was stricken from the statute. Accordingly, its prosecution of this action is constitutionally defective, and the CFPB therefore should be dismissed as a plaintiff in the litigation.

## CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed with prejudice in its entirety.

Dated: August 26, 2020

Respectfully submitted,

**COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS**

By: /s/ Timothy A. Hudson
One of Their Attorneys

By: /s/ David B. Mack
One of Their Attorneys

Timothy A. Hudson, *pro hac vice*
Jordan E. Wilkow, *pro hac vice*
Amie M. Bauer, *pro hac vice*
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlawfirm.com
jwilkow@tdrlawfirm.com
abauer@tdrlawfirm.com

-and-

David B. Mack
O'Connor, Carnathan and Mack LLC
One Van de Graaff Dr., Suite 104
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net

*Attorneys for Defendants*

# **Exhibit A**

KeyCreditRepair.com
OPENING DOORS AGAIN

ACCREDITED BUSINESS BBB

Inc. 500

**Our Promise**

Other companies promise to "sell you the dream" to get you signed up and then drop the ball with bad service, communication and worst of all, awful results. I'd like to extend a different type of promise to you……

**We promise….**

-To treat you like family.
-To keep your credit goals in mind as the ONLY priority.
-To be fully transparent and honest with you.
-To tell you the truth (whether you want to hear it or not).
-To work on as many (or as few) of the accounts you'd like us to work on.
-To never short change you by using the electronic dispute system (It's garbage and doesn't work).
-To answer your calls and help you on the FIRST call no matter what.
-To give you full access to your file so you can follow along.
-To never lock you into any weird contracts.
-To give you the flexibility to move your payment around at any time.
-To Create a custom action plan that meets your needs.

**Also, keep in mind……**

-Great credit will take time.
-This is not an overnight process.
-The Credit Agencies will put up a fight, but we will fight harder.
-Don't get TOO excited if you get great results early on. The next set of results may take twice as long. *"I went on a diet once and lost 10lbs. in the first week. The next 10lbs. took 4 weeks"*. This process is very similar to that😊

We're blessed to start working for you!

Best regards,

Nikitas "Nik" Tsoukalis, Owner

Key Credit Repair
Mailing: 177 Huntington Avenue Suite 1703 #50552 Boston MA 02115-3153 | 617.265.7900 (phone) 617.412.3051 (fax)

KeyCreditRepair.com
OPENING DOORS AGAIN

ACCREDITED BUSINESS

KEY CREDIT SERVICE AGREEMENT

Whereas, _______________________________________________ (hereafter referred to as "Client") desires to retain the services of the Commonwealth Equity Group, LLC d/b/a KeyCreditRepair.com (hereafter referred to as "CEG").

**CONSUMER CREDIT FILE UNDER STATE AND FEDERAL LAW**

You have the right to dispute inaccurate information in your credit report by contacting the credit bureaus directly. However, neither you nor any "credit repair" company or credit repair organization has the right to have accurate, negative information removed from your credit report before it is seven years old. Bankruptcy information can be reported for ten years.

You have the right to obtain a copy of your credit report from a credit bureau. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are the recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud. You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. The law prohibits deceptive practices by credit repair organizations.

You have a right to cancel your contract with any credit repair organization for any reason within 5 days from the date you signed it.

Credit bureaus are required to follow reasonable procedures to ensure that the information on the report is accurate. However, mistakes may occur.

You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning any error should be given to the credit bureau.

If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.

The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact: The Public Reference Branch, Federal Trade Commission, Washington D.C. 20580.

**Service Agreement**

CEG agrees to evaluate the Client's current credit profile and will advise Client on the necessary steps to legally remove information that is not accurate, complete, or verifiable. The Company cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will Company assist Client on improving Client's credit rating or record. Client understands that the removal of information from the credit bureaus does not relieve the financial obligation to the creditor. Accurately reported items on a credit reports cannot be removed.

CEG will prepare all necessary correspondence in dispute of all inaccurate and unverifiable information on Client's credit reports (Experian, Equifax, TransUnion) and will stamp and mail for Client. CEG will agree to prepare and mail each collection agency a formal validation request to ensure Client is only paying off verifiable and accurate collections. CEG agrees to provide unlimited advice to Client regarding their credit report.

CEG guarantees that Client's credit report(s) will cease reflecting 10% of the entries Client has indicated are being inaccurately reported on Client's credit report(s), within 90 days of Client's receiving services from CEG provided Client follows the advice of CEG. This guarantee includes a full refund of all fees paid by Client and is only valid should Client not make any late payments on any of their accounts while CEG is providing services to Client and Client's revolving account balances are below 10% of the available limit. Client also understands that Client is able to dispute any entries on their credit reports without the assistance of CEG. Client agrees to mail all correspondence received from CEG within 3 days to the appropriate agencies if requested to do so by CEG, and further agrees to mail all correspondence received from the credit bureaus in their original form to CEG within 3 days of their receipt by client.

Client further agrees to notify CEG if client has not received answers to correspondence mailed to the credit bureaus within 60 days of the last mailing.

CEG makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement.

CEG's principal place of business is 686 Morton Street Suite 2 Boston Ma 02126.

**Fees**

Client agrees to pay CEG for services rendered. Client must pay by credit debit card or ACH direct withdrawal from a savings or checking account. The <u>Client will not be charged any advance fees for any services under this contract rather such fees will only be charged by CEG to the Client upon CEG's completing the services on behalf of the Client.</u>

The First Work Fee is charged 5 days after the signing of this contract (unless client indicates a date greater than 5 days in payment authorization section of this form). This fee is applied to CEG's review of the Client's financial documents and CEG's taking of the necessary time to consult with the Client regarding the Client's financial documents. CEG will also analyze the Client's credit report with a focus on determining if any information on the Client's credit report is inaccurate, outdated or unverifiable. CEG will also assist the Client in determining the action to take, if any, with each applicable account on Client's credit file. Should such be necessary, CEG will also assist Client in obtaining a copy of the Client's credit report if needed. CEG's services in exchange for the First Work Fee are sold independently of any services regarding Client's credit standing or credit score. The First Work Fee will only be charged upon CEG consulting with the Client and completing the above stated services and under no circumstances will the First Work Fee be paid by the Client prior to CEG completing the above stated services. Client also understands and agrees that he or she is billed by CEG for services rendered after they have been rendered, not for a specific outcome.

KeyCreditRepair.com
OPENING DOORS AGAIN

ACCREDITED BUSINESS

In exchange for the Monthly Service Fee CEG will provide the following credit repair services ("Services") to and for the benefit of the Client, and Client authorizes CEG to provide such for Client. Such services will include attempts to remove inaccurate, erroneous, and/or obsolete credit information reported by Equifax, Experian and Trans Union to the Client's Credit Report. It is estimated that it will take up to six (6) months for Client to achieve his or her goals. CEG will continually analyze and review Client's status during the time the Client is receiving the Services from the Client, and CEG will respond to, receive, and/or initiating correspondence from Client. CEG will assist Client in responding to, receiving, and/or initiating correspondence via e-mail regarding Client's credit report(s). CEG will create letters and/or emails and/or faxes and/or electronic communications and/or other written communications for Client in the attempt to correct errors and other items appearing on the Client's credit reports which Client indicates are inaccurate, incomplete, outdated, or unverified as per the Fair Credit Reporting Act, This includes preparation and transmittal of written correspondence to credit bureaus to verify and/or dispute items appearing on the client's credit report. CEG will review and analyze all correspondence received from credit bureaus, creditors, and others. CEG will conduct follow up calls with Client to discuss Client's status and strategy. CEG will review the Client's credit report updates to determine subsequent steps. CEG will assist Client with credit questions. The Client will not be charged any advance Monthly Service Fees for any Services, rather such fees will only be charged by CEG to the Client upon CEG's completing the Services on behalf of the Client which will not occur until a minimum of 5 days subsequent to the Client entering into this agreement with CEG.

**Dispute Resolution**

This section, as it pertains to dispute resolution procedures, will override any sections of the agreement that appear contrary or which appear to give the Client the right to sue CEG. In the event of any controversy, claim or dispute between the parties arising out of or relating to this agreement or the breach, termination, enforcement, interpretation, ability or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in the Commonwealth/State of Massachusetts. The parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures and an arbitrator shall be selected by the AAA. The arbitrator shall be neutral and independent and shall comply with the AAA code of ethics. The award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the parties. If either party fails to comply with the arbitrator's award, the injured party may petition the circuit court for enforcement. The parties agree that either party may bring claims against the other only in his/her or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings of more than one person's claims, and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost (not attorney's fees) of arbitration equally. If the consumer's share of the cost (not fees) is greater than $2,000.00 (Two-thousand dollars), the company will pay the consumers share of costs in excess of that amount. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award. Binding Arbitration means that both parties give up the right to a trial by a jury. It also means that both parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. This section and the arbitration requirement shall survive any termination.

**CEG's Right to Conduct Business Electronically, to Contact Client Via SMS Text and Via an Autodialer, and CEG's Right to Use Pre-Recorded Messages When Contacting Client**

Client agrees, unless specifically requested otherwise, that by entering into transactions with CEG, Client affirms consent to receive, in an electronic format, all information, copies of agreements and correspondence from CEG and to also send information in an electronic format unless previously agreed upon in writing with CEG.

**CANCELLATION and REFUND POLICY**

**The client understands that they are paying on a month to month basis. The Client understands that they are able to cancel out of this program at any point in time without incurring any cancellation fees or additional charges. The cancellation needs to be submitted in writing and emailed, mailed or faxed to KEY within 5 business days of your next payment date.** KEY grants each client a 5 day grace after payment is due before credit service is suspended. Automatica payment will continue to process for up to but not greater than 30 days after a payment has been declined until approved.

I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement.

____________________________________________
First Middle Last

____________________________________________
Residential Street Address City State Zip

____________________________________________
Phone Number ***Email***

Soc. Sec. #__________-______-__________Date of Birth:__________________(MM-DD-YY)

KeyCreditRepair.com
OPENING DOORS AGAIN

ACCREDITED BUSINESS BBB

**PAYMENT AUTHORIZATION/INFORMATION**

**You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.**

**Note: First work fee date indicated must be at minimum 5 days after the date of enrollment** to allow KEY ample time to perform the credit review and analysis of your credit report and to create the first round of credit bureau disputes (and creditor good-will interventions, if applicable). This fee is only paid once these services have been performed. Per the Federal Trade Commission no fees are allowed to be paid in advance for credit repair services. This policy under the Credit Repair Organizations Act is strictly adhered to. First work fee payment date will default to 5 days after enrollment if indicated earlier or not at all.

☐ **Agency Unlimited**

I agree and authorize Key Credit Repair to charge/debit my Visa, MasterCard, American Express or checking/savings account the **first work fee of $189.95 on_________(date)** + $6.50 expedited billing processing fee and any applicable state tax & then $139.95 a month + $8.95 credit card convenience fee and any applicable state tax each subsequent month for work performed within that month until client cancels this program. Client will be assessed a fee of $2.50 for each insufficient funds notification or declined transaction.

☐ **Agency Unlimited Plus**

I agree and authorize Key Credit Repair to charge/debit my Visa, MasterCard, American Express or checking/savings account **the first work fee of $239.95 on________(date)** + $6.50 expedited billing processing fee and any applicable state tax & then $189.95 each subsequent month + $8.95 credit card convenience fee and any applicable state tax for a maximum of 6 month. Client will receive an additional 6 month of service at no additional fee at the end of the 6 month time period. Payments not to exceed 7 **in total.** Client will be assessed a fee of $2.50 for each insufficient funds notification or declined transaction.

**Credit or Debit Card Information:**

Card Holder Name:__________________________________

Billing Address:________________________________________________________
Address City State Zip Code

Card #:____________________________________________ Expiration:_________ CVV#:______

**Signature:**__________________________________________________________ **Date**________________

DO NOT SIGN BELOW UNLESS CANCELING

**Cancellation Form Copy #1**

**SEC. 407. RIGHT TO CANCEL CONTRACT.(11)**

(a) *In General.* -- Any consumer may cancel any contract with any credit repair organization without penalty or obligation by notifying the credit repair organization of the consumer's intention to do so at any time before midnight of the 3rd business day which begins after the date on which the contract or agreement between the consumer and the credit repair organization is executed or would, but for this subsection, become enforceable against the parties.

(b) *Cancellation Form and Other Information*. -- Each contract shall be accompanied by a form, in duplicate, which has the heading 'Notice of Cancellation' and contains in bold face type the following statement:

**You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.**

**To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice to Key Credit Repair at 177 Huntington Avenue Suite 1703 #50552 Boston Ma 02115 before midnight on ___________(3rd day).**

I hereby cancel this transaction,

______________________________ ______________________________
Client Signature Print Name

______________________
Date

Mail: Key Credit Repair
177 Huntington Avenue Suite 1703 #50552 Boston MA 02115-3153

Fax: Attention: Key Credit Repair
Fax# 617.412.3051

Email: Please scan & Email to support@keycreditrepair.com

KeyCreditRepair.com
OPENING DOORS AGAIN

ACCREDITED BUSINESS

DO NOT SIGN BELOW UNLESS CANCELING

**Cancellation Form Copy #2**

**SEC. 407. RIGHT TO CANCEL CONTRACT.(11)**

(a) *In General.* -- Any consumer may cancel any contract with any credit repair organization without penalty or obligation by notifying the credit repair organization of the consumer's intention to do so at any time before midnight of the 3rd business day which begins after the date on which the contract or agreement between the consumer and the credit repair organization is executed or would, but for this subsection, become enforceable against the parties.

(b) *Cancellation Form and Other Information*. -- Each contract shall be accompanied by a form, in duplicate, which has the heading 'Notice of Cancellation' and contains in bold face type the following statement:

**You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.**

**To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice to Key Credit Repair at (mailing) 177 Hungtington Avenue suite 1703 #50552 Boston Ma 02115 before midnight on ___________(3rd day).**

**I hereby cancel this transaction,**

______________________________ ______________________________
Client Signature Print Name

____________________
Date

Mail: Key Credit Repair
177 Huntington Avenue Suite 1703 #50552 Boston MA 02115-3153

Fax: Attention: Key Credit Repair
Fax# 617.412.3051

Email: Please scan & Email to support@keycreditrepair.com

KeyCreditRepair.com
OPENING DOORS AGAIN

# PRIVACY POLICY of KEYCREDITREPAIR.COM

**WHAT DOES KEYCREDITREPAIR.COM DO WITH YOUR PERSONAL INFORMATION?**

**Why?** Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information.

**Please read this notice carefully to understand what we do.**

1. The types of personal information we collect and share depend on the product or service you have with us. This information can include: Specific product or service needs, Social Security Numbers, Credit Profile, Address & Payment Information
2. All financial companies need to share personal information to run their everyday business. In the section below, we list the reasons financial companies can share their personal information; the reasons chooses to share; and whether you can limit this sharing

| Reasons we can share your info | Do we share your info? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s respond to court orders and legal investigations, or report to credit bureaus | Yes, we share your info with necessary parties to help facilitat the products and services that yo have contracted for. | No |
| For our marketing purposes— to offe our products and services to you | We share your info with vendors that assist us in offering various opportunities to you. | Yes, you can opt out of receivir any marketing from us for any products other than the produc or service you have contracted for. |
| For joint marketing with other financia companies | We occasionally share informatic with other financial and non-financial entities | Yes, you can opt out of any nor essential sharing with third parties. |
| For our affiliates' everyday business purposes— information about your transactions and experiences | Yes, we share your info with affiliated parties to help facilitate your goals | Yes, you can opt out of any nor essential sharing with third parties. |
| For our affiliates' everyday business purposes— information about your creditworthiness | Yes, we share your info with affiliated parties to help facilitate your goals | Yes, you can opt out of any nor essential sharing with third parties. |

**To limit our sharing of information or for ANY Questions: Call us at [insert customer service number]or visit us online at [insert website address].**

Please note if you are a new customer we can begin sharing your information 5 days from the date we sent this notice. When you are no longer our customer, we continue to share your information as described in this notice. However you can contact us at any time to limit our sharing.

***How does keycreditrepair.com protect my personal information?***

To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards, encrypted storage of all personal information, data security and breach protocols and secured files and buildings. All employees are trained and monitored on privacy and security protocols, we monitor all offices with cameras, and protect them with monitored alarm systems, we additionally destroy all physical documents after they are no longer needed, and keep electronic copies of them in a secure encrypted environment.

***How do we collect your personal information?***

We collect your personal information from any and all interactions that you have on our websites, we portals, email communications, telephonic communications, mail services and face to face interactions.

***Why can't I limit all sharing?***

Although federal law does not require us to, we give you the right to limit any sharing that is not directly needed to facilitate our contracted services and or delivery of contracted products.

***What happens when I limit my sharing for an account I hold jointly with someone else?***

We limit sharing for both individuals to ensure protection of your wishes.

**Definitions:**

**Affiliates:** Companies related by common ownership or control. They can be financial and non-financial companies.

**Non-Affiliates** Companies not related by common ownership or control. They can be financial and non-financial companies.

**Joint Marketing:** A formal agreement between non-affiliated financial companies that together market financial products or services to you.

## CERTIFICATE OF SERVICE

I certify that on September 14, 2020, I caused the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** to be electronically filed using this Court's ECF system, serving all attorneys of record by operation of the Court's electronic filing system.

/s/ Timothy A. Hudson

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

I, Timothy Hudson, hereby certify that counsel conferred and attempted in good faith to resolve or narrow the issues raised herein but were unable to reach an agreement.

/s/ Timothy A. Hudson