**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General,<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALES a/k/a NIKITAS TSOUKALIS<br><br>Defendants. | No. 20-cv-10991<br><br>Judge Rya W. Zobel<br><br>Leave to File Granted on 9/29/20<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Timothy A. Hudson
Jordan E. Wilkow
Amie M. Bauer
Tabet DiVito & Rothstein LLC
209 S. LaSalle Street, Suite 700
Chicago, IL 60604
(312) 762-9450
thudson@tdrlawfirm.com
jwilkow@tdrlawfirm.com
abauer@tdrlawfirm.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ALLEGATIONS IN THE COMPLAINT ..... 3

ARGUMENT ..... 3

I. COUNT I FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE ..... 3

A. The Credit Repair Organizations Act (Not The TSR) Controls The Conduct Alleged In The Complaint ..... 3

B. The TSR Is Unconstitutionally Vague ..... 6

1. The TSR's definition of "telemarketing" is void for vagueness under the Due Process Clause ..... 6

a) The TSR fails to provide fair notice as to who is covered by the regulation ..... 7

b) The TSR is so standardless that it permits arbitrary or discriminatory enforcement ..... 10

2. The TSR's definition of "telemarketing" is void for vagueness under the First Amendment ..... 11

C. The TSR Places Unconstitutional Content Based Restrictions on Speech ..... 12

D. The TSR Violates The Equal Protection Clause ..... 15

E. The FTC Exceeded Its Authority In Promulgating the TSR ..... 16

F. The Complaint Fails To Allege That Key Credit A Telemarketer Under the TSR ..... 18

II. COUNT II FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED ..... 19

A. Count II Should Be Dismissed For The Reasons Set Forth In Section I Above.....19

B. The Complaint Fails To Allege That Key Credit Engaged In Deceptive Conduct.....19

III. COUNT III FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.....24

IV. COUNT IV FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.....24

V. COUNT V FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.....24

VI. COUNT VI FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.....24

VII. COUNT VII FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.....28

VIII. COUNT VIII FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.....28

IX. COUNT IX FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.....28

X. THE CFPB SHOULD BE DISMISSED BECAUSE IT ACTED OUTSIDE ITS AUTHORITY IN BRINGING THIS ACTION.....29

CONCLUSION.....29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................18

*Barr v. American Association of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020)....................13, 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................18

*Board of Trustees of State University of New York v. Fox*,
492 U.S. 469 (1989)....................12

*Burson v. Freeman*,
504 U.S. 191 (1992)....................12, 14, 15

*Carey v. Brown*,
447 U.S. 455 (1980)....................16

*In re Consumer Debt Management Northeast, Inc.*,
2002 WL 34587389 (Commonwealth of Massachusetts Division of Banks Jan. 9, 2002)....................25

*Consumer Financial Protection Bur. v. Gordon*,
819 F.3d 1179 (9th Cir. 2016)....................20

*Consumer Financial Protection Bureau v. Navient Corporation*,
No. 3:17-CV-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017)....................20

*Consumer Financial Protection Bureau v. Prime Marketing Holdings, LLC*,
No. 16-0711-BRO, 2017 WL 2772313 (C.D. Cal. Jan. 19, 2017)....................20, 21

*Crosby Legacy Company, LLC v. TechnipFMC PLC*,
No. 18-10814-MLW, 2019 WL 5588993 (D. Mass. Sept. 13, 2019)....................21

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................6, 11

*F.T.C. v. John Beck Amazing Profits, LLC*,
865 F. Supp. 2d 1052 (C.D. Cal. 2012)....................20, 21

*Hosseini v. Capital One*,
217 F. Supp. 3d 441 (D. Mass. 2016) .......................................................................24

*Jones v. Experian Information Solutions, Inc.*,
141 F. Supp. 3d 159 (D. Mass. 2015) .................................................................21, 29

*Mass. Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976).....................................................................................................15

*Massachusetts Association of Private Career Schools v. Healey*,
159 F. Supp. 3d 173 (D. Mass. 2016) .......................................................................11

*Morton v. Mancari*,
417 U.S. 535 (1974).......................................................................................................4

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983).......................................................................................................16

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)...............................................................................................12, 13

*Seila Law LLC v. Consumer Financial Protection Bureau*,
140 S. Ct. 2183 (2020)..............................................................................................2, 29

*Serafine v. Branaman*,
810 F.3d 354 (5th Cir. 2016) ...................................................................................10, 11

*Texas v. E.P.A.*,
726 F.3d 180 (D.C. Cir. 2013).......................................................................................4

*United States v. Estate of Romani*,
523 U.S. 517 (1998).......................................................................................................4

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982).....................................................................................................11

**Statutes**

12 U.S.C. § 5536.............................................................................................................20

15 U.S.C. § 1679........................................................................................................ *passim*

15 U.S.C. § 6101-6108 ...................................................................................1, 11, 14, 17

16 C.F.R. 310............................................................................................................ *passim*

M.G.L. c. 93 § 68.........................................................................................1, 25, 26, 27, 28

M.G.L. c. 93A § 2 ..........................................................................................................1

Defendants Commonwealth Equity Group, LLC d/b/a Key Credit Repair and Nikitas Tsoukalis (together, "Key Credit") respectfully submit this Memorandum of Law in support of their motion to dismiss the amended complaint of the Bureau of Consumer Financial Protection ("CFPB") and the Commonwealth of Massachusetts (together, "Plaintiffs").

**INTRODUCTION**

Plaintiffs have brought this nine-count amended complaint ("Complaint") against Key Credit, a credit repair services provider, for purported violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310, *et seq*. (promulgated pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAPA"), 15 U.S.C. §§ 6101-6108) (Counts I-II); the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536 (Counts III-IV); the Massachusetts Consumer Protection Law ("MA-UDAP"), M.G.L. c. 93A, § 2 (Counts V, VIII-IX); and the Massachusetts Credit Services Organization Law ("MA-CSO"), M.G.L. c. 93, §§ 68A-E (Counts VI-VII).

Although Plaintiffs manage to broaden their Complaint to assert no fewer than nine counts, it is predicated on only three claims. First, notwithstanding Congress's clear, specific, and unequivocal direction to the contrary, *see* 15 U.S.C. § 1679b(b), Plaintiffs contend that Key Credit was prohibited from requesting payment for its services until *six months after* the services were performed. Second, Plaintiffs contend that, because some of Key Credit's customers allegedly did not see an increase to their credit scores or removal of negative entries from their credit reports, Key Credit's alleged statements that its services "likely would result" in such outcomes were somehow false and materially misleading to its customers. And third, Plaintiffs misapprehend or misapply the MA-UDAP and the MA-CSO to contend that Key Credit was required to maintain a

trust account with a Massachusetts bank, and that it failed to make certain required disclosures in its services contracts.

As explained below, all of these claims fail, and all nine counts should be dismissed with prejudice for multiple independent reasons. To begin, Plaintiffs' claims under the TSR (Counts I and II and, by implication, Counts III and V) fail because: (1) the Credit Repair Organizations Act, 15 US.C. § 1679, *et seq*., controls the conduct alleged in the Complaint, not the TSR; (2) the TSR is unconstitutionally vague under both the Due Process Clause and the First Amendment; (3) the TSR places unconstitutional content-based constraints on speech in violation of the First Amendment; (4) the TSR violates the Equal Protection Clause; (5) the TSR constitutes an unlawful agency action in excess of the Federal Trade Commission's ("FTC") statutory authority to promulgate rules under the TCFAPA; (6) Plaintiffs fail to allege that Key Credit is a "telemarketer" or a "seller" under the TSR; and (7) Plaintiffs fail to allege that Key Credit engaged in any deceptive conduct. Moreover, Plaintiffs' failure to allege any deceptive conduct is also fatal to Counts IV, VII and IX.

Next, Plaintiffs' claims under the MA-CSO (Counts VI and VIII) fail because Plaintiffs do not and cannot allege that Key Credit charged any fee prior to full performance of services that Key Credit agreed to perform, and because Plaintiffs' allegations concerning purported disclosure violations are controverted by the plain language of Key Credit's services contract.

Finally, under the Supreme Court's recent decision in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2207 (2020), the CFPB's prosecution of this action is constitutionally defective, and the CFPB therefore should be dismissed from the litigation.

Key Credit moved to dismiss Plaintiffs' original complaint on August 26, 2020. Plaintiffs responded by filing an amended complaint on September 16, 2020. Not only do Plaintiffs'

amended allegations fail to cure the deficiencies of the original complaint, the new allegations in the amended complaint actually strengthen the bases for its dismissal. For all of these reasons, Plaintiffs' Complaint should be dismissed in its entirety, and, particularly with Plaintiffs' having now had an opportunity to amend their complaint, that dismissal should be with prejudice.

## ALLEGATIONS IN THE COMPLAINT

Key Credit markets and sells credit repair services to consumers nationwide. (Compl., ¶ 14.) Plaintiffs allege that Key Credit collects fees for its services "before achieving the promised credit repair results" and does not maintain a trust account. (*Id*. at ¶¶ 27, 29.) Plaintiffs also allege that Key Credit represented that its services "would or likely would result in a substantial increase to consumers' credit scores," but that "in numerous instances" its services did not result in a substantial increase to consumers' credit scores. (*Id*. at ¶¶ 48-49, 60-61, 79-80, 89-90.) Similarly, Plaintiffs allege that Key Credit represented that its services "would or likely would result in the removal of negative entries on consumers' credit reports" but that "in numerous instances" that did not occur. (*Id*. at ¶¶ 50-51, 62-63, 81-82, 91-92.) Plaintiffs contend that the foregoing alleged conduct violated the TSR, the CFPA, the MA-UDAP, and the MA-CSO. (*See id*. at Counts I-IX.)

## ARGUMENT

### I. COUNT I FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count I, Plaintiffs allege that Key Credit engaged in abusive telemarketing practices in violation of the TSR. Count I fails to state a claim and should be dismissed with prejudice.

#### A. The Credit Repair Organizations Act (Not The TSR) Controls The Conduct Alleged In The Complaint.

Under a clear directive from Congress and well-settled law, the federal law that governs the conduct alleged in the Complaint is a statute called the Credit Repair Organizations Act ("CROA"). 15 U.S.C. § 1679 *et seq*. As drafted, and as Plaintiffs attempt to enforce them here,

the rules promulgated by the FTC under the TSR directly conflict with Congress's findings and intent as set forth in CROA. Under well-settled law, the TSR must therefore give way to CROA as it concerns the allegations in the Complaint, and Plaintiffs' TSR claims should be dismissed.

The TSR purports to prohibit credit repair service providers from even *requesting* payment for their services until *six months after* their services were performed. *See* 16 C.F.R. § 310.4(a)(2). CROA, however, expressly addresses how credit repair service providers may charge fees: "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). Accordingly, Congress has determined that, once a service has been fully performed, credit repair organizations may properly collect fees for those completed services. *See id*. This act of Congress cannot be reconciled with Section 310.4(a)(2) of the TSR, and it is CROA that controls.

It is black letter law that "[a] valid statute always prevails over a conflicting regulation." *Texas v. E.P.A.*, 726 F.3d 180, 195 (D.C. Cir. 2013) (internal citations omitted). Moreover, it is the more specific and comprehensive statute that "represents Congress' detailed judgment" on the subject, and "a specific policy embodied in a later federal statute should control [the] construction of [an earlier] statute." *See United States v. Estate of Romani*, 523 U.S. 517, 530-32 (1998). Indeed, "regardless of the priority of enactment," where there is "no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974).

Here, it is self-evident that Congress intended CROA (*i.e.*, the "Credit Repair Organizations Act") to regulate the "credit repair organization" industry. It is a Congressionally enacted statute, it specifically and comprehensively addresses the credit repair industry, and it was

enacted *after* the FTC promulgated the TSR in relevant part. *See* 15 U.S.C. § 1679 *et seq*.; *compare* 15 U.S.C. § 1679 (CROA effective September 30, 1996) *with* 60 Fed. Reg. 43842 (promulgating 16 C.F.R. 310.4(a)(2) August 23, 1995).[1] Accordingly, under well-settled law, CROA (not the TSR) controls Key Credit's credit repair services.

Plaintiffs may argue that no conflict exists between the TSR and CROA because the TSR applies only to "telemarketers," as that term is defined by the regulation. That purported limitation, however, is entirely illusory. As explained in Section I(B) below, virtually every credit repair service provider that receives a telephone call from a prospective client to discuss its services is a "telemarketer" under the TSR. One would be hard pressed to find any credit repair organization that does not fit that description. Indeed, Congress effectively compelled the credit repair industry to engage in telephone consultations with prospective clients when it enacted CROA, which requires that credit repair organizations consult with prospective clients to determine whether their credit report contains inaccurate information *prior* to representing that it can be of assistance in removing the items in question. *See* 15 U.S.C. §§ 1679b(a)(3), 1679c.

As to credit repair organizations, CROA and the TSR occupy the same space, and they directly conflict. Accordingly, CROA controls the conduct alleged in Plaintiffs' Complaint (not the TSR) and Plaintiffs' claims under the TSR (Counts I-III and V) should be dismissed with prejudice.

---

[1] For the first 13 years of its existence, the TSR was not enforced against credit services businesses, who have now long operated under the provisions of CROA The CFPB has only recently sought to enforce the long-dormant TSR provisions at issue in this lawsuit.

**B. The TSR Is Unconstitutionally Vague.**

1. The TSR's definition of "telemarketing" is void for vagueness under the Due Process Clause.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This principle, referred to as the "void for vagueness" doctrine, "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id*. Accordingly, liability for a statutory or regulatory violation "fails to comply with due process" if the statute or regulation "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or is so "standardless" that it authorizes "arbitrary or discriminatory" enforcement. *See id*. (internal quotations omitted).

Here, the TSR's unworkably vague definition of "telemarketing" and, by implication, "telemarketer," violates due process under the void for vagueness doctrine. The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff). In relevant part, the TSR then defines "telemarketing" as "a plan, program or campaign which is conducted to induce the purchase of…services…by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg). Accordingly, a "telemarketer" under the TSR is a person who initiates or receives telephone calls to or from a customer "in connection with" a "plan, program or campaign which is conducted to induce the purchase of…services…by use of one or more telephones and which involves more than one interstate telephone call." *See id.*

The TSR applies only to "telemarketers," as that term is defined by the regulation. *See* 16 C.F.R. §§ 310.3(a), 310.4(a).[2] And the TSR purports to provide that not all businesses that communicate with customers over the telephone – indeed, not even all businesses that *sell* services over the telephone – are necessarily "telemarketers." Rather, only those service providers who initiate or receive calls "in connection with" a "plan, program, or campaign conducted to induce the purchase of its services" qualify as "telemarketers" under the TSR.

a) <u>The TSR fails to provide fair notice as to who is covered by the regulation.</u>

Yet how is a service provider "of ordinary intelligence" to know whether: (1) it is initiating or receiving calls to or from prospective customers in the *absence* of a "plan, program, or campaign which is conducted to induce the purchase of services," (and thus not a telemarketer subject to the TSR); or (2) it is initiating or receiving calls to or from prospective customers "in *connection with*" such a "plan, program or campaign" (and thus a telemarketer subject to the TSR)?

The TSR does not define the terms "plan," "program," or "campaign." *See generally*, 16 C.F.R. § 310.2. But, for example, businesses that only *receive* sales calls must employ *some* means by which prospective customers are prompted to call them. *See* 16 C.F.R. § 310.2(ff) (merely receiving calls sufficient to be deemed a "telemarketer"). Is the means by which these businesses encourage prospective customers to call (for example, online advertising or asking satisfied

---

[2] The TSR also provides for liability for "sellers," but the analysis set forth above is the same. A "seller" is "any person who, *in connection with a telemarketing transaction*, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). Accordingly, only those businesses that "provide, offer to provide, or arrange for others to provide goods or services" to a customer "in connection with" a "plan, program, or campaign conducted to induce the purchase of…services…by use of one or more telephones and which involves more than one interstate telephone call" are "sellers" under the TSR. *See* 16 C.F.R. §§ 310.2(dd), 310.2(gg).

customers to refer others) sufficient to constitute a "plan, program or campaign which is conducted to induce the purchase of services?" If not, why not, and what *is* sufficient? If so, then virtually all businesses are "telemarketers" under the TSR because all businesses who receive sales calls necessarily employ some "plan, program, or campaign to induce the purchase of services." Indeed, without taking some action that could reasonably be construed as a "plan, program, or campaign conducted to induce the purchase of services," how else would a business prompt prospective customers to call?

Accordingly, the distinction that the TSR purports to draw between, on the one hand, all businesses who use a telephone to communicate with potential customers about their services, and, on the other, those businesses that are specifically deemed to be "telemarketers," is meaningless. While the TSR purports to apply only to "telemarketers," virtually all vendors and service providers who communicate with customers over the telephone could reasonably be deemed to satisfy the criteria that purports to set "telemarketers" apart. The TSR therefore fails to provide fair notice as to who is covered by the regulation, and it is void for vagueness.

Far from quarreling with this point, Plaintiffs' amended allegations defiantly underscore it. Plaintiffs now specifically allege that Key Credit "engages in telemarketing because it receives inbound telephone calls from consumers – calls that consumers make in response to advertising placed by [Key Credit]." (Compl., ¶ 16.) The scope of that contention cannot be overstated: receive a telephone call from a consumer in response to advertising, and you are a telemarketer under the TSR. However dubious that proposition might sound, it is precisely what the TSR appears to state, and, constitutional infirmity notwithstanding, the amended complaint confirms that Plaintiffs agree. Again, on this view, the notion that the TSR's burdens apply only to "telemarketers" is meaningless because all a business must do to be deemed a "telemarketer" is

"receive inbound telephone calls from consumers in response to advertising." *See* 16 C.F.R. §§ 310.2(ff)-(gg); *see* Compl., ¶ 16.

Notably, the exemptions in Section 310.6 of the TSR suggest that the FTC may well have recognized this problem. With several notable exceptions, Section 310.6(b)(5) exempts from TSR liability the vast majority of businesses who receive sales calls "in response to an advertisement through any medium." To begin, Section 310.6 therefore confirms that "advertisement[s] through any medium" qualify as a "plan, program or campaign which is conducted to induce the purchase of services," and that, as Plaintiffs themselves allege, businesses that receive calls in response to advertisements are therefore "telemarketers" under the TSR. If that were not the case, there would have been no need for the exemption. Moreover, the exemption (which in turn provides for its own exceptions), hardly cures the unconstitutional vagueness of the TSR's scope. To the contrary, the very need for the exemption highlights the unconstitutional vagueness and overbreadth of the TSR's definition of "telemarketer." And, as discussed *infra* at 15, 17-18, the TSR's selective application of the exemption only compounds the constitutional problem.

The TSR thus "fails to provide a person of ordinary intelligence [and did not provide Key Credit] fair notice" as to what constitutes "telemarketing" under the TSR. In practice, the TSR's vague definition of "telemarketer" creates a trap for the unwary. It appears to permit businesses to use a telephone for their sales without being deemed a telemarketer under some circumstances (an intuitively reasonable possibility). But instead, it creates a regulatory scheme wherein – without notice – there is no reasonable way for businesses to avoid satisfying the vaguely delineated "telemarketer" criteria.[3]

[3] This trap is double deceptive for the credit repair services industry, which is governed by a separate (and, to make matters worse, conflicting) statute, CROA. *See supra* at 3-5.

b) The TSR is so standardless that it permits arbitrary or discriminatory enforcement.

As noted above, statutes also violate the due process clause under the void for vagueness doctrine when they are so vague as to permit arbitrary or discriminatory enforcement. As evidenced by this very litigation, the TSR violates this principle as well.

The TSR's broad and vague definition of "telemarketer" permits the government "to decide in the first instance what constitutes [a 'plan, program, or campaign' for purposes of the Rule], then enforce the law as it sees fit." *See Serafine v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016). "Such unfettered discretion is untenable." *Id*. Indeed, the TSR would not be saved even if the CFPB "promised to limit the scope of its enforcement" to what it viewed to be the "really bad" telemarketers. *See id*. Courts will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id*. (citing *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

For the first 13 years of its existence, the TSR simply was not enforced against credit services businesses. Instead, the credit services industry was (and is) regulated by the Credit Repair Organizations Act, enacted by Congress one year after the TSR promulgated the instant rule. (*See supra* at 3-5.) It is only recently that the CFPB has suddenly sought to hold credit repair services providers – arbitrarily and without notice –accountable to this vague and counter-intuitive regulation.

For all of the foregoing reasons, the TSR is unconstitutionally vague in violation of the due process clause, and Plaintiffs' claims under the TSR should be dismissed with prejudice.

2. The TSR's definition of "telemarketing" is void for vagueness under the First Amendment.

"When speech is involved, rigorous adherence to [the vagueness doctrine's requirements] is necessary to ensure that ambiguity does not chill protected speech." *Fox Television*, 567 U.S. at 254; *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (where a regulation "threatens to inhibit the exercise of constitutionally protected rights ... [such as] the right of free speech or of association, a more stringent vagueness test should apply"); *Massachusetts Association of Private Career Schools v. Healey*, 159 F. Supp. 3d 173, 212 (D. Mass. 2016) ("[w]here a regulation's vagueness threatens to chill free speech, courts must use a more demanding standard"). Under the First Amendment, a law may be invalidated as vague and overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Serafine*, 810 F.3d at 364 (citing *Stevens*, 559 U.S. at 473) (internal quotations omitted).

The TSR's constraints apply to speech uttered over a telephone "to induce the purchase of goods or services."[4] *See* 16 C.F.R. § 310.2(gg); 15 U.S.C. § 6106(4). Because this regulatory scope is vague and overbroad, the TSR chills protected speech.

On its face, speech uttered "to induce the purchase of goods or services" includes speech that is fully protected, and reaches far beyond merely commercial speech (and certainly beyond deceptive or abusive speech). For example, credit repair businesses like Key Credit, who offer counsel and guidance over the telephone concerning best practices for obtaining and maintaining

---

[4] Relevant here, these constraints include a prohibition on requesting payment for services provided with such speech until six months *after* the services were performed. *See* 16 C.F.R. § 310.4(a)(2).

a good credit rating, may well provide such guidance in the hope that the prospective customer will purchase their services. But there is no serious dispute that such counsel and guidance is fully protected speech. Commercial speech (more readily proscribable than fully protected speech) is "speech that proposes a commercial transaction," not simply all speech uttered "for a profit." *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989). Indeed, "[s]ome of our most valued forms of fully protected speech are uttered for a profit." *Id.* Yet while the TSR's scope no doubt covers speech that merely proposes a commercial transaction, it also plainly covers fully protected speech, even if that speech is uttered, in part, to earn a profit.

Consequently, businesses must refrain from engaging in fully protected speech – such as discussing their services over the telephone – for fear that if the government construes them to have engaged in such speech (even in part) to induce the purchase of services, then they will be deemed a "telemarketer" under the TSR. Such a designation can have devastating consequences, such as, relevant here, rendering it unlawful for the business to even *request* payment for its services until six months *after* its services have been performed. The overbreadth of the TSR's scope thus chills protected speech, and, for this additional reason, it is unconstitutionally vague under the First Amendment. Plaintiffs' TSR claims should be dismissed.

**C. The TSR Places Unconstitutional Content-Based Restrictions On Speech.**

Plaintiffs' TSR claims also should be dismissed for the independent reason that the TSR places impermissible content-based restrictions on speech. Content-based restrictions on speech are presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Such restrictions are subject to strict scrutiny and are permissible only if the government shows that "the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992); *see also Barr v. American Association of Political*

*Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020). "[A] law is content-based if a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Barr*, 140 S. Ct. at 2346 (internal quotations omitted). And "[t]hat description applies to a law that singles out specific subject matter for differential treatment." *Id*. (internal quotations omitted).

The TSR might appear to draw only a content-neutral "time/place/manner" distinction, merely targeting speech delivered through telemarketing as opposed to speech delivered by other means. Within the category of telemarketing speech, however, the TSR unambiguously "singles out specific subject matter for differential treatment." *Id*. For example, the TSR disfavors telemarketing speech on the subject of improving an individual's credit rating. A person who engages in *credit repair* telemarketing speech is prohibited from requesting payment for his or her services until six months after the services were performed, whereas telemarketing speech concerning any other subject is not burdened with this constraint. *See* 16 C.F.R. § 310.4(a)(2); *see generally* 16 C.F.R. § 310.4. Thus, whether so mundane a practice as requesting a fee for a service shortly after the service has been rendered is "abusive" under the TSR turns on whether the telemarketer discussed improving a person's credit rating. *Cf. Barr*, 140 S. Ct. at 2346. A telemarketer who says "here are ways you can improve your credit rating" is subject to the payment constraint. A telemarketer who says "here are ways you can improve your insurance coverage" is not. "That is about as content-based as it gets." *Id*.

Because the TSR "singles out [the subject of repairing one's credit] for differential treatment," the regulation "is a content-based restriction on speech." *See id*. Such a restriction is "presumptively invalid," *see R.A.V.*, 505 U.S. at 382, and survives only if precluding telemarketers who engage specifically in credit repair speech from requesting payment until six months after performance of their services is "necessary to serve a compelling state interest and that it is

narrowly drawn to achieve that end." *See Burson*, 504 U.S. at 198. On its face, the TSR cannot meet this standard.

When Congress enacted the TCFAPA, it specifically authorized the FTC to promulgate rules (*i.e.*, the TSR) to protect consumers from "deceptive and other abusive telemarketing acts or practices." *See* 15 U.S.C. § 6101-6102. That may well be a compelling state interest, but there is no basis for the government to assert that preventing *only* telemarketers who provide credit repair services from requesting payment for their services until six months after performance is both "necessary" and "narrowly drawn" to serve that interest. Indeed, Congress itself has specifically found that it is entirely proper for credit repair service providers to be paid upon the full performance of any relevant services. *See* 15 U.S.C. § 1679b(b); *see also supra* at 3-5. Moreover, there are any number of alternative, more narrowly drawn means by which to protect consumers from deceptive or other abusive telemarketing practices. On its face, requesting a fee for services rendered within six months of performance is an arbitrary (much less narrowly drawn) proxy for "deception" or other "abuse."

Similarly, the TSR draws unconstitutional content-based distinctions concerning the speech uttered specifically by purported telemarketers who only "receive" calls. The TSR deems a business to be a "telemarketer" even if it merely *receives* telephone calls "in connection with" a "plan, program, or campaign which is conducted to induce the purchase of services." *See* 16 C.F.R. § 310.2(ff)-(gg). As discussed above, this definition is sufficiently broad to cover virtually all vendors and service providers that conduct business over the telephone, particularly given that mere advertising qualifies as a "plan, program, or campaign which is conducted to induce the purchase of services." (*Supra* at 7-9.)

But the TSR then exempts from its rules telemarketing calls received "in response to an advertisement through any medium." *See* 16 C.F.R. § 310.6(b)(5)-(6). This exemption essentially swallows the rule that merely receiving sales calls is sufficient to qualify as a "telemarketer" under the TSR because, if a telemarketer is receiving sales calls, it has necessarily engaged in some sort of advertising.

The constitutional problem arises because the TSR applies the exemption selectively. Based on content, telemarketing speech on certain topics (such as improving a person's credit rating) does not get the benefit of the exemption. 16 C.F.R. § 310.6(b)(5)-(6). Again, such content-based distinctions are presumptively invalid and survive only if burdening speech on the subject of improving an individual's credit (while exempting virtually all other speech) is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *See Burson*, 504 U.S. at 198. On its face, the TSR cannot meet this standard. Because the TSR draws content-based distinctions among telemarketing speech on different subjects, and because its distinctions cannot survive strict scrutiny, the TSR violates the First Amendment, and Plaintiffs' TSR claims should be dismissed.

**D. The TSR Violates The Equal Protection Clause.**

By discriminating against credit repair telemarketing speech and favoring virtually all other telemarketing speech as described above, the TSR violates the Equal Protection Clause. For this independent reason, Plaintiffs' TSR claims should be dismissed.

Equal protection analysis requires strict scrutiny of a government regulation when the regulation interferes with the exercise of a fundamental right or operates to the particular disadvantage of a suspect class. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Rights protected by the First Amendment are fundamental rights. *See Perry Educ. Ass'n v. Perry Local*

*Educators' Ass'n*, 460 U.S. 37, 54 (1983); *see also Barr*, 140 S. Ct. at 2354 ("the First Amendment is a kind of Equal Protection Clause for ideas") (internal quotation omitted). Specifically, "[w]hen government regulation discriminates among speech-related activities…the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown*, 447 U.S. 455, 461-62 (1980).

Here, for the reasons set forth above, the TSR discriminates against telemarketing speech on the subject of improving one's credit rating. Only credit repair telemarketing speech is subject to the TSR's debilitating payment constraint, and, in the context of businesses that only receive (rather than initiate) sales calls, virtually all telemarketing speech *other* than credit repair telemarketing speech is exempt from the TSR's requirements and constraints. On its face, this content-based discrimination is not necessary and "finely tailored" to serve the interest in protecting consumers from deceptive and other abusive telemarketing acts or practices. Accordingly, the TSR cannot survive strict scrutiny and violates the Equal Protection Clause. For this additional reason, Plaintiffs' TSR claims should be dismissed.

**E. The FTC Exceeded Its Authority In Promulgating The TSR.**

The TSR constitutes an unlawful agency action in excess of the FTC's statutory authority to promulgate rules under the TCFAPA. Under the TCFAPA, Congress authorized the FTC to promulgate rules to protect consumers from deceptive and other abusive telemarketing acts or practices. *See* 15 U.S.C. § 6101-6102; 16 C.F.R. § 310.1. In doing so, Congress issued several directives to the FTC concerning the rules the FTC would promulgate and the conduct that Congress regarded as "abusive telemarketing acts or practices." *See* 15 U.S.C. § 6102(a)(3)(A)-(D). Importantly, all of the conduct identified by Congress concerned *only* unsolicited calls

initiated and made by a telemarketer to a consumer. *See id*. Nevertheless, the FTC exceeded that directive and defined "telemarketer" as a person who initiates *or receives* telephone calls "in connection with" a "plan, program or campaign which is conducted to induce the purchase of goods or services." *See* 16 C.F.R. § 310.2(ff)-(gg).

Perhaps recognizing that broadening the definition of "telemarketer" to include even receiving calls was beyond the scope authorized by Congress, the FTC largely nullified its broader definition by enacting Section 310.6, which exempts, among other things, businesses that receive sales calls "in response to an advertisement through any medium." (*See also supra* at 15.) This exemption swallows the rule because all persons who accept inbound calls necessarily employ *some* form of advertising to prompt those calls – how else would the potential customers be prompted to call?

But the FTC did not stop there. Instead, it carved out a limited number of disfavored industries from the exemptions, leaving *them* subject to the TSR. Thus, rather than comply with its limited mandate of promulgating rules to address abusive and deceptive telemarketing practices, the FTC exceeded it in at least two ways: first, by expanding the reach of the TSR to include businesses that merely receive sales calls, and second, by then selectively enforcing the TSR's manufactured jurisdiction over such businesses to target only certain industries arbitrarily. Indeed, with respect to credit repair businesses, the FTC strayed so far from Congress's directive as to insert rules into the TSR purporting to regulate even the manner in which those businesses may collect fees. This overreach is particularly glaring in light of the fact that Congress separately enacted a statute (CROA) for the specific purpose of regulating the credit repair services industry, *specifically including* provisions governing the manner in which credit repair service providers may collect their fees. *See* 15 U.S.C. § 1679, *et seq.*; *supra* at 3-5.

Far from protecting consumers from deceptive and abusive telemarketing practices, the TSR defines "telemarketer" so broadly as to capture virtually every business with a telephone, attempts to escape the dysfunction of that unworkably broad definition by exempting virtually every business that it covers, and then targets a limited number of disfavored, non-exempt businesses with arbitrary requirements such as a draconian payment collection regime that are decidedly unrelated to any purported telemarketing practice, abusive or otherwise. For all of these reasons, the FTC exceeded its authority in promulgating the TSR, and Plaintiffs' TSR claims should be dismissed.

### F. The Complaint Fails To Allege That Key Credit Is A Telemarketer Under The TSR.

In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must describe the claim in sufficient detail to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim, and conclusory allegations "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009).

Here, Plaintiffs have failed to allege that Key Credit is a "telemarketer" or a "seller" under the TSR. To be a "telemarketer" under the TSR, a person must: (1) "initiate or receive telephone calls to or from a customer or donor"; (2) "in connection with" a "plan, program or campaign which is conducted to induce the purchase of goods or services or a charitable contribution"; (3) "by use of one or more telephone calls"; and (4) "which involves more than one interstate telephone call." *See* 16 C.F.R. §§ 310.2(ff)-(gg). To be a "seller" under the TSR, a person must: (1) provide, offer to provide, or arrange for others to provide goods or services to the customer in exchange for consideration; (2) "in connection with" a "plan program or campaign which is

conducted to induce the purchase of goods or services or a charitable contribution"; (3) "by use of one or more telephone calls"; and (4) "which involves more than one interstate telephone call." 16 C.F.R. §§ 310.2(dd), 310.2(gg).

Plaintiffs' original complaint failed to adequately allege any "plan, program or campaign…conducted to induce the purchase of services," and their amended complaint fares no better. Plaintiffs allege no more than that Key Credit advertises its services and receives calls in response to those advertisements. (*See* Compl., ¶¶ 16, 22-24.) Far from alleging a "plan, program or campaign which is conducted to induce the purchase of services," Plaintiffs specifically allege that Key Credit's advertisements direct prospective customers to contact Key Credit merely for a "free consultation." (*Id*. at ¶ 23.) Plaintiffs otherwise simply cast about the words "telemarketing" and "telemarketer" in conclusory, circular fashion, with no factual support. (*See id*. at ¶¶ 11-12, 16-17, 24.) Such "threadbare recitals of the elements" are insufficient to state a claim, and Plaintiffs have failed to allege that Key Credit is a "telemarketer" or a "seller" under the TSR.

## II. COUNT II FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED.

In Count II, Plaintiffs allege that Key Credit engaged in deceptive telemarketing practices in violation of the TSR. For the reasons that follow, Count II fails to state a claim and should be dismissed.

### A. Count II Should Be Dismissed For The Reasons Set Forth In Section I Above.

For all of the reasons set forth in Section I above, Count II of the Complaint, which alleges "deceptive practices" under the TSR, should be dismissed with prejudice.

### B. The Complaint Fails To Allege That Key Credit Engaged In Deceptive Conduct.

The TSR states that it is a deceptive telemarketing act or practice to "misrepresent, directly or by implication, in the sale of goods or services any ... material aspect of the performance,

efficacy, nature, or central characteristics of goods and services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii). The CFPA similarly states that it is unlawful "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

While it appears that no Massachusetts court has construed Section 310.3 of the TSR, other federal courts have adopted the Federal Trade Commission Act's ("FTCA") definition of "deceptive" when analyzing the TSR and the CFPA due to the similarity in the language of the statutes. *See Consumer Financial Protection Bur. v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016); *Consumer Financial Protection Bureau v. Prime Marketing Holdings, LLC*, No. 16-0711-BRO, 2017 WL 2772313, at *11 (C.D. Cal. Jan. 19, 2017); *Consumer Financial Protection Bureau v. Navient Corporation*, No. 3:17-CV-101, 2017 WL 3380530, at *23 (M.D. Pa. Aug. 4, 2017). Thus, to adequately plead deceptive conduct under the TSR (and the CFPA), Plaintiffs must establish that: (1) there was a representation; (2) that representation was likely to mislead consumers acting reasonably under the circumstances; and, (3) the representation was material. *Id*. To demonstrate that a representation was "likely to mislead consumers," Plaintiff must establish that (1) the representation was false, or, (2) Defendant lacked a reasonable basis for its claims. *Prime Marketing Holdings*, 2017 WL 2772313, at *11; *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012).

Notably, Massachusetts courts construing the MA-UDAP – which Plaintiffs contend was violated by Key Credit on the basis of "deceptive practice" allegations that are identical to those that purportedly support Plaintiffs' deceptive practice claim under the TSR (*compare* Compl., Count II *with* Compl., Count IX) – "have agreed that mere negligence cannot maintain [an MA-UDAP] claim; rather, the defendant must have committed some extreme or egregious fault." *Jones*

*v. Experian Information Solutions, Inc.*, 141 F. Supp. 3d 159, 163-64 (D. Mass. 2015) (citing *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014)) (internal quotations omitted).

In addition, Plaintiffs' "deception" claims (*i.e.*, Counts II, IV, VII, and IX) sound in fraud and must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Prime Marketing Holdings*, 2017 WL 2772313, at **5-6; *Crosby Legacy Company, LLC v. TechnipFMC PLC*, No. 18-10814-MLW, 2019 WL 5588993, at *6 (D. Mass. Sept. 13, 2019) ("a plaintiff bringing a Chapter 93A claim must comply with Rule 9(b)"). Accordingly, Plaintiffs must specify (but fail to do so) the "time, place and content" of any allegedly deceptive representations that form the basis for these claims. *See Prime Marketing Holdings*, 2017 WL 2772313, at *7; *see also Crosby Legacy Company*, 2019 WL 5588993, at *6. Importantly, even under the less stringent pleading requirements of Federal Rule of Civil Procedure 8, Plaintiffs have failed to allege that Key Credit engaged in any deceptive conduct.

Count II identifies the following two allegedly deceptive statements:

- Key Credit's "actions would or likely would result in a substantial increase to consumer's credit scores." (Compl., ¶ 48.)
- Key Credit's "actions would or likely would result in the removal of negative entries on consumers' credit reports. (*Id*. at ¶ 50.)

Counts IV, VII, and IX rely on the same purportedly deceptive statements. (*Id*. at ¶¶ 60, 62, 79, 81, 89, 91.)

Whether analyzed under Rule 8 or Rule 9(b), Plaintiffs do not and cannot allege that either of these statements was false, or that Key Credit did not have a reasonable basis to make them. *See Prime Marketing Holdings*, 2017 WL 2772313, at *11; *F.T.C. v. John Beck*, 865 F. Supp. 2d at 1067. Rather, as to both statements, Plaintiffs allege only that "in numerous instances" Key Credit's services did not result in a "substantial increase" to customers' credit scores (*see* Compl.,

¶¶ 49, 61, 80, 90) or in the removal of negative entries on customers' credit reports (*see id.* at ¶¶ 51, 63, 82, 92).

Plaintiffs' vague allegation that, for some unspecified number of unidentified Key Credit clients, Key Credit's actions did not result in a "substantial increase" to their credit scores is self-evidently insufficient to allege that Key Credit's statement that its actions "would or likely would result" in such an increase was false or without a reasonable basis. Plainly, both statements can be true at the same time, and nothing about some unspecified number of clients not obtaining this result for unspecified reasons demonstrates that Key Credit was without a reasonable basis for stating that its actions would "likely" be successful. And it certainly does not make the statement false. The same is true of Key Credit's alleged statement regarding the removal of negative entries on clients' credit reports.

The Complaint also identifies several other allegedly deceptive statements, none of which are specifically identified in Counts II, IV, VII, and IX. In any event, these other allegedly deceptive statements are not actionable as a matter of law:

- that Key Credit will "fix an unlimited amounts of negative items in [a client's] credit file with all three of the major credit agencies, for one flat fee," (Compl. at ¶ 33);
- that Key Credit's clients see an "average 90 point increase in 90 days," (*id.*);
- "We Clean Up Unlimited Negative Records," (*id.* at ¶ 35);
- "[w]e dramatically increase credit scores to help consumers that are struggling to get approved," (*id.*);
- "[w]e help people whose low credit scores are holding them back from the life they want," (*id.*);
- that Key Credit's "clients start seeing removals in as little as 45 days," (*id.* at ¶ 37);
- "our team of more than 60 credit experts help[s] each and every client individually" to "take the next steps towards credit freedom," (*id.*, ¶ 31); and

- "our consultations are all done by our owner, Nik Tsoukales, and his team of certified credit consultants," (*id*.).

With respect to the first six statements above, Plaintiffs' sole allegation purportedly demonstrating that each statement is either false or was made without a reasonable basis is that "in many instances" Key Credit clients did not experience the outcome described. (*See id*. at ¶¶ 34, 36, 38, 40.) Even if true, this allegation is plainly insufficient to demonstrate the statements' falsity or that Key Credit lacked a reasonable basis to make it. The statements, moreover, are not promised outcomes, and Key Credit's Credit Services Agreement ("CSA") explicitly states that Key Credit makes no "express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (*See* CSA at 2, a true and correct copy of which is attached hereto as **Exhibit A**.)

With respect to the last two statements above, Plaintiffs allege only that Key Credit "has just a handful of Boston-based employees, only some of whom interact directly with consumers," and that "[t]he majority of [Key Credit's] sales and client interactions are conducted by contract telemarketers located in Central America..." (*See* Compl. at ¶ 32.) Even if true, these allegations are plainly insufficient to demonstrate the statements' falsity or that Key Credit lacked a reasonable basis to make them. Plaintiffs do not (and cannot) allege that Key Credit's team are not thoroughly trained, certified credit repair experts, or that Nik Tsoukales and his team do not perform all consultations, helping each client individually. (*See id*. at ¶ 31.) Nor can Plaintiffs allege that Key Credit did not have a reasonable basis for making these statements, or that these statements were material.

In sum, Plaintiffs do not and cannot state a claim for deceptive practices under any pleading standard, and they certainly do not satisfy Rule 9(b)'s heightened pleading standard. For these additional reasons, Count II should be dismissed with prejudice.

## III. COUNT III FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count III, Plaintiffs claim that Key Credit violated the CFPA because "a violation of the TSR by a covered person is also a violation of the CFPA." (Compl., ¶ 57.) For all of the reasons set forth in Sections I and II above, Plaintiffs have failed to allege any violation of the TSR, and Count III should be dismissed with prejudice.

## IV. COUNT IV FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count IV, Plaintiffs claim that Key Credit violated the CFPA by engaging in the same alleged deceptive conduct that Plaintiffs identified in Count II. (*See id*. at ¶¶ 60-63.) For all of the reasons set forth in Section II(B) above, Plaintiffs do not and cannot allege that Key Credit engaged in any deceptive act or practice, and Count IV should be dismissed with prejudice.

## V. COUNT V FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count V, Plaintiffs claim that Key Credit violated the MA-UDAP because, "[u]nder the MA-UDAP, violations of federal consumer protection laws such as the TSR and CFPA constitute violations of § 2 of the MA-UDAP." (*See id*. at ¶ 67.) For all of the reasons set forth in Sections I-IV above, Plaintiffs have failed to allege any violation of the TSR or the CFPA, and Count V should be dismissed with prejudice.

## VI. COUNT VI FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count VI, Plaintiffs claim that Key Credit violated Section 68B(1), Section 68C(6)-(7), and Section 68D(c) of the Massachusetts Credit Services Organization Law ("MA-CSO"), M.G.L. c. 93 §§ 68A-E. (Compl., ¶¶ 71-73.) All of these claims are without merit and are controverted by the plain language of Key Credit's written CSA. *See Hosseini v. Capital One*, 217 F. Supp. 3d 441, 444 n.2 (D. Mass. 2016) ("[w]here a conflict exists between a plaintiff's allegations and the

documents attached to the complaint, the documents ... trump the complaint's allegations") (citing *Schatz v. Republican State Leadership Comm.*, 661 F.3d 50, 55 n.3 (1st Cir. 2012)).

First, Section 68B(1) of the MA-CSO provides that if (and only if) a credit services organization "charge(s) or receive(s) any money or other valuable consideration prior to full, complete and satisfactory performance of the services the credit services organization has agreed to perform for the buyer," then the credit services organization must obtain "a surety bond in an amount not less than ten thousand dollars issued by a surety company authorized to do business in the commonwealth" and establish "a trust account at a federally insured bank or savings and loan association located in the commonwealth." M.G.L. c. 93 § 68B. Plaintiffs allege that Key Credit is subject to these requirements and has failed to meet them. (Compl., ¶ 71.)

As a threshold matter, Plaintiffs' allegation that Key Credit has failed to satisfy the surety bond requirement, (*see id*.), is contradicted by their own Complaint, which specifically admits that Key Credit "maintain[s] a $10,000 surety bond written by Western Surety Company."[5] (*See id*. at ¶ 29.)

More importantly, however, Plaintiffs misconstrue the plain language of Section 68B. Plaintiffs allege that the surety bond and trust account requirements are triggered if a credit repair

[5] Moreover, the trust requirement properly applies to credit services organizations that actually handle their clients' money, which Key Credit does not do. For example, credit services organizations engaged in debt settlement services (a service which Key Credit is not alleged to provide and does not provide) will seek to improve a client's credit rating by settling the client's valid outstanding debt. Such businesses routinely hold their clients' funds for use in satisfaction of the debt settlement the business negotiated on behalf of its client, and Section 68B's trust requirement, properly construed, applies to credit services organizations providing *those* services. *See In re Consumer Debt Management Northeast, Inc.*, 2002 WL 34587389, at *1 (Commonwealth of Massachusetts Division of Banks Jan. 9, 2002). Again, Key Credit is not engaged in such services.

service provider "charg[es] any advance fees – namely, any fee charged before 'full, complete and satisfactory performance' of the credit repair services *offered*." (*See* Compl., ¶ 28 (emphasis added).) That is incorrect, and Plaintiffs' allegation that Key Credit did so is immaterial. The surety bond and trust account are required only if fees are charged before full performance of the services that the credit services provider "*agreed to perform*." *See* M.G.L. c. 93 § 68B (emphasis added). Here, Plaintiffs do not and cannot allege that Key Credit charged any fee "prior to full, complete and satisfactory performance of the services [that Key Credit] has agreed to perform for [any given] buyer." Indeed, Key Credit's CSA explicitly states that its customers will not be charged any advance fees whatsoever. (*See* Ex. A (CSA) at 2-4.) Consequently, Plaintiffs fail to allege that Section 68B's surety bond and trust account requirements apply to Key Credit, and these claims should be dismissed with prejudice.[6]

Second, Section 68C(6)-(7) requires certain disclosures regarding the surety bond and trust account required under Section 68B. *See* M.G.L. c. 93 § 68C(6)-(7); Compl., ¶¶ 75-76. For the reasons set forth above, Plaintiffs have failed to allege that the surety bond and trust account requirements apply to Key Credit, and they have therefore failed as well to allege that Section 68C(6)-(7)'s related disclosure requirement applies to Key Credit. This claim too should be dismissed with prejudice.

---

[6] Plaintiffs' amended allegation that Key Credit charges a first work fee "within five days of enrolling for [Key Credit's] services" is also false and controverted by the plain language of the CSA. (*See* Compl., ¶ 25.) The CSA specifically states that "[t]he First Work Fee is charged 5 days *after* the signing of this contract (unless client indicates a date greater than 5 days in payment authorization section of this form)." (Ex. A at 2 (emphasis added).) In no event is the first work fee charged less than 5 days after enrollment. (*See id*.) Moreover, the CSA specifically identifies the services that Key Credit will perform in return for the first work fee and specifies that the fee "will only be charged by [Key Credit] to the Client upon [Key Credit's] completing the services on behalf of the Client." (*Id*.)

Finally, Plaintiffs allege that Key Credit violated Sections 68C(5) and 68D(c) of the MA-CSO, which provide for certain disclosure requirements concerning credit repair services providers' services contracts. *See* M.G.L. c. 93 §§ 68C(5), 68D(c). Again, Plaintiffs' allegations are controverted by the plain language of Key Credit's services contracts, and these claims should therefore be dismissed with prejudice.

Section 68C(5) of the MA-CSO states that credit services organizations must disclose in writing "a complete and detailed description of the services to be performed by the credit services organization and the total cost to the buyer for such services." (Compl., ¶ 72; M.G.L. c. 93 § 68C(5).) And Section 68D(c) of the MA-CSO provides that the services agreements of credit services organizations are required to include "the terms and conditions of payment, including the total of all payments to be made by the buyer." (Compl., ¶ 72; M.G.L. c. 93 § 68D(c).) Here, Plaintiffs allege that Key Credit's CSA "does not set forth the 'total cost to the buyer' or 'the total of all payments to be made by the buyer.'" (Compl., ¶ 74.) However, Plaintiffs' allegation is contradicted by the plain language of the CSA. (Ex. A at 3-4.)

The CSA unambiguously states that Key Credit's clients may cancel the contract at any time without any cancellation fees or additional charges. (*Id*.) Key Credit requires no more than a one-month commitment with no advance fees, and no obligation to renew. (*See id*. at 2-4.) With respect to that one month, Key Credit performs the services identified in the CSA for which the client subsequently pays the specifically identified "first work fee" of $189.95, plus a processing fee and applicable tax. (*See id*. at 2, 4.) If the client elects to continue working with Key Credit, Key Credit will then perform additional identified services over the course of the next 30 days, following which the client will be charged a fee of $139.95, plus a processing fee and tax, for services rendered. (*See id* at 3, 4.) At any given point, these specifically identified fees identify

the total cost of the services, and the total of all payments "to be made by the buyer." *See* M.G.L. c. 93 §§ 68C(5), 68D(c). No further payments are "to be made by the buyer" – to the contrary, the client can cancel Key Credit's services at any time. To the extent Key Credit is retained to perform any additional services for the additional fee identified in the CSA, it is the client's choice.

Accordingly, Plaintiffs' allegations in Count VI are controverted by the plain language of the CSA, and should be dismissed with prejudice.

## VII. COUNT VII FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count VII, Plaintiffs claim that Key Credit violated the MA-CSO by engaging in the same alleged deceptive conduct that Plaintiffs identified in Count II. (*See id*. at ¶¶ 79-82.) For all of the reasons set forth in Section II(B) above, Plaintiffs do not and cannot allege that Key Credit engaged in any deceptive act or practice, and Count VII should be dismissed with prejudice.

## VIII. COUNT VIII FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count VIII, Plaintiffs claim that Key Credit violated the MA-UDAP because "[a] violation of any section of the MA-CSO relating to the conduct of credit services organizations in Massachusetts…shall also constitute a violation of the MA-UDAP." (Compl., ¶ 86.) For all of the reasons set forth in Section VI above, Plaintiffs have failed to allege any violation of the MA-CSO, and Count VIII should be dismissed with prejudice.

## IX. COUNT IX FAILS TO STATE A CLAIM AND SHOULD BE DISMISSED WITH PREJUDICE.

In Count IX, Plaintiffs claim that Key Credit violated the MA-UDAP by engaging in the same alleged deceptive conduct that Plaintiffs identified in Count II. (*See id*. at ¶¶ 89-92.) Under Massachusetts law, "mere negligence cannot maintain [an MA-UDAP] claim; rather, the defendant must have committed some extreme or egregious fault." *Jones*, 141 F. Supp. 3d at 163-64 (internal quotations omitted) (citing *Baker*, 771 F.3d at 51). For all of the reasons set forth in Section II(B)

above, Plaintiffs do not and cannot allege that Key Credit engaged in any deceptive act or practice, and certainly do not and cannot allege that Key Credit committed "some extreme or egregious fault." *See id*. Count IX should be dismissed with prejudice.

### X. THE CFPB SHOULD BE DISMISSED BECAUSE IT ACTED OUTSIDE ITS AUTHORITY IN BRINGING THIS ACTION.

In *Seila Law*, 140 S. Ct. at 2207, the United States Supreme Court recently confirmed that "the CFPB's leadership by a single independent Director violate[d] the separation of powers." Although the Court found that the unconstitutional statutory provision insulating the CFPB from removal at will was severable from the other statutory provisions that define the CFPB's authority, it recognized that actions taken by the CFPB prior to the severing of the unconstitutional provision were "constitutional[ly] defect[ive]." *See id*. at 2208.

Here, the CFPB initiated this action when its director was not removable at will and before the unconstitutional removal protection was stricken from the statute. Accordingly, its prosecution of this action is constitutionally defective, and the CFPB therefore should be dismissed as a plaintiff in the litigation.

## CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed with prejudice in its entirety.

Dated: September 30, 2020

Respectfully submitted,

**COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS**

By: /s/ Timothy A. Hudson
One of Their Attorneys

By: /s/ David B. Mack
One of Their Attorneys

Timothy A. Hudson, *pro hac vice*
Jordan E. Wilkow, *pro hac vice*
Amie M. Bauer, *pro hac vice*
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlawfirm.com
jwilkow@tdrlawfirm.com
abauer@tdrlawfirm.com

-and-

David B. Mack
O'Connor, Carnathan and Mack LLC
One Van de Graaff Dr., Suite 104
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on September 30, 2020, I caused the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** to be electronically filed using this Court's ECF system, serving all attorneys of record by operation of the Court's electronic filing system.

/s/ Timothy A. Hudson

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

I, Timothy Hudson, hereby certify that counsel conferred and attempted in good faith to resolve or narrow the issues raised herein but were unable to reach an agreement.

/s/ Timothy A. Hudson