UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Bureau of Consumer Financial Protection and the Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney General,

Plaintiffs,

v.

Commonwealth Equity Group, LLC (d/b/a Key Credit Repair) and Nikitas Tsoukales (a/k/a Nikitas Tsoukalis),

Defendants.

Case No. 1:20-cv-10991-RWZ

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
(Leave to file granted 10/07/2020)

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. The TSR is constitutional and valid. .......... 2

A. The Credit Repair Organizations Act does not preempt the TSR. .......... 2

B. The TSR does not unconstitutionally constrain speech. .......... 6

C. The TSR is not unconstitutionally vague. .......... 9

D. The TSR does not violate the Equal Protection Clause. .......... 11

E. The FTC did not exceed its authority in promulgating the TSR. .......... 13

II. All Counts in the Amended Complaint state valid claims for relief. .......... 15

A. The Amended Complaint adequately alleges that Defendants are a telemarketer and seller under the TSR. .......... 17

B. The Amended Complaint adequately alleges that Defendants engaged in deceptive conduct. .......... 19

C. Counts V through IX properly allege claims for violations of the MA-CSA and MA-CSO. .......... 22

D. Count VI properly alleges that Defendants failed to meet the MA-CSO's advance-fee and disclosure requirements. .......... 24

III. Defendants' constitutional objections to the CFPA's removal provision have been resolved. .......... 27

CONCLUSION .......... 28

# TABLE OF AUTHORITIES

Page(s)

Cases

*37712, Inc. v. Ohio Dep't of Liquor Control*,
113 F.3d 614 (6th Cir. 1997) ........ 9
*Am. Sur. Co. of New York v. Marotta*,
287 U.S. 513 (1933) ........ 14
*Ashcroft v. Iqbal*,
556 U.S. 662, (2009) ........ 16, 24
*Ass'n of Civilian Technicians v. FLRA*,
173 F.3d 25 (1st Cir. 1999) ........ 3
*Baker v. Goldman Sachs & Co.*,
949 F. Supp. 2d 298 (D. Mass. 2013) ........ 23
*Bank of New England Old Colony, N.A. v. Clark*,
986 F.2d 600 (1st Cir. 1993) ........ 5
*Barr v. Am. Ass'n of Political Consultants*,
140 S. Ct. 2335 (2020) ........ 8
*Beddall v. State St. Bank & Tr. Co.*,
137 F.3d 12 (1st Cir. 1998) ........ 21
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 16, 24
*Borman's, Inc. v. Michigan Prop. & Cas. Guar. Ass'n*,
925 F.2d 160 (6th Cir.) ........ 13
*Branch v. Smith*,
538 U.S. 254 (2003) ........ 3
*Brewster Wallcovering Co. v. Blue Mtn. Wallcoverings, Inc.*,
68 Mass. App. Ct. 582 (Mass. App. 2007) ........ 23
*Burson v. Freeman*,
504 U.S. 191 (1992) ........ 8
*CFPB v. D&D Mktg.*,
2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ........ 16
*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ........ 20, 22
*CFPB v. Navient Corp.*,
2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) ........ 16
*CFPB v. Prime Mktg. Holdings, LLC*,
16-cv-7111, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) ........ 4, 5
*CFPB v. Think Fin.*,
2018 WL 3707911 (D. Mont. Aug. 3, 2018) ........ 16
*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ........ 12
*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) ........ 15

*Erickson v. Pardus*,
551 U.S. 89 (2007) .......... 16
*Fanning v. FTC*,
821 F.3d 164 (1st Cir. 2016).......... 20
*Farrell v. Pompeo*,
424 F. Supp. 3d 1 (D.D.C. 2019) .......... 14
*FCC v. Beach Commc'ns*,
508 U.S. 307 (1993) .......... 12
*FCC v. Fox TV Stations, Inc.*,
567 U.S. 239 (2012) .......... 10
*Frederick J. Hanna & Assocs.*,
114 F. Supp. 3d 1342 (N.D. Ga. 2015) .......... 16
*FTC v. AFD Advisors*,
2014 WL 274097 (N.D. Ill. Jan. 24, 2014) .......... 17
*FTC v. Affiliate Strategies, Inc.*,
2010 WL 11470099 (D. Kan. June 4, 2010).......... 16
*FTC v. Data Med. Cap., Inc.*,
2010 WL 1049977 (C.D. Cal. Jan. 15, 2010).......... 18
*FTC v. Freecom Comm., Inc.*,
401 F.3d 1192 (10th Cir. 2005) .......... 16, 17
*FTC v. Lalonde*,
545 F. App'x. 825 (11th Cir. 2013).......... 18
*Harrington v. Strong*,
2018 WL 4031067 (D. Neb. Aug. 23, 2018).......... 11
*In re Nat'l Credit Mgmt. Grp.*,
21 F. Supp. 2d 424 (D.N.J. 1998).......... 3, 7
*Langadinos v. Am. Airlines, Inc.*,
199 F.3d 68 (1st Cir. 2000).......... 16
*Lowe v. SEC*,
472 U.S. 181 (1985) .......... 7
*Newman v. Lehman Brothers Holdings Inc.*,
901 F.3d 19 (1st Cir. 2018).......... 28
*Ohralik v. Ohio State Bar Ass'n,*
436 U.S. 447, 456 (1978) (1978) .......... 7
*Parker v. Hurley*,
514 F.3d 87 (1st Cir. 2008).......... 16
*Parker v. Levy*,
417 U.S. 733 (1974) .......... 10, 11
*Posadas v. Nat'l City Bank*,
296 U.S. 497, (1936) .......... 5
*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976) .......... 3, 4, 6
*Resort Car Rental Sys., Inc. v. FTC*,
518 F.2d 962 (9th Cir.1975) .......... 22

*Rhode Island v. Narragansett Indian Tribe*,
19 F.3d 685 (1st Cir. 1994) ........................................ 5
*Rodriguez-Ortiz v. Margo Caribe, Inc.*,
490 F.3d 92 (1st Cir. 2007) ........................................ 24
*Rogan v. Menino*,
175 F.3d 75 (1st Cir. 1999) ........................................ 28
*Ruiz v. Bally Total Fitness Holding Corp.*,
496 F.3d 1 (1st Cir. 2007) ........................................ 28
*SEC v. Tambone*,
597 F.3d 436 (1st Cir. 2010) ........................................ 16
*Seila Law, LLC v. CFPB*,
140 S. Ct. 2183 (2020) ........................................ 28
*Tenn. v. Lexington Law Firms*, 3:96-cv-0344,
1997 WL 367409 (M.D. Tenn. May 14, 1997) ........................................ 4, 5
*United States v. Lahey Clinic Hosp., Inc.*,
399 F.3d 1 (1st Cir. 2005) ........................................ 3, 6
*Vill. of Hoffman Ests. v. Flipside, Hoffman*,
455 U.S. 489 (1982) ........................................ 10
*Wine & Spirits Retailers, Inc. v. Rhode Island*,
481 F.3d 1 (1st Cir. 2007) ........................................ 7, 9, 12
*Wood v. Gen. Motors Corp.*,
673 F. Supp. 1108 (D. Mass. 1987) ........................................ 4

Statutes

12 U.S.C. § 5491(c)(3) ........................................ 28
12 U.S.C. §§ 5531, 5536 ........................................ 1
15 U.S.C. § 1679b(b) ........................................ 4, 8
15 U.S.C. § 6102 ........................................ 2
15 U.S.C. § 6102(a)(3) ........................................ 14
15 U.S.C. § 6105 ........................................ 2
15 U.S.C. § 6106(4) ........................................ 2, 15
15 U.S.C. §§ 1679–1679j ........................................ 3
M.G.L. c. 93, § 68A ........................................ 26
M.G.L. c. 93, § 68B ........................................ 25
M.G.L. c. 93, § 68B(1) ........................................ 25, 27
M.G.L. c. 93, § 68B(4) ........................................ 23
M.G.L. c. 93, § 68E ........................................ 24
M.G.L. c. 93, §§ 68A–68E ........................................ 1, 23, 26
M.G.L. c. 93, § 68C(5) ........................................ 26
M.G.L. c. 93, §§ 68C(6)–(7) ........................................ 26
M.G.L. c. 93A, § 2 ........................................ 1, 23, 24

Rules

Telemarketing Sales Rule, 60 Fed. Reg. 30406 (June 8, 1995) .......... 13
Fed. R. Civ. P. 8(a)(2) .......... 16
Fed. R. Civ. P. 9(b) .......... 16, 17
Fed. R. Civ. P. 12(b)(6) .......... 16

Regulations

16 C.F.R. § 310.2(dd) .......... 11, 19
16 C.F.R. § 310.2(ff) .......... 2, 19
16 C.F.R. § 310.2(gg) .......... 2, 18
16 C.F.R. §§ 310.3 .......... 1
16 C.F.R. § 310.3(a)(2)(iii) .......... 20
16 C.F.R. §§ 310.4 .......... 1, 14
16 C.F.R. § 310.4(a)(2) .......... 4, 7, 8
16 C.F.R. § 310.6 .......... 11
16 C.F.R. §§ 310.6(b)(5) .......... 8, 11, 14
16 C.F.R. §§ 310.6(b)(6) .......... 8, 11, 14
940 CMR 3.16 .......... 23

Other Authorities

H.R. Rep. 102–421(1991) .......... 13

## INTRODUCTION

For more than a decade, Defendants Commonwealth Equity Group (Key Credit) and Nikitas Tsoukales have targeted financially distressed consumers nationwide, selling credit-repair services through false promises that Key Credit would improve consumers' credit scores and remove negative information from consumers' credit reports. Plaintiffs' Amended Complaint seeks to stop Defendants' illegal conduct, obtain redress for the consumers that Defendants harmed, and penalize Defendants for their violations of law.

The Amended Complaint alleges violations of the Consumer Financial Protection Act of 2010 (CFPA),[1] the Telemarketing Sales Rule (TSR),[2] the Massachusetts Consumer Protection Law (MA-UDAP),[3] and the Massachusetts Credit Services Organization Law (MA-CSO).[4] Defendants seek to dismiss Plaintiffs' pleading for myriad reasons, questioning the constitutionality and validity of the Federal Trade Commission's long-standing TSR and claiming that the Amended Complaint is constitutionally defective. Defendants also contend that the Amended Complaint fails to state a claim for relief despite substantial factual allegations supporting Plaintiffs' claims.

For the reasons expressed below, the Court should deny the motion to dismiss.

---

[1] 12 U.S.C. §§ 5531, 5536.
[2] 16 C.F.R. §§ 310.3, 310.4.
[3] M.G.L. c. 93A, § 2.
[4] M.G.L. c. 93, §§ 68A–68E.

## ARGUMENT

### I. The TSR is constitutional and valid.

Defendants advance a series of arguments attacking the TSR itself, but none justifies rejecting that law or dismissing Plaintiffs' case.

#### A. The Credit Repair Organizations Act does not preempt the TSR.

The Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act) authorizes the Federal Trade Commission (FTC) to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices."[5] It defines telemarketing as "a plan, program, or campaign which is conducted to induce purchases of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call."[6] The TSR, promulgated under the Telemarketing Act, incorporates this definition and defines a telemarketer as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor," including telemarketers of credit-repair services.[7] Both the Bureau and the FTC may enforce the TSR.[8]

Defendants are mistaken that when Congress enacted the Credit Repair Organizations Act (CROA),[9] it repealed by implication those provisions of the TSR

[5] 15 U.S.C. § 6102.
[6] 15 U.S.C. § 6106(4).
[7] 16 C.F.R. §§ 310.2(ff),(gg).
[8] 15 U.S.C. § 6105.
[9] 15 U.S.C. §§ 1679–1679j. The Bureau does not have authority to enforce CROA.

that apply to telemarketers of credit-repair services.[10] CROA does not, by its terms, specifically repeal any portion of the TSR or the Telemarketing Act. "[R]epeals by implication are not favored,"[11] and the two situations where an implied repeal may occur are not present here: "(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act."[12] Even in those two situations, "the intention of the legislature to repeal must be clear and manifest," because when two provisions "are capable of co-existence, it is the duty of the courts . . . to regard each as effective."[13]

Defendants claim that CROA conflicts with the TSR and that Congress intended for CROA to displace the TSR's provisions that apply to telemarketing credit-repair services.[14] They are wrong on both counts. Defendants are also wrong when they contend that for the first 13 years of its existence, the TSR was not enforced against marketers of credit-repair services.[15]

---

[10] *See* Defs' Mem. of Law in Supp. of Their Mot. to Dismiss at 3–5, Sept. 14, 2020, ECF No. 25. (Memo).
[11] *Branch v. Smith*, 538 U.S. 254, 273 (2003), *Ass'n of Civilian Technicians v. FLRA*, 173 F.3d 25, 27 (1st Cir. 1999).
[12] *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154 (1976); *see also United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 10 (1st Cir. 2005).
[13] *Radzanower*, 426 U.S. at 154–55; s*ee also Lahey Clinic*, 399 F.3d at 9 ("There is a strong presumption against implied repeals.").
[14] *See* Memo at 4.
[15] *See, e.g.*, *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424 (D.N.J. 1998); *Tenn. v. Lexington Law Firms*, 3:96-cv-0344, 1997 WL 367409 (M.D. Tenn. May 14, 1997).

First, the "conflict" that Defendants imagine between CROA and the TSR is no conflict at all, let alone an irreconcilable one. Indeed, "[i]t is not enough to show that the two statutes produce differing results when applied to the same factual situation."[16] An irreconcilable conflict would occur only if it were impossible to comply with both laws.[17] That is not the situation here. Defendants note that CROA provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."[18] Under the TSR, a telemarketer of credit-repair services may not request or receive payment until at least six months after promised results have been achieved.[19] Although Defendants contend that these two provisions "cannot be reconciled," they plainly can.[20] Complying with the TSR's payment provisions would not cause Defendants to violate CROA. In fact, the opposite is true; if Defendants were to comply with the TSR, they would necessarily comply with CROA, too. That is, the TSR and CROA are capable of coexistence—the relevant provisions may be complied with concurrently. Thus, there is no irreconcilable conflict.[21]

Second, Defendants contend that it is "self-evident" that Congress intended for CROA to displace the TSR provisions that regulate telemarketed credit-repair

---

[16] *Radzanower*, 426 U.S. at 155.
[17] *See Wood v. Gen. Motors Corp.*, 673 F. Supp. 1108, 1114 (D. Mass. 1987).
[18] 15 U.S.C. § 1679b(b).
[19] 16 C.F.R. § 310.4(a)(2).
[20] Memo. at 4.
[21] *See CFPB v. Prime Mktg. Holdings, LLC*, 16-cv-7111, 2016 WL 10516097, at *9 (C.D. Cal. Nov. 15, 2016) (rejecting the same argument that Defendants raise here).

services and, presumably, the authorizing provisions of the Telemarketing Act. This, however, was not self-evident to either of the courts that have addressed the same argument.[22] The sort of implied repeal that Defendants urge occurs only if "the intention of the legislature to repeal [is] clear and manifest."[23] Moreover, "in the absence of a contrary legislative command, when two acts of Congress touch upon the same subject matter the courts should give effect to both, if that is feasible. In other words, so long as the two statutes, fairly construed, are capable of coexistence, courts should regard each as effective."[24] Again, the TSR and CROA are capable of coexistence.

Finally, Defendants contend that Congress intended for CROA to displace portions of the TSR because CROA "comprehensively addresses the credit repair industry."[25] But that is not enough to demonstrate Congress's intent to repeal. CROA regulates credit-repair organizations, including those who engage in telemarketing. The TSR regulates telemarketers, including those who telemarket credit-repair services. Defendants point to nothing in CROA's legislative history indicating that Congress gave any consideration to repealing any portion of the

---

[22] *See Tenn. v. Lexington Law Firms*, 1997 WL 367409, at *6 ("[A]lthough the [CROA] undoubtedly governs Defendant's business, there is no language in that statute indicating that Defendant's telemarketing activities may not simultaneously be regulated by the Telemarketing Act. As such, the Court finds that the FTC properly interpreted the Act to apply to Defendants conduct."); *Prime Mktg. Holdings*, 2016 WL 10516097, at *9 (holding both TSR and CROA effective because there was no "clearly expressed congressional intention to the contrary").
[23] *Posadas v. Nat'l City Bank*, 296 U.S. 497, 504, (1936); *see also Bank of New England Old Colony, N.A. v. Clark*, 986 F.2d 600, 604 (1st Cir. 1993).
[24] *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 703 (1st Cir. 1994).
[25] Memo at 4.

Telemarketing Act or the TSR. Without that, there is no implied repeal.[26] And absent any indication that Congress intended to repeal the credit-repair provisions of the TSR, it is simply irrelevant that CROA post-dates the TSR.[27]

Indeed, there are good reasons why the two separate prohibitions on advance payments exist side-by-side. The risk of deceptive practices, especially in the credit-repair industry, increases significantly when those services are offered through telemarketing. Under those circumstances, consumers typically have less opportunity to scrutinize and verify the representations made by the seller before they are induced to make a purchase. It is wise public policy, therefore, to provide additional protection for consumers of credit-repair services when those services are telemarketed. In that situation, payment must await not only until the services have been provided, but also until there is evidence of a successful outcome—that the consumer's credit was in fact repaired.

**B. The TSR does not unconstitutionally constrain speech.**

Defendants' First Amendment argument fails because the TSR does not regulate its speech. Defendants recognize that the TSR imposes a payment restriction on telemarketers of credit-repair services who may not request or receive payment until at least six months after they have provided promised services.[28]

[26] *See Radzanower*, 426 U.S. at 157–58 (1976) (holding that "there is nothing in the legislative history of the Securities Exchange Act to support the view that Congress in enacting it gave the slightest consideration to the pro tanto repeal of" a section of the National Bank Act); *see also Lahey Clinic*, 399 F.3d at 12 (noting the lack of legislative history supporting implied repeal).

[27] *See* Memo at 5.

[28] *See* Memo at 12–15; 16 C.F.R. § 310.4(a)(2).

This restriction may not be to Defendant's liking, but it is not a content-based restriction on speech.

The government can, and routinely does, regulate the provision of professional services without offending the First Amendment. Indeed, "[t]he power of government to regulate the professions is not lost whenever the practice of a profession entails speech."[29] Further, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."[30] Here, the "course of conduct" that the TSR regulates is the receipt of payment for credit-repair services.[31]

In *In re National Credit Management Group*, the court considered, and rejected, an argument similar to the one that Defendants raise here.[32] In that case, the FTC and the State of New Jersey brought an action to enforce CROA's payment provisions, which prohibit credit-repair organizations from charging or receiving a fee for a service before "such service is fully performed."[33] The defendants argued that this provision unconstitutionally restricted their speech by limiting their ability to sell educational materials. The court rejected that argument and held that

---

[29] *Lowe v. SEC*, 472 U.S. 181, 228 (1985) (White, J., concurring).
[30] *Id.*; *see Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 7 (1st Cir. 2007) (same, holding that a restriction on joint advertising by liquor marketers does not implicate the First Amendment).
[31] *See also Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978) ("the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity").
[32] 21 F. Supp. 2d 424.
[33] *See* 15 U.S.C. § 1679b(b).

CROA merely required them to perform promised services before the customer is charged payment.[34] As such, CROA's payment provision "does not impinge upon the rights of the Defendants under the First Amendment."[35] The same is true here. The TSR's payment provision restricts when Key Credit can receive payment. It does not impinge on its speech or its First Amendment rights.

Defendants also contend that the TSR violates the First Amendment because it draws distinctions based on the nature of the services provided by the telemarketer.[36] In particular, Defendants complain that the TSR imposes payment restrictions only on telemarketers of credit-repair services, and that it does not exempt telemarketers of credit-repair services from coverage.[37] Defendants cite to several cases to support its argument that these sorts of distinctions violate the First Amendment, but none of those cases involves the regulation of commercial enterprises.[38] Indeed, the First Circuit rejected an argument similar to Defendants' argument in *Wine & Spirits Retailers.*[39] In that case, the plaintiffs complained that the restrictions imposed by the state on liquor stores violated their First Amendment rights because similar restrictions were not imposed on other

[34] 21 F. Supp. 2d at 460.
[35] *Id.*
[36] *See* Memo at 12–15.
[37] 16 C.F.R. §§ 310.4(a)(2), 310.6(b)(5)–(6).
[38] For example, *Burson v. Freeman*, 504 U.S. 191 (1992), *see* Memo 12, involved the dissemination of election campaign materials, and *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335 (2020), *see* Memo at 12–13, involved a restriction on political speech.
[39] 481 F.3d at 7.

commercial entities.[40] The court held, however, that

> the precept upon which the Retail Stores rely cannot be construed to divest the states of their ability to devise specific rules for businesses in different fields, that is, for businesses that are not similarly situated. . . . This is merely a reflection of the time-honored tenet that, within wide limits, courts must defer to state legislative classifications constructed to further legitimate economic objectives.[41]

The court relied on *37712, Inc. v. Ohio Department of Liquor Control*, which held that the burden upon a party seeking to overturn a legislative classification that does not discriminate based on a suspect classification is an extremely heavy one.[42] As discussed, the FTC had ample reason for imposing restrictions on telemarketers of credit-repair services, and Defendants have presented nothing to show that the distinction was in any way irrational or based on a suspect classification.

**C. The TSR is not unconstitutionally vague.**

Defendants are also wrong in their contention that the TSR is unconstitutionally vague.[43]

Defendants correctly note that "[t]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: Regulated parties should know what is required of them so they may act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."[44] But Defendants omit that "economic regulation is subject to

---

[40] *Id.*
[41] *Id.*
[42] *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 622 (6th Cir. 1997).
[43] *See* Memo at 6–12.
[44] *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).

a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."[45] Moreover, where, like here, a statute or rule does not implicate constitutionally protected conduct, it is unconstitutionally vague only

> if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.[46]

Thus, "one to whose conduct a statute clearly applies may not successfully challenge it for vagueness."[47]

Defendants make no attempt to argue that the TSR is unconstitutionally vague as applied to their conduct. Instead, they argue that some hypothetical service providers might not know whether they are telemarketers to whom the TSR applies. Defendants focus on the definition of "telemarketing." Under the TSR, telemarketing is "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves one or more interstate telephone call."[48] Defendants complain that there is no definition of "plan, program, or campaign," and they question whether the definition of telemarketing might encompass any seller of goods or services who

---

[45] *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 498 (1982).
[46] *Id.* at 494–95.
[47] *Parker v. Levy*, 417 U.S. 733, 756 (1974).
[48] 16 C.F.R. § 310.2(dd).

receives sales calls.[49] Defendants, however, answer their own question; they note that 16 C.F.R. § 310.6 provides that telephone calls initiated by a customer in response to advertising through any medium are exempt from the TSR unless that advertising relates to, among other things, credit-repair services.[50] Thus, when it comes to a seller of credit-repair services, the TSR applies if that seller receives telephone calls from consumers in response to advertising.

As alleged in the Amended Complaint, the TSR applies to Defendants, and Defendants do not argue otherwise.[51] Indeed, Defendants readily admit that "virtually every credit repair service provider that receives a telephone call from a prospective client to discuss its services is a 'telemarketer' under the TSR," indicating that Defendants have no difficulty determining that the TSR applies to them.[52] It is indeterminacy, not broad application, that renders a provision unconstitutionally vague.[53] Given that the TSR "clearly applies" to Defendants, they may not mount a vagueness challenge here.[54]

**D. The TSR does not violate the Equal Protection Clause.**

Defendants' equal-protection argument also fails.[55] Ordinary enactments that (1) do not impair the interests of members of any suspect or quasi-suspect class and

---

[49] Memo at 7.
[50] 16 C.F.R. § 310.6(5),(6); *see* Memo at 9.
[51] Am. Compl. at ¶¶ 15–16.
[52] Memo at 5.
[53] *See Harrington v. Strong*, No. 8:18CV383, 2018 WL 4031067, at *4 (D. Neb. Aug. 23, 2018) (noting that the fact that a statute has broad application does not necessarily render it unconstitutionally vague).
[54] *See Parker*, 417 U.S. at 756.
[55] *See* Memo at 15–16.

(2) do not inordinately burden the exercise of anyone's fundamental rights are tested under the least demanding equal-protection standard—the rational-relationship inquiry—under which "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."[56] "When social or economic legislation is at issue, the Equal Protection Clause allows the [government] wide latitude . . . and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."[57] "This is merely a reflection of the time-honored tenet that, within wide limits, courts must defer to state legislative classifications constructed to further legitimate economic objectives."[58]

Defendants argue that this Court should apply strict scrutiny to their equal-protection challenge because, they contend, the TSR interferes with their First Amendment rights. But, as explained above, the TSR does not regulate the telemarketer's speech. Rather, it regulates when a telemarketer of credit-repair services may receive payment from consumers. Thus, the TSR provisions that regulate telemarketers of credit-repair services survive equal-protection scrutiny "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." There most certainly is here.

---

[56] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).
[57] *Id.*
[58] *Wine & Spirits Retailers*, 481 F.3d at 7; *see FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").

The mere fact that the TSR does not impose similar restrictions on all other telemarketers is not a classification along suspect lines. Indeed, "[s]uch scope-of-coverage provisions are unavoidable components of most economic or social legislation."[59] Moreover, providers of credit-repair services were among those who practiced abusive telemarketing practices that were called to congressional attention in hearings preceding enactment the Telemarketing Act.[60] "The burden upon a party seeking to overturn a legislative enactment for irrationally discriminating between groups under the equal protection clause is an extremely heavy one,"[61] and it is a burden that Defendants do not meet.

**E. The FTC did not exceed its authority in promulgating the TSR.**

Defendants recognize that the TSR specifically does not apply to telephone calls placed by a customer in response to an advertisement unless that advertisement promotes certain specific services, such as credit-repair.[62] Yet

---

[59] *FCC v. Beach*, 508 U.S. at 316.

[60] *See* H.R. Rep. 102–421, at 16 (1991) (referring to credit-repair as "bogus"); *Innovative Telemarketing and Consumer Fraud in Oregon and the Northwest: Hearing before the Subcommittee on Regulation, Business Opportunities, and Energy of the House Committee on Small Business*, 102d Cong., 2d Sess., 239, 243 (1992) (appendix to statement of Jack E. Swagerty, Chief Inspector, Western Region, U.S. Postal Service) ("Recent years have seen a rise in ads offering – for a fee – credit repair services to consumers with bad debt histories. These deceptive ads are characterized by promises to obtain credit cards regardless of credit rating or erase a bad credit history."); *see also* Telemarketing Sales Rule; Proposed Rule, 60 Fed. Reg. 30406, 30415–16 (June 8, 1995) (noting the strong support from commenters regarding the restrictions on the telemarketing of credit-repair services).

[61] *Borman's, Inc. v. Michigan Prop. & Cas. Guar. Ass'n*, 925 F.2d 160, 162 (6th Cir. 1991).

[62] 16 C.F.R. § 310.6(b)(5), (6).

Defendants argue that Congress did not intend for the TSR to apply to any telemarketing where the call was initiated by the customer in response to an advertisement.[63] Defendants are wrong. They base their argument on 15 U.S.C. § 6102(a)(3), which required the TSR to "include" certain specific provisions: a provision prohibiting coercive or abusive unsolicited calls, a provision prohibiting calls at unreasonable hours, and a provision prohibiting a telemarketer who is selling goods or services (or soliciting for a charity) from failing to disclose the purpose of the call. The TSR includes all of these.[64]

Defendants contend that, because 15 U.S.C. § 6102(a)(3) describes certain categories of telemarketing involving unsolicited calls placed by telemarketers, Congress intended for the TSR's prohibitions to apply only to unsolicited calls. Of course, when used in a statute, the word "include" is "generally used as a word of extension or enlargement rather than as one of limitation or enumeration."[65] This means that by requiring the TSR to include certain prohibitions, Congress did not intend to limit the FTC's authority to prohibit other practices.

Even more importantly, Defendants' argument effectively conflicts with the Telemarketing Act's definition of telemarketing. That definition specifically describes one narrow situation in which calls initiated by customers may not be

---

[63] Memo at 16–18.
[64] *See* 16 C.F.R. § 310.4.
[65] *Am. Sur. Co. of New York v. Marotta*, 287 U.S. 513, 517 (1933); *cf. Farrell v. Pompeo*, 424 F. Supp. 3d 1, 14 (D.D.C. 2019) (noting that "[t]he *expressio unius* canon is a feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved").

encompassed by the TSR's definition of telemarketing. In particular, the definition of telemarketing expressly excludes calls initiated by a customer when those calls were placed in response to a multi-page catalog that is mailed to the customer, that includes descriptions or illustrations of goods or services, that includes the business address of the seller, and that is issued at least once a year.[66] There would have been no need for this narrow exclusion if Congress had intended for the TSR to apply only to unsolicited telephone calls placed by a seller.[67] Defendants have not argued that the calls KCR receives from consumers are in response to a multi-page illustrated catalog that it mails out at least once a year. Accordingly, they have not shown that Congress intended for their conduct to be exempt from the TSR's prohibitions.

**II. All Counts in the Amended Complaint state valid claims for relief.**

Having failed in their legal challenges, Defendants also attack the factual sufficiency of the Amended Complaint's allegations. But Defendants fare no better on that ground.

The notice-pleading standard of the Federal Rules of Civil Procedure requires only that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief."[68] Plaintiffs' pleading provides sufficient notice of the grounds for the claims alleged, and there is no basis for dismissal under Rule

---

[66] 15 USCS § 6106(4).

[67] *See City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020) ("Courts generally ought not to interpret statutes in a way that renders words or phrases either meaningless or superfluous.").

[68] Fed. R. Civ. P. 8(a)(2).

12(b)(6).

In ruling on a motion to dismiss under Rule 12(b)(6), courts must accept as true all well-pleaded facts and draw all reasonable inferences in the plaintiff's favor.[69] Claims are adequately alleged as long as the facts state a "plausible" claim for relief,[70] meaning that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[71] Put another way, a complaint is sufficient if it gives the defendant "fair notice" of the plaintiff's claim and the "grounds upon which it rests."[72]

Defendants argue that Counts II, IV, VII, and IX of the Amended Complaint must meet a heightened pleading standard under Rule 9(b), which applies to claims of fraud or mistake.[73] While the First Circuit has not addressed whether Rule 9(b) applies to CFPA and TSR deception claims, most courts do not apply Rule 9(b) to consumer-protection claims like these.[74] Indeed, "consumer protection claims are not claims of fraud, even if there is a deceptive dimension to them."[75] In an action

[69] *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010); *Parker v. Hurley*, 514 F.3d 87, 90 (1st Cir. 2008); *Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000).
[70] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007); Fed. R. Civ. P. 12(b)(6).
[71] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).
[72] *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*citing Twombly*, 550 U.S. at 555).
[73] Fed. R. Civ. P. 9(b).
[74] *See, e.g., CFPB v. Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d 1342, 1371–74 (N.D. Ga. 2015) (*relying on FTC v. Freecom Comm., Inc.,* 401 F.3d 1192, 1204 n.7 (10th Cir. 2005)); *CFPB v. Think Fin.*, No. CV-17-127, 2018 WL 3707911, at *7–8 (D. Mont. Aug. 3, 2018); *CFPB v. Navient Corp.*, No. 17-cv-101, 2017 WL 3380530, at *24–25 (M.D. Pa. Aug. 4, 2017); *CFPB v. D&D Mktg.*, No. 15-09692, 2016 WL 8849698, at *10–11 (C.D. Cal. Nov. 17, 2016); *FTC v. Affiliate Strategies, Inc.*, No. 09-4104, 2010 WL 11470099, at *7 (D. Kan. June 4, 2010) (TSR); *FTC v. AFD Advisors*, No. 13CV6420, 2014 WL 274097, at *2 (N.D. Ill. Jan. 24, 2014) (TSR).
[75] *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1372.

brought to deter deceptive acts or practices under the CFPA and TSR, like this one, the claims do not require proof of an intent to deceive or reliance by consumers, and Rule 9(b) should not apply to Counts II and IV.[76] The same is true for Count IX for violations of the MA-UDAP. In contrast, Count VII alleges an intent to defraud under the MA-CSO. Still, Rule 9(b) provides that "intent . . . and other conditions of a person's mind may be alleged generally."[77]

Under either Rule 8(a) or 9(b), Plaintiffs' claims are pleaded with sufficient particularity. The Amended Complaint describes the fees charged by Key Credit to consumers, the timing of those fees, the representations by Key Credit regarding credit scores and reports, and the reasons why Key Credit's representations are false, and it includes images of Key Credit's website with the dates that deceptive statements appeared on the website.[78] Plaintiffs have alleged the specific deceptive statements and the reasons why the statements are deceptive. Through these allegations, Plaintiffs have satisfied their burden to state plausible claims for relief.

### A. The Amended Complaint adequately alleges that Key Credit is a telemarketer and seller under the TSR.

Defendants contend that the Court should dismiss Counts I, II, III, and V of the Amended Complaint, asserting that these claims fail to allege that Key Credit engages in telemarketing and acts as a telemarketer or seller under the TSR. The TSR defines telemarketing as "a plan, program, or campaign . . . conducted to

[76] *See FTC v. Freecom Comm., Inc.,* 401 F.3d at 1204 n.7.
[77] Fed. R. Civ. P. 9(b).
[78] Am. Compl. ¶¶ 22, 25–27, 30–40.

induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call."[79] The Amended Complaint includes multiple factual allegations concerning Key Credit's solicitations, which instruct consumers to call the company (via a telephone).[80] Plaintiffs also assert that consumers do, in fact, call Key Credit and speak with sales agents, who use specific sales scripts and enroll consumers in Key Credit's credit-repair program.[81] Enrolled consumers pay Key Credit substantial amounts of money to purchase its services.[82] And Plaintiffs allege that Key Credit markets and sells its "credit-repair service to consumers nationwide," thereby meeting the interstate element of the definition.[83] The Amended Complaint alleges facts to show the requisite "plan, program or campaign" to establish telemarketing under the TSR.[84]

The Amended Complaint also adequately alleges that, in connection with telemarketing, Defendants are "sellers"—they "provide[], offer[] to provide, or arrange[] for others to provide goods or services to the customer in exchange for

[79] 16 C.F.R. § 310.2(gg).
[80] Am. Compl. ¶¶ 16, 23, 24.
[81] Am. Compl. ¶¶ 17, 18, 24, 32.
[82] Am. Compl. ¶¶ 21,25, 26.
[83] Am. Compl. ¶ 14.
[84] *FTC v. Lalonde*, 545 F. App'x. 825, 840 (11th Cir. 2013) ("The undisputed evidence showed that inbound consumer calls were in response to advertisements concerning assistance in obtaining a loan, and thus those inbound calls were subject to the TSR."); *FTC v. Data Med. Cap., Inc.*, 2010 WL 1049977, at *24 (C.D. Cal. Jan. 15, 2010) ("Defendants' practice of marketing and selling their mortgage loan modification and foreclosure rescue services ("to induce the purchase of ... services") during thousands of interstate telephone calls that were initiated by consumers in response to [Defendants'] Internet and radio advertising (the "plan, program or campaign") fits within [the] definition of telemarketing.").

consideration"—and Key Credit is a "telemarketer"—it "initiates or receives telephone calls to or from a customer"—under the TSR.[85] Plaintiffs allege facts showing that Key Credit provides its credit-repair services for money—it enrolled tens of thousands of consumers in its services and took in at least $23 million in fees.[86] In addition, Key Credit, and specifically Tsoukales, designed a marketing program that relied on telemarketing to sell services and drafted the sales scripts used by sales representatives during calls with consumers.[87]

### B. The Amended Complaint adequately alleges that Defendants engaged in deceptive conduct.

Counts II and IV state claims that Defendants engaged in deceptive acts or practices that violated the TSR and the CFPA. Counts VII and IX state claims under the MA-CSO and MA-UDAP.

Under the TSR, it is deceptive for a seller or telemarketer to misrepresent any material aspect of the performance, efficacy, nature, or central characteristics of its services.[88] While the First Circuit has not yet stated the elements of deception under the CFPA, other courts have held, by analogy to the Federal Trade Commission Act, that an act or practice is deceptive under the CFPA when "(1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation,

[85] 16 C.F.R. § 310.2(dd), (ff); Am. Compl. ¶¶ 16, 23, 24, 32.
[86] Am. Compl. ¶¶ 15, 19, 21, 25, 26
[87] Am. Compl. ¶¶ 17, 24.
[88] 16 C.F.R. § 310.3(a)(2)(iii).

omission, or practice is material."[89]

Defendants' arguments acknowledge the facts that Plaintiffs alleged to support their deception claims: Key Credit represented to consumers that enrollment would or likely would result in (1) a substantial increase to consumers' credit scores and (2) the removal of negative entries on consumers' credit reports.[90] Key Credit did not achieve these results; in other words, the representations are false.[91] Plaintiffs allege how, where, and when these material misrepresentations were made to consumers—through Key Credit's website, as well as in Google and Bing advertising—and the Amended Complaint includes images from Key Credit's website showing the alleged misrepresentations.[92] Plaintiffs further allege that Key Credit's representations were likely to mislead consumers acting reasonably under the circumstances and that consumers paid Key Credit money to achieve results that never came to fruition.[93] These facts state at least "plausible" claims for deception.

Defendants attempt to shield themselves behind a disclosure in its Credit Services Agreement (CSA), which they attach to their motion to dismiss. Defendants argue that the CSA cures any deceptive statements that Key Credit

---

[89] *CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016); *see also, Fanning v. FTC*, 821 F.3d 164, 170 (1st Cir. 2016) (restating a similar test used by the FTC in assessing deception: (1) "what claims are conveyed;" (2) "whether those claims are false, misleading, or unsubstantiated;" and (3) "whether the claims are material to prospective consumers").
[90] Memo. at 21–22 (citing Am. Compl. at ¶¶ 31, 33–38, 40).
[91] Am. Compl. at ¶¶ 49, 51, 61, 63.
[92] Am. Compl. at ¶¶ 22–24,33, 35, 37.
[93] Am. Compl. at ¶¶ 19–21, 34, 36, 38–40, 49, 51–53, 61, 63–65.

made to consumers *before* they enrolled in Key Credit's program. But this argument fails for two reasons.

First, the Court may not consider the CSA on a motion to dismiss, at least with respect to Counts II, IV, VII, and IX. While it is true that when "factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6),"[94] Plaintiffs' deception claims do not refer to the CSA, and the CSA is not the basis of those claims. The Court may therefore not consider the CSA at this stage of the case.

Second, even if the Court could consider extraneous evidence when assessing the sufficiency of pleadings, the CSA would not absolve Defendants. "A later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first instance."[95] As one court has noted, advertising is deceptive "if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."[96] In short, Defendants committed their violations before consumers enrolled in the CSA. This conduct caused consumers to be more likely to deal with Key Credit, harming both consumers and Key Credit's competitors, or at least those who played by the rules, and Defendants should be held to account for their violations, even if they later

[94] *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).
[95] *CFPB v. Gordon*, 819 F.3d at 1194 (citing *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir.1975)).
[96] *Resort Car Rental Sys*, 518 F.2d at 964.

made statements that were not deceptive.

Accepting as true Plaintiffs' factual allegations and drawing all reasonable inferences in Plaintiffs' favor, Counts II, IV, VII, and IX state valid claims for relief.

### C. Counts V through IX properly allege claims for violations of the MA-CSA and MA-CSO.

Counts V through IX are interrelated in that they (1) arise from Defendants' unfair, deceptive, and misleading business practices, as pleaded in the Amended Complaint, and (2) refer back to, and through, one another.[97] Broadly speaking, Plaintiffs allege that, through a variety of media and by direct telephone contact, Defendants made material misrepresentations to customers and potential customers concerning the efficacy and scope of its credit-repair services and that those misrepresentations were material, likely to deceive, and did deceive customers and potential customers acting reasonably under the circumstances.[98]

Count V alleges that Defendants violated the MA-UDAP[99] because their unlawful conduct, as detailed in the Amended Complaint,[100] violated the TSR and CFPA, and "violations of federal consumer protection laws such as the TSR and

---

[97] Because Count VI arises from the MA-CSO and is addressed in detail in Defendants' motion to dismiss, it is also afforded lengthier treatment here, in § II(D), below.

[98] *See Brewster Wallcovering Co. v. Blue Mtn. Wallcoverings, Inc.*, 68 Mass. App. Ct. 582, 607 n.57 (Mass. App. 2007) (failure to disclose a material fact that causes consumer "to act differently with respect to a transaction than [she] otherwise would have" gives rise to c. 93A liability) (citations omitted); *Baker v. Goldman Sachs & Co.*, 949 F. Supp. 2d 298, 309 (D. Mass. 2013) (holding that, if sufficiently egregious, even negligent misrepresentation can support a finding of c. 93A liability) (citations omitted).

[99] M.G.L. c. 93A, § 2.

[100] Compl. at ¶¶ 22–40.

CFPA constitute violations of § 2 of the MA-UDAP."[101] Count VII asserts that this same conduct violated the MA-CSO,[102] which prohibits any act or practice "intended to defraud or deceive a buyer in connection with the offer or sale" of credit services, as well as the use by any CSO of "untrue or misleading representations in the offer or sale of" credit services.[103] Count VIII relates back to Count VII, claiming that in violating the MA-CSO, Defendants violated the MA-UDAP, because violations of the former constitute violations of the latter.[104] Finally, Count IX alleges that Defendants' conduct violated § 2 of the MA-UDAP, which prohibits unfair or deceptive acts or practices in the conduct of business in Massachusetts.[105]

For all of the reasons set forth in § II(B), above, Defendants' motion to dismiss should be denied as to the above counts. The factual content of the Amended Complaint is more than sufficient to allow the Court to draw the reasonable inference that Defendants are liable for the misconduct alleged.[106]

---

[101] 940 CMR 3.16; M.G.L. c. 93A, § 2.
[102] M.G.L.c. 93, §§ 68A–68E.
[103] M.G.L. c. 93, § 68B(4).
[104] M.G.L. c. 93, § 68E.
[105] M.G.L. c. 93A, § 2.
[106] *See, e.g., Ashcroft*, 556 U.S. at 674 (to withstand a motion to dismiss, complaint need only have facial plausibility); *Bell Atl. Corp.*, 550 U.S. at 556 (right to relief plausible when complaint pleads "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" sufficient to prove claims); *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007) (dismissal appropriate only where pleadings fail to articulate "plausible entitlement to relief").

**D. Count VI properly alleges that Defendants failed to meet the MA-CSO's advance-fee and disclosure requirements.**

Count VI claims that Defendants have operated in open violation of several provisions of the MA-CSO.[107] In response, Defendants repeatedly point to a version of Key Credit's CSA attached to its motion, arguing that the MA-CSO claims "are controverted by the plain language of Key Credit's written CSA."[108] But the CSA's self-serving language hardly negates the facts set forth in the Amended Complaint; indeed, in many ways, the CSA serves only to reinforce those facts.

Defendants also misapprehend the requirements and application of the MA-CSO and ignores the plain reading of the allegations in the Amended Complaint.[109] Concerning § 68B(1), the relevant portion of the statute provides:

> No credit services organization, its salespersons, agents or representatives, or any independent contractor who sells or attempts to sell the services of a credit services organization shall (1) charge or receive any money or other valuable consideration prior to full, complete and satisfactory performance of the services the credit services organization has agreed to perform for the buyer, unless such organization has obtained a surety bond in an amount not less than ten thousand dollars issued by a surety company authorized to do business in the commonwealth and has established a trust account at a federally insured bank or savings and loan association located in the commonwealth . . . . [110]

Contrary to Defendants' assertion otherwise, the Amended Complaint does not allege that Defendants violated § 68B(1) solely because they "failed to satisfy the

---

[107] Compl. at ¶¶ 70–76.
[108] Memo at 24–25.
[109] *See* Amended Compl. at ¶¶13, 25–29, 70–76.
[110] M.G.L. c. 93, §68B

surety bond requirement."[111] Instead, the Amended Complaint refers to § 68B's *dual* mandates, alleging that Defendants failed to meet both requirements, not one or the other.[112] Section 68B(1) requires that, before charging any type of advance fee, a credit-services organization must post a $10,000 surety bond *and* maintain a trust account at a depository institution located in Massachusetts. The Amended Complaint alleges (and Defendants do not dispute) that Defendants have never established the requisite trust account[113] and thus, as a CSO,[114] Defendants are prohibited from charging advance fees before fully performing all services promised to their customers.[115] The Amended Complaint further avers that, despite this prohibition, Defendants routinely charged such advance fees.[116]

The goal of the MA-CSO's restriction on advance fees is reinforced by its substantive disclosure requirements. Specifically, § 68C(5) requires that CSOs disclose in writing "a complete and detailed description of the services to be

[111] Memo at 25.
[112] Compl. at ¶ 71.
[113] Compl. at ¶ 29.
[114] Citing a non-binding letter from the Massachusetts Division of Banks to a non-profit credit counseling organization, Defendants suggest that § 68B((1)'s trust account requirement should only apply to CSOs that "actually handle their clients' money, which Key Credit does not do". Memo at 25 n. 5. But the MA-CSO makes no such distinction, defining CSOs as any entity that, "with respect to the extension of credit by others, sells, provides, performs, or who represents to sell, provide or perform for the payment of money or other valuable consideration any of the following services: (i) improving a buyer's credit record, history or rating; (ii) obtaining an extension of credit for a buyer; or (iii) providing advice or assistance to a buyer with respect to either clause (i) or (ii). . . ." M.G.L. c. 93, § 68A.
[115] The disclosure requirements governing CSOs seeking to charge advance fees also apply to Defendants. *See* M.G.L. c. 93, §§ 68C(6)–(7) (mandating written disclosures concerning a CSO's surety bond and trust account). By their own admission, Defendants do not disclose the requisite information to their customers.
[116] Compl. at ¶¶ 26–27; 43–44; 71

performed by the [CSO] and the total cost to the buyer for such services," while § 68(D)(c) mandates disclosure in any CSO service agreement of "the terms and conditions of payment, including the total of all payments to be made by the buyer, whether to the [CSO] or to some other person." Key Credit's CSA does not disclose the "total cost" or "total of all payments to be made" because it functionally cannot. By design, the monthly fees charged by Defendants continue until some unspecified time in the future—or forever—rendering it impossible to inform the customer of the total amount he or she will ultimately pay. By introducing its CSA, Defendants are hoisted on their own petard, in that by its very terms, the CSA illustrates how Defendants continually charges advance fees before full performance, while also failing to make the disclosures required by the MA-CSO.[117]

The gravamen of Count VII lies in Plaintiffs' well-pled claims that Defendants deceptively promised (by a variety of means) but failed to deliver specific outcomes to customers and charged both advance and ongoing fees to those customers regardless of whether and when any promised results were achieved. If, as alleged, Defendants routinely promised to improve customers' credit scores (whether "dramatically" or by a specific amount), often within a specified period; remove problematic entries on their credit reports; and successfully dispute certain

[117] Key Credit's CSA is unavailing for any number of reasons but particularly notable is the fact that, as alleged in the Amended Complaint, the CSA explicitly requires automatic withdrawal of monthly fees from customers' accounts *ad infinitum* until and unless the customer affirmatively cancels Key Credit's services in writing. By its plain terms, the CSA thus charges unlawful advance fees prior to "full, complete and satisfactory performance" of the services promised by Key Credit.

debts with creditors, under the MA-CSO, the achievement of those results was a necessary prerequisite to charging fees, since Defendants failed to satisfy § 68B(1)'s dual "advance fee" requirements.[118] Accepting the factual allegations as true, which the Court must do at this stage of the proceedings, the Amended Complaint fairly and fully makes the case that (i) Key Credit is a CSO, yet (ii) it nonetheless failed to make required disclosures in its customer agreements and unlawfully charged advance fees to its customers in violation of the MA-CSO.[119]

## III. Defendants' constitutional objections to the CFPA's removal provision have been resolved.

Finally, Defendants argue that this case should be dismissed because, when the Bureau issued its original complaint in May 2020, the CFPA's for-cause removal provision[120] purported to limit the President's authority to remove the Bureau's Director.[121] But as Defendants note,[122] when the Supreme Court issued its decision in *Seila Law, LLC v. CFPB*, it held that the for-cause removal provision was

---

[118] Defendants claim the CSA "unambiguously states" that customers "may cancel the contract at any time" and have "no obligation to renew" but rather "can cancel Key Credit's services at any time". Memo. at 27–28. Aside from being irrelevant to the argument at hand, this also mischaracterizes the true nature of the CSA, which requires ongoing, automatic debits of Key Credit's monthly fee from customers' checking or credit accounts (plus an "expedited billing processing fee" of $6.50 and "credit card convenience fee" of $8.95). Memo. at Ex. A, p. 4. These fees continue until the customer affirmatively cancels the CSA in writing, thus the "default" is for customers to simply continue paying, regardless of results achieved.

[119] *See, e.g., Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (considering a Rule 12(b)(6) motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom") (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).

[120] 12 U.S.C. § 5491(c)(3).

[121] Memo at 29.

[122] *See* Memo at 29.

unconstitutional and severable from the remainder of the CFPA.[123] Thus, since that decision, which was issued on June 29, 2020, the for-cause removal provision has had no effect, and the Bureau's Director has been fully accountable to the President.

Although the Bureau issued its original complaint before the decision in *Seila Law*, it supplanted that complaint with the Amended Complaint, which it filed on September 16, 2020—more than two months after the decision in *Seila Law*. "An amended complaint, once filed, normally supersedes the antecedent complaint. Thereafter, the earlier complaint is a dead letter and no longer performs any function in the case."[124] As a result, when the Bureau filed the Amended Complaint, the Bureau's Director was fully accountable to the President. Therefore, Defendants' argument, which challenges the issuance of the original complaint, no longer has any relevance.

**CONCLUSION**

For the foregoing reasons, the Court should deny the motion to dismiss.

Respectfully submitted,

s/ Nelle Rohlich
Nelle Rohlich
Benjamin Konop
(202) 435-7280
Nelle.Rohlich@cfpb.gov
Benjamin.Konop@cfpb.gov
Bureau of Consumer Financial Protection
1700 G Street, NW

[123] *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183 (2020).
[124] *Newman v. Lehman Brothers Holdings Inc.*, 901 F.3d 19, 27 (1st Cir. 2018).

Washington, D.C. 20552
*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

s/ Claire Masinton
M. Claire Masinton
(617) 963-2454
Claire.Masinton@mass.gov
Assistant Attorney General
Insurance & Financial Services Division
One Ashburton Place, 18th Floor
Boston, MA 02108
*Attorney for Plaintiff the Commonwealth of Massachusetts*