**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General,<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALES a/k/a NIKITAS TSOUKALIS<br><br>Defendants. | No. 20-cv-10991<br><br>Judge Rya W. Zobel<br><br>Leave to File Granted 11/17/20<br><br>**ORAL ARGUMENT REQUESTED** |

**<u>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

Timothy A. Hudson
Jordan E. Wilkow
Amie M. Bauer
Tabet DiVito & Rothstein LLC
209 S. LaSalle Street, Suite 700
Chicago, IL 60604
(312) 762-9450
thudson@tdrlawfirm.com
jwilkow@tdrlawfirm.com
abauer@tdrlawfirm.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

I. THE CREDIT REPAIR ORGANIZATIONS ACT (NOT THE TSR) CONTROLS THE CONDUCT ALLEGED IN THE COMPLAINT........................................................................1

II. THE TSR VIOLATES THE FIRST AMENDMENT........................................................................3

A. Section 310.4(a)(2) Is A Content-Based Restriction On Speech..............................3

B. The TSR's Selective Application Of Its Restrictions Violates The First Amendment And The Equal Protection Clause ......................................9

III. THE TSR IS UNCONSTITUTIONALLY VAGUE BOTH ON ITS FACE AND AS APPLIED TO KEY CREDIT ..........................................................................12

IV. THE FTC EXCEEDED ITS AUTHORITY IN PROMULGATING THE TSR ..................................13

CONCLUSION........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barr v. American Association of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020) .......... 5

*Billups v. City of Charleston, South Carolina*,
961 F.3d 673 (4th Cir. 2020) .......... 5

*Bolger v. Youngs Drug Products Corp.*,
463 U.S. 60 (1983) .......... 10

*Carey v. Brown*,
447 U.S. 455 (1980) .......... 10

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n*,
447 U.S. 557 (1980) .......... 7, 10

*Farrell v. United States*,
313 F. 3d 1214 (9th Cir. 2002) .......... 2

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .......... 4, 7

*King v. Governor of the State of New Jersey*,
767 F.3d 216 (3d Cir. 2014) .......... 4, 7

*Lowe v. S.E.C.*,
472 U.S. 181 (1985) (White, J., concurring) .......... 6

*In re National Credit Management Group*,
21 F. Supp. 2d 424 (D.N.J. 1998) .......... 7, 8, 9

*Nefedro v. Montgomery Cty.*,
414 Md. 585, 996 A.2d 850 (2010) .......... 5

*Norman v. United States*,
942 F.3d 1111 (Fed. Cir. 2019) .......... 2

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) .......... 6

*In re Opinion of the Justices to the Senate*,
436 Mass. 1201, 764 N.E.2d 343 (2002) .......... 5

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988)....................................................................................................4

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
502 U.S. 105 (1991)................................................................................................ *passim*

*Stavrianoudakis v. U.S. Dept. of Fish & Wildlife*,
435 F. Supp. 1063 (E.D. Cal. 2020)..............................................................................5

*Texas v. Johnson*,
491 U.S. 397 (1989)....................................................................................................6

*U.S. v. National Treasury Employees Union*,
513 U.S. 454 (1995)....................................................................................................5

*United States v. Toth*,
No. 15-CV-13367-ADB, 2020 WL 5549111 (D. Mass. Sept. 16, 2020) ..................................2

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)................................................................................................4, 10

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
481 F.3d 1 (1st Cir. 2007)............................................................................................9

**Statutes**

15 U.S.C. § 1679..........................................................................................1, 3, 8, 11

15 U.S.C. §§ 6101-6108 ..............................................................................3, 10, 13, 14

16 C.F.R. § 310. ................................................................................................ *passim*

**Other Authorities**

H.R. Rep. No. 103-20 (1993)....................................................................................3, 11, 13

S. Rep. 103-80 (1993)............................................................................3, 11, 12, 13, 15

Defendants Commonwealth Equity Group, LLC d/b/a Key Credit Repair and Nikitas Tsoukalis (together, "Key Credit") respectfully submit this limited Reply in further support of their motion to dismiss the amended complaint ("Complaint") of the Bureau of Consumer Financial Protection ("CFPB") and the Commonwealth of Massachusetts (together, "Plaintiffs").[1]

## I. THE CREDIT REPAIR ORGANIZATIONS ACT (NOT THE TSR) CONTROLS THE CONDUCT ALLEGED IN THE COMPLAINT.

In its Memorandum, Key Credit established that the federal law that governs the conduct alleged in the Complaint is the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.* (a federal statute enacted by Congress) and not the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310, *et seq.* (a federal regulation promulgated by the Federal Trade Commission ("FTC")). (Mem. at 3-5.) In response, Plaintiffs do no more than put up a straw man, the first of several in their Opposition Brief.

Plaintiffs insist that Congress did not "repeal by implication" those provisions of the TSR that apply to credit repair organizations when it enacted CROA. (Opp. at 2-3.) Key Credit, however, has not asserted that provisions of the TSR were repealed, by implication or otherwise. (Mem. at 3-5.) Accordingly, Plaintiffs' reliance on "repeal by implication" principles generally, and in particular the "irreconcilability" standard that applies when assessing whether one act of Congress implicitly repeals another act of Congress is wholly misplaced. (*See* Opp. at 2-3.)

At issue here is a federal *regulation* that is inconsistent with a subsequently enacted federal *statute*. And "[i]t is well-settled that subsequently enacted or amended statutes supersede prior

---

[1] For the sake of brevity, Key Credit's Reply Brief does not expressly respond to every argument advanced by Plaintiffs in their Opposition brief. Nevertheless, Key Credit reserves and reasserts all of the arguments in its Memorandum in Support of Its Motion to Dismiss Plaintiffs' Amended Complaint, which is expressly incorporated herein by reference.

inconsistent regulations." *Norman v. United States*, 942 F.3d 1111, 1118 (Fed. Cir. 2019). Under such circumstances, the later enacted statute "controls," notwithstanding that the prior inconsistent regulation "remains on the books." *See Farrell v. United States*, 313 F. 3d 1214, 1219 (9th Cir. 2002); *see also Norman*, 942 F.3d at 1118. These well-established principles were recently reaffirmed in this District. *See United States v. Toth*, No. 15-CV-13367-ADB, 2020 WL 5549111, at **5-6 (D. Mass. Sept. 16, 2020). Plaintiffs' focus on whether any part of the TSR has been repealed is thus immaterial and a mere distraction.

In knocking down the straw man they erected, moreover, Plaintiffs argues that one statute may implicitly repeal another statute only where the two statutes are so irreconcilable that simultaneously complying with both would be impossible. (*See* Opp. at 3.) However, that degree of irreconcilability is not required to find, as is the case here, that a statute supersedes a prior inconsistent regulation. *See Norman*, 942 F.3d at 1118 (finding that subsequent statute controlled over prior inconsistent regulation notwithstanding that simultaneous compliance with both laws was possible); *Farrell*, 313 F. 3d at 1219 (same); *Toth*, 2020 WL 5549111, at **5-6 (same). Indeed, it is enough that the statute and regulation simply provide for restrictions of differing degrees of severity. *See id*.

Here, it is clear that Congress intended the "Credit Repair Organizations Act" to regulate "credit repair organizations" like Key Credit. (*See* Mem. at 3-5.) In contrast with the TSR, CROA is a Congressionally enacted statute, it specifically and comprehensively addresses the credit repair industry, and it was enacted *after* the FTC promulgated the TSR. (*Id*. at 4-5.)

Although the TSR purports to prohibit credit repair service providers from even requesting payment for their services until *six months* after their services were performed, *see* 16 C.F.R. § 310.4(a)(2), Congress later specifically addressed how and when credit repair service providers

may charge fees in CROA. And Congress determined that it is appropriate and permissible for credit repair organizations to collect fees for services rendered at the time the service is fully performed. *See* 15 U.S.C. § 1679b(b). Indeed, that Congress's intent regarding credit repair organizations would not be accurately captured by the TSR is not surprising considering that credit repair organizations are nowhere to be found in the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAPA") (the statute authorizing the FTC to promulgate the TSR), nor are they mentioned anywhere in the House and Senate Reports that accompanied the TCFAPA's enactment. *See generally* 15 U.S.C. §§ 6101-6108; H.R. Rep. No. 103-20 (1993); S. Rep. No. 103-80 (1993).

In any event, the inconsistency is plain: a credit repair organization that conscientiously collects payment from its clients only after services have been rendered -- complying in every respect with its governing federal statute -- nevertheless violates prior inconsistent regulations promulgated by the FTC. Here, the fundamental allegation underlying Plaintiffs' TSR claim concerns the timing of Key Credit's payment collection relative to its performance of services. Under the well-settled law set forth above, however, CROA controls that issue, not the TSR.

For all of these reasons, Plaintiffs' arguments concerning implicit repeal are inapposite and should be discarded. Under the precedents discussed above and in Key Credit's Memorandum, CROA controls the conduct alleged in the complaint, not the TSR, and Plaintiffs' claims under the TSR should be dismissed with prejudice.

## II. THE TSR VIOLATES THE FIRST AMENDMENT.

### A. Section 310.4(a)(2) Is A Content-Based Restriction On Speech.

In its Memorandum, Key Credit established that the TSR's selectively applied restriction on requesting and receiving compensation for services violates the First Amendment. (Mem. at

12-15.) Plaintiffs argue that this restriction cannot violate the First Amendment because it regulates conduct, not speech. Plaintiffs' argument misapprehends and misapplies well-settled First Amendment principles in several respects and should be rejected.

First, the Supreme Court has made clear that a statute that imposes financial burdens on the expression of speech is itself a restriction on speech. *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). And a statute that imposes such a financial burden based on the content of the speech being expressed is a content-based restriction on speech and "presumptively inconsistent with the First Amendment." *Id*.

Importantly, it is well-settled that this fundamental principle is no less applicable where the speech is uttered in return for compensation. *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 801 (1988) ("a speaker's rights are not lost merely because compensation is received"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) ("speech likewise is protected even though it is carried in a form that is 'sold' for profit"); *King v. Governor of the State of New Jersey*, 767 F.3d 216, 225-26 (3d Cir. 2014) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28 (2010)) ("*Humanitarian Law Project* makes clear that verbal or written communications, even those that function as vehicles for delivering professional services, are 'speech' for purposes of the First Amendment").

And, lest there be any doubt, it is also well-settled that a statute is presumptively unconstitutional when it imposes a financial burden in the form of a constraint on a speaker's ability to obtain compensation for his or her speech based on its content. *See Simon & Schuster*, 502 U.S. at 115-16. Indeed, courts have repeatedly held that such laws are properly understood as restrictions on speech, and that they are unconstitutional unless necessary to serve a compelling

state interest and narrowly drawn to achieve that end. *See, e.g., Simon & Schuster*, 502 U.S. at 116-18 (statute imposing constraint on income derived from speech based on its content was an unconstitutional restriction on speech); *Billups v. City of Charleston, South Carolina*, 961 F.3d 673, 682-84 (4th Cir. 2020) (ordinance imposing constraint on tour guides' ability to charge for their services was an unconstitutional restriction on speech); *Stavrianoudakis v. U.S. Dept. of Fish & Wildlife*, 435 F. Supp. 1063, 1094 (E.D. Cal. 2020) (statute "limit[ing] the fee that falconers can charge when giving a conservation education program" was a content-based restriction on speech because it "impose[d] a financial burden on falconers depending on the content of their presentation"); *In re Opinion of the Justices to the Senate*, 436 Mass. 1201, 1205-06, 1210, 764 N.E.2d 343, 347-48, 350 (2002) (statute imposing constraint on income derived from speech based on its content was an unconstitutional restriction on speech); *Nefedro v. Montgomery Cty.*, 414 Md. 585, 595-98, 996 A.2d 850, 856-57 (2010) (ordinance constraining fortunetellers' ability to charge for their services was an unconstitutional restriction on speech); *see also U.S. v. National Treasury Employees Union*, 513 U.S. 454, 468 (1995) (statute constraining employees' ability to be compensated for certain speech "unquestionably imposes a significant burden on expressive activity").

Just like the statutes at issue in the decisions above, Section 310.4(a)(2) of the TSR places a severe constraint on certain speakers' ability to be compensated for their speech, and it is therefore a restriction on speech for purposes of the First Amendment. Importantly, because the applicability of Section 310.4(a)(2) turns on the content of the speech, Section 310.4(a)(2) is a *content-based* restriction on speech. *See Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) ("a law is content-based if a regulation of speech on its face draws distinctions based on the message a speaker conveys," including regulations that "single out

specific subject matter for differential treatment"); *Simon & Schuster*, 502 U.S. at 116. Accordingly, Section 310.4(a)(2) restricts fully protected speech, it does so based on content, and it therefore violates the First Amendment unless it is "necessary to serve a compelling state interest and narrowly drawn to achieve that end." *Simon & Schuster*, 502 U.S. at 118. Plaintiffs argument to the contrary should be rejected.

Next, Plaintiffs mistakenly contend that the restriction in Section 310.4(a)(2) is nonetheless constitutional because "the power of government to regulate the professions is not lost whenever the practice of a profession entails speech." (Opp. at 7 (citing *Lowe v. S.E.C.*, 472 U.S. 181, 228 (1985) (White, J., concurring)).) That principle, however, has no application here.

Justice White's concurrence in *Lowe* and the line of cases on which it relies concern government regulation of an individual's *entry* into certain professions. *See Lowe*, 472 U.S. at 228 (citing *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239 (1957) and *Dent v. West Virginia*, 129 U.S. 114, 121-22 (1889)). And "[r]egulations on entry into a profession, as a general matter, are constitutional if they 'have a rational connection with the applicant's fitness or capacity to practice' the profession." *Id*. But neither the TSR generally nor Section 310.4(a)(2) in particular purports to regulate anyone's entry, or fitness to enter, into a profession. Plaintiffs' argument in this connection is wholly misplaced and should be rejected.

Plaintiffs also misapply precedents concerning the distinction drawn by the Supreme Court between restrictions on conduct that have an incidental effect on speech, *see, e.g., Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456-57 (1978), and restrictions on "expressive conduct," *see, e.g., Texas v. Johnson*, 491 U.S. 397, 404 (1989). Plaintiffs appear to contend that Key Credit's First Amendment challenge should fail because regulating the act of requesting payment for services

restricts conduct with merely an incidental effect on speech. (*See* Opp. at 7 (citing *Ohralik*, 436 U.S. at 456).) Again, Plaintiffs' argument is wholly misplaced.

The protectible speech at issue here is *not* the speech that may incidentally accompany the act of requesting payment for performance.[2] And Key Credit does *not* contend that the act of requesting payment for performance is "expressive conduct." That Plaintiffs appear to believe otherwise belies either a fundamental misapprehension of Key Credit's argument or merely an effort to sidestep it.

In any event, the fully protectible speech at issue is the counsel and guidance that Key Credit provides to its clients regarding best practices for obtaining and maintaining a good credit rating. *See King*, 767 F.3d at 225-26 (citing *Humanitarian Law Project*, 561 U.S. at 27-28) ("*Humanitarian Law Project* makes clear that verbal or written communications, even those that function as vehicles for delivering professional services, are 'speech' for purposes of the First Amendment"). That speech is constrained, based on its content, by the TSR's restrictions on requesting and receiving compensation for engaging in that speech. (*See supra* at 4-6 and cases cited therein.) Because this constraint, on its face, is not "necessary to serve a compelling state interest and narrowly drawn to achieve that end," it violates the First Amendment. (*See infra* at 11-12.)

Finally, Plaintiffs' reliance on *In re National Credit Management Group*, 21 F. Supp. 2d 424, 460 (D.N.J. 1998) is also misplaced. In *National Credit*, the court was asked to consider

---

[2] Though such speech is certainly protected commercial speech. *See Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 561-62 (1980).

whether Section 1679b(b) of CROA, (which prevents credit repair organizations from charging for services until "such service is fully performed"), violates the First Amendment.

Citing *Simon & Schuster*, the Court began its analysis by recognizing that a regulation that imposes a financial burden on the income derived from speech of certain content violates the First Amendment unless the regulation "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Id*. (citing *Simon & Schuster*, 502 U.S. at 118, 123). In analyzing the constraint created by Section 1679b(b), however, the court found that credit repair organizations "are merely required to perform the services before customers incur a resulting charge," and that CROA permits credit repair organizations "to offer their services to the public in ways which will cause little if any financial impact upon them." *Id*. at 460. In particular, the court found that, under CROA, "there is no reason why a customer could not be charged each time the customer called up to order [the defendant's services]." *Id*.

Given the limited nature of the constraint and the extent of the government's asserted interests, the court concluded that Section 1679b(b) did not violate the First Amendment. *Id*. Importantly, the court did not hold (as Plaintiffs appear to believe) that a statutory constraint placed on income derived from speech is not a restriction on speech. Indeed, such a holding could not be reconciled with *Simon & Schuster* and the other precedents discussed above. Nor did the *National Credit* court dispute that, where such a restriction applies based on the content of the speech, it must be "necessary to serve a compelling state interest and narrowly drawn to achieve that end" if it is to survive First Amendment scrutiny.

Instead, Section 1679b(b) withstood the defendant's First Amendment challenge simply because the court found that the extent of the constraints imposed by the statute were essentially *de minimis*. *See National Credit*, 21 F. Supp. 2d at 460. The constraints imposed by the TSR

regulation at issue here, however, are plainly distinguishable. Section 310.4(a)(2) precludes a credit repair service provider from even *requesting* payment for completed services until *six months after* the services have been performed. (Mem. at 4, 12, 14.) In support of its holding, the *National Credit* court expressly found that, under CROA, there was "no reason why a customer could not be charged each time the customer called up to order [services]." Here, the same conduct is expressly prohibited, as is charging a customer at any time up to six months following the completion of services. On its face, so draconian a restriction is neither necessary to serve a compelling state interest nor narrowly drawn to achieve that end (*see infra* at 11-12), and Plaintiffs offer no argument to the contrary.

**B. The TSR's Selective Application Of Its Restrictions Violates The First Amendment And The Equal Protection Clause.**

In its Memorandum, Key Credit also established that the TSR's content-based selective application of its restrictions violates both the First Amendment and the Equal Protection Clause. (Mem. at 14-16.) In a failed effort to dispute this conclusion, Plaintiffs cite to *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 7 (1st Cir. 2007) for the non-controversial proposition that the government may subject differently situated businesses to different regulatory requirements. (*See* Opp. 8-9.) But in relying on *Wine & Spirits*, Plaintiffs simply assume their own conclusion that credit repair service providers are in fact differently situated from other service providers in ways that are material to Congress's directives regarding the TSR. (*See id.*) This argument fails as well.

As a threshold matter, Plaintiffs' unsupported contention that the FTC's disparate treatment of certain businesses under the TSR need have only a rational basis is false. (*See id.* at 9.) On its face, whether the TSR's restrictions apply to a given business turns on the content of the business's speech. For example, Section 310.6(5) exempts many (but not all) telemarketers from the TSR's

harshest restrictions based on the content of their advertisements. *See* 16 C.F.R. § 310.6(5); *see also* 16 C.F.R. § 310.4(a)(2) ("exemption does not apply to…advertisements involving offers for…services represented to remove derogatory information from, or improve, a person's credit history.") And it is axiomatic that advertisements are protected speech. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) (collecting cases).

Accordingly, because the TSR's differing treatment of certain businesses is based on the content of their speech, the distinctions it draws must be "necessary to serve a compelling state interest, and narrowly drawn to achieve that end."[3] *See Simon & Schuster*, 502 U.S. at 118; *Carey v. Brown*, 447 U.S. 455, 461-62 (1980) ("[w]hen government regulation discriminates among speech-related activities…the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized"). Merely asserting that the distinctions drawn by the TSR are not "irrational" is therefore insufficient. (*See* Opp. at 9.)

Congress's asserted interest in authorizing the FTC to promulgate the TSR is to protect consumers from "deceptive and other abusive telemarketing acts or practices." *See* 15 U.S.C. § 6101-6102. That may well be a compelling state interest, but, on their face, the restrictions actually imposed by the TSR are neither necessary nor narrowly drawn to achieve that end.

---

[3] They are at least subject to the less demanding, "but nonetheless substantial," scrutiny applied to constraints placed on commercial speech and articulated in *Central Hudson*, 447 U.S. at 566. *But see Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66, 68 (1983) (noting that, rather than simply analyzing advertisements as *per se* commercial speech, they "must be examined carefully to ensure that speech [within the advertisement] deserving of greater constitutional protection is not inadvertently suppressed").

Congress specifically identified the sort of "abusive practices" that it was concerned about in authorizing the FTC to promulgate the TSR:

> Abusive practices could take the form of such clearly inappropriate practices as threats or intimidation, obscene or profane language, refusal to identify the calling party, or continuous or repeated ringing of the telephone or engagement of the called party in conversation with the intent to annoy, harass, or oppress any person at the called number. An abusive practice under this legislation could also take the form of a sales strategy of unsolicited telephone calls by a telemarketer where a pattern of calls could be considered by reasonable consumers to be coercive of a consumer's right to privacy.

H.R. Rep. No. 103-20, at 4-5 (1993). On its face, subjecting *all* credit repair service providers (even those, like Key Credit, that do *not* make unsolicited sales calls) to the TSR's requirements, and prohibiting *only* credit repair service providers (and no other purported "telemarketers") from requesting payment for their services less than six months after the services have been performed, is neither "narrowly drawn" nor "necessary" to serve any of those interests.

To the contrary, in targeting virtually every credit repair service provider with a telephone, the TSR is so overinclusive as to trample on Congress's stated intent that business transactions involving "contact initiated solely by the consumer for the consumer's convenience with no initial sales contact directed to a particular consumer, by phone or otherwise, from the seller, are not intended to be included within the definition [of telemarketing]." *See* S. Rep. 103-80, 8 (1993).

The TSR is also fatally overinclusive in that there is plainly nothing inherently deceptive or abusive about a service provider requesting payment for its services once they have been rendered. Indeed, in the context of credit repair services, Congress itself has specifically found that it is entirely proper to request payment upon the full performance of any relevant services. *See* 15 U.S.C. § 1679b(b). And yet *all* service providers that do so (so long as they are discussing credit repair services) are deemed to be "abusive" under the TSR.

Moreover, in exempting virtually all telemarketers from its restrictions, the TSR is so underinclusive as to defeat any effort to justify its restrictions in the name of protecting consumers from the "deceptive and other abusive telemarketing acts or practices" that Congress identified. Indeed, Congress specifically expressed concern for telemarketing fraud involving "the sale of vitamins, diet aids, credit card protection programs, luggage, travel, office machine supplies...oil and gas leases, diamonds and other gemstones, applications for cellular telephone lotteries, and rare coins." *See* S. Rep. No. 103-80, at 2 (1993). Yet the TSR entirely exempts providers of these goods and services from its restrictions if they engage only in "inbound" telemarketing, and, in any event, none are burdened by the TSR's payment collection restriction. *See* 16 C.F.R. § 310.6(5); 16 C.F.R. § 310.4(a)(2).

On its face, the TSR cannot survive the strict review required by the First Amendment and the Equal Protection Clause, and Plaintiffs do not and cannot allege any facts that undermine that conclusion. Accordingly, Plaintiffs' TSR-related claims should be dismissed with prejudice.

## III. THE TSR IS UNCONSTITUTIONALLY VAGUE BOTH ON ITS FACE AND AS APPLIED TO KEY CREDIT.

In its Memorandum, Key Credit established that the TSR is unconstitutionally vague on its face under both due process and First Amendment principles. (Mem. at 6-12.) Plaintiffs failed to respond to Key Credit's facial challenge under the vagueness doctrine. Instead, they rely on their mistaken contention that the TSR restrictions at issue do not constrain speech, and argue that Key Credit therefore cannot bring a facial vagueness challenge. (*See* Opp. at 10.)

For all of the reasons discussed *supra* at 4-6, however, the regulations at issue *are* restrictions on speech, and Key Credit has properly brought a facial challenge under the void for vagueness doctrine. On its face, the TSR is unconstitutionally vague for all of the reasons set forth

in Key Credit's Memorandum, (Mem. at 6-12), Plaintiffs elected not to respond to that issue, and their TSR claims should be dismissed with prejudice.

Plaintiffs also incorrectly contend that Key Credit did not raise an as-applied challenge under the vagueness doctrine. To the contrary, Key Credit specifically asserted that the TSR failed to "provide Key Credit fair notice as to what constitutes 'telemarketing' under the TSR." (Mem. at 9; *see generally* Mem. at 7-9.) Plaintiffs do not and cannot allege that Key Credit engages in any of the conduct that Congress stated was to be covered by the TSR. *See* U.S.C. § 6102(a)(3)(A)-(D); H.R. Rep. No. 103-20, at 4-5 (1993); S. Rep. 103-80, 8 (1993). Particularly in light of Congress's directives, the TSR's vague provisions failed to notify Key Credit that its conduct (as alleged in the complaint) constituted "telemarketing" for purposes of the TSR. The TSR therefore is also void for vagueness as applied to Key Credit.

## IV. THE FTC EXCEEDED ITS AUTHORITY IN PROMULGATING THE TSR.

In its Memorandum, Key Credit established that, in at least two respects, the FTC exceeded its Congressional authority in promulgating the TSR. (Mem. at 16-18.) First, by defining "telemarketer" so broadly as to include even persons who merely *receive* telephone calls "in connection with" a "plan, program or campaign which is conducted to induce the purchase of goods or services," *see* 16 C.F.R. §§ 310.2(ff)-(gg), the FTC created a regulatory regime that covers virtually every business that uses a telephone, far exceeding its mandate from Congress. (Mem. at 16-18.) Second, the FTC then excused virtually all telemarketers from the TSRs requirements, and instead targeted a limited number of disfavored businesses with regulatory constraints far afield from anything Congress intended. (*Id*.)

Notably, Plaintiffs offer no response to the second point. (*See* Opp. at 13-15.) In response to the first point, Plaintiffs assert only that Congress did not explicitly state that the TSR could

never apply to businesses that only receive telephone calls. (Opp. at 13-15.) But the question is not whether Congress allowed that, in *some* instances, receiving sales calls from a customer could bring a business within the scope of the TSR. The question is whether Congress intended that *all* businesses that receive sales calls from customers would be regulated as telemarketers, as the TSR purports to provide.

In considering that question, it is noteworthy that Congress issued several directives to the FTC concerning the conduct it considered to be "abusive telemarketing acts or practices," and therefore within the TSR's scope. *See* U.S.C. § 6102(a)(3)(A)-(D). As Key Credit explained in its Memorandum, all of this conduct concerns *only* unsolicited calls initiated and made by a telemarketer to a consumer. *Id*. Plaintiffs dismiss this directive as not "one of limitation or enumeration," and point to Congress's directive that the receipt of calls in one particular circumstance should be excluded from the TSR, reasoning that the exclusion would not have been necessary if Congress intended that receiving calls should always be excluded from the TSR. (Opp. at 14-15.)

But again, the argument that Congress intended for a *per se* exclusion for receiving calls is a straw man. And Plaintiffs are silent as to the argument that Key Credit actually advances. That is, Plaintiffs offer nothing to bridge the chasm between, on the one hand, *Congress*'s clear focus on regulating unsolicited telephone calls made to consumers, and, on the other, the *FTC*'s determination that virtually all businesses who receive telephone calls from customers would be regulated under the TSR as telemarketers. (*See* Opp. at 14.)

In fact, in passing the legislation that authorized the FTC to promulgate the TSR, Congress was explicit that it did *not* intend for the FTC to regulate all businesses that merely receive telephone calls from customers (or even all businesses that receive telephone calls from customers

in connection with a plan conducted to induce the purchase of goods or services). To the contrary, Congress specified that business transactions involving "contact initiated solely by the consumer for the consumer's convenience with no initial sales contact directed to a particular consumer, by phone or otherwise, from the seller, are not intended to be included within the definition [of telemarketing]." S. Rep. 103-80, 8 (1993).

By broadly (and vaguely) defining "telemarketer" to include persons who merely receive telephone calls "in connection with" a "plan, program or campaign which is conducted to induce the purchase of goods or services," the FTC plainly exceeded that mandate and brought within the scope of the TSR businesses that Congress expressly intended to exclude. The TSR therefore constitutes an unlawful agency action in excess of the FTC's statutory authority, and Plaintiffs' claims under the TSR should be dismissed with prejudice.

## CONCLUSION

For all of the foregoing reasons and those set forth in Key Credit's Memorandum in Support of its Motion to Dismiss Plaintiffs' Amended Complaint, the Complaint should be dismissed with prejudice in its entirety.

Dated: November 23, 2020

Respectfully submitted,

**COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS**

By: /s/ Timothy A. Hudson
One of Their Attorneys

By: /s/ David B. Mack
One of Their Attorneys

Timothy A. Hudson, *pro hac vice*
Jordan E. Wilkow, *pro hac vice*
Amie M. Bauer, *pro hac vice*
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlawfirm.com
jwilkow@tdrlawfirm.com
abauer@tdrlawfirm.com

-and-

David B. Mack
O'Connor, Carnathan and Mack LLC
One Van de Graaff Dr., Suite 104
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on November 23, 2020, I caused the foregoing **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** to be electronically filed using this Court's ECF system, serving all attorneys of record by operation of the Court's electronic filing system.

/s/ Timothy A. Hudson

**CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)**

I, Timothy Hudson, hereby certify that counsel conferred and attempted in good faith to resolve or narrow the issues raised herein but were unable to reach an agreement.

/s/ Timothy A. Hudson