UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-CV-10991

CONSUMER FINANCIAL PROTECTION BUREAU and
COMMONWEALTH OF MASSACHUSETTS, Plaintiffs

v.

COMMONWEALTH EQUITY GROUP, LLC dba KEY CREDIT REPAIR and
NIKITAS TSOUKALES, Defendants

<u>MEMORANDUM & ORDER</u>

August 10, 2021

ZOBEL, S.D.J.

The Consumer Financial Protection Bureau ("CFPB") and the Commonwealth of Massachusetts filed a nine-count complaint against Commonwealth Equity Group, doing business as Key Credit Repair ("Key Credit"), and its president, Nikitas Tsoukales, for alleged violations of federal and state law in connection with their business of offering credit repair services. Plaintiffs allege that defendants made false representations about customers' ability to improve their credit rating and requested payment in advance of full performance, in violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310 et seq., the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536, and state law. They seek injunctive relief, monetary damages to benefit consumers who were allegedly harmed by defendants' actions, and civil monetary penalties. (Docket # 26 at 26–27). Defendants move to dismiss all counts. (Docket # 29).

1

I.   **FACTUAL BACKGROUND**[1]

Key Credit offers credit repair services nationwide and is owned and operated by Mr. Tsoukales. Among the services offered is assistance in removing negative information from customers' credit reports and improving their credit rating. Customers learn about Key Credit's services through its website and advertising, and call to request assistance. Mr. Tsoukales created the script that Key Credit's sales representatives use to market its offerings. Customers engage Key Credit on a month-by-month basis, paying a monthly fee before obtaining the promised results on their credit ratings. Key Credit's website promises that "credit experts" and "certified credit consultants" will assist customers, but the majority of customers interact with telemarketers located outside the country. The company also includes promises to "fix unlimited negative items" from a credit report, to achieve an "average 90 point increase in 90 days," and to "dramatically increase credit scores." These representations are alleged to be false.

II.   **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The inquiry is usually limited to the facts alleged in the complaint, incorporated into the

---

[1] For purposes of this motion, defendants accept these facts as true and I construe them in the light most favorable to plaintiffs.

2

complaint, or susceptible to judicial notice. In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003).

## III. DISCUSSION

### A. The Telemarketing Sales Rule

Count I alleges that defendants collected payment for credit repair services before completing the "repair" and without providing the customer with a credit report demonstrating the promised results, in violation of the TSR, 16 C.F.R. § 310.4(a)(2). This violation is also related to counts II, III, and V. Defendants raise numerous defenses against the claim.

#### 1. The Credit Repair Organizations Act and TSR

Defendants first argue that the TSR is secondary to the Credit Repair Organizations Act ("CROA"), which provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). They claim that this provision of the CROA cannot be reconciled with the TSR and that the CROA alone governs their activities.

"[A]lthough the [CROA] undoubtedly governs Defendant's business, there is no language in that statute indicating that Defendant's telemarketing activities may not simultaneously be regulated by the Telemarketing Act." Tennessee v. Lexington Law Firms, No. 96-cv-0344, 1997 U.S. Dist. LEXIS 7403, at *17 (M.D. Tenn. May 14, 1997). As plaintiffs note, compliance with the TSR's payment requirements would not cause

defendants to violate the CROA. The TSR simply adds a precondition to requesting payment, namely that the organization provide proof that the services were rendered more than six months after performance.

Defendants maintain that where a statute and a regulation provide restrictions of differing degrees, there is conflict preemption. Their reply brief cites several judicial decisions that a subsequently enacted statute superseded a prior inconsistent regulation. However, in each of those cases, it was impossible to comply with both the statute and the regulation.[2] That is not the situation here. The TSR and the CROA thus do not conflict. See Radzanower v. Touche Ross & Co., 426 U.S. 148, 155 (1976) (holding that if two provisions "are capable of coexistence, it is the duty of the courts . . . to regard each as effective" (alteration in original) (quoting Morton v. Mancari, 417 U.S. 535, 550–51 (1974))); Consumer Fin. Prot. Bureau v. Prime Mktg. Holdings, LLC, No. 16-cv-07111, 2016 U.S. Dist. LEXIS 194873, at *27 (C.D. Cal. Nov. 15, 2016) (discussing the CROA and TSR and finding that "the two provisions may be complied with concurrently; they do not conflict").

    2.    Alleged Vagueness of the TSR

Defendants next contend that the TSR violates the Due Process Clause because its definition of "telemarketing" fails to provide fair notice as to who is covered by the regulation. The rule defines telemarketing as "a plan, program or campaign which is conducted to induce the purchase of . . . services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

---

[2] See Norman v. United States, 942 F.3d 1111, 1117–18 (Fed. Cir. 2019) (holding that statute and regulation were inconsistent because the later-enacted statute increased a fine to an amount well above the regulatory maximum); Farrell v. United States, 313 F. 3d 1214, 1219 (9th Cir. 2002) (holding that statute controlled because it "flatly contradicted" the regulation).

4

Defendants take issue with the lack of a definition for the terms "plan," "program," and "campaign" because, they say, all businesses that receive sales calls necessarily employ some plan, program, or campaign to induce the purchase of services, and therefore, the TSR would apply to all vendors and service providers who communicate with customers over the telephone.

Defendants acknowledge, however, that the TSR exempts liability for the vast majority of businesses, while expressly declining to exempt credit repair organizations like Key Credit. 16 C.F.R. § 310.6(b)(5). "A [party] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 495 (1982); see 1A Debtor-Creditor Law § 17.04 (2021) ("The Rule specifically covers cases where the consumer makes the first call to the credit repair organization in response to an advertisement or direct mail solicitation . . . .").

Likewise, the TSR's description of a "plan, program, or campaign" to induce the purchase of services is clear, particularly in this context: defendants are alleged to have developed a plan to offer credit relief services to consumers, and to have carried out that plan by advertising and promoting those services. (Docket # 26 at ¶¶ 15–24, 33, 35, 37); see Consumer Fin. Prot. Bureau v. Irvine WebWorks, Inc., No.14-cv-01967, 2016 U.S. Dist. LEXIS 36097, at *36–37 (C.D. Cal. Feb. 5, 2016) ("Defendants' final argument is that the [TSR] is impermissibly vague and that the rule failed to give Defendants fair notice of what conduct was prohibited . . . . The Court disagrees. The regulation was properly published and promulgated prior to the conduct that the Bureau contends violated the [TSR].").

### 3. Alleged First Amendment and Equal Protection Violations

Defendants also assert that the TSR's definition of "telemarketing" places a content-based restriction on speech by burdening credit repair service providers with a restriction as to when they can collect payment for their services. As plaintiffs note, however, the restriction is on conduct—the timing of payment—not on speech. See Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 6 (1st Cir. 2007) ("The statute at issue here merely proscribes conduct . . . . Such a ban is not a ban on commercial speech."). Even if, as defendants would have it, speech in support of sales of their services necessarily leads to payment, "[i]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Id. at 7 (quoting Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 62 (2006).

In line with this assertion, defendants also state that the regulation violates the Equal Protection Clause by discriminating against credit repair telemarketers as a subclass of telemarketers. Yet, as the First Circuit has held, the legislature must be allowed to "devise specific rules for businesses in different fields, . . . . a reflection of the time-honored tenet that, within wide limits, courts must defer to [ ] legislative classifications construed to further legitimate economic objectives." Wine & Spirits Retailers, 481 F.3d at 7. The delayed payment requirement is tied to particularly important consumer protection goals. See (Docket # 34 at 12 (noting that delayed payment allows consumers to pay only after receiving evidence that services were successful); Federal Trade Commission, "Complying with the Telemarketing Sales

6

Rule" (June 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule (stating that delayed payment requirement "is directed at the deceptive marketing and sale of bogus credit repair services . . . . [which] may be able to cause negative credit information to disappear from a consumer's credit report temporarily").

### 4. Whether the Federal Trade Commission Exceeded Its Authority

Defendants claim that the Federal Trade Commission ("FTC") exceeded its authority in promulgating rules targeting their conduct because Congress intended that only unsolicited telemarketing calls would be addressed by the FTC's regulations.

The authorizing statute, 15 U.S.C. § 6101 *et seq.*, however, is not as narrowly written as defendants assert. Instead, the statute defines "telemarketing" using the same definition later adopted by the FTC in the TSR. Id. § 6106(4); 16 C.F.R. § 310.2(gg). This definition does not require an individual to make unsolicited calls in order to engage in telemarketing, but only requires the use of a telephone—which can both make *and* receive calls. 15 U.S.C. § 6016(4). Although Congress directed the FTC to create rules regarding specific telemarketing activities (for example, calls that are made late at night or that are coercive), Congress also authorized the FTC to create additional rules addressing "deceptive telemarketing acts or practices" at its discretion. 15 U.S.C. § 6102(a)(1). Defendants have not demonstrated that Congress intended the FTC to *exclusively* address unsolicited telemarketing calls that would cause the TSR to exceed the Commission's authorized scope of rulemaking.

7

5.  Summary

For the reasons discussed above, defendants' motion to dismiss counts I, II, III, and V is denied insofar as it challenges the TSR.

**B.    Deceptive Conduct**

The complaint alleges that defendants engaged in unfair and deceptive actions by making materially false statements about the efficacy of Key Credit's services and the qualifications of its employees. Further, plaintiffs allege that these deceptive actions violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2, the TSR, 16 C.F.R. § 310.3(a)(2)(iii), and the CFPA, 12 U.S.C. § 5536(a)(1)(A). Defendants counter these claims by stating that plaintiffs failed to apply the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), and that the conduct alleged was not deceptive.

"Claims that rely on allegations of intentional and malicious false statements, even when they are not pleaded as fraud, have been held to be 'effective' allegations of fraudulent misrepresentations that cannot serve as the 'lynchpin' of a cause of action without triggering Rule 9(b)." Timmins Software Corp. v. EMC Corp., 502 F. Supp. 3d 595, 605 (D. Mass. 2020). "The circumstances to be stated with particularity under Rule 9(b) generally consist of the who, what, where, and when of the allegedly misleading representation." Lee v. Conagra Brands, Inc., 958 F.3d 70, 74 (1st Cir. 2020) (quoting Kaufman v. CVS Caremark Corp., 836 F.3d 88, 91 (1st Cir. 2016)).

Plaintiffs allege that defendants made false statements on their website and provide examples of the allegedly false statements along with the dates on which the statements were made. See, e.g., (Docket # 26 at ¶¶ 31, 33, 35, 37). They have

8

therefore complied with the requirements of Rule 9(b) by indicating the who (defendants), what (specific examples of false statements), where (on their website), and when (specific dates when the statements were accessible online). See Martin v. Mead Johnson Nutrition Co., No. 09-cv-11609, 2010 U.S. Dist. LEXIS 104923, at *9–10 (D. Mass. Sep. 30, 2010) (finding Rule 9(b) requirements satisfied where plaintiff included dated copies of advertisements and information taken from website).

In addition, the complaint plainly alleges deceptive conduct: that defendants made false statements about the likely results of using Key Credit's services and the skills and qualifications of its employees. Plaintiffs have also alleged that these statements were material in that they were likely to induce a customer to hire Key Credit in the belief that it would improve their credit rating. Plaintiffs have adequately defined defendants' allegedly deceptive conduct.

### C. Massachusetts Credit Services Organization Law

Defendants next deny that they violated the Massachusetts Credit Services Organization statute ("MA-CSO"), Mass. Gen. Laws ch. 93, §§ 68B(1), 68C(5)–(7) and 68D(c). They do not dispute that they are a credit services organization ("CSO") as defined by the statute. (Docket # 30 at 29–33). But they note that the terms of Key Credit's credit services agreement ("CSA") with customers demonstrate compliance with the MA-CSO. However, while the statute requires CSO contracts to provide customers with the total cost for services, Key Credit's CSA provides a schedule of monthly fees rather than a total sum. See Mass. Gen. Laws ch. 93, § 68C(5), § 68D(c) (requiring a contract to set out the total cost of services). Regardless, at this early stage of these proceedings the alleged existence and use of the CSA is insufficient as there is no

9

evidence that all customers entered into a CSA or that defendants followed the terms of the CSA in every instance.

Next, defendants do not dispute the allegation that they do not have a trust account. (Docket # 30 at 29–33). But under § 68B, a CSO "who sells or attempts to sell" its services and recoup payment prior to full performance must "obtain[] a surety bond in an amount not less than ten thousand dollars issued by a surety company authorized to do business in the commonwealth <u>and</u> . . . establish[] a trust account at a federally insured bank or savings and loan association located in the commonwealth . . . ." Mass. Gen. Laws s. 93, § 68B (emphasis added). In addition, under § 68C(6)–(7), a contract must provide a customer with notice of their right to proceed against a surety bond or trust account, and must provide the name and address of both.

Plaintiffs' allegations suggest that defendants charge monthly fees that may not reflect full performance of the proffered services. Despite the CSA's promise that customers will not be charged advance fees, the question remains whether the monthly fee functions, in effect if not in name, as an advance fee. Whether all services were performed prior to defendants collecting this fee is ultimately a question of fact. Lastly, although defendants argue that the trust account requirement is only designed to apply to CSOs that handle customers' funds, there is no such limitation in the statute. Defendants' alleged violations of the MA-CSO are therefore plausible.

### D.     CFPB Authority

Defendants' final argument is that because the CFPB initiated this case prior to the Supreme Court's decision in <u>Seila Law LLC v. Consumer Financial Protection</u>

Bureau, 140 S. Ct. 2183 (2020), the CFPB should be dismissed as a plaintiff because it lacked authority to bring suit.

"Though the Seila Law decision is still young, the two courts to address this issue thus far have determined that a CFPB enforcement action pending at the time of Seila Law may continue if the action is ratified by the Director." Bureau of Consumer Fin. Prot. v. Citizens Bank, N.A., 504 F. Supp. 3d 39, 51 (D.R.I. 2020) (collecting cases). The amended complaint, filed after the Seila Law decision, serves as ratification of the action and accordingly there is no basis for dismissal on this ground.

## IV.  CONCLUSION

Defendants' Motion to Dismiss (Docket # 29) is DENIED.

August 10, 2021
DATE

Rya W. Zobel
RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE