IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Consumer Financial Protection Bureau and the Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney General,<br><br>Plaintiffs,<br><br>v.<br><br>Commonwealth Equity Group, LLC (d/b/a Key Credit Repair) and Nikitas Tsoukales (a/k/a Nikitas Tsoukalis),<br><br>Defendants. | Case No. 1:20-cv-10991-RWZ |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiffs the Consumer Financial Protection Bureau and the Commonwealth of Massachusetts brought this public enforcement action to address ongoing violations of law by Defendants Commonwealth Equity Group, LLC, and Nikitas Tsoukales. More than two years into the litigation, Defendants have now moved for (partial) judgment on the pleadings, arguing that the method by which Congress chose to fund the Bureau violates the Appropriations Clause and that they have somehow been harmed by that method of funding such that they are entitled to judgment in this case.

Defendants are wrong. As an initial matter, Defendants expressly waived the funding argument they now seek to press when they amended their pleading in order to drop this alleged defense. The argument also fails on the merits. Congress did not violate the "straightforward and explicit command of the Appropriations Clause"—"'that

no money can be paid out of the Treasury unless it has been appropriated by an act of Congress'"—when it enacted a statute authorizing the Bureau to use a specified amount of funds from a specified source for specified purposes. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). That is why every court (bar one) to have considered similar attacks on the Bureau's funding has rejected them. This Court should do the same. And even if Defendants could show any defect in the Bureau's funding, that still would not entitle them to judgment in this case.

## BACKGROUND

The Bureau, like many other agencies, is funded through its organic statute rather than annual spending bills. *See* 12 U.S.C. § 5497. The Bureau's funds come from the earnings of the Federal Reserve System, of which the Bureau is a part. *Id.* § 5491(a). For fiscal years 2013 and later, Congress capped the amount the Bureau can draw at approximately $597.6 million, which is 12% of the total operating expenses of the Federal Reserve System as reported in 2009. *Id.* § 5497(a)(2)(A). The capped amount is then adjusted annually based on a measure of inflation. *Id.* § 5497(a)(2)(B).

The Bureau and the Commonwealth filed this public enforcement action in May 2020. They allege that Defendants violated federal and state law in connection with the telemarketing of credit-repair services. *See* ECF No. 26. These violations are currently ongoing. Plaintiffs seek monetary and injunctive relief for the protection of consumers who have been or may be harmed by Defendants' violations.

In their answer to the amended complaint, Defendants initially asserted as an affirmative defense that the Bureau (but not the Commonwealth) "lacks authority to bring this lawsuit because its structure is unconstitutional, under Article I and Article

II." ECF No. 56 at 27. After Plaintiffs indicated that they intended to move to strike certain portions of the answer, *see* ECF No. 58, Defendants amended their answer to expressly withdraw this purported defense, *see* ECF No. 60 at 3; *see also* Order of June 1, 2022 at 1 n.1 (recognizing that Defendants dropped this defense), ECF No. 69.

At the Court's scheduling conference on August 26, 2021, ECF No. 53, the Court directed the parties to stipulate to a scheduling order. Under the agreement the parties reached, the deadline to amend the pleadings was February 11, 2022. ECF No. 71-17.

## ARGUMENT

### I. Defendants cannot seek judgment on the pleadings based on an issue they specifically chose to withdraw from their pleading.

"[A]ffirmative defenses … must be claimed in the original pleadings, pursuant to Federal Rules of Civil Procedure 8(c), or the defense generally will be held to have been waived." *FDIC v. Ramirez-Rivera*, 869 F.2d 624, 626 (1st Cir. 1989); *accord Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d 444, 449 (1st Cir. 1995) ("Failure to plead an affirmative defense generally results in waiver of the defense and its exclusion from the case.").

The argument that Defendants now seek to raise—that the Bureau's funding is invalid under Article I's Appropriations Clause and that, as a result, the Bureau cannot validly pursue this suit—is an affirmative defense because it would, if accepted, "bar … the right of recovery even if the general complaint were more or less admitted to." *Wolf*, 71 F.3d at 449. Thus, Defendants were required by Rule 8(c) to assert this defense in their pleading. Defendants did not merely fail to plead this defense—they specifically disavowed it by amending their answer in order to drop the claim that the Bureau "lacks

authority to bring this lawsuit because its structure is unconstitutional … under Article I." ECF No. 60 at 3. In doing so, they waived this alleged defense.

"There are certain exceptions to the Rule 8(c) bar … , either where (i) the defendant asserts [the defense] without undue delay and the plaintiff is not unfairly prejudiced by any delay; or (ii) the circumstances necessary to establish entitlement to the affirmative defense did not obtain at the time the answer was filed." *Davignon v. Clemmey*, 322 F.3d 1, 15 (1st Cir. 2003) (citation omitted). These exceptions do not apply here. First, Defendants' will-they-or-won't-they approach to this defense—first asserting it, then withdrawing it in response to Plaintiffs' anticipated motion to strike, now opportunistically seeking to assert it again—is enough to show undue delay. Second, this is clearly not a case in which Defendants were unable to assert the defense at an earlier time. They did so, then changed their minds when faced with Plaintiffs' anticipated motion challenging that defense. The Court should hold Defendants to that decision.

## II. Congress satisfied the Appropriations Clause when it passed a statute to fund the Bureau's operations.

Defendants' claim that the Bureau's funding violates the Appropriations Clause is also substantively meritless. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by law." U.S. Const. Art. I, § 9, cl. 7. As the Supreme Court has long emphasized, the "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'" *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v.*

*United States*, 301 U.S. 308, 321 (1937)). "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Id.*

The Bureau's funding is so authorized. *See* 12 U.S.C. § 5497(a), (c). It thus complies with the Appropriations Clause's "straightforward and explicit command" that federal spending "be authorized by a statute." *Richmond*, 496 U.S. at 424. While the Bureau's funding is not set through annual spending bills, the Appropriations Clause does not require annual appropriations. *Cf.* U.S. Const. Art. I, § 8, cl. 12 (limiting appropriations for the Army—but not for any other purpose—to no more than two years). Indeed, since the Founding Era, Congress has chosen to fund important agencies and programs through sources other than annual spending bills. *See, e.g.*, 1 Stat. 232 (1792) (establishing the Post Office and funding it through postage rates). Today, there are many such agencies. *See, e.g.*, 12 U.S.C. § 16 (Office of the Comptroller of the Currency); *id.* § 243 (Federal Reserve Board); *id.* §§ 1815(d), 1820(e) (FDIC).

Consistent with that history, courts have recognized that "Congress can, consistent with the Appropriations Clause, create governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process." *PHH Corp. v. CFPB*, 881 F.3d 75, 95 (D.C. Cir. 2018) (en banc), *abrogated on other grounds by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020). Indeed, every court but one that has considered the issue has upheld the Bureau's funding. *Compare, e.g.*, *id.* at 95-96 (upholding funding); *CFPB v. CashCall, Inc.*, No. 2:15-cv-7522, 2023 WL 2009938, at *3 (C.D. Cal. Feb. 10, 2023) (same); *CFPB v. TransUnion*, No. 1:22-cv-1880, 2022 WL 17082529, at *5 (N.D. Ill. Nov. 18, 2022) (same); *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 57 (D.R.I. 2020) (same); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-2817, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020) (same; collecting

other cases), *with Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 635-43 (5th Cir. 2022) (holding funding invalid) ("*CFSA*"), *cert. granted*, No. 22-448 (U.S. Feb. 27, 2023).

Defendants fail to mention—let alone address—the overwhelming weight of authority against them. Instead, they mostly parrot the Fifth Circuit's outlier decision in *CFSA*.[1] But that decision—which the Supreme Court this week agreed to review—was mistaken, and its holding that the Bureau's funding violates the Appropriations Clause is without support in constitutional text, historical practice, or judicial precedent.

In particular, the Fifth Circuit erred in concluding that the Bureau's funding is somehow "double-insulated … from Congress's appropriations power" because it comes from the Federal Reserve. Mot. at 2 (quoting *CFSA*, 51 F.4th at 639). The Bureau is part of the Federal Reserve System, 12 U.S.C. § 5491(a), and draws its funds from the combined earnings of the System, *id.* § 5497(a). While it is the Federal Reserve *Board* that actually transfers the statutorily authorized funds to the Bureau, the Board's role in the process is purely ministerial. There is, as a factual matter, no "double insulation."

Nor does this aspect of the Bureau's funding make any difference as a legal matter. The Board's ministerial role in no way insulates the Bureau from congressional control. Congress is free to modify the Bureau's funding at any time by simply passing a statute, just as it would be if the statute instead directed the Secretary of the Treasury to transfer the same capped amount from the government's general funds. The source of

[1] Defendants also cite an unpublished order in *CFPB v. Nationwide Biweekly Admin., Inc.*, 2023 WL 566112 (9th Cir. Jan. 27, 2023). Mot. at 7. But that order simply vacated and remanded a long-pending appeal to allow the district court a chance to apply several new appellate decisions potentially bearing on several issues in the case, including the Bureau's funding. *Id.* at *1-2. The panel noted that its brief order "should not be taken to provide our view of the[] merits." *Id.* at *2. *Nationwide* is no help to Defendants.

the Bureau's funds is also irrelevant for Congress's ability to oversee the Bureau's spending, which it is fully able to do, including because of various provisions in the Bureau's statute. *See* 12 U.S.C. §§ 5496(a)-(b), (c)(2), 5497(a)(5), (e)(4) (requiring audits, reports, and appearances before Congress concerning Bureau spending).

More to the point, none of this has relevance under the Appropriations Clause, which "means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'" *Richmond*, 496 U.S. at 424. Congress satisfied that requirement when it enacted a statute authorizing the Bureau to draw and spend money on its operations.

Defendants misunderstand a provision of the statute stating that Bureau funds "shall not be construed to be Government funds or appropriated monies." Mot. at 6 (quoting 12 U.S.C. § 5497(c)(2)). Defendants appear to view that provision as a self-defeating declaration that Section 5497 violates the Appropriations Clause. But it is nothing of the kind. Section 5497(c) does not purport to describe the status of the Bureau's funds under the Constitution; instead, it merely determines the degree to which various statutory restrictions on appropriations apply to the Bureau's use of funds. *See* Government Accountability Office, *Principles of Federal Appropriations Law*, 2-22, 2-25 to 2-26 & n.29 (4th ed. Rev. 2016), *available at* https://www.gao.gov/assets/2019-11/675709.pdf. Congress has included similar provisions in the statutes of the Federal Reserve Board, 12 U.S.C. § 244, OCC, *id.* §§ 16, 481, and Farm Credit Administration, *id.* § 2250(b)(2), among other agencies.

## III. Any defect in the Bureau's funding would not justify the relief Defendants seek.

Even if Defendants could show an Appropriations Clause problem, it would not entitle them to the relief they seek: judgment on the pleadings on Counts I-V of the Amended Complaint. Mot. at 2; *see also* ECF No. 26 (Am. Compl.).

First, Defendants' claims about the Bureau's funding have no bearing on the ability of *the Commonwealth* to pursue Counts I-V. Even the *CFSA* court recognized that, if the funding provisions of the Bureau's statute were invalid, as the court mistakenly believed they were, the other provisions of the statute would still remain valid. *CFSA*, 51 F.4th at 643 (explaining that "Congress plainly (and properly) authorized the Bureau to promulgate the [challenged regulation]" and citing 12 U.S.C. §§ 5511(a), 5512(b)); *cf. Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197, 2209 (2020) (holding that a provision of the same statute purporting to shield the Bureau's Director from at-will removal was invalid but that all other provisions "remain fully operative without the offending tenure restriction").

Thus, arguments about the Bureau's funding do not affect the Commonwealth's ability to prosecute its claims under the Consumer Financial Protection Act (Counts III and IV). *See generally* 12 U.S.C. § 5552 (authorizing state actions to enforce the CFPA). Those arguments also have no effect on the Commonwealth's ability to pursue its claims under the Telemarketing Sales Rule (Counts I and II)—which was issued by the Federal Trade Commission, not the Bureau, *see* Telemarketing Sales Rule, 60 Fed. Reg. 43842 (Aug. 23, 1995)—or under state law (Count V). So while Defendants ask for judgment on Counts I-V and for those counts to "be dismissed," Mot. at 4, the most relief to which

they could possibly be entitled, even under their own erroneous legal theory, is judgment against *the Bureau* on the counts the Bureau asserts (I-IV).

Second, Defendants are not entitled even to that. This is because the proper remedy for the alleged Appropriations Clause problem would not be to enter judgment against the Bureau on its claims.

If the concern were about particular features of the Bureau's funding mechanism, for example, such as the provision stating that the Bureau shall maintain an account at a Federal Reserve bank rather than holding its funds "in a Treasury account," *see* Mot. at 4 (referencing 12 U.S.C. § 5497(b)(1)-(2)), then the appropriate remedy would be to simply sever the problematic provisions while leaving the rest of the funding mechanism in place, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." (quotation marks omitted)).

And even if the concern were with Congress's decision to fund the Bureau through legislation other than an annual spending bill, that likewise would not warrant dismissal of the Bureau's claims. While Defendants claim to have somehow been harmed by the Bureau's method of funding, *see* Mot. at 6-7 (citing *Collins*, 141 S. Ct. 1761, 1788 (2021)), they have not shown that the Bureau would have acted differently had it been funded by (what Defendants would consider to be) a "valid" appropriation, *see Collins*, 141 S. Ct. at 1789 (holding that a party can obtain relief because of an agency official's unconstitutional insulation from removal if the party can show that the removal restriction itself "inflicted harm"); *id.* at 1801-02 (Kagan, J., concurring in part)

("agree[ing]" with the majority that a party must show that the unconstitutional provision actually "affected the complained-of decision").

Moreover, when Congress has established remedies for unauthorized Executive Branch spending, it has not authorized the unwinding of otherwise-valid government actions, as Defendants seek here. *See* 31 U.S.C. §§ 1349(a), 1350. The only decision Defendants can muster in support of their preferred remedy is *CFSA*. That decision, however, failed to conduct a severability analysis or to consider the application of traditional remedial principles to the Appropriations Clause issue it described. This Court should not follow the badly flawed remedial analysis in that decision.

## CONCLUSION

For all these reasons, the Court should deny Defendants' motion for judgment on the pleadings.

Dated: March 3, 2023

Respectfully submitted,

*s/ Kevin E. Friedl*
Kevin E. Friedl (NY Bar No. 5240080)
(202) 435-9268
Kevin.Friedl@cfpb.gov
Nelle Rohlich (WI Bar No. 1047522)
(202) 435-7280
Nelle.Rohlich@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
*Attorneys for Plaintiff Consumer Financial Protection Bureau*

*s/ Lilia V. DuBois*
Lilia V. DuBois (MA Bar No. 688848)
(617) 963-2239
Lilia.DuBois@state.ma.us
Assistant Attorney General
Insurance & Financial Services Division

One Ashburton Place, 18th Floor
Boston, MA 02108
*Attorney for Plaintiff the Commonwealth of Massachusetts*