**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General,<br>Plaintiffs,<br>v.<br>COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS<br>Defendants. | No. 20-cv-10991<br><br>Judge Rya W. Zobel<br><br>**REQUEST FOR ORAL ARGUMENT** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT ON COUNTS I-V**

Timothy A. Hudson, pro hac vice
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlaw.com

-and-

David B. Mack (BBO No. 631108)
Stephanie R. Parker (BBO No. 687610)
O'Connor, Carnathan and Mack LLC
10 Burlington Mall Road, Suite 301
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net
sparker@ocmlaw.net

Dated: July 28, 2023

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........ 4

I. The Credit Reporting Industry ........ 4

II. Credit Reports and Credit Scores ........ 4

III. Credit Report Errors and Consumer Complaints ........ 5

IV. Credit Repair Companies ........ 6

V. Relevant Regulations and Statutes ........ 6

A. The TSR ........ 7

B. The Credit Repair Organizations Act ("CROA") ........ 9

VI. Key Credit and Its Services ........ 9

VII. Key Credit's Billing Practices ........ 12

VIII. Key Credit Does Not "Promise Results" to Its Customers ........ 12

LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT ........ 14

ARGUMENT ........ 15

I. Key Credit Is Entitled to Summary Judgment on Counts I, III and IV Because Key Credit Does Not "Promise Results" to Its Customers ........ 15

A. The plain language of the Advance Fee Provision applies only if Key Credit "promised results" to its customers ........ 15

B. Key Credit promises to provide specified "services" for its customers and does not "promise results." ........ 17

C. Applying the Advance Fee Provision to promised "services" is unreasonable and would lead to absurd results. ........ 18

D. The TSR and the Bureau's interpretation exceeds its scope of its statutory authority. ........ 20

II. Key Credit Is Entitled to Summary Judgment on Counts I – V As a Matter of Law. ........ 23

A. The TSR places Unconstitutional content-based restrictions on speech in violation of the First Amendment. ........................................................... 23

B. The TSR violates the Equal Protection Clause. .................................................. 26

C. The funding employed by the Bureau to bring this action was not Constitutionally appropriated.................................................................... 27

CONCLUSION.................................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnhart v. Walton*,
535 U.S. 212 (2002) ... 20

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020) ... 23, 24, 26

*Bonner v. Triple-S Mgmt. Corp.*,
68 F.4th 677 (1st Cir. 2023) ... 14

*Burson v. Freeman*,
504 U.S. 191 (1992) ... 23, 24, 26

*Carey v. Brown*,
447 U.S. 455 (1980) ... 27

*Carey v. Saffold*,
536 U.S. 214 (2002) ... 15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ... 15

*CFPB v. Nationwide Biweekly Administration, Inc.*,
No. 18-15431 (9th Cir. Jan. 27, 2023) ... 32

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) ... 27, 28, 29, 30, 31, 32

*Farmers Ins. Exch. v. RNK, Inc.*,
632 F.3d 777 (1st Cir. 2011) ... 14

*Jette v. United of Omaha Life Ins. Co.*,
18 F.4th 18 (1st Cir. 2021) ... 15

*Mass. Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976) ... 26

*Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*,
524 F.3d 54 (1st Cir. 2008) ... 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ... 21

*New York v. U.S. Dept. of Labor*,
363 F. Supp. 3d 109 (D.D.C. 2019) ....................18

*Office of Personnel Mgmt. v. Richmond*,
496 U.S. 414 (1990) ....................30

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) ....................26

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ....................23, 24

*Rempfer v. Sharfstei*n,
583 F.3d 860 (D.C. Cir. 2009) ....................15

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020) ....................28, 29, 30

*U.S. v. Lachman*,
387 F.3d 42 (1st Cir. 2004) ....................15

**Statutes**

12 U.S.C. § 5491 ....................28

12 U.S.C. § 5497 ....................28, 29, 30, 31

12 U.S.C. § 5563 ....................28

12 U.S.C. § 5564 ....................28

15 U.S.C. § 1679 ....................9, 22

15 U.S.C. § 1679b ....................9, 25

15 U.S.C. § 6101 ....................21, 24

15 U.S.C. § 6102 ....................7, 21, 24

**Other Authorities**

16 C.F.R. § 310 ....................6

16 C.F.R. § 310.1 ....................21

16 C.F.R. § 310.2 ....................22, 25

16 C.F.R. § 310.3 ....................28

16 C.F.R. § 310.4 ....................7, 16, 24, 28

16 C.F.R. § 310.6 ....................22, 25, 26

67 Fed. Reg. 4,492 ....................20

Fed. R. Civ. P. 56(a) ....................14

## INTRODUCTION

Since opening its doors in 2008, defendants Commonwealth Equity Group, LLC (d/b/a Key Credit Repair) and Nikitas Tsoukalis (together, "Key Credit") have provided a wide range of credit repair services to qualified customers seeking help to ensure that items on their credit reports are fair, accurate and substantiated. Mr. Tsoukalis started Key Credit after spending years helping people obtain mortgages and seeing first-hand the impact that inaccurate information and other credit deficiencies on one's credit report has on people seeking to obtain loans for first home purchases and cars, among other things. Key Credit is a family business dedicated to educating its customers about ways to improve their credit and to enforce their rights against credit reporting agencies and creditors who persistently violate federal consumer protection laws by including inaccurate or unverified items on consumers' credit reports resulting in lower credit scores and higher interest rates.

Key Credit is not a "scam" and does not offer "bogus" services to its customers. Key Credit's comprehensive, multi-faceted approach to credit repair includes counseling and educating its customers on how to build and maintain a healthy mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. As a long-standing "A"-rated member of the Better Business Bureau, Key Credit has never been found to have violated any provision of Congress' comprehensive Credit Repair Organizations Act. For over 15 years, Key Credit has established a proven track record in helping its customers improve their credit and assisting them in disputing and removing inaccurate, negative items on their credit reports.

The Bureau of Consumer Financial Protection (the "Bureau") now seeks to shudder Key Credit, lay-off its employees, and force Mr. Tsoukalis into bankruptcy. Relevant to this motion, the

Bureau seeks to do so based on its peculiar interpretation of the Advance Fee Provision of the Telemarketing Sales Rule ("TSR"), which prohibits credit repair companies that have a telephone and engage in any advertising from requesting or receiving any payment for services unless "promised results" are achieved. The TSR's express purpose is to put a stop to "abusive" credit repair companies that scam customers by "promising results" based on "bogus" services that the scammers do not (and have no intention to) provide.

Yet the Bureau makes no such claim against Key Credit. The Bureau instead claims that, although Key Credit actually performed agreed-upon services in good faith, its receipt of payment for those services after they were performed was improper because payment should not have been collected until six months after the "promised results" were achieved. Accordingly, despite the absence of any regulatory authority in support of its position, and despite Congress having specifically concluded that it is lawful for legitimate and reputable companies like Key Credit to request and receive payment from customers for agreed-upon services after it has "actually performed" them, the Bureau seeks to hold Key Credit strictly liable under an absurd construction of the TSR.

Without exaggeration, the Bureau's novel interpretation of the TSR would place the entire credit repair industry in violation of the regulation. Much needed credit repair services – those provided by honest companies performing services in good faith and without having improperly "promised results" to anyone – will simply be removed from the marketplace until someone (but not the Bureau) finds a way to provide such services without being paid to do so until *six months* after actually providing them. This Court should not countenance or legitimize the Bureau's interpretation of the TSR for at least three reasons, each of which independently warrant summary judgment in favor of Key Credit on Counts I-V of the Amended Complaint.

First, the TSR's Advance Fee Provision applies only to credit repair companies who "promise results" to customers. Based on the Provision's plain language and expressly stated purpose, it applies to scammers who "promised results" to customers but who offered only "bogus" services that the scammers do not, and have no intention to, provide. There is no genuine dispute of material fact that Key Credit does not "promise results" to its customers. Instead, as evidenced by its written contracts, Key Credit promises only to provide specified services to assist its customers achieve their unique individual goals. The contracts are short and written in plain language. Key Credit's customers can cancel their contracts at any time without penalty and expressly acknowledge that "no express or implied promises or guarantees as to the result or outcome of [Key Credit's] services" have been made that are not set forth in the written contracts.

Second, Key Credit should be awarded summary judgment in its favor because the Bureau's interpretation of the Advance Fee Provision exceeds the scope of its statutory authority.

Third, Key Credit should be awarded summary judgment as a matter of law because the Bureau's interpretation of the TSR places unconstitutional content-based restrictions on Key Credit's speech in violation of the First Amendment, violates the Equal Protection Clause, and because the Bureau's funding to bring this action was not constitutionally appropriated (a matter which is currently pending before the U.S. Supreme Court).

The stakes are high for Key Credit, its employees and their families. Key Credit prays that this Court will carefully consider its argument and reasoning concerning the Bureau's improper claims against it. For the reasons set forth herein, this Court should enter summary judgment in favor of Key Credit on Counts I through V of the Amended Complaint.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I. The Credit Reporting Industry

The credit reporting system contains detailed financial information regarding American consumers. (SUF, ¶ 1.) [1] The system relies on credit bureaus known as consumer reporting agencies ("CRAs") that manage consumer-credit information and serve as repositories for this information. (SUF, ¶ 2.) There are three major CRAs: Equifax, TransUnion and Experian. (*Id.*)

CRAs maintain credit files for consumers consisting of their payment histories as reported by their creditors. (SUF, ¶ 3.) These creditors, known as "furnishers," regularly provide updates on a consumer's credit history to CRAs including mortgage services and credit guarantors such as banks, mortgage companies, credit card issuers, department stores, debt collectors and others. (*Id.*) When a consumer applies to a business for credit, insurance, employment or to lease or rent an apartment or home, that business will often send an inquiry to a CRA that, in turn, sells and electronically sends the consumer's credit report to the inquiring business. (SUF, ¶ 4.)

### II. Credit Reports and Credit Scores

A fundamental purpose of a credit report is to describe a consumer's creditworthiness. (SUF, ¶ 5.) Consumer credit reports are generated by CRAs using data provided by furnishers. (SUF, ¶ 6.) A credit report includes personal and financial information about an individual, such as their name, current and previous addresses, Social Security Number, date of birth, and employment history. (*Id.*) It also provides details on credit accounts (known as "tradelines"), including the names of creditors, account numbers, balances, payment history, and account status (open or closed). (*Id.*)

[1] References to SUF refer to Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on Counts I-V filed contemporaneously with this memorandum.

Other financial information such as bankruptcies, foreclosures, liens, and credit inquiries are also included. (*Id.*)

A credit score is a number that purports to reflect a consumer's creditworthiness at a given point in time. (SUF, ¶ 7.) A credit score is calculated based on all the tradeline information in the credit report through model algorithms used by CRAs. (*Id.*) Credit scoring is a complex process that takes into account various factors, including Payment History (35%); Debt (30%); Length of Credit History (15%); Account Diversity (10%); and Hard Inquiries (10%). (*Id.*) The higher the credit score, the less risky the consumer is viewed by creditors. (SUF, ¶ 8.) The lower the credit score, the more the consumer pays for credit, including higher interest on mortgages, auto loans, installment loans, and credit cards. (*Id.*) Consumers are generally most severely penalized when they have a serious derogatory (or negative) item on their credit report within the past eleven months. (SUF, ¶ 9.)

## III. Credit Report Errors and Consumer Complaints

Credit reports habitually contain erroneous information that harms consumers. (SUF, ¶ 10.) The Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau (the "Bureau") accept consumer complaints related to CRAs. (SUF, ¶ 11.) Both agencies have reported an increase in complaints related to CRAs in recent years. (*Id.*) The FTC tracks these complaints and has found that credit reporting complaints have been among the top consumer complaints since 1997, accounting for approximately 20% of all complaints received. (*Id.*)

In 2020, the FTC received over 246,000 credit reporting complaints. (SUF, ¶ 12.) The most common issues reported by consumers included incorrect information on credit reports, difficulty obtaining credit reports, difficulty disputing errors, and unauthorized inquiries. (*Id.*) Compared to other complaint categories, complaints related to CRAs consistently rank among the top categories

received by both agencies. (*Id.*) For example, a PERC research report analyzed a sample of 200 credit reports from each of the three major CRAs - Equifax, Experian, and TransUnion - and found that a significant number of credit reports contained errors. (SUF, ¶ 13.) Specifically, 26% of the credit reports contained at least one "material error" which is defined as an error that could negatively impact a consumer's creditworthiness or ability to obtain credit. (*Id.*)

To protect consumers from these errors, Congress enacted the Fair Credit Reporting Act ("FCRA") nearly 40 years ago. (SUF, ¶ 14.) One of FCRA's key provisions requires credit bureaus to conduct a reasonable investigation when a consumer disputes an item in their credit report. (*Id.*)

## IV. Credit Repair Companies

Credit repair services are "not a one size fits all" approach because "[e]very credit report, financial situation, and human being has different goals with different timelines" for each customer's specific goals. (SUF, ¶ 16.) Credit repair companies – like Key Credit – provide a wide range of credit repair services to help consumers enforce their legal rights to ensure that items on their credit reports are fair, accurate and substantiated. (SUF, ¶ 15). Among other things, these services address the problems recognized by the FTC and the Bureau; namely, that there are errors and inaccuracies in a consumer's credit report that should be corrected and that harm the consumer's credit worthiness. (*Id.*) Some credit repair companies – like Key Credit – also provide credit counseling and coaching to customers. (*Id.*)

## V. Relevant Regulations and Statutes

Count I of the Amended Complaint alleges a violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310. (Am. Compl., Dkt. 26.) The FTC promulgated the TSR to carry out the Telemarketing and Consumer Fraud and Abuse Prevention Act's ("Telemarketing Act") direction to

"prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1).

**A. The TSR**

Relevant here, one of the TSR's restrictions includes a prohibition on asking for, or receiving, payment for credit repair services that "promised results." Specifically, the TSR's Advance Fee Provision states, in pertinent part:

> (a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> > (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
> >
> > > (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; ***and***
> > >
> > > (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that ***the promised results*** have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2)(i)-(ii), emphasis added.

The requirement to show that "promised results" had still been achieved six months later was the result of a specific type of fraudulent scheme perpetrated by "fundamentally bogus" entities holding themselves out as credit repair companies. (SUF, ¶ 19.) In 2002, the FTC provided further explanation of the rationale underlying the Advance Fee Provision. (SUF, ¶ 20.) Specifically, the FTC explained that the Advance Fee Provision falls within "the purview of its traditional unfairness analysis" because, according to the FTC, "[a]n important characteristic common to credit repair

services" scams prohibited by the TSR "is that in each case the offered service is fundamentally bogus." (*Id.*) Indeed, "the essence of these schemes" was "to take consumers' money for services that the seller has no intention of providing and in fact does not provide." (*Id.*) Accordingly, the Advance Fee Provision was intended to prevent unfair conduct that the FTC viewed as "outright theft." (*Id.*)

The FTC's recent guidance further explains the deceptive conduct targeted by the Advance Fee Provision: a wrongdoer may claim to provide credit repair services and will give the appearance of providing effective services by "flooding a credit bureau with letters disputing the accuracy of [legitimate] negative entries," which result in credit reporting agencies temporarily removing the negative entries pending an investigation. (SUF, ¶ 21.) Faced with such challenges, CRAs sometimes cannot complete the investigations within the statutorily required 30-day period, so the negative tradelines are provisionally removed from a consumer's credit report. (SUF, ¶ 22) The temporary removal of such negative tradelines gives the appearance that the consumer's credit record has improved. (*Id.*) The wrongdoer then takes the consumer's money and the negative/accurate tradelines are returned to the consumer's credit report after the completed investigation confirms that no basis for removal exists. (*Id.*)

In commenting on the TSR's Advance Fee Provision, the U.S. Postal Service stated that it was necessary to distinguish "[s]o-called credit repair services" from "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer." (SUF, ¶ 23.) The "[s]o-called credit repair services" would typically only provide "written advice to customers on how to obtain copies of their credit reports" and encourage customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (*Id.*)

**B. The Credit Repair Organizations Act ("CROA")**

Only a few months after the FTC promulgated the TSR, Congress enacted the Credit Repair Organizations Act ("CROA"). 15 U.S.C. § 1679 *et seq*. As a Congressionally enacted statute, CROA exhaustively addresses the credit repair industry, and it was enacted *after* the FTC promulgated the TSR's Advance Fee Provision in relevant part. (SUF, ¶ 24.) Notably, CROA specifically expressly addresses how credit repair companies may charge fees: "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). Accordingly, Congress determined that, once a service has been fully performed, credit repair organizations may properly collect fees for those completed services. *See id.*

**VI. Key Credit and Its Services**

In 2008, Key Credit began providing credit repair services to qualified customers from its office in Mattapan, Massachusetts. (SUF, ¶ 26.) At relevant times, Key Credit' senior leadership consisted of Nikitas Tsoukalis (Founder and CEO), Jennifer Hadayia (Vice President of Customer Service), Melina Vallas (Head of Sales), Maria Steeves (Head of Operations), and Alejandra Martinez (Head of Quality Control). (*Id.*)

Key Credit is a licensed credit repair company in all states in which it operates. (SUF, ¶ 27.) Key Credit has long maintained an "A" rating with the Better Business Bureau. (*Id.* ¶ 28.)

Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit including: learning each customer's specific concerns and goals; consulting with each consumer about inaccurate and challengeable items on their credit report; analyzing each customer's credit report; preparing and

sending written disputes of inaccurate negative items on a customer's credit reports; following up with credit reporting agencies to ensure that inaccurate/questionable negative tradelines are removed from a customer's credit report; analyzing new credit reports to ensure that inaccurate/questionable negative items have been removed; creating a customized action plan to help improve the customer's credit score; and providing credit counseling and coaching to customers so that they can make educated and informed decisions about their personal credit for themselves. (SUF, ¶ 29.)

Key Credit has a proven track record in assisting its customers in disputing and removing inaccurate, negative items on their credit reports. (SUF, ¶ 30.) Key Credit's comprehensive, multi-faceted approach also includes counseling and educating its customers on how to build and maintain a healthy mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. (SUF, ¶ 31.)

As a long-standing "A"-rated member of the Better Business Bureau, Key Credit enters into written contracts with all of its qualified customers. (SUF, ¶ 32.) The contracts are short, written in plain language, and contain all disclosures required under CROA. (SUF, ¶ 33.) The written contracts also explicitly set forth the scope of the services it provides to its customers, clearly stating that:

- Key Credit "agrees to evaluate the Client's current credit profile and will advise Client on the necessary steps to legally remove information that is not accurate, complete, or verifiable."

- Key Credit "will provide the following credit repair services . . . [s]uch services will include attempts to remove inaccurate, erroneous, and/or obsolete credit information reported by Equifax, Experian and TransUnion to the Client's Credit Report . . . . will continually analyze and review Client's status . . . will respond to, receive, and/or initiat[e] correspondence from Client. . . will assist Client in responding to, receiving, and/or initiating correspondence via email regarding Client's Credit Report(s) . . . will create letters and/or emails and/or faxes and/or electronic communications and/or other written communications for Client in an attempt to correct errors and other items appearing on the Client's credit reports which Client indicates are inaccurate, incomplete, outdated, or unverified as per the [FCRA]. This includes preparation and transmittal of written correspondence to credit bureaus to verify and/or dispute items appearing on the Client's credit report. [Key Credit] will review

and analyze all correspondence received from credit bureaus, creditors, and others . . . will conduct follow up calls with Client to discuss Client's status and strategy . . . will review the Client's credit report updates to determine subsequent steps . . . will assist Client with credit questions."

- Key Credit "will prepare all necessary correspondence in dispute of all inaccurate and unverifiable information on Client's credit reports (Experian, Equifax, TransUnion) and will stamp and mail for client. . . will prepare and mail to each collection agency that can validate a debt a settlement offer. . . will agree to prepare and mail each collection agency a formal validation request to ensure Client is only paying off verifiable and accurate collections. . . [and] agrees to provide unlimited advice and credit coaching to Client."

(SUF, ¶ 34.)

Plaintiffs do not allege or claim that Key Credit's services described above were "bogus" or that it failed to perform its contracted-for services whatsoever. (SUF, ¶ 35.)

In their contracts, Key Credit and its customers also agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (SUF, ¶ 36.) Finally, Key Credit's consumers explicitly acknowledge and agree in their written contracts that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (SUF, ¶ 37.) Each customer also expressly acknowledges that "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement." (SUF, ¶ 38.)

Key Credit does not offer "bogus" services or schemes that "take consumers' money for services that the seller has no intention of providing and in fact does not provide," much less place any conditions on the receipt of fees for "promised results" that any fair and reasonable person could view as "outright theft." (SUF, ¶ 39.) Key Credit also does not and has never engaged in the practice of "flooding" CRAs with dispute letters, whether with the purpose of temporarily removing negative

tradelines or otherwise. (SUF, ¶ 40.) Nor has Key Credit ever encouraged customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (SUF, ¶ 41.) Further, Key Credit has never been found to have violated any provision of CROA, including CROA's prohibition against false or deceptive advertising or conduct. (SUF, ¶ 42.)

## VII. Key Credit's Billing Practices

After a customer signs the written contract, Key Credit waits a minimum of five business days before allowing a customer to make a payment. (SUF, ¶ 43.) Key Credit does so only after the "first work" is fully completed. (*Id.*) "First work" consists of analyzing the customer's credit reports, completing all required data entry, creating all dispute letters, and auditing the credit records. (*Id.*) Subsequent fees are billed on a monthly basis in accordance with the written contracts for services that are fully performed before that fee is charged. (*Id.*) Key Credit's customers determine how long they choose to use Key Credit's services and always retain the right to cancel at any time without penalty. (SUF, ¶ 44.)

## VIII. Key Credit Does Not "Promise Results" to Its Customers

Key Credit provides various safeguards to ensure that its services are accurate and provide "complete clarity" to its customers. (SUF, ¶ 45.) First, Key Credit enters into written contracts that clearly and unambiguously set forth the specific services that Key Credit agrees to provide and what Key Credit does (and does not) promise. (SUF, ¶ 46.) In addition to listing its specific services, Key Credit and its customers agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (SUF, ¶ 47.)

Second, Key Credit provides its representatives with scripts and trains its sales representatives on understanding credit scores, understanding Key Credit's action plans, interacting with customers, and important regulatory information. (SUF, ¶ 48.) In its scripts for sales consultants, Key Credit advises prospective customers that "if there is something they want to challenge [on their credit reports], we'll challenge it for them. We will do the leg work, we'll create and mail the letters for them . . . . We'll be their credit coach while they're with us . . . [and that] if they follow the action plan and if they really understand how their credit works that they can improve their credit score." (SUF, ¶ 49.) Key Credit also trains its sales consultants that "We do not guarantee a specific score change" and "do not guarantee a specific deletion rate" to its customers. (SUF, ¶ 50.)

Key Credit's Founder and CEO also informs sales representatives to:

- "Never promise a timeline
- Never promise we can delete something
- Never tell someone we will get all of the items removed
- Results always vary
- We are brutally honest and that is what's [sic] sets us apart
- Always
    - Let clients know only something that cannot be verified can be deleted
    - Let clients know that if something cannot be verified it cannot remain on credit
    - We increase the odds of removing more items than other companies because we work on all 3 [credit reporting] agencies at the same time and every negative record
    - Give examples of how something can be removed and explain our process.
- Please be careful not to overpromise. This is the only thing that can quickly end a career. The best salesman [sic] are brutally honest."

(SUF, ¶ 51.) Key Credit also trains its customer service and sale representatives to "never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." (SUF, ¶ 52.)

The customer experience begins with phone calls between prospective customers that can consist of short calls (that may last for 30 seconds) or full consultations (that include reviewing a

customer's credit report and going through the customer's goals and the enrollment process). (SUF, ¶ 53.) A full consultation can last up to two hours. (*Id.*) During a full consultation, Key Credit's sales representatives spend substantial time educating prospective customers "through and beyond [the] basics of just removing inaccuracies from their credit report," explaining "what makes up a credit report, how the FICO score algorithm works," and empowering prospective customers "on how they, themselves, without ever signing up or needing [Key Credit] to do anything for them could increase their credit scores by paying down debts, paying off balances, [and] using credit more intelligently." (SUF, ¶ 54.)

Finally, Key Credit regularly monitors customer calls and grades (and sometimes fires) representatives who deviate from these policies. (SUF, ¶ 55.) The Quality Control process includes listening to phone calls between sales associates and prospective customers and utilizing a quality control checklist for each call to ensure that sales associates comply with sales and "compliance-based" training and to enforce that "things that are not allowed to be said and that are fireable offenses." (SUF, ¶ 56.) Key Credit's Head of Quality Control also listen to these calls to ensure quality control. (*Id.*)

**<u>LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT</u>**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011); Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists if a reasonable factfinder could "decide the issue in favor of either party" as to a fact that has the potential "to change the outcome" of the factfinder's determination. *Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 690 (1st Cir. 2023). The party seeking summary judgment

has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Challenges to agency actions not in accordance with law present only "a question of law" concerning the "legal conclusion to be drawn about the agency action." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (internal quotation omitted). Thus, a motion for summary judgment arguing that an agency action was *ultra vires* or otherwise unlawful requires no factfinding, but simply asks whether the agency action was impermissible under existing law.

## ARGUMENT

### I. Key Credit Is Entitled to Summary Judgment on Counts I, III and IV Because Key Credit Does Not "Promise Results" to Its Customers.

Key Credit is entitled to summary judgment on Counts I, III (as to alleged violations of section 310.4 of the TSR) and IV (same) because the TSR's Advance Fee Provision applies only to promised "results" – not "services" – and Key Credit never promised results to its customers.

#### A. The plain language of the Advance Fee Provision applies only if Key Credit "promised results" to its customers.

Interpreting a regulation begins with its plain language. *Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 26 (1st Cir. 2021) (citation omitted). In interpreting a regulation, courts should construe the text so that all of its provisions are given effect and no part is rendered superfluous. *Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 59 (1st Cir. 2008). When interpreting a statute or regulation, a dictionary is a valuable resource for interpretation. *U.S. v. Lachman*, 387 F.3d 42, 51 (1st Cir. 2004) ("Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations."); *see also Carey v. Saffold*, 536 U.S. 214, 219-20 (2002).

Here, the Advance Fee Provision explicitly restricts a credit repair company from requesting or receiving payment for its services if, and only if: (i) the time from which the company

"represented all . . . services will be provided . . . has expired; ***and***" (ii) the company has provided documentation "demonstrating that the ***promised results*** have been achieved." 16 C.F.R. § 310.4(a)(i)(2)-(ii), emphasis added. Accordingly, the unambiguous language of the Provision only applies if Key Credit represented that all of its services would be provided by a specific time ***and*** it "promised results" – not services – to its customers.

"Service" and "result" are not synonymous or interchangeable. A "result" is a "consequence, effect, or conclusion." *Result*, Black's Law Dictionary (11th ed. 2019). In contrast, a "service" is an act of doing something. *Service*, Black's Law Dictionary (11th ed. 2019) (defining "service" as "the performance of some useful act or series of acts for the benefit of another," and an "intangible commodity in the form of human effort, such as labor, skill, or advice"). For example, lawyers and doctors regularly provide services to clients/patients to help them but without a "promised result" or guarantee of success. Here, the FTC easily could have included "promised services" in the TSR's Advance Fee Provision, but it did not. Instead, after limiting when a credit repair company may request or receive payment of any fee or consideration "for goods or *services*," the Advance Fee Provision unambiguously states that it applies if – and only if – a company "promises results" (not "services"). 16 C.F.R § 310.4(a)(2)(i)-(ii).

Without question, if the FTC intended to cover promised "services" instead of or in addition to "promised results" then the FTC would have written the Advance Fee Provision to do so.2 It did not. In short, if "results" are not "promised," then the TSR's Advance Fee Provision is inapplicable here and does not apply to Key Credit.

[2] A "promise" is "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." *Promise*, Black's Law Dictionary (11th ed. 2019).

**B. Key Credit promises to provide specified "services" for its customers and does not "promise results."**

There is no genuine dispute that Key Credit does not promise "results" to customers. Rather, Key Credit promises only to perform specified services for its customers with no promise or guarantee of any result or outcome.

First, the plain and unambiguous terms of its written contracts establish that Key Credit does not "promise results" to its customers. (SUF, ¶¶ 33-34, 36-39, 46.) Specifically, Key Credit's consumers explicitly acknowledge and agree that in their written contracts that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (*Id.* ¶¶ 37, 47.) Each customer also expressly acknowledges that "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement." (*Id.* ¶ 38)

Key Credit and its customers also agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (SUF, ¶ 36.)

On their face, Key Credit's customer contracts promise only that it will provide specified, contracted-for services (not "results"), including: evaluating the customer's current credit profile; "attempting" to remove inaccurate, erroneous, and/or obsolete credit information; receiving and initiating correspondence from the customer; assisting the customer in responding to, receiving, and/or initiating correspondence regarding the customer's credit report(s); creating letters and other communications "in an attempt to correct" errors and other items appearing on the customer's credit reports they indicated are inaccurate, incomplete, outdated, or unverified; preparing and transmitting written correspondence to credit bureaus; reviewing and analyzing all correspondence received from credit bureaus and creditors; conducting follow up calls with customers to discuss the customer's

status and strategy; reviewing credit report updates to determine subsequent steps; and assisting customers with credit questions. (SUF, ¶ 34.)

By providing this information upfront, Key Credit ensures that its clients have realistic expectations and a clear understanding of what Key Credit does – and does not – promise.

Second, Key Credit's policies and training for its representatives prohibit making promises to prospective and actual customers. (SUF, ¶¶ 48-50 (training materials stating, "We do not guarantee a specific score change" and "do not guarantee a specific deletion rate.").) Key Credit also trains its customer service and sale representatives to "never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." (*Id.* ¶¶ 50-52.) To ensure that representatives follow Key Credit's policies, Key Credit regularly monitors customer calls and grades representatives who deviate from these policies.

Accordingly, there is no genuine dispute that Key Credit's customer contracts, training materials, and other safeguards establish that Key Credit does not promise "results" to its customers, but instead promises only to perform specific "services" without any promise or guarantee as to a result or outcome.

### C. Applying the Advance Fee Provision to promised "services" is unreasonable and would lead to absurd results.

Courts must avoid interpreting regulations in a manner that produces "'absurd' results when sensible construction is available." *Bartok v. Hometown Am., LLC*, No. 21-10790-LTS, 2023 WL 3773106, at *5 n.4 (Feb. 27, 2023) (rejecting interpretation of Massachusetts regulations that would "contradict the well-established direction that courts not construe statutes in ways that reach 'absurd' results"). An absurd interpretation may be "further evidence" that the regulation "fails to carry out congressional intent." *New York v. U.S. Dept. of Labor*, 363 F. Supp. 3d 109, 141 (D.D.C. 2019).

Interpreting the TSR's Advance Fee Provision to cover credit repair service providers who do not "promise results" would put Key Credit in a position where it may never be paid for the valuable services it provides to its customers. Indeed, customer conduct outside the control of Key Credit could prevent Key Credit (and others) from demonstrating its services improved a customer's credit record, even if the services are indisputably performed and objectively improved the customer's credit record.

For example, a customer could work with Key Credit to identify inaccurate items in a credit report, Key Credit could dispute those inaccurate items and have them removed from the customer's credit report, the customer's credit score could improve, but then the customer engages in other activity during the six-month waiting period that would harm the customer's credit score and/or report. Through no fault of its own, Key Credit would not be able to charge for the valuable (and successful) work it rendered if the Advance Fee Provision were interpreted to apply even where no "promised results" were made. Likewise, a customer could engage Key Credit to challenge items that the customer believes are inaccurate but, after Key Credit challenges those items, the furnisher could determine that the challenged items are accurate or otherwise refuse to remove them. Yet even though Key Credit promised no results, it could not be paid for its contracted-for services because the customer's credit report would not result in the customer's originally desired outcome despite Key Credit having actually performed the contracted-for services. Interpreting the Advance Fee Provision in the manner sought by the Bureau would lead to these absurd results.

**D. The TSR and the Bureau's interpretation exceeds its scope of its statutory authority.**

An agency rule may not "exceed[] the bounds of the permissible." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002). Here, the FTC and the Bureau's interpretation of the Advance Fee Provision exceed their administrative authority in two ways.

First, the conduct that the Bureau seeks to regulate here is not the conduct proscribed by the Advance Fee Provision. The Advance Fee Provision is intended to prohibit unfair scams in which a credit repair company's "offered service is fundamentally bogus" and of no benefit to a consumer. 67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002) (to be codified at 16 C.F.R. pt. 310). According to the FTC, "the essence of these schemes [is] to take consumers' money for services that the seller has no intention of providing and in fact does not provide." *Id.* (*See also* SUF, ¶¶ 19-20.)

Unlike an empty "promise" to remove accurate credit information, there is no genuine dispute that Key Credit's credit repair services, including to assist its customers in identifying and disputing inaccurate credit information, have value. And, no agency or legislative body prohibits such credit repair services entirely as being somehow inherently fraudulent, "bogus," or otherwise "illusory."

As the Bureau and the FTC have repeatedly acknowledged, widespread errors in credit reports hurt consumers. (SUF, ¶¶ 11-14.) Key Credit's services are valuable and undeniably assist consumers in rectifying the widespread errors that infest the credit reporting industry. Key Credit has a proven track record in assisting its customers in disputing and removing inaccurate, negative items on their credit reports. (*Id.* ¶¶ 29-30.) And Key Credit's comprehensive, multi-faceted approach includes counseling and educating its customers on how to build and maintain a healthy

mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. (*Id.* ¶ 30.)

All of the issues and data cited by the FTC in promulgating the Advance Fee Provision concerned scam artists who promised illusory results based on "bogus" services that amounted to "outright theft." There is no rational basis in the FTC's rulemaking history to suggest that the regulation of legitimate credit repair companies like Key Credit who offer concrete services without "promised results" is what the FTC intended – or even had authority – to regulate. *See e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (a "rational connection" must exist between the scope of a regulation and the "relevant data").

Moreover, neither the Telemarketing Act nor the Advance Fee Provision permits the Bureau to simply enforce a fee rule requiring credit repair companies who offer their services over the phone to wait at least six months before they can be paid for legitimate credit repair services when there are no "promised results" based on "bogus" services. The Bureau's interpretation of the Advance Fee Provision is not connected (much less rationally related) to its purpose of prohibiting abusive conduct by companies who perpetrate "fundamentally bogus" scams amounting to "outright theft" based on illusory services that "promised results."

Second, the TSR constitutes an unlawful agency action in excess of the FTC's statutory authority to promulgate rules under the Telemarketing Act. Under the Telemarketing Act, Congress authorized the FTC to promulgate rules to protect consumers from deceptive and other abusive telemarketing acts or practices. *See* 15 U.S.C. § 6101-6102; 16 C.F.R. § 310.1. In doing so, Congress issued several directives to the FTC concerning the rules the FTC would promulgate and the conduct that Congress regarded as "abusive telemarketing acts or practices." *See* 15 U.S.C.

§ 6102(a)(3)(A)-(D). Notably, all of the telemarketing conduct identified by Congress concerned *only* unsolicited calls initiated and made by a telemarketer to a consumer. *See id*. Nevertheless, the FTC exceeded that directive and defined "telemarketer" as a person who initiates *or receives* telephone calls "in connection with" a "plan, program, or campaign which is conducted to induce the purchase of goods or services." *See* 16 C.F.R. § 310.2(ff)-(gg).

Perhaps recognizing that broadening the definition of "telemarketer" to include even receiving calls was beyond the scope authorized by Congress, the FTC largely nullified its broader definition by enacting Section 310.6, which exempts, among other things, businesses that receive sales calls "in response to an advertisement through any medium." 16 C.F.R. § 310.6(b)(5). (*See also infra* at 26.) This exemption swallows the rule because all persons who accept inbound calls necessarily employ *some* form of advertising to prompt those calls – how else would the potential customers be prompted to call?

But the FTC did not stop there. Instead, it carved out a limited number of disfavored industries from the exemptions, leaving only *them* subject to the TSR. Thus, rather than comply with its limited mandate of promulgating rules to address abusive and deceptive telemarketing practices, the FTC exceeded it in at least two ways: first, by expanding the reach of the TSR to include businesses that merely receive sales calls, and second, by then selectively enforcing the TSR's manufactured jurisdiction over such businesses to target only certain industries. Indeed, with respect to credit repair businesses, the FTC strayed so far from Congress's directive as to insert rules into the TSR purporting to regulate even the manner in which those businesses may collect fees. This overreach is particularly glaring in light of the fact that Congress separately enacted CROA for the specific purpose of regulating the credit repair services industry, *specifically*

*including* provisions governing the manner in which credit repair service providers may collect their fees. *See* 15 U.S.C. § 1679, *et seq.*; *supra* at 6-9.

Far from protecting consumers from deceptive and abusive telemarketing practices, the TSR defines "telemarketer" so broadly as to capture virtually every business with a telephone, attempts to escape the dysfunction of that unworkably broad definition by exempting virtually every business that it covers, and then targets a limited number of disfavored, non-exempt businesses with arbitrary requirements such as a draconian payment collection regime that are decidedly unrelated to any purported telemarketing practice, abusive or otherwise.

## II. Key Credit Is Entitled to Summary Judgment on Counts I – V As a Matter of Law.

Key Credit is also entitled to summary judgment on Counts I, II, III (as to alleged violations of the TSR), and IV (as to alleged violations of the TSR). In addition, judgment should be entered in Key Credit's favor on Count V because, although it is brought by plaintiff Commonwealth of Massachusetts, it is expressly predicated on the viability of Counts I-IV. Summary judgment should be granted in favor of Key Credit for three independent reasons.

### A. The TSR places Unconstitutional content-based restrictions on speech in violation of the First Amendment.

First, Key Credit is entitled to summary judgment on all of the Bureau's TSR-based claims because the TSR places impermissible content-based restrictions on speech. Content-based restrictions on speech are presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Such restrictions are subject to strict scrutiny and are permissible only if the Bureau shows that "the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992); *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020). "[A] law is content-based if a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Barr*, 140 S.

Ct. at 2346 (internal quotations omitted). And "[t]hat description applies to a law that singles out specific subject matter for differential treatment." *Id.* (internal quotations omitted).

The TSR might appear to merely target speech delivered through telemarketing as opposed to speech delivered by other means. Within the category of telemarketing speech, however, the TSR unambiguously "singles out specific subject matter for differential treatment." *Id.* For example, the TSR disfavors telemarketing speech on the subject of improving an individual's credit rating. A company who engages in *credit repair* speech is prohibited from requesting payment for its services until six months after promised results are achieved, whereas speech concerning any other subject is not burdened with this constraint. *See* 16 C.F.R. § 310.4(a)(2); *see generally* 16 C.F.R. § 310.4. Thus, whether so mundane a practice as requesting a fee for a service shortly after the service has been rendered is "abusive" under the TSR turns on whether the speaker discussed improving a person's credit rating. *Cf. Barr*, 140 S. Ct. at 2346. A speaker who says "here are ways you can improve your credit rating" is subject to the payment constraint. A speaker who says "here are ways you can improve your insurance coverage" is not. "That is about as content-based as it gets." *Id.*

Because the TSR "singles out [the subject of repairing one's credit] for differential treatment," the regulation "is a content-based restriction on speech." *See id.* Such a restriction is "presumptively invalid," *see R.A.V.*, 505 U.S. at 382, and survives only if precluding telemarketers who engage specifically in credit repair speech from requesting payment until six months after performance of their services is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *See Burson*, 504 U.S. at 198. On its face, the TSR cannot meet this standard.

When Congress enacted the Telemarketing Act, it specifically authorized the FTC to promulgate rules (*i.e.*, the TSR) to protect consumers from "deceptive and other abusive telemarketing acts or practices." *See* 15 U.S.C. § 6101-6102. That may well be a compelling state interest, but there is no basis for the government to assert that preventing *only* telemarketers who provide credit repair services from requesting payment for their services until six months after performance is both "necessary" and "narrowly drawn" to serve that interest. Indeed, Congress itself has specifically found that it is entirely proper for credit repair service providers to be paid upon the full performance of any relevant services. *See* 15 U.S.C. § 1679b(b). S*ee also supra* at 6. Moreover, there are any number of alternative, more narrowly drawn means by which to protect consumers from deceptive or other abusive telemarketing practices. On its face, requesting a fee for services rendered within six months of performance is an arbitrary (much less narrowly drawn) proxy for "deception" or other "abuse."

Similarly, the TSR draws unconstitutional content-based distinctions concerning the speech uttered specifically by purported telemarketers who only "receive" calls. The TSR deems a business to be a "telemarketer" even if it merely *receives* telephone calls "in connection with" a "plan, program, or campaign which is conducted to induce the purchase of goods or services." 16 C.F.R. § 310.2(ff)-(gg). This definition is sufficiently broad to cover virtually all vendors and service providers that conduct business over the telephone, particularly given that mere advertising qualifies as a "plan, program, or campaign which is conducted to induce the purchase of goods or services." (*Supra* at 7-9.)

But the TSR then exempts from its rules telemarketing calls received "in response to an advertisement through any medium." *See* 16 C.F.R. § 310.6(b)(5)-(6). This exemption essentially swallows the rule that merely receiving sales calls is sufficient to qualify as a "telemarketer" under

the TSR because, if a telemarketer is receiving calls, it has necessarily engaged in some sort of advertising.

The constitutional problem arises because the TSR applies the exemption selectively. Based on content, telemarketing speech on certain topics (such as improving a person's credit rating) does not get the benefit of the exemption. 16 C.F.R. § 310.6(b)(5)-(6). Again, such content-based distinctions are presumptively invalid and survive only if burdening speech on the subject of improving an individual's credit (while exempting virtually all other speech) is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *See Burson*, 504 U.S. at 198. On its face, the TSR cannot meet this standard. Because the TSR draws content-based distinctions among telemarketing speech on different subjects, and because its distinctions cannot survive strict scrutiny, the TSR violates the First Amendment, and Key Credit is entitled to summary judgment on the claims based on the TSR.

**B. The TSR violates the Equal Protection Clause.**

Second, by discriminating against credit repair speech and favoring virtually all other speech as described above, the TSR violates the Equal Protection Clause. For this independent reason, Key Credit is entitled to summary judgment on the Bureau's TSR claims.

Equal protection analysis requires strict scrutiny of a government regulation when the regulation interferes with the exercise of a fundamental right or operates to the particular disadvantage of a suspect class. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Rights protected by the First Amendment are fundamental rights. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983); *see also Barr*, 140 S. Ct. at 2354 ("The First Amendment is a kind of Equal Protection Clause for ideas.") (internal quotation omitted). Specifically, "[w]hen government regulation discriminates among speech-related activities … the Equal Protection

Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown*, 447 U.S. 455, 461-62 (1980).

Here, for the reasons set forth above, the TSR discriminates against telemarketing speech on the subject of improving one's credit rating. Only credit repair telemarketing speech is subject to the TSR's debilitating payment constraint, and, in the context of businesses that only receive (rather than initiate) sales calls, virtually all telemarketing speech *other* than credit repair telemarketing speech is exempt from the TSR's requirements and constraints. On its face, this content-based discrimination is not necessary and "finely tailored" to serve the interest in protecting consumers from deceptive and other abusive telemarketing acts or practices. Accordingly, the TSR cannot survive strict scrutiny and violates the Equal Protection Clause.

**C. The funding employed by the Bureau to bring this action was not Constitutionally appropriated.**

Third, recently developed case law has highlighted the unconstitutionality of the Bureau's unusual funding mechanism. In bringing Counts I-IV of the Amended Complaint, the Bureau has employed, and is continuing to employ, unappropriated and unconstitutional funding sourced from the Federal Reserve. Absent this unconstitutional funding, the Bureau lacks the means to bring this action, and the Bureau's use of unappropriated funds in prosecuting the Amended Complaint has thus harmed Key Credit.

Since the filing of the instant matter, the legal landscape has changed. On October 19, 2022, the U.S. Court of Appeals for the Fifth Circuit held that "Congress's cession of its power of the purse to the Bureau violates the Appropriations Clause and the Constitution's underlying structural separation of powers." *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 644 (5th Cir. 2022) ("*CFSA*"). The Fifth Circuit explained that the Bureau derives its funding not from

an appropriation from Congress, but instead from the Federal Reserve which "is itself outside the appropriations process." *Id*. at 638-39. The Fifth Circuit found this double-insulation to be unconstitutionally infirm, both because the Bureau's "funding is double-insulated on the front end from Congress's appropriations power" and because "Congress relinquished its jurisdiction to review [Bureau] funding on the back end." *Id*. at 639. Therefore, the Fifth Circuit held, the "Bureau's funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers," and consequently, the Bureau "lack[s] the wherewithal to exercise [ ] power via constitutionally appropriated funds." *Id*. at 642, 643.

The Bureau is an independent agency of the United States. (Am. Compl. ¶ 4, Dkt. 26.) *See also* 12 U.S.C. § 5491. The Consumer Financial Protection Act (the "Act") provides the Bureau with "independent litigating authority" to enforce the "Federal consumer financial laws." (*See* Am. Compl. ¶ 4.) *See also* 12 U.S.C. §§ 5563, 5564(a)-(b). Pursuant to that authority, the Bureau has brought this action to enforce, among other things, the TSR, 16 C.F.R. §§ 310.3, 310.4, against Key Credit. (Am. Compl. ¶ 4, Counts I-IV.)

The Bureau does not rely on the Congressional "annual appropriations process for funding." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2193-94 (2020); *see also* 12 U.S.C. § 5497(a). Instead, it receives funding "directly from the Federal Reserve." *Seila Law*, 140 S. Ct. at 2194; 12 U.S.C. § 5497(a). Each year, the Bureau simply requisitions from the Federal Reserve an amount "determined by the [Bureau's] Director to be reasonably necessary to carry out" the Bureau's functions. 12 U.S.C. § 5497(a); *see also Seila Law*, 140 S. Ct. at 2194. The Federal Reserve must grant that request so long as it does not exceed 12% of the Federal Reserve's "total operating expenses." 12 U.S.C. § 5497(a)(1)-(2); *see also Seila Law*, 140 S. Ct. at 2194.

Thus, "Congress did not merely cede *direct* control over the [Bureau]'s budget by insulating it from annual or other time limited appropriations. It also ceded *indirect* control by providing that the Bureau's self-determined funding be drawn from a source that is itself outside the appropriations process." *CFSA*, 51 F.4th at 638-39. Further, the Bureau is "literally off the books: Rather than hold funds in a Treasury account," it "maintains a separate fund" at the Federal Reserve bank that is "permanently available" to the Director "without any further act of Congress." *Id*. at 639 (internal quotations and citation omitted).

The funding employed by the Bureau to "enforc[e] 'Federal consumer financial laws'" and exercise its "independent litigating authority" in connection with this action was drawn from funds transferred to the Bureau from "the combined earnings of the Federal Reserve System," in accordance with the process detailed above and at 12 U.S.C. § 5497(a)(1). (*See also* Am. Compl. ¶ 4, Dkt 26.) In the Fifth Circuit's view, the "[Bureau]'s perpetual insulation from Congress's appropriations power, including the express exemption from congressional review of its funding, renders the Bureau no longer dependent and, as a result, no longer accountable to Congress and, ultimately, to the people." *CFSA*, 51 F.4th at 639. "By abandoning its 'most complete and effectual' check on 'the overgrown prerogatives of the other branches of the government' – indeed, by enabling them in the Bureau's case – Congress ran afoul of the separation of powers embodied in the Appropriations Clause." *Id*. at 639-40 (quoting The Federalist No. 58 (J. Madison)).

The Framers of the Constitution "carefully separate[d] the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse." *Id.* at 635; *see also Seila Law*, 140 S. Ct. at 2203. Their reasoning was twofold: first, "they viewed Congress's exclusive power over the purse as an indispensable check on the overgrown prerogatives of the other branches of the government." *CFSA*, 51 F.4th at 636 (citing The Federalist No. 58); *Seila Law,* 140 S. Ct. at

2203 (Congress's "power over the purse" is "the most complete and effectual weapon in representing the interests of the people"). Second, the Framers believed that "vesting Congress with control over fiscal matters was the best means of ensuring transparency and accountability to the people." *CFSA*, 51 F.4th at 636 (citing The Federalist No. 48).

The Constitution's Appropriations Clause is a "straightforward and explicit command" that "ensures Congress's *exclusive* power over the federal purse." *CFSA*, 51 F.4th at 637 (citing *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990)) (emphasis in original). Indeed, Congress is obligated "to use that authority to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power." *Id*. at 637 (internal quotation omitted). Accordingly, "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Richmond*, 496 U.S. at 425.

The Bureau's funding mechanism violates the Appropriations Clause and the separation of powers principles embodied in it. *CFSA*, 51 F.4th at 635-42 (holding that the Bureau's funding mechanism is unconstitutional because it impermissibly places the Bureau outside of the congressional appropriations process). As set forth above, the Bureau receives its funding "outside the appropriations process," directly from the Federal Reserve. *Seila Law*, 140 S. Ct. at 2194, 2204; 12 U.S.C. § 5497. Each year, rather than submit to Congressional oversight and seek an appropriation from Congress, the Bureau's Director unilaterally "determine[s]" an amount "reasonably necessary to carry out the authorities" of the Bureau under Federal consumer financial law, and the Federal Reserve is then required to transfer that amount to the Bureau. *Seila Law*, 140 S. Ct. at 2194; 12 U.S.C. § 5497(a)(1). (These "authorities" include the authority to bring the instant action against Key Credit, (*see* Am. Compl. ¶ 4).)

The Act therefore causes Congress to cede direct control over the Bureau's budget by insulating the Bureau from the congressional appropriations process, and it causes Congress to cede indirect control over the Bureau's budget by providing that the Bureau's (self-determined) funding is to be drawn from a source that is itself outside the appropriations process. *See CFSA*, 51 F.4th at 638-39. Going further, the Act then makes explicit that the funds provided to the Bureau through this process "shall not be construed to be Government funds or appropriated monies," thereby causing Congress to relinquish even its jurisdiction to review the Bureau's funding *ex post*. *See* 12 U.S.C. § 5497(c)(2); *see also CFSA*, 51 F.4th at 639. "Wherever the line between a constitutionally and unconstitutionally funded agency may be, this unprecedented arrangement crosses it." *CFSA*, 51 F.4th at 639.

It is uncontested and beyond dispute that the funding employed by the Bureau to "enforce the federal consumer financial laws and exercise its independent litigating authority" in connection with this action was obtained through the funding mechanism described above. The funding employed by the Bureau to bring this action against Key Credit therefore was not constitutionally appropriated. Because the funding employed by the Bureau to bring this action was wholly drawn – and continues to be wholly drawn – "through the Act's unconstitutional funding scheme, there is a linear nexus between the infirm provision (the Bureau's funding mechanism)" and the prosecution of Counts I-IV of the Amended Complaint. *See CFSA*, 51 F.4th at 643. Without its "unconstitutional funding," the Bureau lacks any other means to prosecute this case. *See id*. Key Credit was "thus harmed by the Bureau's improper use of unappropriated funds to [bring this action]," and it is entitled to summary judgment on Counts I-IV as a "product of the Bureau's unconstitutional funding scheme." *See id*.

Indeed, the U.S. Court of Appeals for the Ninth Circuit vacated a nearly $8 million judgment won by the Bureau and remanded the case to the district court for further analysis based on the Fifth Circuit's ruling on the constitutionality of the Bureau. *See CFPB v. Nationwide Biweekly Admin., Inc.*, No. 18-15431 (9th Cir. Jan. 27, 2023).

*CFSA* establishes that Key Credit is entitled to summary judgment on Counts I-V. According to the Fifth Circuit's holding, every Bureau action funded outside the appropriation process – such as this one – is itself unlawful. The Bureau lacks any constitutional means to spend money, and "[b]ecause the funding employed by the Bureau" to prosecute this case is "wholly drawn through the agency's unconstitutional funding scheme," Key Credit is "entitled to a 'rewinding of [the Bureau's] action.'" *CFSA*, 51 F.4th at 643 (quoting *Collins v. Yellen*, 141 S. Ct. 1761, 1788 (2021)). For this independent reason, summary judgment should be granted in favor of Key Credit.

**CONCLUSION**

For the foregoing reasons, Key Credit respectfully requests that the Court grant its motion for summary judgment in its entirety as to Counts I through V of the Amended Complaint.

Dated: July 28, 2023

Respectfully Submitted,

COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS

By: /s/ Timothy A. Hudson
One of Their Attorneys

By: /s/ Stephanie R. Parker
One of Their Attorneys

Timothy A. Hudson, pro hac vice
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlaw.com

-and-

David B. Mack (BBO No. 631108)
Stephanie R. Parker (BBO No. 687610)
O'Connor, Carnathan and Mack LLC
10 Burlington Mall Road, Suite 301
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net
sparker@ocmlaw.net

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 28, 2023.

/s/ Stephanie R. Parker
Stephanie R. Parker