**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General,<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS<br><br>Defendants. | No. 20-cv-10991<br><br>Judge Rya W. Zobel |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNTS I-V**

Defendants Commonwealth Equity Group, LLC d/b/a Key Credit Repair and Nikitas Tsoukalis (together, "Key Credit") hereby submit this Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on Counts I-V.

## UNDISPUTED MATERIAL FACTS

### I. The Credit Reporting Industry

1. The credit reporting system contains detailed financial information regarding American consumers. (Expert Report of Evan Hendricks at 2, attached as **Exhibit A** to Affidavit of Timothy Hudson ("Hudson Affidavit").)

2. The system relies on credit bureaus known as consumer reporting agencies ("CRAs") that manage consumer-credit information and serve as repositories for this information. (Hudson Aff., Ex. A at 2 (Hendricks Report).) There are three major CRAs: Equifax, TransUnion and Experian. (Hudson Aff., Ex. A at 2 (Hendricks Report).)

3. CRAs maintain credit files for consumers consisting of their payment histories as reported by their creditors. (Hudson Aff., Ex. A at 2 (Hendricks Report).) These creditors, known as "furnishers," regularly provide updates on a consumer's credit history to CRAs including mortgage services and credit guarantors such as banks, mortgage companies, credit card issuers, department stores, debt collectors and others. (Hudson Aff., Ex. A at 2 (Hendricks Report).)

4. When a consumer applies to a business for credit, insurance, employment or to lease or rent an apartment or home, that business will often send an inquiry to a CRA that, in turn, sells and electronically sends the consumer's credit report to the inquiring business. (Hudson Aff., Ex. A at 2 (Hendricks Report).)

## II. Credit Reports and Credit Scores

5. A fundamental purpose of a credit report is to describe a consumer's creditworthiness. (Hudson Aff., Ex. A at 2 (Hendricks Report).)

6. Consumer credit reports are generated by CRAs using data provided by furnishers. (Expert Rebuttal Report of Michael Citron at 6, attached as **Exhibit B** to Hudson Aff.) A credit report includes personal and financial information about an individual, such as their name, current and previous addresses, Social Security Number, date of birth, and employment history. (Hudson Aff., Ex. B at 5-6 (Citron Report).) It also provides details on credit accounts (known as "tradelines"), including the names of creditors, account numbers, balances, payment history, and account status (open or closed). (*Id.*) Other financial information such as bankruptcies, foreclosures, liens, and credit inquiries are also included. (*Id.*)

7. A credit score is a number that purports to reflect a consumer's creditworthiness at a given point in time. (Hudson Aff., Ex. A at 3 (Hendricks Report).) A credit score is calculated based on all the tradeline information in the credit report through model algorithms used by CRAs.

(*Id*. at 5.) Credit scoring is a complex process that takes into account various factors, including Payment History (35%); Debt (30%); Length of Credit History (15%); Account Diversity (10%); and Hard Inquiries (10%). (Hudson Aff., Ex. B at 7-8 (Citron Report).)

8. The higher the credit score, the less risky the consumer is viewed by creditors. (Hudson Aff., Ex. A at 4 (Hendricks Report).) The lower the credit score, the more the consumer pays for credit, including higher interest on mortgages, auto loans, installment loans, and credit cards. (*Id*.)

9. Consumers are generally most severely penalized when they have a serious derogatory (or negative) item on their credit report within the past eleven months. (Hudson Aff., Ex. A at 5 (Hendricks Report).)

## III. Credit Report Errors and Consumer Complaints

10. Credit reports habitually contain erroneous information that harms consumers. (Hudson Aff., Ex. B at 9-11 (Citron Report); *see also* Hudson Aff., Ex. A at 6 (Hendricks Report) ("The credit reporting system has a decades-long problem with addressing inaccurate credit reports.").)

11. The Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau ("Bureau") accept consumer complaints related to CRAs. (Hudson Aff., Ex. B at 9 (Citron Report).) Both agencies have reported an increase in complaints related to CRAs in recent years. (*Id.*) The FTC tracks these complaints and has found that credit reporting complaints have been among the top consumer complaints since 1997, accounting for approximately 20% of all complaints received. (*Id*.) (citing Bureau's 2023 Annual report of credit and consumer reporting complaints).

12. In 2020, the FTC received over 246,000 credit reporting complaints. (Hudson Aff., Ex. B at 9 (Citron Report).) The most common issues reported by consumers included incorrect information on credit reports, difficulty obtaining credit reports, difficulty disputing errors, and unauthorized inquiries. (*Id*.) Compared to other complaint categories, complaints related to CRAs consistently rank among the top categories received by both agencies. (*Id*.)

13. For example, a PERC research report analyzed a sample of 200 credit reports from each of the three major CRAs - Equifax, Experian, and TransUnion - and found that a significant number of credit reports contained errors. (Hudson Aff., Ex. B at 9 (Citron Report) (citing PERC research report).) Specifically, 26% of the credit reports contained at least one “material error” defined as an error that could negatively impact a consumer’s creditworthiness or ability to obtain credit. (*Id.*)

14. To protect consumers from these errors, Congress enacted the Fair Credit Reporting Act (“FCRA”) nearly 40 years ago. (Hudson Aff., Ex. B at 17 (Citron Report).) One of FCRA’s key provisions requires credit bureaus to conduct a reasonable investigation when a consumer disputes an item in their credit report. (*Id*.)

**IV. Credit Repair Companies**

15. Credit repair companies – like Key Credit – provide a wide range of credit repair services to help consumers enforce their legal rights to ensure that items on their credit reports are fair, accurate, and substantiated. (Declaration of Nikitas Tsoukalis (“Tsoukalis Decl.”) ¶ 4.) Among other things, these services address the problems recognized by the FTC and the Bureau; namely, that there are errors and inaccuracies in a consumer’s credit report that should be corrected and that harm the consumer’s credit worthiness. (*Id.*) Some credit repair companies – like Key Credit – also provide credit counseling and coaching to customers. (*Id.* ¶ 5.)

16. Credit repair services are "not a one size fits all" approach because "[e]very credit report, financial situation, and human being has different goals with different timelines" for each customer's specific goals. (Deposition of N. Tsoukalis ("Tsoukalis Dep.") at 55:2-5, attached as **Exhibit C** to Hudson Aff.)

## V. Relevant Regulations and Statutes

17. Count I of the Amended Complaint alleges a violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310. Am. Compl., Dkt. 26. The FTC promulgated the TSR to carry out the Telemarketing and Consumer Fraud and Abuse Prevention Act's ("Telemarketing Act") direction to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1).

### A. The TSR

18. Relevant here, one of the TSR's restrictions includes a prohibition on asking for, or receiving, payment for credit repair services that "promised results." Specifically, the TSR's Advance Fee Provision states, in pertinent part:

> (a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> > (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
> >
> > > (i) The time from in which the seller has represented all of the goods or services will be provided to that person has expired; ***and***
> > >
> > > (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that ***the promised results*** have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2)(i)-(ii), emphasis added.

19. The requirement to show that "promised results" had still been achieved six months later was the result of a specific type of fraudulent scheme perpetrated by "fundamentally bogus" entities holding themselves out as credit repair companies. (67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002) (to be codified at 16 C.F.R. pt. 310), attached as **Exhibit D** to Hudson Aff.)

20. In 2002, the FTC provided further explanation of the rationale underlying the Advance Fee Provision. Specifically, the FTC explained that the Advance Fee Provision falls within "the purview of its traditional unfairness analysis" because, according to the FTC, "[a]n important characteristic common to credit repair services" scams prohibited by the TSR "is that in each case the offered service is fundamentally bogus." (Hudson Aff., Ex. D at 4,511 (67 Fed. Reg. 4,492).) Indeed, "the essence of these schemes" was "to take consumers' money for services that the seller has no intention of providing and in fact does not provide." (*Id.*) Accordingly, the Advance Fee Provision was intended to prevent unfair conduct that the FTC viewed as "outright theft." (*Id.*)

21. The FTC's recent guidance further explains the deceptive conduct targeted by the Advance Fee Provision: a wrongdoer may claim to provide credit repair services and will give the appearance of providing effective services by "flooding a credit bureau with letters disputing the accuracy of [legitimate] negative entries," which result in credit reporting agencies temporarily removing the negative entries pending an investigation. (FTC, *Complying with the Telemarketing Sales Rule*, attached as **Exhibit E** to Hudson Aff.)

22. Faced with such challenges, CRAs sometimes cannot complete the investigations within the statutorily required 30-day period, so the negative tradelines are provisionally removed from a consumer's credit report. (*Id.*) The temporary removal of such negative tradelines gives the appearance that the consumer's credit record has improved. (*Id.*) The wrongdoer then takes the

consumer's money and the negative/accurate tradelines are then returned to the consumer's credit report after the completed investigation confirms that no basis for removal exists. (*Id*.)

23. In commenting on the TSR's Advance Fee Provision, the U.S. Postal Service stated that it was necessary to distinguish "[s]o-called credit repair services" from "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer." (U.S. Postal Serv., Comment Letter on Proposed Telemarketing Sales Rule, attached as **Exhibit F** to Hudson Aff.) The "[s]o-called credit repair services" would typically only provide "written advice to customers on how to obtain copies of their credit reports" and encourage customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (*Id*.)

**B. The Credit Repair Organizations Act ("CROA")**

24. Only a few months after the FTC promulgated the TSR, Congress enacted the Credit Repair Organizations Act ("CROA"). 15 U.S.C. § 1679 *et seq*. As a Congressionally enacted statute, CROA exhaustively addresses the credit repair industry, and it was enacted *after* the FTC promulgated the TSR's Advance Fee Provision. *See* 15 U.S.C. § 1679 *et seq*.; *compare* 15 U.S.C. § 1679 (CROA effective September 30, 1996) *with* 60 Fed. Reg. 43,841 (promulgating 16 C.F.R. 310.4(a)(2) August 23, 1995).

25. Notably, CROA specifically addresses how credit repair companies may charge fees: "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b).

Accordingly, Congress determined that, once a service has been fully performed, credit repair organizations may properly collect fees for those completed services. (*See id.*)

## VI. Key Credit and Its Services

26. In 2008, Key Credit began providing credit repair services to qualified customers from its office in Mattapan, MA. (Hudson Aff., Ex. C at 13:14-23 (Tsoukalis Dep.).) At relevant times, Key Credit' senior leadership consisted of Nikitas Tsoukalis (Founder and CEO), Jennifer Hadayia (Vice President of Customer Service), Melina Vallas (Head of Sales), Maria Steeves (Head of Operations), and Alejandra Martinez (Head of Quality Control). (Hudson Aff., Ex. C at 19:3-24, 22:17-23:9 (Tsoukalis Dep.); Deposition of N. Tsoukalis ("Tsoukalis Dep. II") at 27:4-10, attached as **Exhibit G** to Hudson Aff.; Deposition of Jennifer Hadayia ("Hadayia Dep.") at 13:1-8, attached as **Exhibit H** to Hudson Aff.)

27. Key Credit is a licensed credit repair company in all states in which it operates. (Hudson Aff., Ex. C at 16:11-22 (Tsoukalis Dep.).)

28. Key Credit has long maintained an "A" rating with the Better Business Bureau. (Hudson Aff., Ex. C at 77:11-17 (Tsoukalis Dep.).)

29. Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit including: learning each customer's specific concerns and goals; consulting with each consumer about inaccurate and challengeable items on their credit report; analyzing each customer's credit report; preparing and sending written disputes of inaccurate negative items on a customer's credit reports; following up with credit reporting agencies to ensure that inaccurate/questionable negative tradelines are removed from a customer's credit report; analyzing new credit reports to ensure that inaccurate/questionable negative items have been removed; creating a customized action plan to

help improve the customer's credit score; and providing credit counseling and coaching to customers so that they can make educated and informed decisions about their personal credit for themselves. (Hudson Aff., Ex. C at 33:2-16, 36:14-24 (Tsoukalis Dep.); Transcript of Investigational Hearing Testimony of Nikitas Tsoukalis, May 16, 2019 ("May 2019 Hearing Tr.") at 86:24-87:7, attached as **Exhibit I** to Hudson Aff.; Tsoukalis Decl. ¶¶ 7-9; Key Credit customer contracts, attached as **Exhibits J-L** to Hudson Aff.)

30. Key Credit has a proven track record in assisting its customers in disputing and removing inaccurate, negative items on their credit reports. (Tsoukalis Decl. ¶ 6.)

31. Key Credit's comprehensive, multi-faceted approach also includes counseling and educating its customers on how to build and maintain a healthy mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. (Tsoukalis Decl. ¶ 7.)

32. As a long-standing "A"-rated member of the Better Business Bureau, Key Credit enters into written contracts with all of its qualified customers. (Tsoukalis Decl. ¶ 10.)

33. The contracts are short, written in plain language, and contain all disclosures required under CROA. (Tsoukalis Decl. ¶ 11; *see* Hudson Aff., Ex. J at KCR_0057364; Hudson Aff., Ex. K at KCR_0057369-73 ; Hudson Aff., Ex. L at KCR_0057341-45.)

34. The written contracts also explicitly set forth the scope of the services it provides to its customers (Hudson Aff., Ex. C at 53:24-54:6 (Tsoukalis Dep.)), clearly stating that:

- Key Credit "agrees to evaluate the Client's current credit profile and will advise Client on the necessary steps to legally remove information that is not accurate, complete, or verifiable." (Hudson Aff., Ex. J at KCR_0057364; Hudson Aff., Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341.)
- Key Credit "will provide the following credit repair services . . . [s]uch services will include attempts to remove inaccurate, erroneous, and/or obsolete credit information reported by Equifax, Experian and TransUnion to the Client's Credit

Report . . . . will continually analyze and review Client's status . . . will respond to, receive, and/or initiat[e] correspondence from Client. . . will assist Client in responding to, receiving, and/or initiating correspondence via email regarding Client's Credit Report(s) . . . will create letters and/or emails and/or faxes and/or electronic communications and/or other written communications for Client in an attempt to correct errors and other items appearing on the Client's credit reports which Client indicates are inaccurate, incomplete, outdated, or unverified as per the [FCRA]. This includes preparation and transmittal of written correspondence to credit bureaus to verify and/or dispute items appearing on the Client's credit report. [Key Credit] will review and analyze all correspondence received from credit bureaus, creditors, and others . . . will conduct follow up calls with Client to discuss Client's status and strategy . . . will review the Client's credit report updates to determine subsequent steps . . . will assist Client with credit questions." (Hudson Aff., Ex. K at KCR_0057370; Hudson Aff., Ex. L at KCR_0057342.)

- Key Credit "will prepare all necessary correspondence in dispute of all inaccurate and unverifiable information on Client's credit reports (Experian, Equifax, TransUnion) and will stamp and mail for client. . . will prepare and mail to each collection agency that can validate a debt a settlement offer. . . will agree to prepare and mail each collection agency a formal validation request to ensure Client is only paying off verifiable and accurate collections. . . [and] agrees to provide unlimited advice and credit coaching to Client." (Hudson Aff., Ex. J at KCR_0057364; Hudson Aff., Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341.)

35. Plaintiffs do not allege or claim that Key Credit's services described above were "bogus" or that Key Credit failed to perform its contracted-for services whatsoever. (Am. Compl., Dkt. 26.)

36. In their contracts, Key Credit and its customers also agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (Hudson Aff., Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341; *see also* Hudson Aff., Ex. J at KCR_0057364 ("Accurately reported items on a credit report[] cannot be removed.").)

37. Finally, Key Credit's consumers explicitly acknowledge and agree that in their written contracts that Key Credit "makes no other express or implied promises or guarantees as to

the result or outcome of its services except as outlined in this agreement." (Hudson Aff., Ex. J at KCR_0057364; Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341.)

38. Moreover, each customer expressly acknowledges that "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement." (Hudson Aff., Ex. J at KCR_0057365; Hudson Aff., Ex. K at KCR_0057371; Hudson Aff., Ex. L at KCR_0057342.)

39. Key Credit does not offer "bogus" services or schemes that "take consumers' money for services that the seller has no intention of providing and in fact does not provide," much less place any conditions on the receipt of fees for "promised results" that any fair and reasonable person could view as "outright theft." (Tsoukalis Decl. ¶ 14; Hudson Aff., Ex. D at 4,511 (67 Fed. Reg. 4,492).)

40. Key Credit also does not and has never engaged in the practice of "flooding" CRAs with dispute letters, whether with the purpose of temporarily removing negative tradelines or otherwise. (Tsoukalis Decl. ¶ 15.)

41. Nor has Key Credit ever encouraged customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (Tsoukalis Decl. ¶ 16.)

42. Further, Key Credit has never been found to have violated any provision of CROA, including CROA's prohibition against false or deceptive advertising or conduct. (Tsoukalis Decl. ¶ 17.)

## VII. Key Credit's Billing Practices

43. After a customer signs the written contract, Key Credit then waits a minimum of five business days before allowing a customer to make a payment. (Hudson Aff., Ex. G at 17:21-

18:9 (Tsoukalis Dep. II); Hudson Aff., Ex. J at KCR_0057364 (contract states that customer's first payment will be "5 days after the signing of this contract (unless the client indicates a date greater than 5 days …)"); Hudson Aff., Ex. K at KCR_0057369-70 ("The Client will not be charged any advance Monthly Service Fees for any Services, rather such fees will only be charged by [Key Credit] to the Client upon [Key Credit's] completing the Services on behalf of the Client which will not occur until a minimum of 5 days subsequent to the Client entering into this agreement with [Key Credit]."); Hudson Aff., Ex. L at KCR_0057341-42 (same).) Key Credit does so only after the "first work" is fully completed. (Hudson Aff., Ex. I at 114:21-115:22 (May 2019 Hearing Tr.).) "First work" consists of analyzing the customer's credit reports, completing all required data entry, creating all dispute letters, and auditing the credit records. (*Id.*) Subsequent fees are billed on a monthly basis in accordance with the written contracts for services that are fully performed before that fee is charged. (Hudson Aff., Ex. I at 121:8-15 (May 2019 Hearing Tr.); Tsoukalis Decl. ¶ 13.)

44. Key Credit's customers determine how long they choose to use Key Credit's services and always retain the right to cancel at any time without penalty. (Hudson Aff., Ex. C at 51:10-12, 57:21-58:2 (Tsoukalis Dep.) ("Clients are the boss. . . . that's why it is a cancel anytime policy. They can cancel for any reason at any time without any minimum time-frames they are with [Key Credit])"); Hudson Aff., Ex. H at 14:5-15:1 (Hadayia Dep.); Hudson Aff., Ex. J at KCR_0057365-67 (contract); Hudson Aff., Ex. K at KCR_0057369 (contract stating "You have a right to cancel your contract with any credit repair organization for any reason within 5 days from the date you signed it."); Hudson Aff., Ex. L at KCR_0057342 (contract).)

**VIII. Key Credit Does Not Promise Results to Its Customers**

45. Key Credit provides various safeguards to ensure that its services are accurate and provide "complete clarity" to its customers. (Hudson Aff., Ex. C at 47:12-48:2 (Tsoukalis Dep.).)

46. First, Key Credit enters into written contracts that clearly and unambiguously set forth the specific services that Key Credit agrees to perform and what Key Credit does and does not promise. (Hudson Aff., Ex. C at 47:12-25, 53:15-21 (Tsoukalis Dep.); Hudson Aff., Ex. I at 87:20-25, 107:14-19 (May 2019 Hearing Tr.); Hudson Aff., Exs. J-L (contracts).)

47. In addition to listing the specific services that Key Credit agrees to perform, Key Credit and its customers agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (Hudson Aff., Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341; *see also* Hudson Aff., Ex. J at KCR_0057364 ("Accurately reported items on a credit report[] cannot be removed.").)

48. Second, Key Credit provides its representatives with scripts and trains its sales representatives on understanding credit scores, understanding Key Credit's action plans, interacting with customers, and important regulatory information. (Hudson Aff., Ex. I at 59:8-60:5, 65:11-17, 100:17-101:4 (May 2019 Hearing Tr.).)

49. In its scripts for sales consultants, Key Credit advises prospective customers that "if there is something they want to challenge [on their credit reports], we'll challenge it for them. We will do the leg work, we'll create and mail the letters for them . . . . We'll be their credit coach while they're with us . . . [and that] if they follow the action plan and if they really understand how their credit works that they can improve their credit score." (Hudson Aff., Ex. I at 54:25-55:14 (May 2019 Hearing Tr.).)

50. Key Credit also trains its sales consultants that "We do not guarantee a specific score change" and "do not guarantee a specific deletion rate" to its customers. (Key Credit Consultant A to Z at KCR 0018438, attached as **Exhibit M** to Hudson Aff.)

51. Key Credit's Founder and CEO also informs sales representatives to:

- "Never promise a timeline
- Never promise we can delete something
- Never tell someone we will get all of the items removed
- Results always vary
- We are brutally honest and that is what's [sic] sets us apart
- Always
  - Let clients know only something that cannot be verified can be deleted
  - Let clients know that if something cannot be verified it cannot remain on credit
  - We increase the odds of removing more items than other companies because we work on all 3 [credit reporting] agencies at the same time and every negative record
  - Give examples of how something can be removed and explain our process.
- Please be careful not to overpromise. This is the only thing that can quickly end a career. The best salesman [sic] are brutally honest."

(KCR_0020907-08, attached as **Exhibit N** to Hudson Aff.)

52. Key Credit also trains its customer service and sale representatives to "never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." (Hudson Aff., Ex. N at KCR_0020907.)

53. The customer experience begins with phone calls between prospective customers that can consist of short calls (that may last for 30 seconds) or full consultations (that include reviewing a customer's credit report and going through the customer's goals and the enrollment

process). (Hudson Aff., Ex. C at 156:16-157:15 (Tsoukalis Dep.); Tsoukalis Decl. ¶ 9.) A full consultation can last up to two hours. (Tsoukalis Decl. ¶ 9.)

54. During a full consultation, Key Credit's sales representatives spend substantial time educating prospective customers "through and beyond [the] basics of just removing inaccuracies from their credit report," explaining "what makes up a credit report, how the FICO score algorithm works," and empowering prospective customers "on how they, themselves, without ever signing up or needing [Key Credit] to do anything for them could increase their credit scores by paying down debts, paying off balances, [and] using credit more intelligently." (Hudson Aff., Ex. G at 23:11-24:12 (Tsoukalis Dep. II).)

55. Finally, Key Credit regularly monitors customer calls and grades (and sometimes fires) representatives who deviate from these policies. (*See* Hudson Aff., Ex. N at KCR_0020907; *see also* Hudson Aff., Ex. O.)

56. The Quality Control process includes listening to phone calls between sales associates and prospective customers and utilizing a quality control checklist for each call to ensure that sales associates comply with sales and "compliance-based" training and to enforce that "things that are not allowed to be said and that are fireable offenses." (Hudson Aff., Ex. C at 154:18-156:1 (Tsoukalis Dep.).) Key Credit's Head of Quality Control listens to the calls to ensure quality control. (Hudson Aff., Ex. C at 23:5-9; 47:12-25 (Tsoukalis Dep.); Hudson Aff., Ex. I at 66:2-67:6 (May 2019 Hearing Tr.).)

Dated: July 28, 2023

Respectfully Submitted,

COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS

By: /s/ Timothy A. Hudson
One of Their Attorneys

By: /s/ Stephanie R. Parker
One of Their Attorneys

Timothy A. Hudson, pro hac vice
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlaw.com

-and-

David B. Mack (BBO No. 631108)
Stephanie R. Parker (BBO No. 687610)
O'Connor, Carnathan and Mack LLC
10 Burlington Mall Road, Suite 301
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net
sparker@ocmlaw.net

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 28, 2023.

/s/ *Stephanie R. Parker*

Stephanie R. Parker