**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General,<br>Plaintiffs,<br>v.<br>COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS<br>Defendants. | No. 20-cv-10991<br><br>Judge Rya W. Zobel<br><br>**REQUEST FOR ORAL ARGUMENT** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Timothy A. Hudson, *pro hac vice*
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., Ste. 700
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlaw.com

-and-

David B. Mack (BBO No. 631108)
Stephanie R. Parker (BBO No. 687610)
O'Connor, Carnathan and Mack LLC
10 Burlington Mall Road, Ste. 301
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net
sparker@ocmlaw.net

Dated: August 18, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS AND ........ 3

DEFENDANTS' STATEMENT OF ADDITIONAL UNDIPUSTED MATERIAL FACTS ........ 3

LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT ........ 3

ARGUMENT ........ 4

I. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COUNTS I, III AND IV REGARDING THE TSR'S ADVANCE FEE PROHIBITION ........ 4

A. The Advance Fee Provision does not cover all credit repair companies, and only applies to companies that "promise results" and "represent" a time frame by which all of its services will be provided. ........ 5

1. The plain language of the Advance Fee Provision contradicts Plaintiffs' interpretation. ........ 6

2. The Advance Fee Provision does not require Key Credit – or any "seller" – to provide a time frame for the completion of its services or any documentation to consumers whatsoever before it can receive payment for its services. ........ 8

B. Key Credit does not "promise results" to its customers and does not "represent" a time frame by which "all" services will be provided. ........ 9

C. Applying the Advance Fee Provision to promised "services" is unreasonable and would lead to absurd results. ........ 11

D. The Bureau's interpretation exceeds its scope of its statutory authority. ........ 13

II. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COUNTS II-V AND VII- IX REGARDING DECEPTIVE ACTS OR PRACTICES. ........ 17

A. Key Credit did not make deceptive representations that customers would see substantial increases to their credit scores. ........ 17

B. Key Credit did not represent that it could remove all negative items from consumer credit reports. ........ 22

III. PLAINTIFFS' MOTION SHOULD BE DENIED AS A MATTER OF LAW ON COUNTS I – V BECAUSE THE TSR PLACES UNCONSTITUTIONAL CONTENT-BASED RESTRICTIONS ON SPEECH IN VIOLATION OF THE FIRST AMENDMENT, THE TSR VIOLATES THE EQUAL

PROTECTION CLAUSE, AND (3) THE FUNDING EMPLOYED BY THE BUREAU TO BRING THIS ACTION WAS NOT CONSTITUTIONALLY APPROPRIATED.......................................26

IV. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT AGAINST MR. TSOUKALIS INDIVIDUALLY.......................................................................................26

V. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT VI.........................29

VI. KEY CREDIT'S AFFIRMATIVE DEFENSES PRECLUDE SUMMARY JUDGMENT. ......................33

CONCLUSION.......................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Libery Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................................4

*Barnhart v. Walton*,
535 U.S. 212 (2002) ..................................................................................................13

*Bartok v. Hometown Am., LLC*,
No. 21-10790-LTS, 2023 WL 3773106 (Feb. 27, 2023)...................................................11

*Bonner v. Triple-S Mgmt. Corp.*,
68 F.4th 677 (1st Cir. 2023)..........................................................................................3

*Carey v. Saffold*,
536 U.S. 214 (2002) ....................................................................................................6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .............................................................................................3, 33

*CFPB v. Morgan Drexen, Inc.*,
No. SACV 13-1267-JLS, 2014 WL 12581776 (C.D. Cal. Nov. 25, 2014)................ 18, 19, 21

*In re Consumer Debt Mgmt. Ne., Inc.*,
2002 WL 34587389 (Mass. Division of Banks Jan. 9, 2002)...............................................30

*Fanning v. FTC*,
F.3d 164, 170 (1st Cir. 2016).......................................................................................17

*Farmers Ins. Exch. v. RNK, Inc.*,
632 F.3d 777 (1st Cir. 2011)..........................................................................................3

*FTC v. Fleetcor Techs., Inc.*,
620 F. Supp. 3d 1268 (2022) ...................................................................................23, 25-26

*FTC v. Nudge, LLC*,
No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695 (D. Utah June 14, 2022) ........ 20, 23, 24, 25

*FTC v. Pantron I Corp.*,
33 F.3d 1088 (9th Cir. 1994) ......................................................................................18

*FTC v. Patriot Alcohol Testers, Inc.*,
798 F. Supp. 851 (D. Mass. 1992) ..................................................................... 18, 20, 24

*Hosseini v. Capital One*,
217 F. Supp. 3d 441 (D. Mass. 2016)....................29

*Jette v. United of Omaha Life Ins. Co.*,
18 F.4th 18 (1st Cir. 2021)....................6

*Jones v. Experian Info. Sols., Inc.*,
141 F. Supp. 3d 159 (D. Mass. 2015)....................17, 26

*Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*,
524 F.3d 54 (1st Cir. 2008)....................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................15

*New York v. U.S. Dept. of Labor*,
363 F. Supp. 3d 109 (D.D.C. 2019)....................11

*Pacholec v. Home Depot USA, Inc.*,
No. 06-cv-827 (PGS), 2007 WL 4893481 (D.N.J. July 31, 2007)....................25

*In re Removatron Int'l Corp.*,
111 F.T.C. 206, 1998 WL 1025512 (F.T.C. Nov. 4, 1988)....................21

*Removatron Int'l Corp. v. FTC*,
884 F.2d 1489 (1989)....................21

*Rempfer v. Sharfstein*,
583 F.3d 860 (D.C. Cir. 2009)....................4

*U.S. v. Corps. for Character, LC*,
116 F. Supp. 3d 1258 (D. Utah 2015)....................22, 25

*U.S. v. Lachman*,
387 F.3d 42 (1st Cir. 2004)....................6

*In re Vistaprint Corp Mktg. & Sales Practices Litig.*,
MDL No. 4:08-md-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009)....................20, 25

**Statutes**

15 U.S.C. § 1679, *et seq.*....................16

15 U.S.C. § 6101....................15

15 U.S.C. § 6102....................15

M.G.L. c. 93 § 68B....................30, 31

M.G.L. c. 93 § 68C ........ 31, 32, 33

M.G.L. c. 93 § 68D ........ 31, 32, 33

**Other Authorities**

16 C.F.R. § 310.1 ........ 15

16 C.F.R. § 310.2 ........ 15

16 C.F.R. § 310.4 ........ 7, 9

16 C.F.R. § 310.6 ........ 16

60 Fed. Reg. 43,842 ........ 13

67 Fed. Reg. 4,492 ........ 14

Fed. R. Civ. P. 56(a) ........ 3

Black's Law Dictionary (11th ed. 2019) ........ 7

# INTRODUCTION

Key Credit is not a "scam" and does not offer "bogus" services to its customers. Key Credit's comprehensive, multi-faceted approach to credit repair includes counseling and educating its customers on how to build and maintain a healthy mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. For over 15 years, Key Credit – an "A"-rated member of the Better Business Bureau – has established a proven track record in helping its customers improve their credit and assisting them in disputing and removing inaccurate, negative items on their credit reports. Key Credit has never been found to have breached any of its customer contracts or to have violated any Federal or State statute, rule or regulation.

Plaintiffs Bureau of Consumer Financial Protection (the "Bureau") and the Commonwealth of Massachusetts (together "Plaintiffs") move for summary judgment on all counts of their Amended Complaint.

Summary judgment should be denied with respect to the counts for alleged violations of the Advance Fee Provision of the Telemarketing Sales Rule ("TSR") (Counts I, III, and IV) because that Provision applies only if Key Credit "promised results" and "represented a time frame" by which "all" of its services would be completed, and Key Credit made no such promises and representations.[1] To the contrary, all Key Credit customers expressly acknowledged and agreed in written contracts that Key Credit promised only to provide specified *services* to assist its customers in achieving their unique individual goals, and that "no express or implied promises or guarantees as to the result or outcome of [Key Credit's] services" have been made that are not set forth in the

---

[1] Key Credit is entitled to summary judgment in their favor on Counts I-IV for the reasons set forth in their Memorandum in Support of Their Motion for Summary Judgment. (Dkt. 111.)

written contracts. Not surprisingly, Plaintiffs present no evidence whatsoever that Key Credit "promised results." On this basis alone, Plaintiffs' motion should be denied and, at a minimum, a genuine dispute of material fact exists with respect to the application of the TSR's Advance Fee Provision. In addition, applying the Advance Fee Provision in the manner proposed by Plaintiffs is unreasonable and would lead to absurd results, and the Bureau's peculiar interpretation exceeds the scope of its statutory authority.

Summary judgment also should be denied with respect to the counts for alleged deceptive representations (Counts II-V and VII-IX) because Plaintiffs utterly fail to establish that no genuine dispute of material facts exists that the purported statements were made, that the statements were likely to mislead customers acting reasonably, and materiality. Further, summary judgment should be denied on Plaintiffs' related claims arising under Massachusetts law because Plaintiffs provide no evidence and, at a minimum, a genuine dispute of material fact exists regarding whether Key Credit committed "some extreme or egregious fault."

Plaintiffs' motion also should be denied as to Counts I – V as a matter of law because the TSR places unconstitutional content-based restrictions on speech in violation of the First Amendment, violates the Equal Protection Clause, and the funding employed by the Bureau to bring this action was not Constitutionally appropriated.

With respect to Count VI and VII, summary judgment should be denied because the alleged violations of Section 68B(1), Section 68C(6)-(7), and Section 68D(c) of the Massachusetts Credit Services Organization Law ("MA-CSO"), M.G.L. c. 93 §§ 68A-E are controverted by the plain language of Key Credit's written customer agreements.

The stakes are high for Key Credit and its employees and their families. Plaintiffs now seek to close Key Credit's doors and force Key Credit and Mr. Tsoukalis to lay-off employees and file

for bankruptcy. Plaintiffs seek to do so primarily based on the Bureau's (i) novel and incorrect interpretation of the TSR despite its express purpose to stop "abusive" credit repair companies that scam customers by "promising results" based on "bogus" services that the scammers do not (and have no intention to) perform and (ii) two isolated advertising statements on Key Credit's website that are neither misleading nor deceptive. For the reasons set forth herein, this Court should deny Plaintiffs' motion for summary judgment in in its entirety.

## RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS AND DEFENDANTS' STATEMENT OF ADDITIONAL UNDIPUTED MATERIAL FACTS

Key Credit respectfully refers the Court to its separately-filed Response to Plaintiffs' Statement of Facts whcih Key Credit incorporates by reference herein. Key Credit also incorporates by reference its Statement of Additional Undisputed Material Facts, which is included at the end of Key Credit's Response to Plaintiffs' Statement of Facts.[2]

## LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011); Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists if a reasonable factfinder could "decide the issue in favor of either party" as to a fact that has the potential "to change the outcome" of the factfinder's determination. *Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 690 (1st Cir. 2023). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[2] References to "KCR ASUF" refer to Key Credit's Statement of Additional Undisputed Material Facts.

Challenges to agency actions not in accordance with law present only "a question of law" concerning the "legal conclusion to be drawn about the agency action." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (internal quotation omitted). Thus, a motion for summary judgment arguing that an agency action was *ultra vires* or otherwise unlawful requires no factfinding, but simply asks whether the agency action was impermissible under existing law.

The record supports a reasonable jury's verdict in favor of Key Credit on each of Plaintiffs' claims. Plaintiffs' motion for summary judgment therefore must be denied. *Anderson v. Libery Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

## ARGUMENT

### I. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COUNTS I, III AND IV REGARDING THE TSR'S ADVANCE FEE PROHIBITION.

Plaintiffs wrongly argue that this Court should interpret the TSR's Advance Fee Provision to apply a six-month prohibition on any credit repair company that discusses or offers services over the telephone. (Dkt. 116 at 11.) Plaintiffs' proffered interpretation is without merit and their motion for summary judgment on Counts I, III (as to alleged violations of section 310.4 of the TSR), and IV (same) should be denied for four reasons, all of which independently support denial of summary judgment.

First, Plaintiffs' interpretation is contrary to the plain language of the Advance Fee Provision and thus applies the wrong standard for application of the Advance Fee Provision. Indeed, Plaintiffs' interpretation would require the Court to read the words "promised results" and the time frame "in which the seller has represented" that its services will be provided out of the TSR's Advance Fee Provision. Second, there is no genuine dispute of material fact that Key Credit does not "promise results" to consumers and does not "represent" a time frame in which its services

will be provided to its customers. Third, Plaintiffs' incorrect interpretation would lead to absurd results. Finally, Plaintiffs' interpretation exceeds the scope of the Bureau's statutory authority.

**A. The Advance Fee Provision does not cover all credit repair companies, and only applies to companies that "promise results" and "represent" a time frame by which all of its services will be provided.**

Plaintiffs admit that the TSR's Advance Fee Provision can only apply to Key Credit if "two conditions are met: (i) the time frame in which the ***seller has represented*** all of the good or services will be provided to [a specific consumer] has expired; ***and*** (ii) the seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that ***the promised results*** were achieved." (Dkt. 116 at 8, citing 16 C.F.R. § 310.4(a)(2) (emphasis added).) Plaintiffs also admit, as they must, that these "two preconditions" are "critical" to the application of the TSR's Advance Fee Provision's intent to combat "deceptive marketing and sale of bogus credit repair services." (*Id.* at 8-9.) Plaintiffs fail to establish either of these "preconditions," much less that no genuine dispute of material facts exists as to both.

Despite gesturing to the correct standard's "two preconditions," Plaintiffs nonetheless apply – and ask this Court to apply – a different standard entirely to Key Credit. Specifically, Plaintiffs argue that they are entitled to summary judgment because, according to them, Key Credit did not provide its customers with documentation in the form of a consumer report from a consumer reporting agency demonstrating that "some measurable result" was achieved. (Dkt. 116 at 9; *see also id*. at 11 (arguing that Key Credit does not wait until six months after demonstrating "credit improvement or any other results" before charging consumers.) However, based on its plain and unambiguous terms, the TSR's Advance Fee Provision applies *only* if a credit repair company like Key Credit: (1) failed to provide documentation demonstrating that "promised results were achieved" (not "any" or "demonstrable" results as Plaintiffs argue in their motion); and (2) "represented" a time frame in which its services will be provided to consumers.

Plaintiffs do not and cannot argue that Key Credit "promised results" to its customers and they offer no evidence whatsoever – zero – that Key Credit "promised results" to its customers. Rather than attempt to meet their burden to show that Key Credit "promised results" to consumers, Plaintiffs argue, in a single conclusory sentence buried in a footnote and without citation to any authority (because none exists), that "the Court need not reach the question of what results were promised" because "Key Credit "do[es] not wait six months before charging any consumer, regardless of when or if they achieve results." (Dkt. 116 at 11 n.63.) Plaintiffs' unsupported, conclusory assertion is baseless and must be rejected. Likewise, Plaintiffs admit that Key Credit does not represent a time frame within which all of its services will be provided. (*Id.* at 11.) On these bases alone, the Court should deny Plaintiffs' Motion on Counts I, III and IV as to the Advance Fee Provision.

1. The plain language of the Advance Fee Provision contradicts Plaintiffs' interpretation.

Plaintiffs' evasion of their obligation to establish that Key Credit "promised results" or "represented" a time frame to its customers is contrary to the TSR's Advance Fee Provision. Interpreting a regulation begins with its plain language. *Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 26 (1st Cir. 2021) (citation omitted). In interpreting a regulation, courts should construe the text so that all of its provisions are given effect and no part is rendered superfluous. *Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 59 (1st Cir. 2008). When interpreting a statute or regulation, a dictionary is a valuable resource for interpretation. *U.S. v. Lachman*, 387 F.3d 42, 51 (1st Cir. 2004) ("Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations."); *see also Carey v. Saffold*, 536 U.S. 214, 219-20 (2002).

Here, the Advance Fee Provision explicitly restricts a credit repair company from requesting or receiving payment for its services if, and only if: (i) the time from which the company "***represented*** all . . . services will be provided . . . has expired; ***and***" (ii) the company has provided documentation "demonstrating that the ***promised results*** have been achieved." 16 C.F.R. § 310.4(a)(2)(i)-(ii), emphasis added. Accordingly, the unambiguous language of the Provision only applies if Key Credit "represented" that "all" of its services would be provided by a specific time ***and*** it "promised results" – not services – to its customers.

"Service" and "result" are not synonymous or interchangeable. A "result" is a "consequence, effect, or conclusion." *Result*, Black's Law Dictionary (11th ed. 2019). In contrast, a "service" is an act of doing something. *Service*, Black's Law Dictionary (11th ed. 2019) (defining "service" as "the performance of some useful act or series of acts for the benefit of another," and an "intangible commodity in the form of human effort, such as labor, skill, or advice"). For example, lawyers and doctors regularly provide services to clients/patients to help them but without a "promised result" or guarantee of success. Here, the FTC easily could have included "promised services" in the TSR's Advance Fee Provision, but it did not. Instead, after limiting when a credit repair company may request or receive payment of any fee or consideration "for goods or *services*," the Advance Fee Provision unambiguously states that it applies if – and only if – a company "promises results" (not "services"). 16 C.F.R § 310.4(a)(2)(i)-(ii).

Without question, if the FTC intended to cover promised "services" – instead of or in addition to "promised results" – then the FTC would have written the Advance Fee Provision to do so. It did not. Likewise, if the FTC intended for the Advance Fee Provision to apply until a seller had performed all services for its customers – rather than only to sellers who "represented" a time frame by which all services would be performed – then the FTC would have written the

Provision to do so. Again, it did not. In short, if "results" are not "promised" or no time frame for the completion of all services is not "represented," then the Advance Fee Provision is inapplicable here and does not apply to Key Credit.

2. <u>The Advance Fee Provision does not require Key Credit – or any "seller" – to provide a time frame for the completion of its services or any documentation to consumers whatsoever before it can receive payment for its services.</u>

Plaintiffs argue that Key Credit can somehow be found liable under the TSR's Advance Fee provision "because there is no dispute that [Key Credit] do[es] not wait six months before charging any consumer, regardless of when or if they achieve results." (Dkt. 116 at 11 n.63.) Plaintiffs also incorrectly argue that it is "impossible for Key Credit to comply" with the Advance Fee Provision's so-called "requirement to refrain from billing until the expiration of a set time frame." (*Id.* at 11.) But the Provision imposes no requirement whatsoever that Key Credit (or any "seller") provide anyone with "a set time frame." This Court should decline Plaintiffs invitation to manufacture a regulatory obligation for Key Credit – and every other "seller" under the TSR – that does not exist.

Nothing in the Advance Fee Provision or the TSR generally requires that Key Credit (or any "seller"): "wait six months before charging any consumer" for service rendered, provide any documentation whatsoever to any consumers (whether with respect to the services Key Credit provides, the results its service achieve, or otherwise), or provide consumers with "a set time frame" by which all services will be provided (Dkt. 116 at 11 & n.63). Plaintiffs do not and cannot cite to any provision of the TSR or Advance Fee Provision that does so.

Instead, in keeping with the intent of the Advance Fee Provision to combat the "marketing and sale of bogus credit repair services" (Dkt. 116 at 8), the Provision promulgates a narrow and specific requirement that a "seller" wait six months before receiving payment ***if and only if***: (i) the

seller "represented" a "time frame" in which "all of the good or services will be provided" to a consumer, ***and*** (ii) the seller "promised results" to a consumer in which case it must provide documentation demonstrating that the promised results were achieved. 16 C.F.R. § 310.4(a)(2). Unless those "two preconditions" are present, the Advance Fee Provision does not purport to place any requirements on a seller as to when it can receive payment for its services or what documentation it must provide to consumers. On its face, the Advance Fee Provision targets sellers of "bogus" credit repair services who "promise results" within a specific "time frame," and not companies like Key Credit who do no such thing.

**B. Key Credit does not "promise results" to its customers and does not "represent" a time frame by which "all" services will be provided.**

At a minimum, there is a genuine dispute as to whether Key Credit "promises results" to its customers. Indeed, the undisputed facts establish that Key Credit promises only to perform specified services for its customers with no promise or guarantee of any result or outcome. In their Motion, Plaintiffs do not argue otherwise and provide exactly no evidence to the contrary.

First, the plain and unambiguous terms of its written contracts establish that Key Credit does not "promise results" to its customers. (KCR SUF, ¶¶ 33-34, 36-39, 46.) Specifically, Key Credit's consumers explicitly acknowledge and agree in their written contracts that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (*Id.* ¶¶ 37, 47.) Each customer also expressly acknowledges that "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement." (*Id.* ¶ 38.)

Key Credit and its customers also agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (*Id.* ¶ 36.) On their

face, Key Credit's customer contracts promise only that it will provide specified, contracted-for services (not "results"). (*Id.* ¶ 34.)

Second, Key Credit's policies and training for its representatives prohibit making promises to prospective and actual customers. (KCR SUF, ¶¶ 48-50 (training materials stating, "We do not guarantee a specific score change" and "do not guarantee a specific deletion rate.").) Key Credit also trains its customer service and sale representatives to "never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." (*Id.* ¶¶ 50-52.) To ensure that representatives follow Key Credit's policies, Key Credit regularly monitors customer calls and grades representatives who deviate from these policies. (*Id.* ¶¶ 55-56.)

Accordingly, there is no genuine dispute that Key Credit's customer contracts, training materials, and other safeguards establish that Key Credit does not promise "results" to its customers, but instead promises only to perform specific "services" without any promise or guarantee as to a result or outcome.

In addition, there is no genuine dispute that Key Credit does not "represent" a time frame by which it will provide all services to its customers.

First, Plaintiffs admit that Key Credit does not "offer[] a definitive time frame for [its] services" but instead offers its services "without a specified performance or end date." (Dkt. 116 at 11.) On this basis alone, their Motion should be denied.

Second, Plaintiffs attempt to manufacture a representation where none exists also fails. Specifically, Plaintiffs assert that Key Credit provides a definitive time frame "for only one service:" that its customers' credit reports will "cease reflecting 10% of the entries" customers identified as inaccurate "within 90 days of [the customer] receiving services" from Key Credit. (*Id.* at 12.) However, Plaintiffs fail to inform the Court that this "guarantee" applies only if the customer

"follows the advice of" Key Credit in which case Key Credit will "full[y] refund" "all fees" paid by the customer. (Dkt. 114-11 at KCR_0057369; Dkt. 114-12 at KCR_0057341.) Thus, Key Credit does not represent that "all" of its services will be provided within 90 days and only guarantees that the customer will receive a full refund if 10% of inaccurate entries are not removed within 90 days.[3]

In addition, Plaintiffs' argument that Key Credit states that it will work within its power to legally improve a customer's credit profile within one year is facially not a "representation" that it will provide "all" of its services within a specific time frame. Rather, the customer is at all times fully in control of its relationship with Key Credit and can cancel services at any time without penalty. (KCR ASUF, ¶ 19.) Accordingly, Plaintiffs' motion should be denied because Key Credit does not "promise results" to its customers and does not "represent" a time frame by which all services will be provided. At a minimum, a genuine dispute of material fact exists and precludes summary judgment.

### C. Applying the Advance Fee Provision to promised "services" is unreasonable and would lead to absurd results.

Courts must avoid interpreting regulations in a manner that produces "'absurd' results when sensible construction is available." *Bartok v. Hometown Am., LLC*, No. 21-10790-LTS, 2023 WL 3773106, at *5 n.4 (Feb. 27, 2023) (rejecting interpretation of Massachusetts regulations that would "contradict the well-established direction that courts not construe statutes in ways that reach 'absurd' results"). An absurd interpretation may be "further evidence" that the regulation "fails to carry out congressional intent." *New York v. U.S. Dept. of Labor*, 363 F. Supp. 3d 109, 141 (D.D.C. 2019).

[3] Plaintiffs do not and cannot claim that Key Credit fails to honor this money-back guarantee.

Interpreting the TSR's Advance Fee Provision to cover credit repair service providers who do not "promise results" would put Key Credit in a position where it may never be paid for the valuable services it provides to its customers. Indeed, customer conduct outside the control of Key Credit could prevent Key Credit (and others) from demonstrating its services improved a customer's credit record, even if the services are indisputably performed and objectively improved the customer's credit record.

For example, a customer could work with Key Credit to identify inaccurate items in a credit report, Key Credit could dispute those inaccurate items and have them removed from the customer's credit report, the customer's credit score could improve, but then the customer engages in other activity during the six-month waiting period that would harm the customer's credit score and/or report. Through no fault of its own, Key Credit would not be able to charge for the valuable (and successful) work it rendered if the Advance Fee Provision were interpreted to apply even where no "promised results" were made. Likewise, a customer could engage Key Credit to challenge items that the customer believes are inaccurate but, after Key Credit challenges those items, the furnisher could determine that the challenged items are accurate or otherwise refuse to remove them. Yet even though Key Credit promised no results, it could not be paid for its contracted-for services because the customer's credit report would not result in the customer's originally desired outcome despite Key Credit having actually performed the contracted-for services. Interpreting the Advance Fee Provision in the manner sought by Plaintiffs would lead to these absurd results.

With respect to Plaintiffs' "time frame" argument, it is undisputed that Key Credit agrees to provide services to its customers on a monthly basis. (KCR ASUF, ¶ 19.) Key Credit's customers, in turn, retain exclusive control over continuing their relationship with Key Credit on a month-to-month basis, and can cancel services at any time without penalty. (*Id.*) According to Plaintiffs'

proffered interpretation, which has no basis in regulatory history and has not been accepted by any court, Key Credit (and no credit repair company) could offer a month of services unless it agrees to provide "all" services that its customers request or may need within that single month or otherwise agrees not to provide any other services after the first month expiree. No law or regulation even purports to prohibit credit repair companies from providing services on a month-to-month basis, including Congress' Credit Repair Organizations Act, the Telemarking Act, or the TSR.

Further, Plaintiffs' argument that the "time frame" requirement is intended to prevent credit repair companies from "string[ing] along consumers for months and months" (Dkt. 116 at 11) is baseless. Not surprisingly, Plaintiffs cite no authority for their assertion regarding the FTC's so-called "intent." The regulation history is clear: the FTC intended the Advance Fee Provision to target "fundamentally bogus" entities who engage in "outright theft" by "tak[ing] consumers' money for services that the seller has no intention of providing and in fact does not provide." (KCR SUF, ¶ 19; *see also* 60 Fed. Reg. 43,842, 43,853 ("Once the fee is paid, however, the seller fails to deliver . . ..") In 2002, the FTC provided further explanation of the rationale underlying the Advance Fee Provision. (KCR SUF, ¶ 20.) Yet, according to Plaintiffs, the Advance Fee Provision should be interpreted to impose a "time frame" requirement on Key Credit even when there is no evidence (or claim) that Key Credit does not provide its contractually agreed upon services to its customers. Interpreting the Advance Fee Provision in the manner sought by Plaintiffs is unreasonable and would lead to these absurd results.

### D. The Bureau's interpretation exceeds its scope of its statutory authority.

An agency rule may not "exceed[] the bounds of the permissible." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002). Here, the FTC and the Bureau's interpretation of the Advance Fee Provision exceed their administrative authority in two ways.

First, the conduct that the Bureau seeks to regulate here is not the conduct proscribed by the Advance Fee Provision. The Advance Fee Provision is intended to prohibit unfair scams in which a credit repair company's "offered service is fundamentally bogus" and of no benefit to a consumer. 67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002) (to be codified at 16 C.F.R. pt. 310). According to the FTC, "the essence of these schemes [is] to take consumers' money for services that the seller has no intention of providing and in fact does not provide." *Id.* (*See also* KCR SUF, ¶¶ 19-20.)

Unlike an empty "promise" to remove accurate credit information, there is no dispute that Key Credit's credit repair services, including assiting customers in identifying and disputing inaccurate credit information, have value. And, no agency or legislative body prohibits such credit repair services entirely as being somehow inherently fraudulent, "bogus," or otherwise "illusory."

As the Bureau and the FTC have repeatedly acknowledged, widespread errors in credit reports hurt consumers. (KCR SUF, ¶¶ 11-14.) Key Credit's services are valuable and undeniably assist consumers in rectifying the widespread errors that infest the credit reporting industry. Key Credit has a proven track record in assisting its customers in disputing and removing inaccurate, negative items on their credit reports. (*Id.* ¶¶ 29-30.) And Key Credit's comprehensive, multi-faceted approach includes counseling and educating its customers on how to build and maintain a healthy mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. (*Id.* ¶ 30.)

All of the issues and data cited by the FTC in promulgating the Advance Fee Provision concerned scam artists who promised illusory results based on "bogus" services that amounted to "outright theft." There is no rational basis in the FTC's rulemaking history to suggest that the regulation of legitimate credit repair companies like Key Credit who offer concrete services

without "promised results" is what the FTC intended – or even has authority – to regulate. *See e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (a "rational connection" must exist between a regulation's scope and the "relevant data").

Moreover, neither the Telemarketing Act nor the Advance Fee Provision permits the Bureau to simply enforce a fee rule requiring credit repair companies who offer their services over the phone to wait at least six months before they can be paid for legitimate credit repair services when (i) there are no "promised results" based on "bogus" services, or (ii) there is no time frame represented by which by "all" services will be provided when a company enters in to a monthly contract with its customers. The Bureau's interpretation of the Advance Fee Provision is not connected (much less rationally related) to its purpose of prohibiting abusive conduct by companies who perpetrate "fundamentally bogus" scams amounting to "outright theft" based on illusory services that "promised results."

Second, the TSR constitutes an unlawful agency action in excess of the FTC's statutory authority to promulgate rules under the Telemarketing Act. Under the Telemarketing Act, Congress authorized the FTC to promulgate rules to protect consumers from deceptive and other abusive telemarketing acts or practices. *See* 15 U.S.C. § 6101-6102; 16 C.F.R. § 310.1. In doing so, Congress issued several directives to the FTC concerning the rules the FTC would promulgate and the conduct that Congress regarded as "abusive telemarketing acts or practices." *See* 15 U.S.C. § 6102(a)(3)(A)-(D). Notably, all of the telemarketing conduct identified by Congress concerned *only* unsolicited calls initiated and made by a telemarketer to a consumer. *See id.* Nevertheless, the FTC exceeded that directive and defined "telemarketer" as a person who initiates *or receives* telephone calls "in connection with" a "plan, program, or campaign which is conducted to induce the purchase of goods or services." *See* 16 C.F.R. § 310.2(ff)-(gg).

Perhaps recognizing that broadening the definition of "telemarketer" to include even receiving calls was beyond the scope authorized by Congress, the FTC largely nullified its broader definition by enacting Section 310.6, which exempts, among other things, businesses that receive sales calls "in response to an advertisement through any medium." 16 C.F.R. § 310.6(b)(5). This exemption swallows the rule because all persons who accept inbound calls necessarily employ *some* form of advertising to prompt those calls – how else would the potential customers be prompted to call?

But the FTC did not stop there. Instead, it carved out a limited number of disfavored industries from the exemptions, leaving only *them* subject to the TSR. Thus, rather than comply with its limited mandate of promulgating rules to address abusive and deceptive telemarketing practices, the FTC exceeded it in at least two ways: first, by expanding the reach of the TSR to include businesses that merely receive sales calls, and second, by then selectively enforcing the TSR's manufactured jurisdiction over such businesses to target only certain industries. Indeed, with respect to credit repair businesses, the FTC strayed so far from Congress's directive as to insert rules into the TSR purporting to regulate even the manner in which those businesses may collect fees. This overreach is particularly glaring in light of the fact that Congress separately enacted CROA for the specific purpose of regulating the credit repair services industry, *specifically including* provisions governing the manner in which credit repair service providers may collect their fees. *See* 15 U.S.C. § 1679, *et seq.*

Far from protecting consumers from deceptive and abusive telemarketing practices, the TSR defines "telemarketer" so broadly as to capture virtually every business with a telephone, attempts to escape the dysfunction of that unworkably broad definition by exempting virtually every business that it covers, and then targets a limited number of disfavored, non-exempt

businesses with arbitrary requirements such as a draconian payment collection regime that are decidedly unrelated to any purported telemarketing practice, abusive or otherwise.

## II. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COUNTS II-V AND VII- IX REGARDING DECEPTIVE ACTS OR PRACTICES.

Plaintiffs argue that Key Credit violated the CFPA, TSR, and MA-UDAP by making two deceptive statements on its website: (1) "claiming that Key Credit's services would result in substantial increases in consumers' credit scores"; and (2) implying that Key Credit's "services could result in the removal of all negative items from consumers' credit reports." (Dkt. 116 at 14-15.) Plaintiffs' argument is without merit.

To establish that Key Credit made deceptive representations, Plaintiffs must prove: (1) the representation was made; (2) the representation was likely to mislead customers acting reasonably; and (3) materiality. *Fanning v. FTC*, F.3d 164, 170 (1st Cir. 2016). Further, under Massachusetts law, "mere negligence cannot maintain [an MA-UDAP] claim; rather, the defendant must have committed some extreme or egregious fault." *Jones v. Experian Info. Sols., Inc.*, 141 F. Supp. 3d 159, 163-64 (D. Mass. 2015) (internal quotations omitted) (citing *Baker v. Goldman, Sachs, & Co.*, 771 F.3d 37, 51 (1st Cir. 2014). Plaintiffs fail to meet their burden and are therefore not entitled to summary judgment on Counts II-V and VII-IX.[4]

### A. Key Credit did not make deceptive representations that customers would see substantial increases to their credit scores.

Plaintiffs assert that Key Credit represented that "its services lead to significant improvements in credit scores." (Dkt. 116 at 16.) Plaintiffs cite Key Credit advertising statements about "average" credit score increases to support the claimed representations, including: "90+

[4] Plaintiffs argue that Key Credit engaged in deceptive acts under the CFPA, TSR, and MA-UDAP for the same reasons. (Dkt. 116 at 23.)

point average credit score increase in the first 90 days" and "most of our customers see a 90-point increase in 90-days." (*Id.*) Plaintiffs fail to establish the second and third requirements for deceptive representations. Even if a consumer could interpret statements such as "*average* 90 point increase in 90 days" to mean that they would see significant increases in their credit score, Plaintiffs fail to establish that the statements were likely to mislead consumers acting reasonably.

Plaintiffs do not – and cannot – prove that statements such as "average 90 point increase in 90 days" were likely to "mislead customers acting reasonably under the circumstances." *FTC v. Patriot Alcohol Testers, Inc.*, 798 F. Supp. 851, 857 (D. Mass. 1992). To determine whether a representation would mislead consumers, courts must view the representations as a whole and "in context rather than in isolation." *Id.*

Plaintiffs argue that the alleged representations were misleading because Key Credit "lacked a reasonable basis for asserting" that the average customer saw a 90-point increase in their credit score (Dkt. 116 at 16). *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994) ("To prevail on [the reasonable-basis] theory, the government must 'show that the advertiser lacked a reasonable basis for asserting that the message was true.'"). Plaintiffs' argument fails for three reasons.[5]

First, contrary to Plaintiffs' contention, none of Key Credit's statements show that Key Credit made guarantees that consumers would significantly increase their credit scores and no such language is found on Key Credit's website, call transcripts, or contracts. *See CFPB v. Morgan Drexen, Inc.*, No. SACV 13-1267-JLS (JEMx), 2014 WL 12581776, at *7 (C.D. Cal. Nov. 25,

[5] Plaintiffs' assertion that Key Credit cannot substantiate its representations is conclusory and ignores how courts determine whether a reasonable basis exists. *Cf. Pantron I Corp.*, 33 F.3d at 1096 (courts must determine what level of substantiation the advertiser was required to have and whether the advertiser possessed that level of substantiation).

2014). In *CFPB v. Morgan Drexen, Inc.*, the court explained that advertising statements such as "Be debt free," or that a customer could become debt free do not "necessarily suggest that someone 'will' become debt free or that any guarantees are being made." *Id.* (analyzing whether defendants engaged in deceptive and misleading advertising under the CFPA and TSR).

Similarly, Key Credit's statements about "average" customer credit score increases did not guarantee that customers would see such increases. In fact, Key Credit representatives were trained to "never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." (KCR SUF, ¶ 52.) In addition, Key Credit's customers expressly acknowledge and agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (*Id.* ¶ 36.) Key Credit's customers also explicitly acknowledged and agreed in writing that Key Credit made "no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement" and that they "have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement." (*Id.* ¶¶ 37-38.) By providing this information upfront, Key Credit ensures that its clients have realistic expectations and a clear understanding of what Key Credit does – and does not – promise.

Considering the statements as a whole and in context with Key Credit's consultations and service agreements, Key Credit's statements were that consumers could see increases in their credit scores, but it was not guaranteed. *See Morgan Drexen, Inc.*, 2014 WL 12581776, at *7; *see also* KCR SUF, ¶¶ 37, 53-55; Pl. Ex. 72 at KCR_0057369; Pl. Ex. 73 at KCR_0057364; Pl. Ex. 74 at 1; Pl. Ex. 75 at KCR_0023268; Pl. Ex. 76 at KCR_0057341. In light of Key Credit's training

policies and the clear disclaimers in its short, written contracts, ordinary consumers were not likely to be misled into believing that Key Credit guaranteed 90-point increases to their credit scores (KCR SUF, ¶¶ 33-34, 46). *See In re Vistaprint Corp Mktg. & Sales Practices Litig.*, MDL No. 4:08-md-1994, 2009 WL 2884727, at *11 (S.D. Tex. Aug. 31, 2009) (clear and easily understandable written disclosures available to consumers before finalizing their agreement were not, as a matter of law, unfair or deceptive); *FTC v. Nudge, LLC*, No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695, at *17 (D. Utah June 14, 2022) (disclaimers and disclosures such as "we do not guarantee your success" and "we make no earnings or return on investment claims or guarantees" could lead "a reasonable trier of fact to conclude that ordinary consumers were not likely to be misled with regard to their likely earnings").

Second, Plaintiffs offer no evidence to support their contention that the statements were false or misleading or that Key Credit lacked a reasonable basis for asserting that the average customer saw a 90-point increase in their credit score. For instance, Plaintiffs conducted no consumer surveys that would suggest that the statements were false and misleading. And, despite having been provided with access to Key Credit's *entire* customer database, Plaintiffs appear to have conducted no analysis whatsoever to demonstrate that the statements were false or misleading. Plaintiffs also do not proffer any evidence about how much Key Credit customers increased their credit scores. *See FTC v Patriot Alcohol Testers, Inc.*, 798 F. Supp. 851, 857-58 (D. Mass. 1992) (record included affidavits and reports about underlying product). This alone is sufficient to deny Plaintiffs' motion.

Third, the undisputed record establishes that Key Credit's statement regarding an average 90-point increase has a reasonable basis and is an achievable goal based on the company's experience. (Dkt. 114-2 at 29.) Indeed, Key Credit's statement regarding a "90 point *average* credit

score increase in the first 90 days" statement is based on Mr. Tsoukalis personally "review[ing] thousands of credit reports" during the first "five to six years" of the company when he provided credit repair services to Key Credit's customers. (*See* Pl. Ex. 4, 35:9-17; 175:20-177:21.) Plaintiffs offer no evidence to rebut Mr. Tsoukalis' undisputed testimony based on his own personal experience at Key Credit over many years.

Finally, Plaintiffs' reliance on factually distinguishable caselaw is misplaced. For example, Plaintiffs rely on cases involving representations to consumers who purchased the products at issue off-the-shelf. *See Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1989) (representations about hair removal products purchased directly by consumers); *see also In re Removatron Int'l Corp.*, 111 F.T.C. 206, 1998 WL 1025512, at *9-10 (F.T.C. Nov. 4, 1988) (discussing food and drug products and representations requiring scientific levels of support). Unlike customers purchasing off-the-shelf products, Key Credit customers had consultations with representatives before signing a contract with Key Credit. (KCR SUF, ¶¶ 53-54.) During the consultations, Key Credit representatives educated prospective customers about removing inaccuracies from their credit reports, explained credit reports and the FICO score algorithm, and empowered the prospective customers "on how they, themselves, without ever signing up or needing [Key Credit] to do anything for them could increase their credit scores by paying down debts, paying off balances, [and] using credit more intelligently." (*Id.* ¶ 54.)

Based on the record, there is no dispute that Key Credit's statements about average credit score increases were not likely to mislead consumers acting reasonably. Alternatively, at a minimum, a genuine issue of fact exists and precludes summary judgment. *See Morgan Drexen*,

*Inc.*, 2014 WL 12581776, at *7-8 (genuine dispute precluded summary judgment in light of competing evidence, including advertising fine print).

Even if Plaintiffs could prove the first two requirements for deceptive misrepresentations, they failed to prove the third requirement – materiality. Contrary to Plaintiffs' argument, Key Credit's alleged representations that it could significantly increase consumer credit scores are not express claims entitled to a presumption of materiality. *See U.S. v. Corps. for Character, LC*, 116 F. Supp. 3d 1258, 1268 (D. Utah 2015) (express claims are "claims that directly state the representation at issue").

**B. Key Credit did not represent that it could remove all negative items from consumer credit reports.**

Plaintiffs next argue that Key Credit engaged in deceptive acts by representing that it could remove all negative items from consumer credit reports. Plaintiffs do not and cannot meet their burden of proving the three requirements for deceptive representations.

First, Plaintiffs cannot establish that Key Credit ever made the representation that it could remove all negative items from a customer's credit report. Indeed, Plaintiffs admit that Key Credit never represented that it could remove all negative items from consumer credit reports. (Dkt. 116 at 17.) Instead, Plaintiffs argue that Key Credit's website included statements implying such a representation—specifically, "Clean Up Unlimited Negative Records," and "We can also fix Unlimited Items in your credit file." (*Id.*) But Plaintiffs never explain how those statements imply that Key Credit can remove all negative items on a credit report. Indeed, Plaintiffs ignore the context of Key Credit's statements, including other information on Key Credit's website and Key Credit's customer contracts.

To assess "the meaning and representations conveyed by an advertisement," courts "look to the advertisement's overall, net impression, rather than the literal truth or falsity of the words."

*FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1268, 1289 (2022). To determine the net impression of an implied representation, such as Plaintiffs allege here, courts examine "the representation, including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction." *Nudge, LLC*, 2022 WL 2132695, at *15 n.188 (internal quotation omitted); *see also Fleetcor Techs., Inc.*, 620 F. Supp. 3d at 1289 (courts consider extrinsic evidence to determine whether an alleged representation was made when it is not expressly stated or "clearly and conspicuously" implied).

The "net impression" of Key Credit's statements is that it never represented that it would remove all negative items on a customer's credit report. The statements on Key Credit's website do not imply that Key Credit could remove all negative items from credit reports. For example, Key Credit's website explains that Key Credit does not charge customers for each inaccurate item removed from a credit report or limit the number of inaccurate items worked on. (*See, e.g.*, Pl. Ex. 26 at KCR_0028758-60 ("We charge a flat monthly fee."); Suppl. Hudson Aff., Ex. Q at KCR_0025609 ("we offer an unlimited service … rather than just a set number of negative items per month"); Suppl. Hudson Aff., Ex. R at 92:20-93:2 (Key Credit expert admitting that statements about fixing "unlimited items" refer to Key Credit not limiting the number of inaccurate items worked on each month).) Key Credit's statements about helping fix or clean up items on credit reports is a competitive differentiator compared to other credit repair companies that may only dispute a few negative items as a time. (*See* Pl. Ex. 24 at KCR_0028432 ("Where most companies charge a monthly fee to do a maximum amount of work, we offer an unlimited service that is much,

much faster."); Pl. Ex. 26 at KCR_0028760 (same); Suppl. Hudson Aff., Ex. Q at KCR_0025612 (same).)

The "nature of the transaction" between Key Credit and its customers further demonstrates that Key Credit did not represent that it could remove all negative items from a customer's credit report. *Nudge, LLC*, 2022 WL 2132695, at *15 n.188, *17-18. Key Credit informs all of its customers of the distinction between inaccurate and accurate negative items and how they relate to the customer's rights. (KCR SUF, ¶¶ 29, 31, 36, 54.) Before signing a contract with Key Credit, prospective customers were educated about the removal of inaccurate items from their credit reports during telephone consultations with company representatives. (*Id*. ¶¶ 53-54.) Importantly, Key Credit contracts clearly state, "***Accurately reported items on a credit report cannot be removed***," and "***neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, negative information removed from your credit report before it is seven years old***." (Dkt. 114-10 at KCR_0057364; Dkt. 114-11 at KCR_0057369; Dkt. 114-12 at KCR_0057341 (emphasis added).)

Even if Plaintiffs could prove that Key Credit represented that it could remove all negative items on consumer credit reports, which they cannot, Plaintiffs fail "to establish that the representation would mislead consumers acting reasonably under the circumstances." *Patriot Alcohol Testers, Inc.*, 798 F. Supp. at 857. Considering the statements as a whole and in context, there is no support for the argument that reasonable consumers could interpret advertising statements about fixing or cleaning up items on a credit report to mean that Key Credit represented it could remove all negative items on credit reports. *See id.* (viewing each statement as a whole and in context, rather than isolation, court could not conclude that reasonable consumers would adopt the FTC's interpretation). A reasonable consumer simply could not interpret statements such

as "we fix unlimited items" as representing that Key Credit could remove all negative items from their credit report. *See Nudge, LLC*, 2022 WL 2132695, at *17-18; *cf. Corps. for Character*, 116 F. Supp. 3d at 1272-73 (denying plaintiffs' motion for summary judgment on issue of whether telling consumers "***all*** proceeds would go to [charity] when up to 93% went to fundraising is misleading") (emphasis added).

The other statements on Key Credit's website, together with Key Credit's contracts, establish that Key Credit's statements such as "Clean Up Unlimited Negative Records," and "We can also fix Unlimited Items in your credit file" were not deceptive. *See In re Vistaprint Corp. Mktg & Sales Practices Litig.*, 2009 WL 2884727, at *6, 11-12 (defendants' webpages were not deceptive under Massachusetts law, as a matter of law, because webpages themselves refuted the allegedly deceptive statements), *affirmed by Bott v. Vistaprint USA Inc.*, 392 Fed. Appx. 327, 327-28 (5th Cir. 2010) (district court "properly observed that [a] consumer cannot decline to read clear and easily understandable terms that are provided on the same webpage … and then claim that the webpage … is deceptive") (internal quotation omitted); *cf. Pacholec v. Home Depot USA, Inc.*, No. 06-cv-827 (PGS), 2007 WL 4893481, at *5 (D.N.J. July 31, 2007) (defendant did not engage in deceptive practice by offering a damage waiver to customers because the optional nature of the waiver was disclosed in the parties' contract). A reasonable consumer would interpret such statements as meaning that Key Credit does not limit the number of inaccurate items worked on each month or charge additional fees per item.

Even if Plaintiffs could prove the first two requirements for their deceptive representation claims, they have not established that such representations were material. The alleged representation that Key Credit could help to remove all negative items on customer credit reports is not entitled to a presumption of materiality as an express claim or for any other reason. *Fleetcor*

*Techs., Inc.*, 620 F. Supp. 3d at 1289. In addition to failing to establish that Key Credit engaged in any deceptive act or practice, Plaintiffs also present no evidence (because none exists) that Key Credit committed "some extreme or egregious fault." *Jones*, 141 F. Supp. 3d at 163-64 (internal quotations omitted) (citing *Baker*, 771 F.3d at 51).

For all of these reasons, Plaintiffs have failed to prove that Key Credit ever made the so-called representation that it could remove "all" negative items on customer credit reports, that any such representation was likely to mislead consumers acting reasonably under the circumstances, and that such representation was material. At a minimum, a genuine dispute of material fact exists as to each of those elements. Because Plaintiffs cannot prove any of the three requirements for their deceptive representation claims, their motion for summary judgment should be denied.

## III. PLAINTIFFS' MOTION SHOULD BE DENIED AS A MATTER OF LAW ON COUNTS I – V BECAUSE THE TSR PLACES UNCONSTITUTIONAL CONTENT-BASED RESTRICTIONS ON SPEECH IN VIOLATION OF THE FIRST AMENDMENT, THE TSR VIOLATES THE EQUAL PROTECTION CLAUSE, AND (3) THE FUNDING EMPLOYED BY THE BUREAU TO BRING THIS ACTION WAS NOT CONSTITUTIONALLY APPROPRIATED.

For the sake of brevity, Key Credit adopts and incorporates the arguments set forth in Section II of Defendants' Memorandum in Support of Their Motion for Summary Judgment on Counts I-V. (Dkt. 111.)

## IV. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT AGAINST MR. TSOUKALIS INDIVIDUALLY.

Plaintiffs argue that summary judgment should be entered against Mr. Tsoukalis individually for Key Credit's purported violations of the Advance Fee Provision, the TSR's prohibition on deceptive acts and practices, the CFPA, and for purportedly engaging in deception based on Mr. Tsoukalis' providing "substantial assistance" to Key Credit. (Dkt. 116 at 12-13, 18, 21-22.) Plaintiffs fail to meet their burden to establish that no genuine dispute of material fact exists, and their motion should be denied.

Plaintiffs rely on Mr. Tsoukalis' purported "day-to-day involvement" at Key Credit to establish individual liability under the TSR and CFPA. However, Plaintiffs misleadingly attempt to conflate Mr. Tsoukalis' work when he first started Key Credit more than 15 years ago with his work as the company grew and evolved over the ensuing years. Notwithstanding Plaintiffs' assertion to the contrary, genuine disputes of material fact exist that preclude summary judgment.

Approximately 15 years ago when he started Key Credit and had no other employees, Mr. Tsoukalis engaged directly with consumers in the sale of Key Credit's services and conducted more than 15,000 sales consultations himself. At that time, "like many small businesses, [Mr. Tsoukalis] did everything from speaking to clients and washing the windows and literally cleaning the office and the ordering supplies and even cleaning bathrooms, typical of many small businesses." (KCR ASUF, ¶ 25.)

Over time as the business grew, Key Credit created "a management team in charge of many of the day-to-day tasks of the company." (KCR ASUF, ¶ 27 (citing Suppl. Hudson Aff., Ex. P at 88:1-18, 90:6-12 (Tsoukalis Dep.) (as Key Credit was "growing, while I would love to have my hands in everything, there are a lot of moving parts and so much of the work is being delegated").) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't . . . ." (KCR ASUF, ¶ 28.)

Along with Mr. Tsoukalis, Key Credit's senior leadership consisted of Jennifer Hadayia (Vice President of Customer Service), Melina Vallas (Head of Sales), Maria Steeves (Head of Operations), and Alejandra Martinez (Head of Quality Control). (KCR SUF, ¶ 26; *see also* KCR ASUF, ¶ 28.)

For the past ten years, Ms. Hadayia, as the Vice President of Customer Service, has been responsible for the daily management of staff and customer relations, including interviewing new

customer service support members; training new staff members; managing customer complaints; and handling cancelled customer files. (KCR ASUF, ¶ 29.)

Mr. Tsoukalis long ago stopped taking the customer service and sales calls himself. (*Id.* ¶ 30.) Mr. Tsoukalis does not "field those responses [to complaints]. Those responses are dealt with by [Key Credit's] client support team, Jennifer Hadayia." (*Id.*) Mr. Tsoukalis would be involved only if a complaint was provided to the "customer support team and someone from the team shared that with me and possibly asked me for guidance., in which case I would give it or ask the head of our client support team . . . to address the issue appropriately." (*Id.*) As such, customer complaints are directed to team leaders and members of management who handle Key Credit's day-to-day tasks, rather than Mr. Tsoukalis. (*Id.*)

Melina Vallas, Key Credit's Head of Sales for the past ten years, has supervised the sales department and its operations, including the hiring, firing, and daily management of approximately 20 sales agents. (KCR ASUF, ¶ 31.) In her role, Ms. Vallas is responsible for revising Key Credit's customer agreements, which detailed customer billing and payment authorization, and drafting and revising call scripts; and compiling sale agents' call scores (*Id.*)

Ms. Vallas, not Mr. Tsoukalis, "runs" the sale department and "is in charge of making decisions about to who to hire and terminate." (*Id.* ¶¶ 32-33.) Issues and practices about Key Credit sales representatives are "formulated collectively" by Key Credit's "head of sales, client support, sales team leaders, support team leaders, operations, managers, and team leaders." (*Id.* ¶ 32.)

Mr. Tsoukalis does not draft sales scripts, which is instead handled by "a management team in charge of many of the day-to-day tasks of the company." (*Id.* ¶ 33.)

Alejandra Martinez, Head of Quality Control, is responsible for listening to sales agents' phone calls; ensuring quality customer service and sales agent performance; compiling sale agents'

call scores; and safeguarding sales agent compliance. (*Id.* ¶ 34.) Mr. Tsoukalis does not review sales calls made by Key Credit's sales representatives. (*Id.*)

In addition to Key Credit's management team, many other important tasks are the responsibility of various third-parties, marketing agencies and freelancers who are not run by the company. (KCR ASUF, ¶¶ 35-37.) For example, Key Credit's service agreements are created by Key Credit's regulatory lawyers at the law firm of Greenspoon Marder, who also advise Key Credit on the fees charged to its customers. (*Id.* ¶ 34.) Key Credit's website and its content were provided by a third-party company known as Conversion Hut which has responsibility for the website and its contents. (*Id.* ¶ 36.) Castellum Pro, a third-party contracting company, provided independent contractors who performed work on behalf of Key Credit as team leads and sales agents. (*Id.* ¶ 37.) Castellum Pro also helped recruit sales agents and handle administrative functions, such as billing and payroll for Castellum Pro contractors. (*Id.*) Plaintiffs' reliance on Mr. Tsoukalis titles and alleged day-to-day involvement with Key Credit's operations as a basis for individual liability is misplaced. As set above, Key Credit has an entire team of managers and other team leaders and staff that handles the day-to-day activities of the company, not Mr. Tsoukalis. Key Credit also utilizes a variety of various third-parties, marketing agencies and freelancers who are not run by the company, much less Mr. Tsoukalis. For all of these reasons, and at a minimum, a genuine issue of material fact exists as to whether Mr. Tsoukalis handled the day-to-day operations of Key Credit that could subject him to individually liability and Plaintiffs' motion should be denied.

## V. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT VI.

In Count VI, Plaintiffs claim that Key Credit violated Section 68B(1), Section 68C(6)-(7), and Section 68D(c) of the Massachusetts Credit Services Organization Law ("MA-CSO"), M.G.L. c. 93 §§ 68A-E. (Dkt 26 ¶¶ 71-73.) These claims are without merit and are controverted by the plain language of Key Credit's written customer agreements. *See Hosseini v. Capital One*, 217 F.

Supp. 3d 441, 444 n.2 (D. Mass. 2016) ("[w]here a conflict exists between a plaintiff's allegations and the documents attached to the complaint, the documents ... trump the complaint's allegations") (citing *Schatz v. Republican State Leadership Comm.*, 661 F.3d 50, 55 n.3 (1st Cir. 2012)).

First, Section 68B(1) of the MA-CSO provides that if (and only if) a credit services organization "charge(s) or receive(s) any money or other valuable consideration prior to full, complete and satisfactory performance of the services the credit services organization has agreed to perform for the buyer," then the credit services organization must obtain "a surety bond in an amount not less than ten thousand dollars issued by a surety company authorized to do business in the commonwealth" and establish "a trust account at a federally insured bank or savings and loan association located in the commonwealth." M.G.L. c. 93 § 68B. Plaintiffs allege that Key Credit is subject to these requirements and has failed to meet them. (Dkt. 26 ¶ 71.)

As a threshold matter, Plaintiffs' allegation that Key Credit has failed to satisfy the surety bond requirement, (*see id*.), is contradicted by their own Complaint, which specifically admits that Key Credit "maintain[s] a $10,000 surety bond written by Western Surety Company." (*Id.* ¶ 29.)[6]

More importantly, however, Plaintiffs misconstrue the plain language of Section 68B. Plaintiffs claim that the surety bond and trust account requirements are triggered if a credit repair service provider "charg[es] any advance fees – namely, any fee charged before 'full, complete and satisfactory performance' of the credit repair services *offered*." (*See* Dkt. 26 ¶ 28 (emphasis added).) That is incorrect, and Plaintiffs' argument that Key Credit did so is immaterial. The surety

[6] Moreover, the trust requirement properly applies to credit services organizations that actually handle their clients' money, which Key Credit does not do. For example, credit services organizations engaged in debt settlement services (a service which Key Credit does not provide) will seek to improve a client's credit rating by settling the client's valid outstanding debt. Such businesses routinely hold their clients' funds for use in satisfaction of the debt settlement the business negotiated on behalf of its client, and Section 68B's trust requirement, properly construed, applies to credit services organizations providing *those* services. *See In re Consumer Debt Mgmt. Ne., Inc.*, 2002 WL 34587389, at *1 (Mass. Division of Banks Jan. 9, 2002). Again, Key Credit is not engaged in such services and Plaintiffs present no evidence to the contrary.

bond and trust account are required only if fees are charged before full performance of the services that the credit services provider "*agreed to perform*." *See* M.G.L. c. 93 § 68B (emphasis added). Here, Plaintiffs provide no evidence (as none exists) that Key Credit charged any fee "prior to full, complete and satisfactory performance of the services [that Key Credit] has agreed to perform for [any given] buyer." Indeed, Key Credit's customer agreements explicitly states that its customers will not be charged any advance fees whatsoever. (*See* KCR SUF, ¶ 43; Dkt. 114-11 at KCR_0057369-70 ("The Client will not be charged any advance Monthly Service Fees for any Services"); Dkt. 114-12 at KCR_0057341-42 (same).) Consequently, Plaintiffs fail to establish that Section 68B's surety bond and trust account requirements apply to Key Credit, and these claims should be dismissed with prejudice.[7]

Second, Section 68C(6)-(7) requires certain disclosures regarding the surety bond and trust account required under Section 68B. *See* M.G.L. c. 93 § 68C(6)-(7); Compl., ¶¶ 75-76. For the reasons set forth above, Plaintiffs present no evidence that the surety bond and trust account requirements apply to Key Credit, and they have therefore failed as well to establish that Section 68C(6)-(7)'s related disclosure requirement applies to Key Credit.

Finally, Plaintiffs argue that Key Credit violated Sections 68C(5) and 68D(c) of the MA-CSO, which provide for certain disclosure requirements concerning credit repair services providers' services contracts. *See* M.G.L. c. 93 §§ 68C(5), 68D(c). Again, Plaintiffs' argument is

[7] The written customer agreements explicitly state that "[t]he First Work Fee is charged 5 days *after* the signing of this contract (unless client indicates a date greater than 5 days in payment authorization section of this form)." (Dkt. 114-10 at KCR_0057364 (emphasis added); *see* Dkt. 114-12 at KCR_0057341; KCR SUF, ¶ 41.) In no event is the first work fee charged less than 5 days after enrollment. (KCR SUF, ¶ 41.) Moreover, the customer agreements specifically identify the services that Key Credit will perform in return for the first work fee and specify that the fee "will only be charged by [Key Credit] to the Client upon [Key Credit's] completing the services on behalf of the Client. … Client also understands and agrees that he or she is billed … not for a specific outcome." (Dkt. 114-10 at KCR_0057364; *see* KCR SUF, ¶ 41.)

controverted by the plain language of Key Credit's customer agreements, and summary judgment should be denied.

Section 68C(5) of the MA-CSO states that credit services organizations must disclose in writing "a complete and detailed description of the services to be performed by the credit services organization and the total cost to the buyer for such services." M.G.L. c. 93 § 68C(5). And Section 68D(c) of the MA-CSO provides that the services agreements of credit services organizations are required to include "the terms and conditions of payment, including the total of all payments to be made by the buyer." (M.G.L. c. 93 § 68D(c).) Here, Plaintiffs claim that Key Credit's customer agreement "does not set forth the 'total cost to the buyer' or 'the total of all payments to be made by the buyer.'" (Dkt. 26 ¶ 74.) However, Plaintiffs' allegation is contradicted by the plain language of the written customer agreements. (Dkt. 114-10; Dkt. 114-11; Dkt. 114-12; *see also* Pl. Ex. Pl. Ex. 72 at KCR_0057369, KCR_0057371; Ex. 73 at KCR_0057365; Ex. 74 at 1-3; Ex. 75 at KCR_0023268-70; Ex. 76 at KCR_0057341-42.)

The customer agreements unambiguously state that Key Credit's clients may cancel the contract at any time without any cancellation fees or additional charges. (KCR SUF, ¶¶ 43-44; KCR ASUF, ¶ 19.) Key Credit requires no more than a one-month commitment with no advance fees, and no obligation to renew. (*See* KCR SUF, ¶ 43; Dkt. 114-11 at KCR_0057369-70 ("The Client will not be charged any advance Monthly Service Fees for any Services"); Dkt. 114-12 at KCR_0057341-42 (same.) With respect to that one month, Key Credit performs the services identified in the agreements for which the client subsequently pays the specifically identified "first work fee" of $189.95, plus a processing fee and applicable tax. (*See* KCR SUF, ¶¶ 43-44; Dkt. 114-10 at KCR_0057364, 65); Dkt. 114-11 at KCR_0057371.) If the client elects to continue working with Key Credit, Key Credit will then perform additional identified services over the

course of the next 30 days, following which the client will be charged a fee of $139.95, plus a processing fee and tax, for services rendered. (*See* KCR SUF, ¶¶ 43-44; Dkt. 114-10 at KCR_0057364, 65); Dkt. 114-11 at KCR_0057371.) At any given point, these specifically identified fees identify the total cost of the services, and the total of all payments "to be made by the buyer." *See* M.G.L. c. 93 §§ 68C(5), 68D(c). No further payments are "to be made by the buyer" – to the contrary, the client can cancel Key Credit's services at any time. To the extent Key Credit is retained to perform any additional services for the additional fee identified in the agreements, it is the client's choice.

Accordingly, Plaintiffs' claims Count VI are controverted by the plain language of the written agreements, and Plaintiffs' motion should be denied.

## VI. KEY CREDIT'S AFFIRMATIVE DEFENSES PRECLUDE SUMMARY JUDGMENT.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [he] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Here, Plaintiffs do not seek summary judgment on any of Key Credit's Affirmative Defense. Although Plaintiffs previously moved to strike certain of Key Credit's affirmative defenses, others remain. Notably, Key Credit has asserted, among other things, that Plaintiffs' claims and recovery are barred or limited by the terms of the applicable statute of limitations. *See* Aff. Def. No. 4 (Dkt. 60), citing 12 U.S.C. § 5564(g)(1); *see also* Aff. Def. Nos. 3 (claims and recovery are barred or limited to the extent they seek to impose liability on Defendants for acts or omissions taken in good faith, with a reasonable basis in fact and/or law), 11 (relevant Sections of TSR at issue are unenforceable on their face and as applied to Key Credit in this case), 13 (claims

and recovery are barred or limited to the extent the clients on behalf of whom Plaintiffs seek to obtain customer-focused relief agreed to the terms of KCR's services, voluntarily paid for delivered credit repair services, and/or consented to or expressly authorized the alleged conduct), 14 (claims and recovery for restitution, refunds, and/or disgorgement are barred on the ground and to the extent that Defendants were not unjustly enriched), and 15 (claims are barred on the ground that some or all of the consumers on behalf of whom Plaintiffs seek to obtain relief have valid and outstanding legal obligations to Key Credit).

Plaintiffs' motion raises no challenge to these affirmative defenses, including with respect to the statute of limitations, and thus they remain at issue and preclude summary judgment.

## CONCLUSION

For all of the foregoing reasons, Key Credit respectfully requests that the Court deny Plaintiff's motion for summary judgment in its entirety.

Dated: August 18, 2023

Respectfully Submitted,

COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS

By: /s/ Timothy A. Hudson
One of Their Attorneys

By: /s/ Stephanie R. Parker
One of Their Attorneys

Timothy A. Hudson, *pro hac vice*
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., Ste. 700
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlaw.com

-and-

David B. Mack (BBO No. 631108)
Stephanie R. Parker (BBO No. 687610)
O'Connor, Carnathan and Mack LLC
10 Burlington Mall Road, Ste. 301
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net
sparker@ocmlaw.net

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 18, 2023.

/s/ Stephanie R. Parker
Stephanie R. Parker