**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General, | No. 20-cv-10991 |
| Plaintiffs, | Judge Rya W. Zobel |
| v. | **REQUEST FOR ORAL ARGUMENT** |
| COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS | |
| Defendants. | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Defendants Commonwealth Equity Group, LLC d/b/a Key Credit Repair and Nikitas Tsoukalis (together, "Key Credit") respectfully submit this Response to Plaintiffs' Statement of Material Facts and Defendants' Statement of Additional Undisputed Material Facts:

**RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

1. Defendant Key Credit is a limited-liability company incorporated in Massachusetts in 2007. The company was originally incorporated as Global Mortgage Brokers LLC, then changed its name to Commonwealth Equity Group, LLC, in 2008, and finally adopted the name Key Credit Repair in 2015 then Commonwealth Equity Group, LLC D/B/A Key Credit Repair in 2017. Its principal place of business is or was located at 686 Morton Street, Suite 2, Boston, MA, 02126. (Ex. 1 at ¶¶ 5-8 (Decl. of Dani Schneider dated July 28, 2023); Ex. 2 (Massachusetts Secretary of State Incorporation Documents); ECF 56 at ¶ 6 (Defs.' Answer to Am. Compl.); Ex. 4 at 13:21-14:2 (Dep. of Key Credit under Fed R. Civ. P. 30(b)(6) with Tsoukales testifying, Oct. 18, 2022)).

**RESPONSE:** Undisputed.

2. Defendant Tsoukales founded Key Credit and is Key Credit's Chief Executive Officer, President, "VP of Sales and Marketing" and sole shareholder. (Ex. 1 at ¶ 5-8 (Schneider Decl.); Ex. 2 (Massachusetts Secretary of State Incorporation Documents); ECF 56 at ¶ 8 (Defs.' Answer to Am. Compl.); Ex. 3 at 30 (April 2017 Business Plan, KCR_0025502); Ex. 4 at 11:24-12:2, 20:2-10 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); Ex. 5 at 7:18-9:9 (Dep. of

Tsoukales, Oct. 18, 2022); Ex. 6 at 20:22-21:9 (Investigational Hearing (IH) of Tsoukales, May 16, 2019)).

**RESPONSE:** Undisputed that Mr. Tsoukalis is the founder of Key Credit and is Key Credit's Chief Executive Officer and sole shareholder. Key Credit disputes that Mr. Tsoukalis is Key Credit's "VP of Sales and Marketing." (*See* Pl. Ex. 5 at 16:4-9, 27:6-15, 27:20-22; Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II); Tsoukalis Aff. (Dkt. 113) ¶ 3.)

3. Key Credit purports to provide credit-repair or credit-improvement services to consumers. (ECF 56 at ¶¶ 6, 14 (Defs.' Answer to Am. Compl.)); Ex. 7 at Nos. 2, 3 (Defs' Resp.to Pls.' Req. for Admis.)).

**RESPONSE:** Undisputed that Key Credit provides credit-repair or credit-improvement services to consumers. Key Credit disputes Paragraph 3 to the extent it implies that Key Credit "purports" to provide services. (*See* Dkt. 56 ¶¶ 6, 14.)

4. Tsoukales describes the company's credit-repair services as "[a]ssisting clients in improving their credit scores" and "[d]oing the leg work for them to remove inaccurate records" from their credit reports. (Ex. 6 at 29:15-30:13 (Tsoukales IH)).

**RESPONSE:** Undisputed that Paragraph 4 accurately quotes language from the cited transcript. Key Credit disputes that Paragraph 4 accurately describes all of Key Credit's services. (*See* KCR SUF ¶¶ 29, 31, 34[1]; Dkt. 56 ¶¶ 6, 14.)

5. The services that Key Credit purports to provide to consumers include evaluating consumers' credit profiles, analyzing consumers' consumer-report information, and advising consumers on steps to remove information that is not accurate, complete, or verifiable. (Ex. 7 at Nos. 7-9 (Defs' Resp. to Pls.' Req. for Admis.)); Ex. 4 at 33:5-16 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Disputed that Paragraph 5 describes all of Key Credit's services and to the extent it implies that Key Credit "purports" to provide services. (*See* KCR SUF ¶¶ 29, 31, 34; Dkt. 56 ¶¶ 6, 14.) Otherwise undisputed.

[1] References to "KCR SUF" are to Defendants' Statement of Undisputed Material Facts filed in Support of Their Motion for Summary Judgment on Counts I-V of the Amended Complaint. (Dkt. 112.)

6. Key Credit began marketing and selling credit-repair services in 2008 and began offering credit-repair services over the telephone in 2010. (ECF 56 at ¶ 19 (Defs.' Answer to Am. Compl.)); Ex. 7 at No. 3 (Defs' Resp. to Pls.' Req. for Admis.); Ex. 4 at 11:24-12:2, 20:2-10 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); Ex. 5 at 7:18-9:9 (Tsoukales Dep.); Ex. 6 at 20:22-21:9 (Tsoukales IH)).

**RESPONSE:** Undisputed.

7. Consumers who enroll with Key Credit are looking to improve their credit in order to purchase a home or get access to other consumer financing like a student loan. (Ex. 6 at 44:15-25 (Tsoukales IH); Ex. 1 (Schneider Decl. at ¶¶ 9-20) (explanation and summary of consumer complaints)).

**RESPONSE:** Undisputed. However, the declaration cited does not support the statement in Paragraph 7.

8. Key Credit's target demographic for its services are consumers with credit scores below 650 and household incomes of less than $30,000. (Ex. 3 at 17-18 (April 2017 Business Plan, KCR_0025502)).

**RESPONSE:** Disputed. The document cited in Paragraph 8 does not support the proposition for which it is cited.

9. Since its inception, Key Credit has enrolled tens of thousands of consumers nationwide in its credit-repair services, including nearly 40,000 consumers nationwide from 2016 through 2019. (ECF 56 at ¶ 19 (Defs.' Answer to Am. Compl.); Ex. 6 at 47:11-12, 47:20-48:6 (Tsoukales IH)).

**RESPONSE:** Undisputed.

10. To attract potential customers, Key Credit relies predominantly on consumers searching the Internet for ways to improve their credit. Key Credit's top source of customer leads since at least 2017 is Google. (Ex. 4 at 81:1-7 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Key Credit does not dispute that, since at least 2017, Google Search has been its primary source of leads for new customers. Key Credit disputes the remaining statements in Paragraph 10 as the document cited does not support the proposition for which it is cited.

11. Key Credit uses Google as well as a network of other websites to attract consumers in "every city, town, and borough in the United States" to its website. (Ex. 3 at 19 (April 2017 Business Plan, KCR_0025502)).

**RESPONSE:** Undisputed as to the States in which Key Credit offers its services, and disputed as to the States in which Key Credit does not offer its services.

12. Key Credit uses search engine optimization to achieve a high rank on search engines, which positions its website as a top result when consumers conduct an Internet search for the term "credit repair." (Ex. 3 at 19 (April 2017 Business Plan, KCR_0025502)).

**RESPONSE:** Undisputed.

13. Key Credit also uses paid advertisements like Google Ads, which is Google's pay-per-click advertising service. (Ex. 3 at 20-21 (April 2017 Business Plan, KCR_0025502)); (Ex. 6 at 41:15-23 (Tsoukales IH)).

**RESPONSE:** Undisputed.

14. Google is Key Credit's largest advertising expense—between 2017 and 2022 Key Credit paid more than $4 million to Google for "advertising." (Ex. 8 (Profit and Loss 2017-2022, KCR_0001750) (line items for advertising expenses show that the largest advertising expense was $4,093,991 paid to Google)).

**RESPONSE:** Undisputed.

15. Key Credit uses similar methods to attract consumers through Microsoft search engine products, including Bing. Between 2017 and 2022, Key Credit paid Microsoft $997,934 for advertising. (Ex. 8 (Profit and Loss 2017-2022, KCR_0001750); (Ex. 4 at 77-78 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Undisputed.

16. Key Credit also pays third-party lead generators to conduct digital marketing campaigns to reach consumers across the country and generate inbound and outbound telephone sales. Ex. 7 at Nos. 1, 3 (Defs.' Resp. to Pls.' Req. for Admis.); ECF 56 at ¶ 16 (Defs.' Answer to Am. Compl.); Ex. 4 at 93:1-94:7; 123:13-20, 146:17-147:11, 149:14-154:3, 160:10-15 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); Ex. 6 at 48:7-48:25, 51:9-52:8; 55:15-22; 71:14-18 (Tsoukales IH); Ex. 12 (2021 Key Credit weekly sales telephone call summary report to Tsoukales, KCR_0019187); Ex. 11 (email from Tsoukales to Key Credit staff recruiting sales agents for new Key Credit telemarketing campaigns, KCR_0018756); Ex. 21 (email from Tsoukales to lead generator about new telemarketing campaign to generate clients, KCR_0020652); Ex. 9 (email from Tsoukales launching new outbound telemarketing campaign, KCR_0008793); Ex. 13 (Key Credit's Daily Phone Call Summary for 5/3/19 sent by email from Tsoukales to Key Credit staff member, KCR_0009024); Ex. 10 (Key Credit "click to dial" program "this is the single best tool to kill outbound calls LIKE A BOSS," KCR_0016006); Ex. 14 (Tsoukales email to sales team handling new leads from affiliate telemarketing campaign "[these] leads. . . need to get screened VERY FAST so we're not wasting our time and money," KCR_0020375); Ex. 15 (email exchange between Tsoukales and lead generator launching new telemarketing campaign with Tsoukales'

telemarketing script, KCR_0021218); Ex.16 (email exchange with Tsoukales and lead generator with Tsoukales' scrip to generate inbound telemarketing calls, KCR_0026285); Ex. 17 (Tsoukales email to sales team on new telemarketing campaign using Tsoukales' script "I see that you have been transferred to me because of a recent personal loan decline. Let me pull a credit report so we can work on getting your score back up and approved for this loan," KCR_0008644); Ex. 18 (email about new Key Credit telemarketing campaign "[Tsoukales] wants you to follow the script he sent out yesterday," KCR_0008647); Ex. 19 (email instructing sales agents to "follow the exact script [Tsoukales] sent yesterday when dealing with affiliates"(KCR_0015241)); Ex. 20 (email exchange between Tsoukales and lead generator "[q]uick update on conversion rates so far. . .[i]t's looking pretty good" (KCR_0021196)); Ex. 22 (email from Tsoukales instructing sales team to use new script for affiliate sales calls, KCR_0020373).

**RESPONSE:** Undisputed that, for brief periods of time during its fifteen years of existence, Key Credit has paid third-party lead generators to conduct digital marketing campaigns to reach consumers and generate inbound (not outbound) telephone sales. Otherwise disputed; Key Credit does not currently pay third-party lead generators to conduct digital marketing campaigns to reach consumers and generate inbound or outbound telephone sales. (*See* documents cited in Paragraph 16 above; Suppl. Hudson Aff., Ex. P at 122:15-20 (Tsoukalis Dep.).)

17. Consumers who find Key Credit through Internet searches are redirected to the company's website. (Ex. 6 at 41:15-25 (Tsoukales IH)).

**RESPONSE:** Undisputed.

18. Key Credit's website URL is keycreditrepair.com. (ECF 56 at ¶ 22 (Defs.' Answer to Am. Compl.); Ex. 4 at 85:8-9 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); Ex. 6 at 80:3-5 at (Tsoukales IH)).

**RESPONSE:** Undisputed.

19. From March 26, 2016, until December 8, 2018, Key Credit's website landing page and/or "free consultation" page prominently displayed representations about Key Credit's ability to improve consumers' credit scores by 90 points, including:

a. "90+ Point Average Credit Score Increase In The First 90 Days";

b. "Average 90 Point Increase In 90 Days"; and

c. "Most of our customers see a 90-Point Increase in 90-Days."

(Ex. 23 at KCR_0027417 (website capture of free consultation page from Mar. 26, 2016, KCR_0027415)); Ex. 24 at KCR_0028430-31 (website capture of free consultation page from Apr. 28, 2017, KCR_0028428); Ex. 25 at KCR_0028733-34 (website capture of free consultation page from May 18, 2017, KCR_0028731); Ex. 26 at KCR_0027857-58 (website capture of free consultation page from June 22, 2017, KCR_0028755); Ex. 27 at KCR_0028842 (website capture of landing page from July 29, 2017, KCR_0028840); Ex. 28 at KCR_0029043 (website capture of landing page from Sept. 30, 2017, KCR_0029041); Ex. 29 at KCR_0029238-40 (website capture of free consultation page from Dec. 15, 2017, KCR_0029236); Ex. 30 at KCR_0029409 (website capture of landing page from June 30, 2018, KCR_0029407); Ex. 31 at KCR_0029673-74 (website capture of free consultation page from Oct. 18, 2018, KCR_0029670); Ex. 32 at KCR_0029689 (website capture of landing page from Oct. 20, 2018, KCR_0029687); Ex. 33 at KCR_0029706 (website capture of landing page from Nov. 3, 2018, KCR_0029704); Ex. 34 at KCR_0029719 (website capture of landing page from Dec. 1, 2018, KCR_0029717); Ex. 35 at KCR_0029724 (website capture of landing page from Dec. 8, 2018, KCR_0029722)).

**RESPONSE:** Undisputed that the quotations in Paragraph 19 are excerpts that appeared in various iterations of Key Credit's website pages from March 26, 2016, until December 8, 2018. Key Credit disputes that the quotations all appeared on the website in each year and disputes that the excerpts quoted above reflect all of the relevant information contained on the website's landing page, other pages on the website, or the parties' written contracts among other things. (*See* Exhibits cited in Paragraph 19 above.) Key Credit disputes Plaintiffs' characterization that Key Credit made representations, which is an improper characterization that is not an assertion of material fact.

20. From April 28, 2017, until March 9, 2019, Key Credit's website landing page and/or "free consultation" page prominently displayed representations regarding Key Credit's ability to remove negative items from consumers' credit reports, including:

a. "We can also fix Unlimited Items in your credit file";

b. "Clean Up Unlimited Negative Records"; and

c. "We Fix Unlimited Negative Items."

(Ex. 24 at KCR_0028430 (website capture of free consultation page from Apr. 28, 2017, KCR_0028428)); Ex. 25 at KCR_0028733 (website capture of free consultation page from May 18, 2017, KCR_0028731); Ex. 26 at KCR_0028757 (website capture of free consultation page from June 22, 2017, KCR_0028755); Ex. 27 at KCR_0028842 (website capture of landing page from July 29, 2017, KCR_0028840); Ex. 28 at KCR_0029043 (website capture of landing page from Sept. 30, 2017, KCR_0029041); Ex. 29 at KCR_0029238 (website capture of free consultation page from Dec. 15, 2017, KCR_0029236); Ex. 30 at KCR_0029409 (website capture

of landing page from June 30, 2018, KCR_0029407); Ex. 31 at KCR_0029672 (website capture of free consultation page from Oct. 18, 2018, KCR_0029670); Ex. 32 at KCR_0029689 (website capture of landing page from Oct. 20, 2018, KCR_0029687); Ex. 33 at KCR_0029706 (website capture of landing page from Nov. 3, 2018, KCR_0029704); Ex. 34 at KCR_0029719 (website capture of landing page from Dec. 1, 2018, KCR_0029717); Ex. 35 at KCR_0029724 (website capture of landing page from Dec. 8, 2018, KCR_0029722); Ex. 36 at KCR_0029729 (website capture of landing page from Dec. 22, 2018, KCR_0029727); Ex. 37 at KCR_0029879 (website capture of landing page from Feb. 9, 2019, KCR_0029877); Ex. 38 at KCR_0029899 (website capture of landing page from Mar. 9, 2019, KCR_0029897)).

**RESPONSE:** Undisputed that the quotations in Paragraph 20 are excerpts that appeared in various iterations of Key Credit's website pages from April 28, 2017 until March 9, 2019. Key Credit disputes that the quotations all appeared on the website in each year and disputes that the excerpts quoted above reflect all of the relevant information contained on the website's landing page, other pages on the website, or the parties' written contracts among other things. (*See* Exhibits cited in Paragraph 20 above; *see also* Suppl. Hudson Aff., Exs. Q-R.) Key Credit disputes Plaintiffs' characterization that Key Credit made representations, which is an improper characterization that is not an assertion of material fact.

21. For example, on July 29, 2017, Key Credit displayed the following image at the top of its website landing page:




(Ex. 27 at KCR_0028842 (website capture of landing page from July 29, 2017, KCR_0028840)).

**RESPONSE:** Undisputed.

22. Key Credit's website displayed purported customer testimonials that included the following statements:

a. "Key Credit Repair removed all of my negative records and I have only been with them for 2 months;" and

b. "Within two weeks of speaking to you, my FICO score jumped 110 points."

(Ex. 24 at KCR_0028430, 32 (website capture of free consultation page from Apr. 28, 2017, KCR_0028428)); Ex. 39 at KCR_0028393 (website capture of landing page from May, 1 2017, KCR_0028390); Ex. 25 at KCR_0028733, 35 (website capture of free consultation page from May 18, 2017, KCR_0028731); Ex. 26 at KCR_0028757, 61 (website capture of free consultation page from June 22, 2017, KCR_0028755); Ex. 29 at KCR_0029238, 39 (website capture of free consultation page from Dec. 15, 2017, KCR_0029236); Ex. 31 at KCR_0029672, 74 (website capture of free consultation page from Oct. 18, 2018, KCR_0029670)).

**RESPONSE:** Undisputed that the quotations in Paragraph 22 are incomplete excerpts that appeared in iterations of Key Credit's website. Key Credit disputes that excerpts quoted above are complete. (*See* Exhibits cited in Paragraph 22 above.)

23. The years during which Key Credit made the representations in ¶¶ 19-21 above—2017 and 2018—corresponded to Key Credit's highest years of revenue. (Ex. 40 at No. 1 (Defs' Answers to Interrogs.)).

**<u>RESPONSE:</u>** Undisputed that Key Credit's highest gross revenues were in in 2017 and 2018. Key Credit disputes Plaintiffs' characterization that Key Credit made representations, which is an improper characterization that is not an assertion of material fact.

24. Key Credit's website instructs consumers to call a toll-free number for a "free consultation" or to fill out a "free consultation" form on the website with information that enables the company's sales agents to call consumers. (Ex. 4 at 146:20-147:2 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); *see e.g.* Ex. 23 at KCR_0027417 (website capture of free consultation page from Mar. 26, 2016, KCR_0027415); Ex. 26 at KCR_0027857-58 (website capture of free consultation page from June 22, 2017, KCR_0028755); Ex. 31 at KCR_0029672 (website capture of free consultation page from Oct. 18, 2018, KCR_0029670); Ex. 38 at KCR_0029899 (website capture of landing page from Mar. 9, 2019, KCR_0029897)).

**<u>RESPONSE:</u>** Disputed as to Paragraph 24's characterization "instructs." Otherwise undisputed.

25. Key Credit participates in interstate telephone calls in connection with its credit-repair services. (Ex. 7 at No. 1 (Defs' Resp. to Pls' Req. for Admis.); *see also* (Ex. 6 at 47:3-48:9 (Tsoukales IH)).

**<u>RESPONSE:</u>** Undisputed.

26. To enroll in Key Credit's services, consumers must speak to one of the company's sales agents. (Ex. 6 at 48:7-9, 67:14-17 (Tsoukales IH) (consumers enroll over the phone except the few who live local to the company in Massachusetts)).

**<u>RESPONSE:</u>** Undisputed.

27. To handle its call volume, Key Credit contracts with Castellum Pro Services, a company located in Central America to conduct all or nearly all of its telephone sales calls with consumers throughout the United States. (Ex. 4 at 20:14-16, 27:9-12 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); (Ex. 6 at 56:6- 59:7 (Tsoukales IH)); Ex.117 (2018 contract between Key Credit Repair and Castellum Pro, KCR_0000012).

**<u>RESPONSE:</u>** Undisputed that, since approximately 2015, Key Credit contracted with Castellum Pro Services, a company located in Central America to conduct a majority of its telephone sales calls with consumers throughout the United States; disputed with respect to sales calls before approximately 2015. (*See* Pl. Ex. 6 at 57:11-20.)

28. When a consumer calls Key Credit or when a sales agent returns a call to a consumer who submitted a "free consultation" form on the company's website, Key Credit's sales agents use sales scripts, including scripts created by Tsoukales. (Ex. 6 at 52:5-55:14, 65:11-19 (Tsoukales IH)).

**RESPONSE:** Undisputed that Key Credit representatives use scripts for guidance created by Tsoukalis and others. Key Credit disputes that sales representatives follow scripts verbatim; instead, they use them for general guidance. (Suppl. Hudson Aff., Ex. P at 43:7-19 (Tsoukalis Dep.).)

29. Key Credit's sales agents are instructed to explain the company's credit-repair program to consumers using the following language:

> "So, WHAT WE DO HERE - is we work on improving your Credit Scores by reducing the number of negative records that are placed in your report…. So, if you are dealing with any sort of Collections, Charged Off Accounts, Late Payments, Evictions, and Repossessions. Anything that is negative and damaging your Credit, we can help you with [sic]."

(Ex. 52 at KCR_0007769 (sales script, KCR_0007769); *see also* Ex. 53 at KCR_0007911 (Revised Sales Script 7.18.19, KCR_0007911)).

**RESPONSE:** Undisputed that the quotation in Paragraph 29 is an excerpt from a sales script. Key Credit disputes that the excerpted quote reflects all of the relevant information contained in Key Credit sales scripts and other information provided to prospective customers. (*See* Exhibits cited in Paragraph 29 above.) Sales representatives do not follow scripts verbatim and instead use them for general guidance. (Suppl. Hudson Aff., Ex. P at 43:7-19 (Tsoukalis Dep.).)

30. During calls with consumers, Key Credit's sales agents tell consumers that the company improves consumers' credit scores by reducing the number of negative items on consumers' credit reports with such explanations as:

> a. "[W]e will work on improving your score by reducing the numbers of negative items on your credit report, items such as collections, charge-offs, late payments, or inquiries. We do this by writing a series of letters to the credit agencies and your creditors …. The letters are disputed letters, appeals, goodwill interventions, violations letters …";

b. "What we basically do is to dispute and challenge negative items on your credit report to help you boost up your score, so if you want, we can complete a free credit consultation right now"; and

c. "[W]hat we do here is that we work on improving your credit score by reducing the number of negative records that are placed in your report."

(Ex. 54 at 11:23-12:13 (Consumer Call Transcript, KCR_0001838); Ex. 56 at 2:11-15 (Consumer Call Transcript, KCR_0001879) Ex. 55 at 25:7-14 (Consumer Call Transcript, KCR_0007782)).

**RESPONSE:** Undisputed that the quotations in Paragraph 30 are excerpts from three call transcripts. Key Credit disputes that the excerpted quotes reflect all of the relevant information contained in the call transcripts and other information provided to prospective customers. (*See* Exhibits cited in Paragraph 30 above.) Sales representatives do not follow scripts verbatim and instead use them for general guidance. (Suppl. Hudson Aff., Ex. P at 43:7-19 (Tsoukalis Dep.).)

31. During calls with consumers, Key Credit's sales agents tell consumers things like "we dispute every single negative item placed on your report with all 3 Credit Bureaus." (Ex. 52 (sales script, KCR_0007769); *see also* Ex. 57 (How it works script, KCR_0015851); Ex. 58 at KCR_0001780 (Full Sales Script, KCR_0001779); Ex. 59 at (2017 SMS Keycredit Templates, KCR_0015828); Ex. 56 at 26:1-5, 29:10-12 (Consumer Call Transcript, KCR_0007782); Ex. 60 at 17:1-9 (Consumer Call Transcript, KCR_0014169); Ex. 61 at 11:17-12:14 (Consumer Call Transcript, KCR_0001844); Ex. 55 at 13:22-14:5 (Consumer Call Transcript, KCR_0001879) ("Everything that affects and gives a negative impact on your credit, late payments, hard inquiries, collections, charge offs and bankruptcy, everything that's affecting your credit. We'll fight for everything sir.")).

**RESPONSE:** Undisputed that the quotation in Paragraph 31 is an excerpt from a sales script. Key Credit disputes that all sales scripts included the language quoted in Paragraph 31 and that the excerpted quote reflects all of the relevant information contained in the sales scripts, calls with consumers, or Key Credit's contracts with its customers. (*See, e.g.*, Exhibits cited in Paragraph 31 above.) For example, Key Credit expressly tells every customer that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report) . . . ." (*See* KCR SUF ¶ 36.) Sales representatives do not follow scripts verbatim

and instead use them for general guidance. (Suppl. Hudson Aff., Ex. P at 43:7-19 (Tsoukalis Dep.).)

32. When consumers ask how long the program takes, a sales script instructs sales agents to tell consumers: "On average when a client comes to us, they are normally around the 350's – 400's and they stay with us for about 6-9 months. On average they graduate our program with a 740 or above." (Ex. 52 (sales script, KCR_0007769)).

**RESPONSE:** Undisputed that the quotation in Paragraph 32 is an excerpt from a sales script. Key Credit disputes that the excerpted quote reflects all of the relevant information contained in the sales scripts, calls with consumers, or Key Credit's contracts with its customers. (*See*, e.g., Exhibit cited in Paragraph 32 above.) Sales representatives do not follow scripts verbatim and instead use them for general guidance. (Suppl. Hudson Aff., Ex. P at 43:7-19 (Tsoukalis Dep.).)

33. Key Credit provides periodic instructions to sales agents by email. (Ex. 62 (Tsoukales selling tips email KCR_0019812); Ex. 63 (Script and Negative Items email, KCR_0001777)).

**RESPONSE:** Undisputed. (*See, e.g.*, KCR SUF, ¶ 50.)

34. In a 2017 email providing "selling tips," Tsoukales instructed sales agents to "sell the benefits" of Key Credit's services by telling consumers:

> "We drastically improve your credit scores so you can start getting approved for things like home loans, car loans and credit cards again. We do this by removing negative items from your credit report. It's a fantastic process and our clients see an average 90 point increase in the first 90 days."

(Ex. 62 (Tsoukales selling tips email KCR_0019812)).

**RESPONSE:** Undisputed.

35. In 2021, a "senior enrollment counselor" emailed a sales agent encouraging her to tell prospective customers that "[o]ur typical client comes in with around 10-15 negative accounts they are with us for around 3-5 months and leave with A+ credit which is typically a 740 credit score and above." (Ex. 63 (Script and Negative Items email, KCR_0001777)).

**RESPONSE:** Undisputed.

36. During calls with consumers, Key Credit's sales agents make statements such as "the majority of our clients, they get 90 points in 90 days as an average," (Ex. 61 at 23:1-4

(Consumer Call Transcript, KCR_0001844); Ex. 55 at 13:4-8 (Consumer Call Transcript, KCR_0001879); *see also* Ex. 60 at 24:5-7 (Consumer Call Transcript, KCR_0014169); Ex. 64 at 11:25-12:3 (Consumer Call Transcript, KCR_0017956) Ex. 65 at 5:25-6:1 (Consumer Call Transcript, KCR_0019581); Ex. 66 at 8:18-20 (Consumer Call Transcript, KCR_0020918)).

**RESPONSE:** Undisputed that the quotation in Paragraph 36 is an excerpt from certain call transcripts. Key Credit disputes that the excerpted quote reflects all of the relevant information contained in the call transcripts and other information provided to prospective customers and disputes that the quoted language was stated in other calls. (*See* Exhibits cited in Paragraph 36 above.)

37. During calls with consumers, Key Credit's sales agents make statements such as "we need to fight for everything that's negative," "we … challenge every single negative item you have on your credit report," and "we're going to remove all negative items." (Ex. 61 at 5:12-13, 11:21-24 (Consumer Call Transcript, KCR_0001844); Ex. 55 at 2:11-13, 7:21-24 (Consumer Call Transcript, KCR_0001879); Ex. 56 at 25:10-14, 26:3-5, 28:23-25, 29:10-12 (Consumer Call Transcript, KCR_0007782); Ex. 67 at 5:12-15, 6:21-7:2, 12:21-24 (Consumer Call Transcript, KCR_0007797); Ex. 68 at 11:21-23 (Consumer Call Transcript, KCR_0019585); Ex. 69 at 3:4-5:17, 6:16-21 (Consumer Call Transcript, KCR_0020918); Ex. 70 at 8:18-20 (Consumer Call Transcript, KCR_0020923)).

**RESPONSE:** Undisputed that the quotation in Paragraph 37 is an excerpt from certain call transcripts. Key Credit disputes that the excerpted quotes reflect all of the relevant information contained in the call transcripts and other information provided to prospective customers and disputes that the quoted language was stated in other calls. (*See* Exhibits cited in Paragraph 37 above.) Key Credit advises every customer, in writing, that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report) . . . ." (*See* KCR SUF ¶ 36.)

38. Key Credit also tells consumers that the process takes time and encourages clients to "stick with it as long as you can afford it" because "[t]he worst thing that could happen is your credit continues to get way, way better." (Ex. 118 at KCR_0015823 (Client Q How long does it take); Ex. 53 at KCR_0007914 (Revised Sales Script 7.18.19)).

**RESPONSE:** Undisputed that the first quotation in Paragraph 38 is an excerpt from a sales script at Exhibit 118 cited above and that the second quotation is an excerpt from a sale script at Exhibit 53 cited above. Key Credit disputes that the excerpted quotes are from any sales call or otherwise reflect all of the relevant information contained in the sales scripts, calls with consumers, or Key Credits contracts with its customers. (*See, e.g.*, Exhibits cited in Paragraph 38 above.)

39. Key Credit offers customers two or three programs with differing levels of service depending on which programs were available when the customer enrolled:

a. Basic: Key Credit disputes five items a month with one credit bureau at a time;

b. Unlimited (sometimes called Standard): Key Credit disputes all negative items on a customer's credit report with all three major credit bureaus and provides purported "credit coaching"; and

c. Unlimited Plus (sometimes called Prime or Accelerated): In addition to the services included in the Unlimited program, for consumers with debts in collections, Key Credit provides cease and desist letters, debt-settlement templates, and sometimes sends debt-validation letters to debt collectors.

(Ex. 53 at KCR_0007912-13 (Revised Sales Script 7.18.19); Ex. 52 at KCR_0007771 (sale script); Ex. 119 at KCR_0015852 (scripts 12.27.18 new programs, KCR_0015852); Ex. 71 at KCR_0000335 (Sales Bible 6.20.18, KCR_0000320); Ex. 74 at 3 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023270, 74 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057371, 75 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057343 (2021 Service Agreement, KCR_0057340); *see also* Ex. 6 at 114:13-121:15 (Tsoukales IH)).

**RESPONSE:** Undisputed.

40. Key Credit charges a "First Work Fee" ranging from $99.95 to at least $289.95 then a monthly service fee ranging from $99.95 to at least $189.95, depending on the program selected. (Ex. 6 at 32:11-33:6, 114:13-121:15 (Tsoukales IH); Ex. 58 at KCR_0001779 (Full Sales Script); Ex. 53 at KCR_0007912-13 (Revised Sales Script 7.18.19, KCR_0007911); Ex. 59 at KCR_0015829-30 (2017 SMS Keycredit Templates, KCR_0015828); Ex. 71 at KCR_0000327, 335 (Sales Bible 6.20.18, KCR_0000320); Ex. 101 at KCR_0015855 (How much does it cost script, KCR_0015854); Ex. 73 at KCR_0057365 (2016 Service Agreement, KCR_0057364); Ex. 74 at 3 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023270, 74 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057371, 75 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057343 (2021 Service Agreement, KCR_0057340)).

**RESPONSE:** Undisputed that Key Credit has charged a First Work Fee between $99.95 to $289.95 and a monthly service fee between $99.95 to $189.95, depending on the program selected. Key Credit also frequently gives discounts and free months of services to customers. (Ex. 6 at 119:8-10; Ex. 7 ($100 discount).)

41. Sales agents request payment information and arrange the first payment during the initial sales pitch. (Ex. 54 at 5:17-19, 17:4-8 (Consumer Call Transcript, KCR_0001838); Ex. 61 at 22:11-23:22 (Consumer Call Transcript, KCR_0001844); Ex. 56 at 39:1-40:3 (Consumer Call Transcript, KCR_0007782); Ex. 60 at 30:6-24 (Consumer Call Transcript, KCR_0014169); Ex. 68 at 42:5-19 (Consumer Call Transcript, KCR_0019585); Ex. 69 at 27:1-28:25 (Consumer Call Transcript, KCR_0020918); Ex. 70 at 28:2-30:1(Consumer Call Transcript, KCR_0020923)).

**RESPONSE:** Undisputed that Key Credits sales representatives request payment information and arrange for receipt of the First Work Fee after the prospective customer has agreed to engage Key Credit to provide its services and pursuant to the written customer agreements. Key Credit disputes Paragraph 41 to the extent it implies that customers are charged before entering into the written customer agreement and disputes to the characterization on the basis that the characterization is not supported by the documents cited in Paragraph 41. Key Credit does not process a payment during any initial sales calls and Plaintiffs cite no evidence to the contrary because none exists. (*See* Hudson Aff. (Dkt. 114), Exs. J-L.)

42. The company processes payments for the first-work fees five days to two weeks after enrollment or on a specific date selected by the customer. Ex. 73 at KCR_0057364-65 (2016 Service Agreement, KCR_0057364); Ex. 74 at 2-3 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023269-70 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057369, 71 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057341, 43 (2021 Service Agreement, KCR_0057340); (Ex. 71 at KCR_0000328 (Sales Bible 6.20.18, KCR_0000320)("you can pick a first payment date); *see e.g.,* Ex. 61 at 17:14-19:1 (Consumer Call Transcript, KCR_0001844)(customer chooses first payment date); Ex. 55 at 14:6-15:14, 18:17-24 (Consumer Call Transcript, KCR_0001879).

**RESPONSE:** Undisputed.

43. Consumers are required to authorize Key Credit to automatically charge or debit both the first-work fees and the monthly fees. (Ex. 73 at KCR_0057364-65 (2016 Service Agreement, KCR_0057364); Ex. 74 at 3 (2018 Service Agreement, IH Ex 8); Ex. 75 at

KCR_0023268, 70 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057369, 71 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057341, 43 (2021 Service Agreement, KCR_0057340); Ex. 47, Attach. A at 4 (Decl. of Antionette Blunt with attachs. dated October 26, 2022)).

**RESPONSE:** Admitted, and such authorizations are made in writing by the customers.

44. Key Credit charges consumers monthly fees until the customer cancels or, in some instances, the company tells consumers that the monthly fees will cease after a given number of payments are made. (Ex. 71 at KCR_0000328 (Sales Bible 6.20.18, KCR_0000320); Ex. 59 at KCR_0015832 (2017 SMS Keycredit Templates, KCR_0015828); Ex. 54 at 12:15-19 (Consumer Call Transcript, KCR_0001838); Ex. 56 at 31:4-5 (Consumer Call Transcript, KCR_0007782); Ex. 60 at 16:8-10; 20:4-14 (Consumer Call Transcript, KCR_0014169); Ex. 65 at 6:18-7:1 (Consumer Call Transcript, KCR_0019581; Ex. 68 at 20:10-12 (Consumer Call Transcript, KCR_0019585); Ex. 69 at 7:9-19, 8:11-12 (Consumer Call Transcript, KCR_0020918); *see also* Ex. 73 at KCR_0057365 (2016 Service Agreement, KCR_0057364); Ex. 74 at 3 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023270 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057371 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057342-43 (2021 Service Agreement, KCR_0057340)).

**RESPONSE:** Undisputed. Key Credit also frequently gives discounts and free months of services to customers. (Ex. 6 at 119:8-10; Ex. 7.)

45. Key Credit's monthly charge is typically a static fee—it does not change and it is not related to the credit improvements achieved for customers. (Ex. 73 at KCR_0057365 (2016 Service Agreement, KCR_0057364); Ex. 74 at 3 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023270 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057371 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057343 (2021 Service Agreement, KCR_0057340); see also Ex. 53 at KCR_0007912-13 (Revised Sales Script 7.18.19); Ex. 52 at KCR_0007771 (sale script); Ex. 119 at KCR_0015852 (scripts 12.27.18 new programs, KCR_0015852); Ex. 71 at KCR_0000335 (Sales Bible 6.20.18, KCR_0000320)).

**RESPONSE:** Undisputed that Key Credit's monthly charge is typically a static fee that is agreed upon in writing, is not based on achieving improvements to a customer's credit; otherwise disputed as to the characterization which is not supported by the documents cited in Paragraph 45. Answering further, Key Credit charges in arrears for services it has provided. (*See* Exhibits cited in Paragraph 45 above.)

46. Key Credit does not set a timeframe in which all of the credit-repair services will be provided to a customer. (Ex. 4 at 50:20-55:5, 74:13-15 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); Ex. 7 at No. 16 (Def's Resp. to Pls.' Req. for Admis.); but *see* Ex. 73 at KCR_0057364

(2016 Service Agreement, KCR0057364) (setting a one-year period); Ex. 72 at KCR_0057369 (2019 Service Agreement, KCR_0057368) ("Client's credit report(s) will cease reflecting 10% of the entries Client had indicated are being inaccurately reported . . . within 90 days"; Ex. 75 at KCR_0023268 (2019 Service Agreement, KCR_0023268)(same)).

**RESPONSE:** Undisputed. Key Credit's customers set the time frame in which they agree to accept Key Credit's services and can cancel at any time without penalty. (*See* documents cited in Paragraph 46.)

47. Defendants charge consumers before they have provided a consumer report demonstrating that any results have been achieved, such report having been issued more than six months after achieving the results. Ex. 7 at Nos. 5, 14-15 (Def's Resp. to Pls.' Req. for Admis.); ECF 56 at ¶ 26 (Defs.' Answer to Am. Compl.); Ex. 6 33:1-6, 39:8-12, 114:13-116:1-9 (Tsoukales IH); Ex. 47 (Blunt Decl. with attachs.); Ex. 48 (Decl. of Robert Finney with attachs. dated October 27, 2022); Ex. 49 (Decl. of Clinton Perrow with attach. dated November 1, 2022); Ex. 50 (Decl. of Jeffrey Vess dated March 13, 2023); *see also* service agreements showing the company processes payments for the first-work fees five days to two weeks after enrollment (*see*, e.g. Ex. 74 at 2-3 (2018 Service Agreement, IH Ex 8); Ex. 72 at KCR_0057369, 71 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057341, 43 (2021 Service Agreement, KCR_0057340)).

**RESPONSE:** Undisputed; but Key Credit disputes that it has any legal obligation to provide a consumer report demonstrating that any results have been achieved, such report having been issued more than six months after achieving the results. (*See* KCR Motion for Summary Judgment and Memorandum in Support Thereof, Dkt. Nos. 110 and 111.)

48. Key Credit tells consumers that it requires "**NO CONTRACTS**." (*See, e.g.*, Ex. 53 at KCR_0007912 (Revised Sales Script 7.18.19, KCR_0007911); Ex. 52 at KCR_0007771 (sales script, KCR_0007769); Ex. 39 at KCR_0028393 (website capture of landing page from May, 1 2017, KCR_0028390); Ex. 25 at KCR_0028733 (website capture of free consultation page from May 18, 2017, KCR_0028731); Ex. 26 at KCR_0028757 (website capture of free consultation page from June 22, 2017, KCR_0028755); Ex. 29 at KCR_0029238 (website capture of free consultation page from Dec. 15, 2017, KCR_0029236); Ex. 54 at 5:11-13, 12:15-19 (Consumer Call Transcript, KCR_0001838); Ex. 56 at 31:4-5 (Consumer Call Transcript, KCR_0007782); Ex. 60 at 16:8-10 (Consumer Call Transcript, KCR_0014169); Ex. 68 at 20:7-8; 36:11 (Consumer Call Transcript, KCR_0019585); Ex. 69 at 6:13-14, 7:1-3, 8:6-12 (Consumer Call Transcript, KCR_0020918); Ex. 70 at 8:13-23 (Consumer Call Transcript, KCR_0020923); Ex. 79 at 5:17-19, 6:5 (Consumer Call Transcript, KCR_0020933); Ex. 80 at 7:5-22 (Consumer Call Transcript, KCR_0020938); *see also* Ex. 3 at 10 (April 2017 Business Plan, KCR_0025502).

**RESPONSE:** Undisputed that the language quoted in Paragraph 48 has appeared on Key Credit's website and in selected call transcripts. Key Credit disputes that quotation above reflects all of the relevant information contained in Key Credit's communications with its customers because Key Credit does not require a specific contractual time period as its customers themselves exclusively control the time period for which they choose to receive services from Key Credit. (*See* Exhibits cited in Paragraph 48 above.)

49. Key Credit requires consumers to sign a service agreement to enroll in services. (*See*, *e.g.*, Ex. 3 at 25 (April 2017 Business Plan, KCR_0025502); Ex. 58 at KCR_0001781 (Full Sales Script); Ex. 4 at 53:15-21(Key Credit 30(b)(6) Dep. (Tsoukales testimony)); *see* also Ex. 6 at 53:15-17; 107:4-19 (Tsoukales IH).

**RESPONSE:** Undisputed.

50. Between 2016 and 2021, Key Credit used multiple versions of a service agreement with slight variations between them. (Ex. 73 (2016 Service Agreement, KCR_0057364); Ex. 74 (2018 Service Agreement, IH Ex 8); Ex. 75 (2019 Service Agreement, KCR_0023268); Ex. 72 (2019 Service Agreement, KCR_0057368); Ex. 76 (2021 Service Agreement, KCR_0057340)).

**RESPONSE:** Undisputed.

51. Key Credit provides the service agreement electronically and customers sign it using an electronic document signing system, such as DocuSign. (Ex. 3 at 25, 28 (April 2017 Business Plan, KCR_0025502); Ex. 56 at 38:25-39:5 (Consumer Call Transcript, KCR_0007782); Ex. 60 at 30:2-24 (Consumer Call Transcript, KCR_0014169); Ex. 68 at 36:10-20 (Consumer Call Transcript, KCR_0019585); Ex. 66 at 26:16-24 (Consumer Call Transcript, KCR_0020918); Ex. 70 at 25:10-18, 27:21-25 (Consumer Call Transcript, KCR_0020923); Ex. 72 at KCR_0057376 (2019 Service Agreement, KCR_0057368)).

**RESPONSE:** Undisputed.

52. Consumers are asked to sign and return the agreement while still on the phone with Key Credit's sales agents. (*See* Ex. 59 at ___ (2017 SMS Keycredit Templates, KCR_0015828); Ex. 58 at KCR_0001779 (Full Sales Script); Ex. 68 at 36:10-42:25 (Consumer Call Transcript, KCR_0019585); Ex. 56 at 39:1-40:7 (Consumer Call Transcript, KCR_0007782); Ex. 69 at 26:16-28:24 (Consumer Call Transcript, KCR_0020918); Ex. 70 at 25:10-29:23 (Consumer Call Transcript, KCR_0020923)).

**RESPONSE:** Undisputed that customers who agree to accept services from Key Credit are then asked to review, ask questions, sign and return the written agreement provided to them which

sometimes occurs while on the phone and sometimes occurs after the phone calls. Key Credit disputes that customers must sign the agreements while on the phone because customers can (and do) sign the agreements at any time after the calls and the documents cited in Paragraph 52 provide no evidence to the contrary. Customers only sign the agreements "[w]hen they are ready to engage with [Key Credit] but before they become a client." (Pl. Ex. 4 at 53:15-21.)

53. Key Credit's service agreements state that it offers these types of services:

a. "[the company] agrees to evaluate Client's current credit profile and will advise Client on necessary steps to legally remove information";

b. "[the company] agrees to provide unlimited advice and credit coaching to Client" or "agrees to provide unlimited advice to Client regarding their credit report"; and

c. "[the company] will prepare all necessary correspondence in dispute of all inaccurate and unverifiable information on Client's credit reports;"

Ex. 73 at KCR_0057364 (2016 Service Agreement, KCR_0057364); Ex. 74 at 1 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023268 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057369 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057341 (2021 Service Agreement, KCR_0057340)).

**RESPONSE:** Undisputed that the quotations in Paragraph 53 are excerpts from service agreements, but Key Credit disputes that the excerpted quotes reflect all of the relevant information contained in Key Credit's contracts with its customers. (*See, e.g.*, Exhibits cited in Paragraph 53 above; Hudson Aff. (Dkt. 114), Exs. J-L.)

54. The service agreements disavow Key Credit's prior representations by stating that it will not "assist Client on improving Client's credit rating or record" and it "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report)" because "[a]ccurately reported items on a credit reports (sic) cannot be removed." Ex. 74 at 1 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023268 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057369 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057341 (2021 Service Agreement, KCR_0057340); *see also* Ex. 73 at KCR_0057364 (2016 Service Agreement, KCR_0057364)).

**RESPONSE:** Undisputed that Key Credit's customers are informed and expressly agree and acknowledge that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." Key Credit disputes that the written contracts disavow prior representations. (*See*, *e.g.*, Exhibits cited in paragraph 54 above including customers' express acknowledge and agreement that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement" and "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement."; *see also* Hudson Aff., Exs. J-L.)

55. The services actually performed by Key Credit for consumers are "credit dispute services" that consist of mailing letters to consumers' creditors and the three national consumer reporting agencies (CRAs). (Ex. 3 at 10 (April 2017 Business Plan, KCR_0025502); *see also* Ex. ___ at 29:15-25, 33:7-35:9 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); Ex. 4 at KCR_0007911-13 (Revised Sales Script 7.18.19, KCR_0007911); Ex. 52 at KCR_0007769-70 (sales script, KCR_0007769).

**RESPONSE:** Undisputed that Key Credit provides "credit dispute services" for its customers that include mailing letters to customers' creditors and the three national consumer reporting agencies (CRAs). Key Credit disputes that this is the only service that Key Credit provides to its customers. (*See* KCR SUF, ¶¶ 29, 31, 34.)

56. On its website, Key Credit describes the work it performs by stating that it: (1) analyzes consumers' credit reports by "looking for negative items like collections, charge-offs, tax liens, judgments and late payments that may be hurting your score"; (2) "write[s] to each of the 3 credit agencies (Transunion, Experian and Equifax) as well as the actual creditors" sending "letters [that] include disputes, appeals, validation requests and goodwill interventions"; (3) does this for "all of the negative items on [consumers'] reports"; and (4) "repeat[s] the process" whereby it " analyze[s] the items not yet removed and generate[s] new letters addressing them again" and it "will do this every 30-45 days until you are happy with the number of removals and/or the credit score increase you have as a result." Ex. 26 at KCR_0028758 (website capture of free consultation page from June 22, 2017, KCR_0028755); Ex. 25 at KCR_0028734 (website capture of free consultation page from May 18, 2017, KCR_0028731).

**RESPONSE:** Undisputed that the quotations in Paragraph 56 above are excerpted from various iterations of Key Credit's website. Key Credit disputes Paragraph 56 to the extent it implies that Key Credit does not advise every customer, in writing, that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report) . . . ." (*See* KCR SUF, ¶ 36.)

57. Key Credit could not identify a customer who gained at least a ninety-point increase in their credit scores within ninety days. (Ex. 40 at No. 7 (Def. Key Credit's Answer to Pls' Interrogs.)).

**RESPONSE:** Disputed, as the document cited in Paragraph 57 does not support the statement for which it is cited and because Key Credit's basis for its "90 point average credit score increase in the first 90 days" statement is based on Mr. Tsoukalis' personally "review[ing] thousands of credit reports" during the first "five to six years" of the company when he personally provided credit repair services to Key Credit's customers. (*See* Pl. Ex. 4 at 35:9-17; 175:20-177:21 (Key Credit 30(b)(6) Dep., Tsoukalis testimony).)

58. Key Credit's basis for its representation that consumers will see a "90 point average credit score increase in the first 90 days," is Tsoukales's personal observation. (Ex. 40 at 35:9-17; 175:20-177:21 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Undisputed that Key Credit's basis for its "90 point average credit score increase in the first 90 days" statement is based on Mr. Tsoukalis' personally "review[ing] thousands of credit reports" during the first "five to six years" of the company when he personally provided credit repair services to Key Credit's customers. (*See* Pl. Ex. 4 at 35:9-17, 175:20-177:21 (Key Credit 30(b)(6) Dep., Tsoukalis testimony).)

59. On behalf of Key Credit, Tsoukales testified that the 90-point representation came from "data" not based on "an algorithm or a spreadsheet," but in his mind from when he "was working with people closely. . . when [the] company was smaller." (Ex. 4 at 177:2-6. (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Disputed. Key Credit's basis for its "90 point average credit score increase in the first 90 days" statement is based on Mr. Tsoukalis' personally "review[ing] thousands of credit reports" during the first "five to six years" of the company when he personally provided credit repair services to Key Credit's customers. (*See* Pl. Ex. 4 at 35:9-17, 175:20-177:21 (Key Credit 30(b)(6) Dep., Tsoukalis testimony).)

60. Key Credit does not track or calculate either the (1) the average credit score changes of its customers or (2) its customers' credit score improvements in the first 90 days of services. (Ex. 4 at 174:22-178:23 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)). Ex. 6 at 92:2-93:16 (Tsoukales IH)).

**RESPONSE:** Disputed, as the documents cited do not support the statement in Paragraph 60. If customers provide Key Credit with access to their credit reports then Key Credit can and does track credit score changes and improvements in the first 90 days of service. (Pl. Ex. 4 at 174:22-175:19, 176:12-177:6.)

61. Tsoukales testified that Key Credit cannot remove negative items that are accurate and within the limitations period. (Ex. 4 at 178:24-179:16 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Disputed. Mr. Tsoukalis was asked whether it is possible to "remove something" if the record is accurate and he testified (correctly) that "If something has passed the statute of limitations, it could have happened and it was accurate at that time but it is now obsolete. So that is an example of something that was accurate at one point but not accurate today. Many of the credit reports have examples of items like that. If the record is verified and confirmed and documented, then it cannot be removed." (Pl. Ex. 4 at 179:3-16.) Answering further, Key Credit advises every customer, in writing, that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report) . . . ." (*See* KCR SUF, ¶ 36.)

62. Key Credit does not track whether its services result in the removal of, or permanent removal of, negative items from customers' credit reports. (Ex. 4 Depo: 178:12-20. (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Disputed. (*See* Pl. Ex. 4 at 174:22-175:19, 176:12-177:6, 178:8-20.)

63. Customers complain that Key Credit's services did not result in an increase to their credit scores or in the removal of negative items on their credit reports and consumers have reported being distressed and vulnerable when they sought assistance from Key Credit. (Ex. 1 at ¶ 14-20 (Schneider Decl.); Ex. 47 (Blunt Decl. with attachs.); Ex. 48 (Finney Decl. with attachs.); Ex. 49 (Perrow Decl. with attachs.); Ex. 50 (Vess Decl.)).

**RESPONSE:** Key Credit does not dispute that Plaintiffs purport to have identified 106 complaints from more than 40,000 consumers who worked with Key Credit from 2016 through 2019 alone, reflecting purported complaints from approximately 0.002% of Key Credit's customers during that 4-year period. Key Credit disputes Paragraph 63 on the grounds that the microscopically small number of complaints to which it refers is inadmissible under the Federal Rules of Evidence, including the Hearsay Rule.

64. Tsoukales personally "created thousands of documents" related to Key Credit's business activities and he oversees "everything" at the company. (Ex. 4 at 56:2-8 56:11-62:14 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 6 at 27:7-28:1(Tsoukales IH).

**RESPONSE:** Undisputed that over more than 15 years Mr. Tsoukalis has created thousands of documents and oversees the company. Key Credit otherwise disputes Paragraph 64 because Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. [Mr. Tsoukalis doesn't], mostly." (Pl. Ex. 5 at 25:1-6.)

65. Tsoukales is responsible for Key Credit's marketing. (Ex. 4 at 108:14-109:12 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 5 at 15:25-16:9 (Tsoukales Dep.); Ex. 6 at 80:13-82:3 (Tsoukales IH); Ex. 21 (email from Tsoukales to lead generator about new telemarketing campaign to generate clients, KCR_0020652); Ex. 81 (email from Tsoukales to Key Credit staff about new marketing initiatives, KCR_0008230); Ex. 82 (email from Key Credit representative to Tsoukales with summaries of Key Credit sales agents' performances, KCR_0001812).

**RESPONSE:** Disputed, as the documents cited in Paragraph 65 do not support the proposition for which they are cited. As of October 18, 2022, Mr. Tsoukalis "only recently" began managing

Google Ad campaigns in which "quite a few people" provided input – including third-parties, marketing agencies and freelancers – that are not run by the company. (Pl. Ex. 4 at 108:14-109:17.) Mr. Tsoukalis has "ma[de] suggestions" and Key Credit's management team "collectively decides" on Key Credit's marketing. (Pl. Ex. 5 at 16:4-9.) Mr. Tsoukalis relies on "a management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II).) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I don't, mostly." (Pl. Ex. 5 at 25:1-6.)

66. Tsoukales leads Key Credit's relationships with its marketing partners, including lead generators and search engines, such as Google. (Ex. 4 at 108:14-109:12 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 81 at KCR_0008230 (email from Tsoukales to Key Credit staff about new marketing initiatives); Ex. 121 at KCR_0008793 (email from Tsoukales launching new outbound telemarketing campaign).

**RESPONSE:** Disputed, as the documents cited in Paragraph 66 do not support the proposition for which they are cited. As of October 18, 2022, Mr. Tsoukalis "only recently" began managing Google Ad campaigns in which "quite a few people" provided input – including third-parties, marketing agencies and freelancers – that are not run by the company. (Pl. Ex. 4 at 108:14-109:17.) Mr. Tsoukalis has "ma[de] suggestions" on marketing to Key Credit's "management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. S at 16:4-9, 20:25-21:8 (Tsoukalis Dep. II).)

67. Tsoukales is responsible for the content of Key Credit's website. (Ex. 4 at 86:24-87:25, 94:14-96:22 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 83 at KCR_0019586) (email exchange with Tsoukales directing changes to Key Credit website); Ex. 84 at KCR_0021134 (email exchange with Tsoukales directing changes to Key Credit website).

**RESPONSE:** Disputed. Key Credit's website and its content were provided by a third-party company known as Conversion Hut which has responsibility for the website and its contents. (Pl. Ex. 4 at 86:15-87:13, 94:14-95:4.) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I don't, mostly." (Pl. Ex. 5 at 25:1-6.)

68. Tsoukales conducts marketing on behalf of Key Credit including creating and appearing in videos and sharing personal testimonials about Key Credit's credit-repair services. (Ex. 85 at KCR_0027341 (Tsoukales video on Key Credit's website); Ex. 86 at KCR_0027346 (Tsoukales "insider credit tips" on Key Credit's website; Ex. 87 at KCR_0039534 (Tsoukales testimonial on Key Credit's website telling consumers "[f]eel free to contact me").

**RESPONSE:** Undisputed that Mr. Tsoukalis has created and appeared in videos and shared personal testimonials about Key Credit's credit-repair services. Otherwise disputed because Mr. Tsoukalis has "ma[de] suggestions" on marketing to Key Credit's "management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. S at 16:4-9, 20:25-21:8 (Tsoukalis Dep. II).) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I don't, mostly." (Pl. Ex. 5 at 25:1-6.)

69. Tsoukales has directly engaged with consumers in the marketing and sale of Key Credit's credit-repair services and states that he has conducted more than 15,000 sales consultations himself. (Ex. 4 at 49:13-18, 55:9-56:8 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 5at 7:18-9:9 at (Tsoukales Dep.); Ex. 89 at KCR_14170 (email exchange telling a consumer that Tsoukales will handle the consumer's Key Credit consultation because "our owner handles the majority of the consultations to ensure that you get the best service levels possible").

**RESPONSE:** Disputed that Mr. Tsoukalis has always and directly engaged with consumers in the marketing and sale of Key Credit services. Undisputed that approximately 15 years ago when he started Key Credit and had no other employees, Mr. Tsoukalis engaged directly with consumers in the sale of Key Credit's services and conducted more than 15,000 sales consultations himself. At that time, "like many small businesses, [Mr. Tsoukalis] did everything from speaking to clients and washing the windows and literally cleaning the office and the ordering supplies and even cleaning bathrooms, typical of many small businesses. (Pl. Ex. 5 at 8:2-9.) However, over time as the business grew, Key Credit created "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't, mostly." (Pl. Ex. 5 at 25:1-6.) And Mr. Tsoukalis stopped taking the customer service and sales calls himself. (Pl. Ex. 4 at 13:4-10; Pl. Ex. 5 at 8:1-9.)

70. Tsoukales receives and reviews consumer complaints, responds to Better Business Bureau (BBB) complaints, and guides staff on how to respond to other consumer complaints. (Ex. 5 at 24:13-25 (Tsoukales Dep.); Ex. 90 at KCR_0002497) (2017 consumer complaint sent to Tsoukales) Ex. 91 at KCR_0006728 (2019 consumer complaint sent to Tsoukales); Ex. 92 at KCR_0007379 (2020 consumer complaint sent to Tsoukales; Ex. 93 at KCR_0019375 (2016 consumer complaint sent to Tsoukales); Ex. 94 at KCR_0021114 (2019 consumer compliant sent to Tsoukales; (Ex. 1 at ¶ 14-20 (Schneider Decl.)).

**RESPONSE:** Disputed. Customer complaints are handled by Key Credit's customer support team, headed by Jennifer Hadayia, who are "more experienced than [Mr. Tsoukalis] in client support issues, to address the issue appropriated. (Pl. Ex. 5 at 24:13-25.) Consumers reach out to Mr. Tsoukalis with complaints "very, very rarely . . . [Key Credit] ha[s] an entire team of managers and team leaders and staff that handles the day to day. I don't, mostly." (Pl. Ex. 5 at 25:1-6.) Mr. Tsoukalis does not "field those responses [to complaints]. Those responses are dealt with by [Key Credit's] client support team, Jennifer Hadayia." (Pl. Ex. 5 at 26:23-27:5.) Mr. Tsoukalis would be involved only if a complaint was provided to the "customer support team and someone from the team shared that with me and possibly asked me for guidance., in which case I would give it or ask the head of our client support team . . . to address the issue appropriately." (Pl. Ex. 5 at 24:17-25)

71. Tsoukales drafts and reviews Key Credit's sales scripts, including scripts used by third-party lead generators, and gives tips to sales agents on how to sell Key Credit's services. (Ex. 5 at 16:14-22 (Tsoukales Dep.); Ex. 6 at 52:5-10 (Tsoukales IH); Ex. 95(Tsoukales email to sales agents regarding Key Credit's and scripts, KCR_0000577); Ex. 96 (email with Tsoukales' new sales script for affiliates, KCR_0001785); Ex. 97 at (email instructing sales agents to "follow the exact script [Tsoukales] sent yesterday when dealing with affiliates," KCR_0015241); Ex. 10 (Key Credit "click to dial" program "this is the single best tool to kill outbound calls LIKE A BOSS," at KCR_0016006); Ex. 22 (email from Tsoukales instructing sales team to use new script for affiliate sales calls, KCR_0020373); Ex. 15 (email exchange between Tsoukales and lead generator launching new telemarketing campaign with Tsoukales' telemarketing script, KCR_0021218 ); Ex. 18 (email about new Key Credit telemarketing campaign "[Tsoukales] wants you to follow the script he sent out yesterday," KCR_0008647); Ex. 102 (email from Tsoukales to Key Credit client relations employee with sales script: "This is the money pitch. I've done [over] 15k of these myself. It's excellent." KCR_0019016); Ex. 103 (Tsoukales selling tips email, KCR_0019812).

**RESPONSE:** Undisputed that Mr. Tsoukalis reviews Key Credit's sales scripts, including scripts used by third-party lead generators, and sent the emails cited in Paragraph 71 above to sales representatives with tips on how to sell Key Credit's services to prospective customers. Otherwise disputed. Mr. Tsoukalis does not draft sales scripts, which is instead handled by "a management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. P at 41:14-23, 44:6-19, 47:3-20 (Tsoukalis Dep.); Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II).) Melina Vallas is Key Credit's "head of sales" and she, not Mr. Tsoukalis, and "runs" the sale department. (Pl. Ex. 5 at 27:6-15, 27:20-22.) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't, mostly." (Pl. Ex. 5 at 25:1-6.) Issues and practices regarding Key Credit sales representatives are "formulated collectively" by Key Credit's "head of sales, client support, sales team leaders, support team leaders, operations, managers, and team leaders." (Pl. Ex. 5 at 17:10-17.) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't, mostly." (Pl. Ex. 5 at 25:1-6.) Key Credit has "a management team in charge of many of the day-to-day tacks of the company." (Suppl. Hudson Aff., Ex. S at 21:4-8 (Tsoukalis Dep. II).)

72. Tsoukales monitors Defendants' inbound and outbound call volume, participates in the hiring and training of Defendants' sales agents and customer representatives, reviews sale agents' calls, and monitors and guides their work, compensation, bonuses, and commissions. (Ex. 5 at 16:18-17:3, 19:21-20:17, 29:3-5 (Tsoukales Dep.); Ex. 104 (email from Tsoukales with Key Credit's daily telemarketing sales report, KCR_0009024) Ex. 105 (Tsoukales training videos and recordings "how. . . to do the perfect consultation," KCR_0000539); Ex. __ (Tsoukales email to sales team with Tsoukales' "sales bible". . ."save it. read it, ask me questions. . . become a ninja," KCR_0000592); Ex. 107 (email exchange with Tsoukales launching a search for 10 new sales agents "to hit our goal," KCR_0011778); Ex. 108 (email exchange from Tsoukales "I was listening to [sales agents'] calls today and they didn't sound like 100's to me. Please check today's calls in call rail. They sound like kaka," KCR_0001757); Ex. 109 (email exchange with Tsoukales reviewing Key Credit Repair's sales agents' calls, KCR_0001814); Ex. 110 (email to Tsoukales regarding sales agents' performance, KCR_0008854 ); Ex. 99 (email from Tsoukales about sales agent's resignation, KCR_0010606); Ex. 14 (Tsoukales email to sales team handling new leads from affiliate telemarketing campaign "[these] leads. . . need to get screened VERY FAST so we're not wasting our time and money," KCR_0020375); Ex. 112 (Tsoukales email to Key Credit Repair

sales agents about commission structure, KCR_0002291); Ex. 113 (Tsoukales email exchange about sales agents' bonuses, KCR_0003084); Ex. 114 (Tsoukales email about payroll, KCR_0009911); Ex. 115 (Tsoukales email about payroll and bonuses, KCR_0010041); Ex. 116 (Tsoukales email about team leader bonuses, KCR_0010314).

**RESPONSE:** Undisputed that Mr. Tsoukalis has received reports on Key Credit's call volume; otherwise disputed. Mr. Tsoukalis does not review sales calls made by Key Credit's sales representatives. (Pl. Ex. 5 at 19:17-20.) Melina Vallas is Key Credit's "head of sales" and she, not Mr. Tsoukalis, "is in charge of making decisions about to who to hire and terminate" and "runs" the sale department. (Pl. Ex. 5 at 27:6-15, 27:20-22.) Other issues and practices regarding Key Credit sales representatives are "formulated collectively" by Key Credit's "head of sales, client support, sales team leaders, support team leaders, operations, managers, and team leaders." (Pl. Ex. 5 at 17:10-17.) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't, mostly." (Pl. Ex. 5 at 25:1-6.) Key Credit has "a management team in charge of many of the day-to-day tacks of the company." (Suppl. Hudson Aff., Ex. S at 21:4-8 (Tsoukalis Dep. II).)

73. Tsoukales plays a role in determining the fees charged to consumers and authored the company's service agreements, which set out the company's fee structure. (Ex. 4 at 17:21-24, compare to 27:6-15 (Tsoukales Dep.); Ex. 5 at 51:18-52:17 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Key Credit does not dispute that Key Credit's service agreements were created by Key Credit's regulatory lawyers at the law firm of Greenspoon Marder, who also advised Key Credit on the fees charged to its customers; otherwise disputed. (Pl. Ex. 4 at 52:16-21; Pl. Ex. 5 at 18:1-13.)

74. Tsoukales was responsible for setting up Key Credit's bank accounts, is a signatory on all the accounts, has a role in determining the fees charged to consumers, and bases his income on the profits of the company. (Ex. 5 at 10:20-11:13; 12:4-10 (Tsoukales Dep.)).

**<u>RESPONSE:</u>** Key Credit disputes that Mr. Tsoukalis "has a role in determining the fees charged to consumers", as the document cited in Paragraph 74 does not support that statement, and to the extent that Key Credit's service agreements were created by Key Credit's regulatory lawyers at the law firm of Greenspoon Marder, who also advised Key Credit on the fees charged to its customers. (Pl. Ex. 4 at 52:16-21; Pl. Ex. 5 at 18:1-13.) Otherwise undisputed.

75. Credit repair is Key Credit's only product or service and "99.9 percent of [its] revenues are from credit repair services." (Ex. 6 at 29:15-30:13 (Tsoukales IH); Ex. 4 at 164:20-165:2 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**<u>RESPONSE:</u>** Undisputed.

76. Key Credit provided its annual gross revenue figures for each year from 2008 to 2021, and for 2022 it provided its gross revenue from January 1, 2022, through March 22, 2022. (Ex. 40 at No. 1 (Defs' Answers to Interrogs.)).

**<u>RESPONSE:</u>** Undisputed.

77. To capture the amount of gross revenue attributable to telemarketing, the Bureau added the gross revenue amounts from 2011 (the first full year during which Key Credit engaged in telemarketing) through March 22, 2022, which totals $31,723,003:

a. 2011: $539,425.00

b. 2012: $899,904.00

c. 2013: $1,299,689.00

d. 2014: $1,928,116.00

e. 2015: $2,031,084.00

f. 2016: $3,136,907.00

g. 2017: $4,467,380.00

h. 2018: $5,016,892.00

i. 2019: $3,996,726.00

j. 2020: $3,524,671.00

k. 2021: $3,949,966.81

l. 2022 through March 22, 2022: $932,242.35

(Ex. 40 at No. 1 (Defs' Answers to Interrogs.); Ex. 7 at No. 3 (Def's Resp. to Pls.' Req. for Admis.) (Key Credit began offering credit-repair services to consumers over the telephone in 2010)).

**RESPONSE:** Key Credit disputes Plaintiffs' characterization that Key Credit's gross revenues from 2011 through March 22, 2022 are attributable to telemarketing and that Key Credit engaged in telemarketing, which is a legal term of art and not an assertion of material fact to which a response is required. Key Credit does not dispute the gross revenue amounts listed in Paragraph 77. Otherwise undisputed.

78. Defendants do not maintain a trust account as required by Massachusetts. (Ex. 4 at 62:15-63:2 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Undisputed.

79. Defendants' service agreements do not disclose (a) a statement asserting the buyer's right to proceed against the surety bond or trust account required § 68B of the MA-CSO or (b) the name and business address of any such surety company and trust-account depository, together with the name of the trustee and the account number. (*See* Ex. 73 (2016 Service Agreement, KCR_0057364); Ex. 74 (2018 Service Agreement, IH Ex 8); Ex. 75 (2019 Service Agreement, KCR_0023268); Ex. 72 (2019 Service Agreement, KCR_0057368); Ex. 76 (2021 Service Agreement, KCR_0057340); Ex. 4 at 67:7-76:7 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Undisputed that Key Credit service agreements do not contain a statement asserting the buyer's right to proceed against the surety bond or trust account or the name and business address of any such surety company and trust-account depository, together with the name of the trustee and the account number. Key Credit otherwise disputes Paragraph 79 on the basis that it calls for a legal conclusion.

80. Defendants' service agreements do not disclose (a) a complete and detailed description of the services to be performed by the company and the total cost to the buyer for such services or (b) the terms and conditions of payment, including the total of all payments to be made by the buyer. (*See* Ex. 73 (2016 Service Agreement, KCR_0057364); Ex. 74 (2018 Service Agreement, IH Ex 8); Ex. 75 (2019 Service Agreement, KCR_0023268); Ex. 72 (2019 Service

Agreement, KCR_0057368); Ex. 76 (2021 Service Agreement, KCR_0057340); Ex. 4 at 67:7-76:7 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

**RESPONSE:** Disputed. (*See* Exhibits cited in paragraph 80 above; Hudson Aff. (Dkt. 114), Exs. J-L.)

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

**I. Credit Report Errors and Consumer Complaints**

1. Credit reports habitually contain erroneous information that harms consumers. (KCR SUF, ¶ 10.[2]) The Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau (the "Bureau") accept consumer complaints related to CRAs. (*Id.* ¶ 11.) Both agencies have reported an increase in complaints related to CRAs in recent years. (*Id.*) The FTC tracks these complaints and has found that credit reporting complaints have been among the top consumer complaints since 1997, accounting for approximately 20% of all complaints received. (*Id*.)

2. In 2020, the FTC received over 246,000 credit reporting complaints. (KCR SUF, ¶ 12.) The most common issues reported by consumers included incorrect information on credit reports, difficulty obtaining credit reports, difficulty disputing errors, and unauthorized inquiries. (*Id*.) Compared to other complaint categories, complaints related to CRAs consistently rank among the top categories received by both agencies. (*Id*.) For example, a PERC research report analyzed a sample of 200 credit reports from each of the three major CRAs - Equifax, Experian, and TransUnion - and found that a significant number of credit reports contained errors. (*Id.* ¶ 13.) Specifically, 26% of the credit reports contained at least one "material error" which is defined as an error that could negatively impact a consumer's creditworthiness or ability to obtain credit. (*Id*.)

[2] References to "KCR SUF" are to Defendants' Statement of Undisputed Material Facts filed in Support of Their Motion for Summary Judgment on Counts I-V of the Amended Complaint. (Dkt. 112.)

3. To protect consumers from these errors, Congress enacted the Fair Credit Reporting Act ("FCRA") nearly 40 years ago. (*Id.* ¶ 14.) One of FCRA's key provisions requires credit bureaus to conduct a reasonable investigation when a consumer disputes an item in their credit report. (*Id*.)

**II. Credit Repair Companies**

4. Credit repair services are "not a one size fits all" approach because "[e]very credit report, financial situation, and human being has different goals with different timelines" for each customer's specific goals. (KCR SUF, ¶ 16.) Credit repair companies – like Key Credit – provide a wide range of credit repair services to help consumers enforce their legal rights to ensure that items on their credit reports are fair, accurate and substantiated. (*Id.* ¶ 15.) Among other things, these services address the problems recognized by the FTC and the Bureau; namely, that there are errors and inaccuracies in a consumer's credit report that should be corrected and that harm the consumer's credit worthiness. (*Id*.) Some credit repair companies – like Key Credit – also provide credit counseling and coaching to customers. (*Id*.)

**III. The TSR**

5. The FTC promulgated the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310, to carry out the Telemarketing and Consumer Fraud and Abuse Prevention Act's ("Telemarketing Act") direction to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1).

6. Relevant here, one of the TSR's restrictions includes a prohibition on asking for, or receiving, payment for credit repair services that "promised results." Specifically, the TSR's Advance Fee Provision states, in pertinent part:

> (a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

> (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
>
> > (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; ***and***
> >
> > (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that ***the promised results*** have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2)(i)-(ii), emphasis added.

7. The requirement to show that "promised results" had still been achieved six months later was the result of a specific type of fraudulent scheme perpetrated by "fundamentally bogus" entities holding themselves out as credit repair companies. (KCR SUF, ¶ 19.) In 2002, the FTC provided further explanation of the rationale underlying the Advance Fee Provision. (*Id.* ¶ 20.) Specifically, the FTC explained that the Advance Fee Provision falls within "the purview of its traditional unfairness analysis" because, according to the FTC, "[a]n important characteristic common to credit repair services" scams prohibited by the TSR "is that in each case the offered service is fundamentally bogus." (*Id.*) Indeed, "the essence of these schemes" was "to take consumers' money for services that the seller has no intention of providing and in fact does not provide." (*Id.*) Accordingly, the Advance Fee Provision was intended to prevent unfair conduct that the FTC viewed as "outright theft." (*Id.*)

8. The FTC's recent guidance further explains the deceptive conduct targeted by the Advance Fee Provision: a wrongdoer may claim to provide credit repair services and will give the appearance of providing effective services by "flooding a credit bureau with letters disputing the

accuracy of [legitimate] negative entries," which result in credit reporting agencies temporarily removing the negative entries pending an investigation. (KCR SUF, ¶ 21.) Faced with such challenges, CRAs sometimes cannot complete the investigations within the statutorily required 30-day period, so the negative tradelines are provisionally removed from a consumer's credit report. (*Id.* ¶ 22) The temporary removal of such negative tradelines gives the appearance that the consumer's credit record has improved. (*Id*.) The wrongdoer then takes the consumer's money and the negative/accurate tradelines are returned to the consumer's credit report after the completed investigation confirms that no basis for removal exists. (*Id*.)

9. In commenting on the TSR's Advance Fee Provision, the U.S. Postal Service stated that it was necessary to distinguish "[s]o-called credit repair services" from "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer." (KCR SUF, ¶ 23.) The "[s]o-called credit repair services" would typically only provide "written advice to customers on how to obtain copies of their credit reports" and encourage customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (*Id*.)

## IV. Key Credit and Its Services

10. In 2008, Key Credit began providing credit repair services to qualified customers from its office in Mattapan, Massachusetts. (KCR SUF, ¶ 26.) At relevant times, Key Credit' senior leadership consisted of Nikitas Tsoukalis (Founder and CEO), Jennifer Hadayia (Vice President of Customer Service), Melina Vallas (Head of Sales), Maria Steeves (Head of Operations), and Alejandra Martinez (Head of Quality Control). (*Id*.)

11. Key Credit is a licensed credit repair company in all states in which it operates. (*Id.* ¶ 27.) Key Credit has long maintained an "A" rating with the Better Business Bureau. (*Id.* ¶ 28.)

12. Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit including: learning each customer's specific concerns and goals; consulting with each consumer about inaccurate and challengeable items on their credit report; analyzing each customer's credit report; preparing and sending written disputes of inaccurate negative items on a customer's credit reports; following up with credit reporting agencies to ensure that inaccurate/questionable negative tradelines are removed from a customer's credit report; analyzing new credit reports to ensure that inaccurate/questionable negative items have been removed; creating a customized action plan to help improve the customer's credit score; and providing credit counseling and coaching to customers so that they can make educated and informed decisions about their personal credit for themselves. (*Id.* ¶ 29.)

13. Key Credit has a proven track record in assisting its customers in disputing and removing inaccurate, negative items on their credit reports. (*Id.* ¶ 30.) Key Credit's comprehensive, multi-faceted approach also includes counseling and educating its customers on how to build and maintain a healthy mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. (*Id.* ¶ 31.)

14. As a long-standing "A"-rated member of the Better Business Bureau, Key Credit enters into written contracts with all of its qualified customers. (*Id.* ¶ 32.) The contracts are short, written in plain language, and contain all disclosures required under CROA. (*Id.* ¶ 33.) Customers only sign the agreements "[w]hen they are ready to engage with [Key Credit] but before they become a client." (Pl. Ex. 4 at 53:15-21.) The written contracts also explicitly set forth the scope of the services it provides to its customers, clearly stating that:

- Key Credit "agrees to evaluate the Client's current credit profile and will advise Client on the necessary steps to legally remove information that is not accurate, complete, or verifiable."

- Key Credit "will provide the following credit repair services . . . [s]uch services will include attempts to remove inaccurate, erroneous, and/or obsolete credit information reported by Equifax, Experian and TransUnion to the Client's Credit Report . . . . will continually analyze and review Client's status . . . will respond to, receive, and/or initiat[e] correspondence from Client. . . will assist Client in responding to, receiving, and/or initiating correspondence via email regarding Client's Credit Report(s) . . . will create letters and/or emails and/or faxes and/or electronic communications and/or other written communications for Client in an attempt to correct errors and other items appearing on the Client's credit reports which Client indicates are inaccurate, incomplete, outdated, or unverified as per the [FCRA]. This includes preparation and transmittal of written correspondence to credit bureaus to verify and/or dispute items appearing on the Client's credit report. [Key Credit] will review and analyze all correspondence received from credit bureaus, creditors, and others . . . will conduct follow up calls with Client to discuss Client's status and strategy . . . will review the Client's credit report updates to determine subsequent steps . . . will assist Client with credit questions."

- Key Credit "will prepare all necessary correspondence in dispute of all inaccurate and unverifiable information on Client's credit reports (Experian, Equifax, TransUnion) and will stamp and mail for client. . . will prepare and mail to each collection agency that can validate a debt a settlement offer. . . will agree to prepare and mail each collection agency a formal validation request to ensure Client is only paying off verifiable and accurate collections. . . [and] agrees to provide unlimited advice and credit coaching to Client."

(KCR SUF, ¶ 34.)

15. Plaintiffs do not allege or claim that Key Credit's services described above were "bogus" or that it failed to perform its contracted-for services whatsoever. (*Id.* ¶ 35.)

16. In their contracts, Key Credit and its customers also agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (*Id.* ¶ 36.) Finally, Key Credit's consumers explicitly acknowledge and agree in their written contracts that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (*Id.* ¶ 37.) Each customer

also expressly acknowledges that "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement." (*Id.* ¶ 38.)

17. If customers provide Key Credit with access to their credit reports, then Key Credit can and does track credit score changes and improvements in the first 90 days of service. (Pl. Ex. 4 at 174:22-175:19; 176:12-177:6.)

18. Key Credit does not offer "bogus" services or schemes that "take consumers' money for services that the seller has no intention of providing and in fact does not provide," much less place any conditions on the receipt of fees for "promised results" that any fair and reasonable person could view as "outright theft." (KCR SUF, ¶ 39.) Key Credit also does not and has never engaged in the practice of "flooding" CRAs with dispute letters, whether with the purpose of temporarily removing negative tradelines or otherwise. (*Id.* ¶ 40.) Nor has Key Credit ever encouraged customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (*Id.* ¶ 41.) Further, Key Credit has never been found to have violated any provision of CROA, including CROA's prohibition against false or deceptive advertising or conduct. (*Id.* ¶ 42.)

## V. Key Credit's Billing Practices

19. After a customer signs the written contract, Key Credit waits a minimum of five business days before allowing a customer to make a payment. (KCR SUF, ¶ 43.) Key Credit does so only after the "first work" is fully completed. (*Id.*) "First work" consists of analyzing the customer's credit reports, completing all required data entry, creating all dispute letters, and auditing the credit records. (*Id.*) Subsequent fees are billed on a monthly basis in accordance with the written contracts for services that are fully performed before that fee is charged. (*Id.*) Key

Credit's customers determine how long they choose to use Key Credit's services and always retain the right to cancel at any time without penalty. (*Id*. ¶ 44.)

## VI. Key Credit Does Not "Promise Results" to Its Customers"

20. Key Credit provides various safeguards to ensure that its services are accurate and provide "complete clarity" to its customers. (KCR SUF, ¶ 45.) First, Key Credit enters into written contracts that clearly and unambiguously set forth the specific services that Key Credit agrees to provide and what Key Credit does (and does not) promise. (*Id.* ¶ 46.) In addition to listing its specific services, Key Credit and its customers agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (*Id.* ¶ 47.)

21. Second, Key Credit provides its representatives with scripts and trains its sales representatives on understanding credit scores, understanding Key Credit's action plans, interacting with customers, and important regulatory information. (*Id.* ¶ 48.) Sales representatives do not follow scripts verbatim and instead use them for general guidance. (Pl. Ex. 4 at 43:7-19.) In its scripts for sales consultants, Key Credit advises prospective customers that "if there is something they want to challenge [on their credit reports], we'll challenge it for them. We will do the leg work, we'll create and mail the letters for them . . . . We'll be their credit coach while they're with us . . . [and that] if they follow the action plan and if they really understand how their credit works that they can improve their credit score." (KCR SUF, ¶ 49.) Key Credit also trains its sales consultants that "We do not guarantee a specific score change" and "do not guarantee a specific deletion rate" to its customers. (*Id*. ¶ 50.)

22. Key Credit also informs sales representatives to:

- "Never promise a timeline
- Never promise we can delete something

- Never tell someone we will get all of the items removed
- Results always vary
- We are brutally honest and that is what's [sic] sets us apart
- Always
  - Let clients know only something that cannot be verified can be deleted
  - Let clients know that if something cannot be verified it cannot remain on credit
  - We increase the odds of removing more items than other companies because we work on all 3 [credit reporting] agencies at the same time and every negative record
  - Give examples of how something can be removed and explain our process.
- Please be careful not to overpromise. This is the only thing that can quickly end a career. The best salesman [sic] are brutally honest."

(*Id.* ¶ 51.) Key Credit also trains its customer service and sale representatives to "never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." (*Id.* ¶ 52.)

23. The customer experience begins with phone calls between prospective customers that can consist of short calls (that may last for 30 seconds) or full consultations (that include reviewing a customer's credit report and going through the customer's goals and the enrollment process). (*Id.* ¶ 53.) A full consultation can last up to two hours. (*Id.*) During a full consultation, Key Credit's sales representatives spend substantial time educating prospective customers "through and beyond [the] basics of just removing inaccuracies from their credit report," explaining "what makes up a credit report, how the FICO score algorithm works," and empowering prospective customers "on how they, themselves, without ever signing up or needing [Key Credit] to do anything for them could increase their credit scores by paying down debts, paying off balances, [and] using credit more intelligently." (*Id.* ¶ 54.)

24. Finally, Key Credit regularly monitors customer calls and grades (and sometimes fires) representatives who deviate from these policies. (KCR SUF, ¶ 55.) The Quality Control process includes listening to phone calls between sales associates and prospective customers and

utilizing a quality control checklist for each call to ensure that sales associates comply with sales and "compliance-based" training and to enforce that "things that are not allowed to be said and that are fireable offenses." (*Id.* ¶ 56.) Key Credit's Head of Quality Control also listen to these calls to ensure quality control. (*Id.*)

**VII. Mr. Tsoukalis' Role at Key Credit.**

25. Approximately 15 years ago when he started Key Credit and had no other employees, Mr. Tsoukalis engaged directly with consumers in the sale of Key Credit's services and conducted more than 15,000 sales consultations himself. At that time, "like many small businesses, [Mr. Tsoukalis] did everything from speaking to clients and washing the windows and literally cleaning the office and the ordering supplies and even cleaning bathrooms, typical of many small businesses. (Pl. Ex. 5 at 8:2-9; *see also* Pl. Ex. 4 at 176:24-177:4.)

26. During the company's early years, Mr. Tsoukalis' personally "review[ed] thousands of credit reports" and personally provided credit repair services to Key Credit's customers. (*See* Pl. Ex. 4 at 35:9-17, 175:20-177:21.)

27. Over time as the business grew, Key Credit created "a management team in charge of many of the day-to-day tasks of the company." (Pl. Ex. 5 at 20:25-21:8, 25:1-6; Suppl. Hudson Aff., Ex. P at 88:1-18, 90:6-12 (Tsoukalis Dep.) (as Key Credit was "growing, while I would love to have my hands in everything, there are a lot of moving parts and so much of the work is being delegated"); Pl. Ex. 5 at 13:8-11.)

28. Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't . . . ." (Pl. Ex. 5 at 25:1-6; *see also* Suppl. Hudson Aff., Ex. P at 44:13-19 (Tsoukalis Dep.).) Along with Mr. Tsoukalis, Key Credit's senior leadership consisted of Jennifer Hadayia (Vice President of Customer Service), Melina Vallas (Head of Sales), Maria Steeves (Head of Operations), and Alejandra Martinez (Head of Quality Control).

(KCR SUF, ¶ 26; *see also* Pl. Ex. 5 at 16:4-9, 27:6-15, 27:20-22; Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II).)

29. For the past ten years, Ms. Hadayia, as the Vice President of Customer Service, has been responsible for the daily management of staff and customer relations, including interviewing new customer service support members; training new staff members; managing customer complaints; and handling cancelled customer files. (Hudson Aff. (Dkt. 114), Ex. H at 13:17-25, 15:6-17 (Hadayia Dep.) ("[I]n the end I am the one that actually cancels a file out."); Pl. Ex. 5 at 26:23-27:5.) As part of the management team, Ms. Hadayia was regarded as the most qualified team member than Mr. Tsoukalis to handle client support issues. (Pl. Ex. 5 at 24:13-25.)

30. Mr. Tsoukalis long ago stopped taking the customer service and sales calls himself. (Pl. Ex. 4 at 13:4-10; Pl. Ex. 5 at 8:1-9.) Mr. Tsoukalis does not "field those responses [to complaints]. Those responses are dealt with by [Key Credit's] client support team, Jennifer Hadayia." (Pl. Ex. 5 at 26:23-27:5.) Mr. Tsoukalis would be involved only if a complaint was provided to the "customer support team and someone from the team shared that with me and possibly asked me for guidance., in which case I would give it or ask the head of our client support team . . . to address the issue appropriately." (Pl. Ex. 5 at 24:17-25.) As such, customer complaints are directed to team leaders and members of management who handle Key Credit's day-to-day tasks, rather than Mr. Tsoukalis. (Pl. Ex. 5 at 25:1-6.)

31. Melina Vallas, Key Credit's Head of Sales for the past ten years, has supervised the sales department and its operations, including the hiring, firing, and daily management of approximately 20 sales agents. (Suppl. Hudson Aff., Ex. P at 32:7-10 (Tsoukalis Dep.); Pl. Ex. 5 at 27:6-22.) In her role, Ms. Vallas is responsible for revising Key Credit's customer agreements,

which detailed customer billing and payment authorization, and drafting and revising call scripts. (Suppl. Hudson Aff., Ex. P at 136:6-13 (Tsoukalis Dep.); Pl. Ex. 4 at 72:2-13.)

32. Ms. Vallas is Key Credit's "head of sales" and she, not Mr. Tsoukalis, and "runs" the sale department and "is in charge of making decisions about to who to hire and terminate." (Pl. Ex. 5 at 27:6-15, 27:20-22.) Issues and practices regarding Key Credit sales representatives are "formulated collectively" by Key Credit's "head of sales, client support, sales team leaders, support team leaders, operations, managers, and team leaders." (Pl. Ex. 5 at 17:10-17.)

33. Mr. Tsoukalis does not draft sales scripts, which is instead handled by "a management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. P at 41:14-23, 44:6-19, 47:3-20 (Tsoukalis Dep.); Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II).)

34. Alejandra Martinez, Head of Quality Control, is responsible for listening to sales agents' phone calls; ensuring quality customer service and sales agent performance; compiling sale agents' call scores and safeguarding sales agent compliance. (Suppl. Hudson Aff., Ex. P at 154:14-155:5, 155:17-156:1 (Tsoukalis Dep.).) Mr. Tsoukalis does not review sales calls made by Key Credit's sales representatives. (Pl. Ex. 5 at 19:17-20.)

35. In addition to Key Credit's management team, many other important tasks are the responsibility of various third-parties, marketing agencies and freelancers that are not run by the company. (Pl. Ex. 4 at 108:14-109:17; Pl. Ex. 5 at 19:10-16.) For example, Key Credit's service agreements are created by Key Credit's regulatory lawyers at the law firm of Greenspoon Marder, who also advise Key Credit on the fees charged to its customers. (Pl. Ex. 4 at 52:16-21; Pl. Ex. 5 at 17:25-18:1-13.)

36. Key Credit's website and its content were provided by a third-party company known as Conversion Hut which has responsibility for the website and its contents. (Pl. Ex. 4 at 86:15-87:13, 94:14-95:4.)

37. Castellum Pro, a third-party contracting company, provided over 55 independent contractors who performed work on behalf of Key Credit as team leads and sales agents. (Suppl. Hudson Aff., Ex. P at 20:11-21:1; 23:12-23 (Tsoukalis Dep.).) Castellum Pro also helped recruit sales agents and handle administrative functions, such as billing and payroll for Castellum Pro contractors. (Suppl. Hudson Aff., Ex. P at 26:13-27:6 (Tsoukalis Dep.).)

Dated: August 18, 2023

Respectfully Submitted,

COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS

By: /s/ Timothy A. Hudson
One of Their Attorneys

By: /s/ Stephanie R. Parker
One of Their Attorneys

Timothy A. Hudson, pro hac vice
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlaw.com

-and-

David B. Mack (BBO No. 631108)
Stephanie R. Parker (BBO No. 687610)
O'Connor, Carnathan and Mack LLC
10 Burlington Mall Road, Suite 301
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net
sparker@ocmlaw.net

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 18, 2023.

/s/ Stephanie R. Parker
Stephanie R. Parker