UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Bureau of Consumer Financial Protection and the Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney General,

Plaintiffs,

v.

Commonwealth Equity Group, LLC (d/b/a Key Credit Repair) and Nikitas Tsoukales (a/k/a Nikitas Tsoukalis),

Defendants.

Case No. 1:20-cv-10991-RWZ

**Memorandum in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Counts I-V**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

- I. Defendants are covered by the TSR's prohibition on charging consumers advance fees for credit-repair services. .......... 2
  - A. Defendants misconstrue the import of the "promised results" language. .......... 2
  - B. Defendants' interpretation conflicts with the TSR's rulemaking and enforcement history. .......... 6
  - C. Defendants made promises to consumers. .......... 8
  - D. Requiring Key Credit to comply with § 310.4(a)(2) is reasonable and does not lead to absurd results. .......... 10
- II. Defendants' recycled attacks on the TSR and the Bureau's funding are without merit. ... 12
  - A. The Court has already rejected each of these arguments. .......... 13
  - B. The Court should reject these arguments again. .......... 14
    1. The FTC was statutorily authorized to issue the TSR. .......... 14
    2. The advance-fee provision does not violate the First Amendment. .......... 15
    3. The advance-fee provision does not violate the Equal Protection Clause. .......... 16
    4. Congress did not violate the Appropriations Clause when it appropriated money for the Bureau's operations. .......... 16

CONCLUSION .......... 18

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bartok v. Hometown Am., LLC*,
2023 WL 3773106 (D. Mass. Feb. 27, 2023) ........ 12
*CFPB v. CashCall, Inc.*,
2023 WL 2009938 (C.D. Cal. Feb. 10, 2023) ........ 17
*CFPB v. Citizens Bank, N.A.*,
504 F. Supp. 3d 39 (D.R.I. 2020) ........ 17
*CFPB v. Consumer Advoc. Ctr., Inc.*,
2023 U.S. Dist. Lexis 119260 (C.D. Cal. July 7, 2023) ........ 17
*CFPB v. Daniel A. Rosen, Inc.*,
No. 21-cv-07492 (C.D. Cal. Sept. 20, 2021) ........ 8
*CFPB v. Fed. Debt Assistance Assoc., LLC.*,
No. 17-cv-02997 (D. Md. Oct. 12, 2017) ........ 8
*CFPB v. Law Offs. of Crystal Moroney, P.C.*,
63 F.4th 174 (2d Cir. 2023) ........ 17, 18
*CFPB v. Nexus Servs., Inc.*,
2023 WL 5019529 (W.D. Va. Aug. 7, 2023) ........ 17
*CFPB v. Progrexion Mktg., Inc.*
2023 WL 2548008 (D. Utah Mar. 10, 2023) ........ 2, 5, 6, 10
*CFPB v. Prime Mktg. Holdings, LLC*
No. 2:16-cv-07111 (C.D. Cal. Feb. 10, 2017) ........ 8
*CFPB v. TransUnion*,
2022 WL 17082529 (N.D. Ill. Nov. 18, 2022) ........ 17
*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937) ........ 17
*Community Financial Services Association of America, Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) ........ 18
*FCC v. Beach Commc'ns*,
508 U.S. 307 (1993) ........ 16
*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ........ 10
*FTC v. Fin. Freedom Processing, Inc.*,
538 Fed. Appx. 488 (5th Cir. 2013) ........ 10
*FTC v. Gill*,
71 F. Supp. 2d 1030 (C.D. Cal. 1999) ........ 10
*FTC v. Luebke Baker*,
No. 1:12-CV-01145 (C.D. Ill. May 11, 2012) ........ 8
*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ........ 15
*Illinois v. Nat'l Credit Mgmt. Grp.*,
1996 WL 351196 (N.D. Ill. June 24, 1996) ........ 8

*In re Hill*,
562 F.3d 29 (1st Cir. 2009) ... 12
*In re Nat'l Credit Mgmt. Grp.*,
21 F. Supp. 2d 424 (D.N.J. 1998) ... 15
*Long Island Oil Prods. Co., Inc. v. Local 553 Pension Fund*,
775 F.2d 24 (2d Cir. 1985) ... 11
*OPM v. Richmond*,
496 U.S. 414 (1990) ... 17
*PHH Corp. v. CFPB*,
881 F.3d 75 (D.C. Cir. 2018) ... 17
*Removatron Int'l. Corp. v. FTC*,
884 F.2d 1489 (1st Cir. 1989) ... 10
*Sea-Land Serv., Inc. v. Barry*,
41 F.3d 903 (3d Cir. 1994) ... 11
*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020) ... 17
*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ... 15
*United States v. Hansen*,
143 S. Ct. 1932 (2023) ... 15
*Wine & Spirits Retailers, Inc. v. Rhode Island*,
481 F.3d 1 (1st Cir. 2007) ... 16

Statutes

12 U.S.C. § 5497(a), (c) ... 18
15 U.S.C. § 1681 ... 2
15 U.S.C. § 6102(a)(1) ... 15
15 U.S.C. § 6106(4) ... 15
31 U.S.C. §§ 1349(a), 1350 ... 19
31 U.S.C. §§ 1349(a), 1350 ... 19
U.S. Const. Art. I, § 9, cl. 7 ... 18

Regulations

16 C.F.R. § 310.4 ... Passim
60 Fed. Reg. 8313, 8318 (Feb. 14, 1995) ... 6
60 Fed. Reg. 30406 (June 8, 1995) ... 17
60 Fed. Reg. 43,842 (Aug. 23, 1995) ... 6, 17
65 Fed. Reg. 10,428 (Feb. 28, 2000) ... 7
67 Fed. Reg. 4492 (Jan. 30, 2002) ... 7

Other Authorities

H.R. Rep. 102-421 ... 17

## INTRODUCTION

The thrust of Defendants' summary judgment motion boils down to a simple misguided argument: that because Key Credit purportedly does not "promise" results to consumers, the advance-fee provision of the Telemarketing Sales Rule ("TSR" or "Rule") does not apply to it. This is plainly both legally and factually incorrect.

Defendants' reading of the TSR is fatally flawed. It impermissibly attempts to turn a provision (16 C.F.R. § 310.4(a)(2)(ii)) that governs when a telemarketer like Key Credit can receive payment into a substantive limitation on coverage of the TSR. And Defendants do not (and cannot) show any authority for their proposition that when the FTC wrote "promised results" into the TSR, it really meant "guaranteed results." Indeed, Defendants' faulty reading of the Rule conflicts with the Rule's regulatory background, enforcement history, and recent precedent.

And even if that were not the case, as fully addressed in Plaintiffs' motion for summary judgement, Defendants routinely made promises to consumers that its services would improve consumers' credit standing, cause significant credit score increases, and result in the removal of unlimited negative items from credit reports. These promises were made both in Key Credit's advertisements and in its sales calls with consumers.

The remainder of Defendants' motion resorts to repeating—often verbatim—claims that Defendants previously asserted in this case and that the Court previously rejected. As this Court has already held, the FTC did not exceed its authority in promulgating the TSR, the Rule's advance-fee provision does not violate the First Amendment or the Equal Protection Clause, and the Bureau's method of funding is fully valid under the Appropriations Clause.

## ARGUMENT

### I. Defendants are covered by the TSR's prohibition on charging consumers advance fees for credit-repair services.

#### A. Defendants misconstrue the import of the "promised results" language.

The linchpin of Defendants' summary judgment motion hinges on their argument that since Key Credit never "promised results," it is not covered by the Rule's provision regarding advance fees. This argument rests on a plainly incorrect reading of the Rule. This point is made obvious by reviewing the Rule's text and applying it to the instant facts.

Section 310.4(a)(2) states:

> (a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> . . .
>
> (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
>
> (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and
>
> (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose.

This section consists of two parts: subsections (a) and (2) state the coverage of the provision, while romanettes (i) and (ii) govern when an entity covered by the provision can receive payment.[1] As established in Plaintiffs' motion for summary judgement, it is undisputed

[1] *See CFPB v. Progrexion Mktg., Inc.*, 2:19-CV-00298-BSJ, 2023 WL 2548008, at *4 (D. Utah Mar. 10, 2023) (quoting 16 C.F.R. § 310.4(1)(2) ("The language and structure of the rule demonstrate that it defines, by examples, conduct of telemarketers considered abusive. Subsection (a) expressly states that conduct described in the numbered subsections to follow constitutes 'an abusive telemarketing act or practice.'").

that Key Credit is both a seller and telemarketer that provides goods and services and uses telephone calls to do so.[2] It therefore is covered by subsection (a).

Subsection (2) refers to receiving consideration for goods or services. Defendants admit in their motion that Key Credit charges for services, e.g., "Key Credit promises only to perform specified services for its customers…."[3] Defendants also point to Key Credit's contract language which represents that "Key Credit 'will provide the following credit repair services….'"[4]

Finally, subsection (2) indicates that the provision applies to payment for "goods or services **represented** to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating."[5] Once again, Defendants concede in their motion that Key Credit's services are designed to help consumers improve their credit: "Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit."[6] Similarly, the contract language that Key Credit employed states that it "will provide the following **credit repair** services . . . [s]uch services will include attempts to remove inaccurate, erroneous, and/or obsolete credit information reported by Equifax, Experian and TransUnion to the Client's Credit Report…."[7] Hence, Key Credit is covered by subsection (2).

Because Key Credit meets the coverage requirements of § 310.4(a)(2), Key Credit is subject to romanettes (i) and (ii), which outline **the only** situations under which the company can solicit and receive payment for telemarketed credit-repair services. Therefore, Key Credit can only receive payment once the time frame for delivery of its services has elapsed[8] and Key

---

[2] Mem. in Supp. of Pls.' Mot. Summ. J. (Pls.' Mem.) 10, ECF No. 116.
[3] Defs.' Mem. of Law in Supp. of Mot. Summ. J. (Defs' Mem.) 17, ECF No. 111.
[4] Defs.' Mem. 10.
[5] 16 C.F.R. § 310.4(a)(2) (emphasis added).
[6] Defs.' Mem. 9.
[7] Defs.' Mem. 10. (emphasis added).
[8] 16 C.F.R. § 310.4(a)(2)(i).

Credit has provided the customer with a consumer report demonstrating the achievement of the promised results, such report having been issued more than six months after the results were achieved.[9] Importantly, given that the regulation contains an "and" between romanettes (i) and (ii), Key Credit must satisfy **both** provisions before it can request or receive payment.

Despite this plain reading and application of § 310.4(a)(2), Defendants fundamentally misconstrue the Rule. They assume that the default is that a telemarketer can receive payment and the "[a]dvance [f]ee [p]rovision explicitly restricts a credit repair company from requesting or receiving payment for its services **if, and only if**" romanettes (i) or (ii) are triggered."[10] This is flatly incorrect. As the above analysis shows, telemarketers can only solicit and receive payment once they **satisfy** both romanettes (i) and (ii).

As a result of this basic flaw in their analysis of the Rule, Defendants' focus on the phrase "promised results" found in romanette (ii) is doomed to fail. Romanettes (i) and (ii) clearly set out preconditions for solicitation and receipt of payment; they do not and cannot limit the coverage provisions of § 310.4(a)(2).

Compounding their mistake, Defendants further argue that the "promise results" language in romanette (ii) excludes sellers like Key Credit that "promise services."[11] Defendants attempt to bolster this interpretation by equating "promised results" with a guarantee by referencing the definitions of "promise" and "result" in Black's Law Dictionary.[12] Based on this unsound reasoning, Defendants then conclude that the advance-fee provision only applies to sellers or telemarketers who guarantee that their credit-repair services will yield specific results.[13]

[9] 16 C.F.R. § 310.4(a)(2)(ii).
[10] Defs.' Mem. 15-16. (emphasis added).
[11] Defs.' Mem. 16.
[12] Defs.' Mem. 16.
[13] Defs.' Mem. 17-18.

But Defendant's twisted interpretation is incompatible with the text of § 310.4(a)(2). There is no basis in the Rule for Key Credit's invented distinction between telemarketers that promise services and those that promise specific results. Indeed, the representations that a seller like Key Credit makes that establish its coverage under subsection (2) (i.e., that its services will help consumers improve their credit standing) constitute the "promised results" mentioned in romanette (ii).

The court in *CFPB v. Progrexion Marketing, Inc.* reached this same conclusion when addressing an almost identical argument from the defendant credit-repair companies in that case:

> The [R]ule text does not offer any exception to the six-month waiting period for telemarketers who do not offer "promised results." Rather, romanette (ii) of the advance-fee provision assumes that a telemarketer promises a result of some sort. This seems a reasonable assumption on the part of its drafters. It is reasonable to presume a practice is abusive if that practice consists of charging a customer money and then offering them no result of any kind in return. Close examination reveals the advance-fee provision requires a particular result: one measurable in "a consumer report from a consumer reporting agency." [] Rather than finding the lack of promised results somehow absolves Defendants from compliance with the advance-fee provision, the court finds it evidences Defendants' failure to comply with the advance-fee provision of the TSR.[14]

As the court's holding highlights, the advance-fee provision reasonably assumes that a telemarketer or seller "promises a result of some sort." Plaintiffs' position, consistent with that of the FTC, is that credit repair, by its commonly understood definition, encompasses promises of improved, enhanced, or restored credit. The "promised result" of these services is that the consumer will have a better credit record for having retained the credit-repair service provider. As described below, Key Credit routinely promises these results to consumers.[15]

Further, while Defendants' motion focuses on romanette (ii), it glosses over the fact that Key Credit systematically failed to satisfy romanette (i) by soliciting and receiving payment

---

[14] *Progrexion Mktg.,* 2023 WL 2548008, at *6.
[15] *See infra* part I.C.

before the time frame for its services had expired. Key Credit's motion suggests that the company doesn't represent to consumers that its services will be completed in any particular time frame.[16] But leaving aside the advertisements and statements mentioned above wherein Key Credit did make timeframe representations (i.e., 90 points in 90 days), this argument cannot save Defendants. As set forth in Plaintiffs' summary judgment motion, by failing to offer a time frame for credit-repair services, it is impossible for Key credit to comply with romanette (i).[17] With that provision failed, Key Credit is barred from receiving payment for telemarketed credit-repair services.

### B. Defendants' interpretation conflicts with the TSR's rulemaking and enforcement history.

Defendants' motion cites to no authority for the proposition that when promulgating the Rule, the FTC intended to create a class of credit-repair companies that promised specific results and were therefore covered by the Rule, and a separate class of credit-repair companies that did not promise specific results and therefore were allowed to charge advance fees. Rather, in first proposing the TSR, the FTC explicitly stated that § 310.4(a)(2) "restricts the telemarketing of credit-repair services."[18] The proposed provision's general applicability to all telemarketed credit repair services was evident to commenters. Thirty-seven State Attorneys General joined a comment observing that a "ban on advance payments should have the effect of limiting the lawful scope of these forms of telemarketing to offers of services where the offeror is confident

---

[16] Defs.' Mem. 18.
[17] Pls. Mem.11-12.
[18] 60 Fed. Reg. 8313, 8318 (Feb. 14, 1995); *see also Progrexion Mktg.*, 2023 WL 2548008, at *5 (citing 60 Fed. Reg. 43,842, 43,843-44 (Aug. 23, 1995)) (noting that even if the plain language of § 310.4(a)(2) were ambiguous, the intended meaning is clear from the Discussion or the Rule in the Federal Register at the time the TSR was implemented).

enough that the service will be provided that there is a willingness to defer payment until after the service has been performed."[19]

The FTC's intention that § 310.4(a)(2) apply to all telemarketed credit-repair goods and services was further reflected in subsequent TSR rulemaking activities, which reviewed but did not alter the provision. The FTC's description of § 310.4(a) states: "Section 310.4(a) specifies that four listed activities (i.e., threats, intimidation or profane or obscene language, and requesting or receiving payment for credit repair, advance fee loan, or recovery room services before the consumer has received the services) are abusive telemarketing acts or practices, in violation of the Rule."[20] Similarly, in proposing to amend other provisions of the TSR, the FTC stated that it imposed a delayed-payment requirement on credit-repair services "because there are no disclosures that could effectively remedy the problems that arise from the telemarketing of those illusory services; the harm to consumers could be averted only by specifying that the seller's performance of [these services] must precede payment by the consumer."[21] In that same 2002 Notice of Proposed Rulemaking, the FTC described the payment restriction with respect to credit-repair services as "requesting or receiving payment for credit repair services prior to delivery and proof that such services have been rendered," with no mention of guarantees or promises.[22]

Defendants' interpretation is also unpersuasive because it conflicts with § 310.4(a)(2)'s enforcement history. In the TSR's 28-year history, the federal government has interpreted the advance-fee provision consistently with Plaintiffs' position here and has never suggested that

---

[19] Ex. 1 (Decl. Donald S. Clark, Attachment D, *Tennessee v. Lexington Law Firms*, No. 3-96-0344 (M.D. Tenn. Dec. 16, 1996)).
[20] 65 Fed. Reg. 10,428, 10,432 (Feb. 28, 2000).
[21] 67 Fed. Reg. 4492, 4504 n.106 (Jan. 30, 2002).
[22] *Id.* at 4,511.

liability for a violation requires proof that a seller or telemarketer guaranteed specific results.[23] Defendants cannot point to a single enforcement pleading that includes the element it asserts is an essential component of a § 310.4(a)(2) claim.

**C. Defendants made promises to consumers.**

Defendants' repeated claim throughout their motion that Key Credit "never promised results to its customers"[24] is contradicted by the factual record. As established in Plaintiffs' motion for summary judgment,[25] it is indisputable that Key Credit did, in fact, make a variety of promises ranging from general representations that its services could help consumers improve their credit to very specific promises to achieve discrete results. Key Credit's website has routinely contained such promises (including on the current version of its website) by prominently displaying representations, such as: "A Simple Program To Correct Your Credit Scores"[26]; "90+ Point Average Credit Score Increase In The First 90 Days" [27]; "We can also fix Unlimited Items in your credit file"[28]; "[W]e get our clients to their goals of improving their credit score a lot faster than our competitors"[29]; "[W]e can work on every single negative item at once[]"[30]; and "Clients can start seeing corrections in as little as 45 days."[31] Key Credit's website has also routinely used "testimonials" to tout purported client results, such as: "Within two

[23] *See, e.g.*, Compl., *FTC v. Luebke Baker,* No. 1:12-CV-01145 (C.D. Ill. May 11, 2012); Compl., *Illinois v. Nat'l Credit Mgmt. Grp.*, No. 96-C-2073, 1996 WL 351196, at *2 (N.D. Ill. June 24, 1996); Compl., *CFPB v. Prime Mktg. Holdings, LLC*, No. 2:16-cv-07111 (C.D. Cal. Feb. 10, 2017), https://files.consumerfinance.gov/f/documents/201708_cfpb_prime-market-holdings_complaint.pdf; Compl., *CFPB v. Fed. Debt Assistance Assoc., LLC*, No. 17-cv-02997 (D. Md. Oct. 12, 2017 ), https://files.consumerfinance.gov/f/documents/201710_cfpb_FDAA-complaint.pdf; Compl., *CFPB v. Daniel A. Rosen, Inc.*, No. 21-cv-07492 (C.D. Cal. Sept. 20, 2021), https://files.consumerfinance.gov/f/documents/cfpb_credit-repair-cloud_complaint_2021-09.pdf.
[24] Defs.' Mem. 15-18.
[25] Pls.' Mem. 2-4, 10, 14-24
[26] Ex. 2 ¶ 10(C) (Schneider Decl., Aug. 16, 2023).
[27] Pls.' Statement of Material Facts ¶ 19, ECF No. 117.
[28] Pls.' Statement of Material Facts ¶ 20.
[29] Ex. 2, Attachment B at 57 (Schneider Decl.).
[30] Ex. 2 ¶ 10(D) (Schneider Decl., Aug. 16, 2023).
[31] Ex. 2 ¶ 10(E) (Schneider Decl., Aug. 16, 2023).

weeks of speaking to you, my FICO score jumped 110 points"[32]; and "Key Credit Repair removed all of my negative records and I have only been with them for 2 months . . . Before Key Credit Repair I couldn't get a credit card, now I can."[33]

Likewise, Key Credit uses marketing scripts that instruct sales agents to reiterate these types of promises using language such as: "we work on improving your Credit Scores by reducing the number of negative records that are placed in your report."[34] Transcripts of calls between sales agents and consumers also show agents making these types of representations, including: "The majority of our clients, they get 90 points in 90 days as an average";[35] "On average when a client comes to us they are normally around the 350's – 400's. . . [o]n average they graduate our program with a 740 or above";[36] and "We dispute every single negative item placed on your report with all 3 Credit Bureaus."[37]

Despite these representations, Defendants argue that "the plain and unambiguous terms of [Key Credit's] written contracts establish that Key Credit does not 'promise results' to its customers."[38] Among other provisions, Defendants point to a disclaimer contained in the agreements which states that "Key Credit 'makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement[]'"[39]; and a statement that Key Credit "cannot and will not remove any derogatory information . . . , nor will [Key Credit] assist Client on improving Client's credit rating or record."[40]

[32] Pls.' Statement of Material Facts ¶ 22.
[33] Ex. 2 ¶ 10(F) (Schneider Decl., Aug. 16, 2023).
[34] Pls.' Statement of Material Facts ¶ 22.
[35] Pls.' Statement of Material Facts ¶ 36.
[36] Pls.' Statement of Material Facts ¶ 32.
[37] Pls.' Statement of Material Facts ¶ 31.
[38] Defs.' Mem. 17.
[39] Defs.' Mem. 17.
[40] Defs.' Mem. 17.

But it is well-established that a seller cannot lawfully disavow the promises it makes to consumers in its marketing and sales calls with language in later written contracts.[41] Indeed, in *Progrexion Marketing*, a group of credit-repair companies—operating under the same business model as Key Credit—unsuccessfully attempted to convince the district court that they did not "promise results" based on disclaimers in their contracts.[42] The district court soundly rejected this argument given the defendants' representations in their marketing that promoted credit improvements and touted past credit-improvement results.[43] This Court should do the same here.

**D. Requiring Key Credit to comply with § 310.4(a)(2) is reasonable and does not lead to absurd results.**

Defendants argue that requiring Key Credit to comply with § 310.4(a)(2)—in accordance with the plain language of the Rule—would lead to "absurd results," and thus the plain reading of the statute should be rejected.[44] Specifically, Key Credit laments that if forced to comply with the advance-fee provision, it would be put "in a position where it may never be paid for the valuable services it provides."[45] To show these purportedly "absurd results," Key Credit offers

[41] *See FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 633 (6th Cir. 2014) (citation omitted) (finding that Defendants provision of clearer descriptions of their services and disclaimers in written materials did not negate representations made in earlier in phone calls and stating that "Defendants cannot make considerable material misrepresentations to consumers and then bury corrections and disclaimers in subsequent communications" ); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (finding that credit-repair company's provision of clearer descriptions of their services and disclaimers in written materials and contracts did not cure representations made in earlier in phone calls and advertisements); *see also Removatron Int'l. Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir. 1989) ("Each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads. Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings."); *FTC v. Fin. Freedom Processing, Inc.*, 538 Fed. Appx. 488, 489-50 (5th Cir. 2013) (same).
[42] *Progrexion Mktg.*, 2023 WL 2548008, at *2 ("A portion of that contract states: Lexington [or Creditrepair.com] cannot guarantee and you are not paying for a particular credit report outcome or result; you are paying only for Lexington's [or Creditrepair.com's] efforts on your behalf.").
[43] The court found that defendants had promised results in their online advertising and through hotswap partners by making representations like those described above. *Id.* at *6 ("[E]ven assuming Defendants do not promise any results (this assumption is, of course, contradicted by Defendants' advertising online and through hotswap partners)").
[44] Defs.' Mem. 18-19.
[45] Defs.' Mem. 19.

two hypothetical situations in which Key Credit provides credit-repair services but cannot provide the customer with a "consumer report . . . demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved,"[46] and thus would be prohibited from charging consumers under the advance-fee provision. But rather than leading to "absurd results," the plain reading of the text leads to results that achieve the Rule's purpose.

Defendants' first hypothetical—that Key Credit might dispute an inaccurate item, which then might be removed from a customer's credit report, and the customer might then "engage[] in other activity during the six-month waiting period that would harm the customer's credit score and/or report,"[47] thus preventing Key Credit from charging the consumer—is not an absurd result. First, if the inaccurate item was removed from the consumer's credit report, the item would still not appear on the consumer's credit report six months later regardless of subsequent acts by the consumer. But more fundamentally, Defendants' complaint is that some burden or risk has been transferred from consumers to sellers of telemarketed credit-repair services. Statutes, regulations, and rules often result in the allocation of benefits and burdens.[48] Just because one party does not like the result does not make it absurd.[49]

Defendants' second hypothetical also does not show an "absurd result," but rather appears to be an example of the conduct that the Rule was designed to protect against. Defendants

---

[46] 16 C.F.R. § 310.4(a)(2)(ii).
[47] Defs.' Mem. 19.
[48] *See, e.g., Long Island Oil Prods. Co., Inc. v. Local 553 Pension Fund*, 775 F.2d 24, 29 (2d Cir. 1985) ("Congress has vast discretion when adjusting and distributing the economic benefits and burdens. . . . It is not our task to decide who should receive what benefit, and at whose expense. . . . [L]egislation may not be stricken simply because it arguably shifts some burdens[.]").
[49] *See, e.g.*, *Sea-Land Serv., Inc. v. Barry*, 41 F.3d 903, 910 (3d Cir. 1994) (rejecting an employer's interpretation as contrary to the plain meaning of a statute and stating "[s]uch equitable complaints are not new, and although we are sympathetic, we are bound by the statute before us"); *id.* (noting that courts "are not at liberty to ignore the unambiguous mandate of [a] statute," nor "free to re-evaluate the relative burdens and benefits of a balance that Congress has struck").

hypothesize that "a customer could engage Key Credit to challenge items that the customer believes are inaccurate but, after Key Credit challenges those items, the furnisher could determine that the challenged items are accurate or otherwise refuse to remove them."[50] According to the FTC:

> Credit repair services that promise, in return for an advance fee, to help improve a consumer's credit rating, without regard to the reasons why the customer's credit rating is unfavorable, necessarily abuse the vast majority of their customers, because the vast majority of those customers cannot be helped…. By prohibiting the collection of a fee for credit repair services until actual credit improvement has been shown, the Rule prevents this telemarketing abuse.

In Defendants' hypothetical, it appears that Key Credit took action "without regard to why the customer's credit rating [was] unfavorable," and the customer was one of "the vast majority" of consumers who could not be helped by credit-repair services.

Finally, even the law cited by Defendants does not support their position. Defendants rely on the statutory interpretation rule that courts should "not construe statutes in ways that reach 'absurd' results *when sensible construction is available*."[51] Or, as the First Circuit instructs: if the meaning of the language of a statute "produces a plausible (though not inevitable) result, that is generally the end of the matter."[52] Here, the plain reading of § 310.4(a)(2) clearly produces sensible and plausible results and should be "the end of the matter."

## II. Defendants' recycled attacks on the TSR and the Bureau's funding are without merit.

Defendants raise a number of arguments challenging the validity of the TSR itself as well as the Bureau's statutory method of funding. They say that the FTC lacked authority to issue

---

[50] Defs.' Mem. 19.

[51] *Bartok v. Hometown Am., LLC*, 21-10790-LTS, 2023 WL 3773106, at *5 n.4 (D. Mass. Feb. 27, 2023) (citation omitted) (emphasis added); Defs.' Mem. 18 (quoting *Bartok*, 2023 WL 3773106, at *5 n.4).

[52] *In re Hill*, 562 F.3d 29, 32 (1st Cir. 2009) (citations omitted) ("Statutory interpretation begins with the language of the statute. We assume that the words Congress chose, if not specially defined, carry their plain and ordinary meaning. If that meaning produces a plausible (though not inevitable) result, that is generally the end of the matter."

§ 310.4(a)(2), that the provision violates the First Amendment and the Equal Protection Clause, and that the Bureau's funding violates the Appropriations Clause. The Court has already considered—and rejected—each of these arguments, some of them more than once. It should do so again.

### A. The Court has already rejected each of these arguments.

Defendants' claims mirror almost exactly arguments that they previously offered in their motion to dismiss and motion for judgment on the pleadings. In their motion to dismiss, Defendants claimed that: "the FTC exceeded its authority in promulgating the TSR"; "the TSR places unconstitutional content-based restrictions on speech"; and "the TSR violates the Equal Protection Clause."[53] In their motion for judgment on the pleadings, Defendants contended that "[t]he Bureau's funding mechanism violates the Appropriations Clause" and thus Plaintiffs could not press its claims here.[54]

The Court rejected each of these arguments—some of them more than once.[55] The Court held, for example, that "Defendants have not demonstrated that Congress intended the FTC to exclusively address unsolicited telemarketing calls that would cause the TSR to exceed the Commission's authorized scope of rulemaking."[56] It pointed out, in rejecting Defendants' First Amendment attack, that the advance-fee provision is a "restriction … on conduct—the timing of payment—not on speech."[57] And, in disagreeing with Defendants' claim that "the regulation violates the Equal Protection Clause by discriminating against credit repair telemarketers," the

[53] Mot. to Dismiss 12-18, ECF No. 30; *see also* Mot. for Recons. 5-9, ECF No. 54 (repeating First Amendment claim).
[54] Mot. for J. on the Pleadings 5-7, ECF No. 96.
[55] *See* Order Denying Mot. to Dismiss 6-7, ECF No. 4; Order Denying Mot. for Recons., ECF No. 57; Order Denying Mot. for J. on the Pleadings, ECF No. 108; *see also* Order Striking Affirmative Defenses, ECF No. 69 (recognizing that Court had rejected certain of these arguments and striking them from Defendants' answer).
[56] Order Denying Mot. to Dismiss 7.
[57] *Id.* at 6.

Court explained that "courts must defer to [ ] legislative classifications construed to further legitimate economic objectives" and that the advance-fee provision "is tied to particularly important consumer protection goals."[58]

Defendants' motion for summary judgment does not even acknowledge—let alone attempt to respond to—the Court's prior analysis of these issues. Instead, it simply repeats, often word-for-word, the very same arguments that Defendants previously put before the Court and that the Court rejected.[59] Defendants thus have given the Court no reason to reconsider its prior rulings. As explained below, it should not.

**B. The Court should reject these arguments again.**

Defendants' attacks on the TSR and the Bureau's funding remain incorrect.

**1. The FTC was statutorily authorized to issue the TSR.**

By statute, Congress directed the FTC to issue rules "prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices."[60] It further provided that "such rules" "shall include" provisions addressing four specified abusive telemarketing practices—for example, a "restriction[] on … when unsolicited telephone calls can be made to consumers."[61] Because the four enumerated provisions involve unsolicited calls to consumers, Defendants claim that Congress intended for the TSR to apply only to unsolicited calls.[62]

But as the Court has already explained, "[t]he authorizing statute … is not as narrowly written as defendants assert."[63] The statute "does not require an individual to make unsolicited

---

[58] *Id.*
[59] *Compare, e.g.*, Mot. to Dismiss 12-15 (arguing that the TSR violates the First Amendment), *with* Defs.' Mot. for Summ. J. 23-26 (reproducing the same passage nearly verbatim).
[60] 15 U.S.C. § 6102(a)(1).
[61] *Id.* § 6102(a)(3)(A)-(D).
[62] Defs.' Mot. for Summ. J. 21-23.
[63] Order Denying Mot. to Dismiss 7.

calls in order to engage in telemarketing, but only requires the use of a telephone—which can both make and receive calls."[64]

The statutory definition of "telemarketing" further shows that the term generally encompasses incoming calls from consumers because the definition expressly excludes incoming calls from consumers in certain narrow circumstances.[65] There would have been no need for this narrow exclusion if Congress had intended for the TSR to apply only to unsolicited telephone calls placed by a seller, as Defendants erroneously claim.

### 2. The advance-fee provision does not violate the First Amendment.

Defendants' First Amendment argument fails because the advance-fee provision is a "restriction … on conduct—the timing of payment—not on speech."[66] "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."[67]

Here, the "course of conduct" that the advance-fee provision regulates is the receipt of payment for credit-repair services. That straightforward regulation of commercial conduct does not implicate the First Amendment, as this Court has already concluded.[68]

---

[64] *Id.* (first emphasis added); *see also* 15 U.S.C. § 6106(4) (defining "telemarketing" by reference to the "use of one or more telephones").

[65] *See* 15 U.S.C. § 6106(4) (excluding calls initiated by a customer when those calls were placed in response to catalogs meeting specified conditions).

[66] Order Denying Mot. to Dismiss 6.

[67] *United States v. Hansen*, 143 S. Ct. 1932, 1947 (2023) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.").

[68] *See* Order Denying Mot. to Dismiss 6; *cf. In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424, 459-60 (D.N.J. 1998) (rejecting similar First Amendment attack on upfront-fee provision in § 310.4(a)(4) of the TSR because the provision "merely regulates when payment may be collected").

### 3. The advance-fee provision does not violate the Equal Protection Clause.

Defendants' equal-protection argument also fails. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."[69] As this Court has explained, "the legislature must be allowed to 'devise specific rules for businesses in different fields, … a reflection of the time-honored tenet that, within wide limits, courts must defer to [ ] legislative classifications construed to further legitimate economic objectives.'"[70]

Here, there was plainly a "rational basis" for the FTC to have adopted the advance-fee ban for telemarketed credit-repair services. For example, both Congress and the FTC identified significant consumer abuses in the market for such services.[71] Thus, as the Court held already, the advance-fee provision "is tied to particularly important consumer protection goals."[72] It easily passes rational-basis review.

### 4. Congress did not violate the Appropriations Clause when it appropriated money for the Bureau's operations.

Defendants also contend—again—that Plaintiffs cannot pursue this case because, in Defendants' view, the method by which Congress chose to fund the Bureau violates the Appropriations Clause. Defendants are wrong.

As an initial matter Defendants expressly waived the funding argument they now seek to press. As Plaintiffs explained in their opposition to Defendant's motion for judgment on the

---

[69] *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993).
[70] Order Denying Mot. to Dismiss 6 (quoting *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 7 (1st Cir. 2007)).
[71] *See, e.g.*, H.R. Rep. 102-421, at 16 (1991) (reporting on fraud in the market for credit-repair services); TSR; Proposed Rule, 60 Fed. Reg. 30406, 30415-16 (June 8, 1995) (noting the strong support from commenters regarding the restrictions on the telemarketing of credit-repair services); TSR; Final Rule, 60 Fed. Reg. 43842, 43853 (Aug. 23, 1995) (finding that, "[o]nce the fee is paid," sellers of credit-repair services often "fail[] to deliver the promised services or achieve the promised results, and the consumer's credit record does not improve").
[72] Order Denying Mot. to Dismiss 6.

pleadings,[73] a defense is waived if it is not asserted in the answer, and, here, Defendants not only failed to assert their funding defense in their answer, they affirmatively disavowed the defense by amending their answer to "withdraw[]" it.[74]

Defendants are also wrong on the merits—as every court (bar one) that has ever considered the issue has concluded.[75] The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by law."[76] As the Supreme Court has long emphasized, the "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'"[77] "[I]n other words, the payment of money from the Treasury must be authorized by a statute."[78] The Bureau's funding is so authorized.[79] It thus complies with the Appropriations Clause's "straightforward and explicit command."[80]

As before, Defendants rely almost entirely on the Fifth Circuit's outlier decision in *Community Financial Services Association of America, Ltd. v. CFPB* ("*CFSA*").[81] But the decision in *CFSA*—which the Supreme Court has agreed to review—was in error. As the Second

---

[73] *See* Plfs.' Opp'n. to Defs.' Mot. for J. on the Pleadings 3-4, ECF No. 97.
[74] *See* Am. Affirmative Defenses to Am. Compl. 3, ECF No. 60.
[75] *See, e.g.*, *CFPB v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 181-84 (2d Cir. 2023) (upholding Bureau's funding), petition for cert. pending, No. 22-1233 (U.S.); *PHH Corp. v. CFPB*, 881 F.3d 75, 95-96 (D.C. Cir. 2018) (en banc) (same), *abrogated on other grounds by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020); *CFPB v. Nexus Servs., Inc.*, No. 5:21-cv-00016, 2023 WL 5019529, at *6 (W.D. Va. Aug. 7, 2023) (same); *CFPB v. Consumer Advoc. Ctr., Inc.*, 2023 U.S. Dist. Lexis 119260, at *40-41 (C.D. Cal. July 7, 2023); *CFPB v. CashCall, Inc.*, No. 2:15-cv-7522, 2023 WL 2009938, at *3 (C.D. Cal. Feb. 10, 2023) (same); *CFPB v. TransUnion*, No. 1:22-cv-1880, 2022 WL 17082529, at *5 (N.D. Ill. Nov. 18, 2022) (same); *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 57 (D.R.I. 2020) (same and collecting cases).
[76] U.S. Const. Art. I, § 9, cl. 7.
[77] *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).
[78] Id.
[79] *See* 12 U.S.C. § 5497(a), (c).
[80] *Richmond*, 496 U.S. at 424.
[81] 51 F.4th 616, 635-43 (5th Cir. 2022) (holding funding invalid) ("*CFSA*"), *cert. granted*, No. 22-448 (U.S. Feb. 27, 2023).

Circuit has explained, that decision is without support "in Supreme Court precedent," "in the Constitution's text," or "in the history of the Appropriations Clause."[82]

Even if Defendants could show an Appropriations Clause problem, it would not entitle them to the relief they seek: summary judgment on Counts I-IV. First, and as Plaintiffs have repeatedly explained in this case, Defendants' arguments about the Bureau's funding have no relevance at all to the Commonwealth's ability to continue pursuing these claims on behalf of its citizens. Defendants do not dispute the point.

Second, the proper remedy for any Appropriations Clause problem would not require entering judgment against Plaintiffs either. When Congress has established remedies for unauthorized Executive Branch spending, it has not authorized the unwinding of otherwise-valid government actions, as Defendants effectively seek here.[83] So, even if the Bureau's spending on this lawsuit were unauthorized (it is not), unwinding this action would be unwarranted.

## CONCLUSION

Based on the evidentiary record and governing law the Court should deny Defendants' request for summary judgment on Counts I-V.

[82] *Law Offs. of Crystal Moroney*, 63 F.4th at 181-83; *see also* Br. for Pet'rs at 27-38, *CFSA*, No. 22-448 (U.S. filed May 8, 2023), 2023 WL 3385418.
[83] *See* 31 U.S.C. §§ 1349(a), 1350.

Dated: August 18, 2023

Respectfully submitted,

Eric Halperin
*Enforcement Director*
Alusheyi J. Wheeler
*Deputy Enforcement Director*
Jade Burns
*Assistant Litigation Deputy*

/s/ Nelle Rohlich
Nelle Rohlich (WI Bar No. 1047522)
(202) 435-7280
Nelle.rohlich@cfpb.gov
Carmen Christopher
Carmen.christopher@cfpb.gov
Patricia Hensler
Patricia.hensler@cfpb.gov
Benjamin Konop
Benjamin.konop@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
*Attorneys for Plaintiff Consumer Financial Protection Bureau*

/s/ Lilia V. DuBois
Commonwealth of Massachusetts
Maura Healey, Attorney General
Lilia V. DuBois (MA Bar No. 688848)
(617) 963-2239
Lilia.DuBois@state.ma.us
Assistant Attorney General
Insurance & Financial Services Division
One Ashburton Place, 18th Floor
Boston, MA 02108

*Attorneys for Plaintiffs*