UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Bureau of Consumer Financial Protection and the Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney General,

Plaintiffs,

v.

Commonwealth Equity Group, LLC (d/b/a Key Credit Repair) and Nikitas Tsoukales (a/k/a Nikitas Tsoukalis),

Defendants.

Case No. 1:20-cv-10991-RWZ

**PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF FACTS AND PLAINTIFFS' ADDITIONAL UNDISPUTED MATERIAL FACTS**

Plaintiffs Bureau of Consumer Financial Protection ("Bureau") and the Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney General, hereby submit this response to Defendants' Commonwealth Equity Group, LLC (d/b/a Key Credit Repair) (Key Credit) and Nikitas Tsoukales (a/k/a Nikitas Tsoukalis) Statement of Material Facts, (ECF 112), filed in support of Defendants' Motion for Summary Judgment, (ECF 110). Plaintiffs also provide additional undisputed material facts in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

**DEFENDANTS' CLAIMED UNDISPUTED MATERIAL FACTS**

1. The credit reporting system contains detailed financial information regarding American consumers. (Expert Report of Evan Hendricks at 2, attached as **Exhibit A** to Affidavit of Timothy Hudson ("Hudson Affidavit").)

**Plaintiffs' response:** Undisputed.

2. The system relies on credit bureaus known as consumer reporting agencies ("CRAs") that manage consumer-credit information and serve as repositories for this information. (Hudson Aff., Ex. A at 2 (Hendricks Report).) There are three major CRAs: Equifax, TransUnion and Experian. (Hudson Aff., Ex. A at 2 (Hendricks Report).)

**Plaintiffs' response:** Undisputed.

3. These creditors, known as "furnishers," regularly provide updates on a consumer's credit history to CRAs including mortgage services and credit guarantors such as banks, mortgage companies, credit card issuers, department stores, debt collectors and others. (Hudson Aff., Ex. A at 2 (Hendricks Report).)

**Plaintiffs' response:** Undisputed.

4. When a consumer applies to a business for credit, insurance, employment or to lease or rent an apartment or home, that business will often send an inquiry to a CRA that, in turn, sells and electronically sends the consumer's credit report to the inquiring business. (Hudson Aff., Ex. A at 2 (Hendricks Report).)

**Plaintiffs' response:** Disputed in part. Plaintiffs dispute the assertion only to the extent it misstates the Hendricks Report, which states: "When a consumer applies to an entity for credit, insurance, or employment, that entity ("user") will often send an inquiry to a CRA. The CRA then sells and electronically sends the consumer's credit report to the user."

5. A fundamental purpose of a credit report is to describe a consumer's creditworthiness. (Hudson Aff., Ex. A at 2 (Hendricks Report).)

**Plaintiffs' response:** Undisputed.

6. Consumer credit reports are generated by CRAs using data provided by furnishers. (Expert Rebuttal Report of Michael Citron at 6, attached as **Exhibit B** to Hudson Aff.) A credit report includes personal and financial information about an individual, such as their name, current and previous addresses, Social Security Number, date of birth, and employment history. (Hudson Aff., Ex. B at 5-6 (Citron Report).) It also provides details on credit accounts (known as "tradelines"), including the names of creditors, account numbers, balances, payment history, and account status (open or closed). (*Id.*) Other financial information such as bankruptcies, foreclosures, liens, and credit inquiries are also included. (*Id.*)

**Plaintiffs' response:** Undisputed but immaterial. General information about how credit reports are generated and the types of information they contain is immaterial to Defendants' liability under Counts I-V of the Amended Complaint. With respect to the first sentence, Plaintiffs object to the admissibility of Ex. B (Citron Report), which is cited as sole support for the statement, because it is (1) improper expert testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny; (2) inadmissible hearsay under Fed. R. Evid. 801 and 802; and (3) and is not sworn as required by Fed. R. Civ. P. 56(c)(4). Plaintiffs further object under Fed. R. Civ. P. 56(c)(2) that there is no admissible evidence to support the alleged facts.

7. A credit score is a number that purports to reflect a consumer's creditworthiness at a given point in time. (Hudson Aff., Ex. A at 3 (Hendricks Report).) A credit score is calculated based on all the tradeline information in the credit report through model algorithms used by CRAs.

(*Id*. at 5.) Credit scoring is a complex process that takes into account various factors, including Payment History (35%); Debt (30%); Length of Credit History (15%); Account Diversity (10%); and Hard Inquiries (10%). (Hudson Aff., Ex. B at 7-8 (Citron Report).)

**Plaintiffs' response:** Undisputed but immaterial. The credit-scoring calculations and models relating to consumers' creditworthiness have no bearing on Defendants' liability for Counts I-V of the Amended Complaint. With respect to the last sentence, Plaintiffs object to the admissibility of Ex. B (Citron Report), which is cited as sole support for the statement, because it is (1) improper expert testimony under Fed. R. Evid. 702 and *Daubert* and its progeny; (2) inadmissible hearsay under Fed. R. Evid. 801 and 802; and (3) and is not sworn as required by Fed. R. Civ. P. 56(c)(4). Plaintiffs further object under Fed. R. Civ. P. 56(c)(2) that there is no admissible evidence to support the alleged fact.

8. The higher the credit score, the less risky the consumer is viewed by creditors. (Hudson Aff., Ex. A at 4 (Hendricks Report).) The lower the credit score, the more the consumer pays for credit, including higher interest on mortgages, auto loans, installment loans, and credit cards. (*Id*.)

**Plaintiffs' response:** Undisputed.

9. Consumers are generally most severely penalized when they have a serious derogatory (or negative) item on their credit report within the past eleven months. (Hudson Aff., Ex. A at 5 (Hendricks Report).)

**Plaintiffs' response:** Undisputed.

10. Credit reports habitually contain erroneous information that harms consumers. (Hudson Aff., Ex. B at 9-11 (Citron Report); *see also* Hudson Aff., Ex. A at 6 (Hendricks Report)

("The credit reporting system has a decades-long problem with addressing inaccurate credit reports.").)

**Plaintiffs' response:** Disputed but immaterial. Defendants mischaracterize the cited quotation from the Hendricks Report, which does not mean that "[c]redit reports habitually contain erroneous information that harms consumers." Moreover, whether credit reports habitually contain erroneous information that harms consumers is immaterial to Defendants' liability for Counts I-V of the Amended Complaint. Plaintiffs also object to the admissibility of Ex. B (Citron Report), which is cited as support for the statement, because it is (1) improper expert testimony under Fed. R. Evid. 702 and *Daubert* and its progeny; (2) inadmissible hearsay under Fed. R. Evid. 801 and 802; and (3) and is not sworn as required by Fed. R. Civ. P. 56(c)(4). Plaintiffs further object under Fed. R. Civ. P. 56(c)(2) that there is no admissible evidence to support the alleged fact.

11. The Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau ("Bureau") accept consumer complaints related to CRAs. (Hudson Aff., Ex. B at 9 (Citron Report).) Both agencies have reported an increase in complaints related to CRAs in recent years. (*Id.*) The FTC tracks these complaints and has found that credit reporting complaints have been among the top consumer complaints since 1997, accounting for approximately 20% of all complaints received. (*Id.*) (citing Bureau's 2023 Annual report of credit and consumer reporting complaints).

**Plaintiffs' response:** Disputed in part but immaterial. Plaintiffs do not dispute that the Citron Report includes the first two sentences asserted in ¶ 11; however, there are no citations in the Report in support of those sentences. The third sentence in ¶ 11, which is stated in the Citron Report, cites to the CFPB's 2023 Annual report of credit and consumer reporting complaints ("CFPB's 2023 Report") (https://files.consumerfinance.gov/f/documents/cfpb _ fcra-611-e

report_ 2023-0 1 .pdf) but does not have a pin cite to the relevant text, and Plaintiffs could not identify within the CFPB's 2023 Report information to support the assertion that "[t]he FTC tracks these complaints and has found that credit reporting complaints have been among the top consumer complaints since 1997, accounting for approximately 20% of all complaints received." Additionally, the existence and frequency of consumer complaints about CRAs to the FTC and the CFPB is immaterial to Defendants' liability for Counts I-V of the Amended Complaint. Plaintiffs also object to the admissibility of Ex. B (Citron Report), which is cited as support for ¶ 11, because it is (1) improper expert testimony under Fed. R. Evid. 702 and *Daubert* and its progeny; (2) inadmissible hearsay under Fed. R. Evid. 801 and 802; and (3) and is not sworn as required by Fed. R. Civ. P. 56(c)(4). Plaintiffs further object under Fed. R. Civ. P. 56(c)(2) that there is no admissible evidence to support the alleged fact.

12. In 2020, the FTC received over 246,000 credit reporting complaints. (Hudson Aff., Ex. B at 9 (Citron Report).) The most common issues reported by consumers included incorrect information on credit reports, difficulty obtaining credit reports, difficulty disputing errors, and unauthorized inquiries. (*Id.*) Compared to other complaint categories, complaints related to CRAs consistently rank among the top categories received by both agencies. (*Id.*)

**Plaintiffs' response:** Disputed in part but immaterial. Plaintiffs do not dispute that the Citron Report contains the statements made in ¶ 12. Although the Citron Report cites to the CFPB's 2023 Report to support the first two sentences in ¶ 12, Plaintiffs dispute that the CFPB's 2023 Report provides support for those sentences. As to the second sentence, Plaintiffs do not dispute that "incorrect information on credit reports" is among the most common issues reported by consumers, but Plaintiffs dispute that the CFPB's 2023 Report supports the assertions in the remainder of the sentence, i.e., that "difficulty obtaining credit reports, difficulty disputing errors,

and unauthorized inquiries" are included in the most common issues reported by consumers. Finally, the third sentence is contained in the Citron Report, but there is no citation to any support for the assertion that "[c]ompared to other complaint categories, complaints related to CRAs consistently rank among the top categories received by both agencies." Additionally, the number of credit-reporting complaints received by the FTC in 2020 and the types of issues identified in those complaints are immaterial to Defendants' liability for Counts I-V of the Amended Complaint. Plaintiffs also object to the admissibility of Ex. B (Citron Report), which is cited as support for ¶ 12, because it is (1) improper expert testimony under Fed. R. Evid. 702 and *Daubert* and its progeny; (2) inadmissible hearsay under Fed. R. Evid. 801 and 802; and (3) and is not sworn as required by Fed. R. Civ. P. 56(c)(4). Plaintiffs further object under Fed. R. Civ. P. 56(c)(2) that there is no admissible evidence to support the alleged facts.

13. For example, a PERC research report analyzed a sample of 200 credit reports from each of the three major CRAs - Equifax, Experian, and TransUnion - and found that a significant number of credit reports contained errors. (Hudson Aff., Ex. B at 9 (Citron Report) (citing PERC research report).) Specifically, 26% of the credit reports contained at least one "material error" defined as an error that could negatively impact a consumer's creditworthiness or ability to obtain credit. (*Id.*)

**Plaintiffs' response:** Disputed in part but immaterial. Plaintiffs do not dispute that the Citron Report contains the first two sentences in ¶ 13. In support of the first sentence, the Citron Report cites to PERC. 2011. U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts to support; however, Plaintiffs could not identify within the voluminous PERC materials supporting evidence for the first sentence. For the second sentence in ¶ 13, there is no citation to support the statement in the Citron Report. Additionally, the result of a PERC research analysis of

200 credit reports is immaterial to Defendants' liability for Counts I-V of the Amended Complaint. Plaintiffs also object to the admissibility of Ex. B (Citron Report), which is cited as sole support for ¶ 13, because it is (1) improper expert testimony under Fed. R. Evid. 702 and *Daubert* and its progeny; (2) inadmissible hearsay under Fed. R. Evid. 801 and 802; and (3) and is not sworn as required by Fed. R. Civ. P. 56(c)(4). Plaintiffs further object under Fed. R. Civ. P. 56(c)(2) that there is no admissible evidence to support the alleged facts.

14. To protect consumers from these errors, Congress enacted the Fair Credit Reporting Act ("FCRA") nearly 40 years ago. (Hudson Aff., Ex. B at 17 (Citron Report).) One of FCRA's key provisions requires credit bureaus to conduct a reasonable investigation when a consumer disputes an item in their credit report. (*Id.*)

**Plaintiffs' response:** Disputed in part but immaterial. The meaning of "these errors" and "key provisions" is vague and ambiguous, but Plaintiffs do not dispute that Congress enacted the FCRA in 1970. (*See* 15 U.S.C. § 1681). Plaintiffs also do not dispute that the FCRA and its implementing regulations require CRAs to investigate any dispute that meets statutory and regulatory requirements, (*see, e.g.*, Consumer Financial Protection Circular 2022-07 https://www.consumerfinance.gov/compliance/circulars/consumer-financial-protection-circular-2022-07-reasonable-investigation-of-consumer-reporting-disputes/), including 15 U.S.C. § 1681i(a), which requires, among other things, CRAs to conduct reasonable investigations when consumers dispute an item in their credit reports as specified in the statute. Additionally, the purpose and requirements of the FCRA are immaterial to Defendants' liability for Counts I-V of the Amended Complaint. Plaintiffs also object to the admissibility of Ex. B (Citron Report), which is cited as sole support for ¶ 14, because it is (1) improper expert testimony under Fed. R. Evid. 702 and *Daubert* and its progeny; (2) inadmissible hearsay under Fed. R. Evid. 801 and 802; and

(3) and is not sworn as required by Fed. R. Civ. P. 56(c)(4). Plaintiffs further object under Fed. R. Civ. P. 56(c)(2) that there is no admissible evidence to support the alleged facts.

15. Credit repair companies – like Key Credit – provide a wide range of credit repair services to help consumers enforce their legal rights to ensure that items on their credit reports are fair, accurate, and substantiated. (Declaration of Nikitas Tsoukalis ("Tsoukalis Decl.") ¶ 4.) Among other things, these services address the problems recognized by the FTC and the Bureau; namely, that there are errors and inaccuracies in a consumer's credit report that should be corrected and that harm the consumer's credit worthiness. (*Id.*) Some credit repair companies – like Key Credit – also provide credit counseling and coaching to customers. (*Id.* ¶ 5.)

**Plaintiffs' response**: Disputed in part. Defendants provide no support for this paragraph other than ¶¶ 4 and 5 of Defendant Tsoukales's Affidavit submitted in support of Defendants' motion for summary judgment. The entirety of ¶¶ 4 and 5 are just the statements above, which are vague and conclusory and do not meet the requirements of Fed. R. Civ. P. 56 and should not be considered by the Court. (*See, e.g.*, *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1998) ("Vague and conclusory statements in an affidavit do not meet the specificity requirement of Federal Rule 56.")). Plaintiffs dispute the first two sentences to the extent that they imply that Key Credit's services reliably and consistently "address the problems recognized by the FTC and the Bureau" and reliably and consistently correct errors and inaccuracies in consumers' credit reports. Defendants did not track whether Key Credit's services resulted in the removal of negative items from customers' credit reports. (Pls.' Statement of Facts ⁋ 62, ECF 117). And customers have complained that Key Credit's services did not result in an increase to their credit scores or in the removal of negative items on their credit reports. (*See* Pls.' Statement of Facts ¶¶ 62-63, ECF 117 (attaching consumer declarations)). Plaintiffs do not dispute that some credit

reports may contain errors and inaccuracies that should be corrected and may harm a consumer's creditworthiness. Plaintiffs do not dispute that Defendants represent that Key Credit's services can: (1) help consumers enforce their legal rights to ensure that items on their credit reports are fair, accurate, and substantiated; and (2) provide credit counseling and coaching to consumers. Whether or not Defendants *succeed* in providing such services is immaterial to Defendants' liability for requesting and receiving advance fees in violation of § 310.4(a)(2).

16. Credit repair services are "not a one size fits all" approach because "[e]very credit report, financial situation, and human being has different goals with different timelines" for each customer's specific goals. (Deposition of N. Tsoukalis ("Tsoukalis Dep.") at 55:2-5, attached as **Exhibit C** to Hudson Aff.)

**Plaintiffs' response:** Disputed in part but immaterial. The meaning of the statement is vague and ambiguous. As constructed, the statement literally says that every credit report has different goals with different timelines and every financial situation has different goals with different timelines, which is nonsensical. Also, Plaintiffs cannot understand the intended meaning of the phrase, "Credit repair services are 'not a one size fits all approach.'" Plaintiffs, however, do not dispute that human beings have different goals with different timelines and that sellers of credit-repair services offer different types of credit-repair services. Additionally, whether credit-repair services are a "one size fits all" approach is immaterial to Defendants' liability for Counts I-V.

17. Count I of the Amended Complaint alleges a violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310. Am. Compl., Dkt. 26. The FTC promulgated the TSR to carry out the Telemarketing and Consumer Fraud and Abuse Prevention Act's ("Telemarketing Act")

direction to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1).

**Plaintiffs' response:** Undisputed.

18. Relevant here, one of the TSR's restrictions includes a prohibition on asking for, or receiving, payment for credit repair services that "promised results." Specifically, the TSR's Advance Fee Provision states, in pertinent part:

> (a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
>
> (i) The time from in which the seller has represented all of the goods or services will be provided to that person has expired; ***and***
>
> (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that ***the promised results*** have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2)(i)-(ii), emphasis added.

**Plaintiffs' response:** Disputed. Plaintiffs dispute that "one of the TSR's restrictions includes a prohibition on asking for, or receiving, payment for credit repair services that "promised results," which is a legal conclusion and a mischaracterization of the plain language of § 310.4(a)(2) as explained in the Memorandum in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Counts I-V, at parts I.A. to B.

19. The requirement to show that "promised results" had still been achieved six months later was the result of a specific type of fraudulent scheme perpetrated by "fundamentally bogus" entities holding themselves out as credit repair companies. (67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002) (to be codified at 16 C.F.R. pt. 310), attached as **Exhibit D** to Hudson Aff.)

**Plaintiffs' response:** Disputed. The statement is not supported by Exhibit D. The page of the Federal Register cited by Defendants as support for the assertion states:

> The abusive practices relating to credit repair services, recovery services, and advance fee loan services each meet the criteria for unfairness. An act or practice is unfair under Section 5 of the FTC Act if it causes substantial injury to consumers, if the harm is not outweighed by any countervailing benefits, and if the harm is not reasonably avoidable. An important characteristic common to credit repair services, recovery services, and advance fee loan services is that in each case the offered service is fundamentally bogus. It is the essence of these schemes to take consumers' money for services that the seller has no intention of providing and in fact does not provide. Each of these schemes had been the subject of large numbers of consumer complaints and enforcement actions. Thus, each caused substantial injury to consumers. Amounting to nothing more than outright theft, these practices conferred no potentially countervailing benefits. Finally, having no way to know these offered services were illusory, consumers had no reasonable means to avoid the harm that resulted from accepting the offer. Thus, these practices meet the statutory criteria for unfairness, and accordingly, the remedy imposed by the Rule to correct them is to prohibit requesting or receiving payment for these services until after performance of the services is completed.

Moreover, Defendants' statement is erroneous and a legal conclusion to the extent it suggests that § 310.4(a)(2) only applies to sellers or telemarketers engaged in "a specific type of fraudulent scheme perpetrated by 'fundamentally bogus' entities." Section 310.4(a)(2) applies to all sellers and telemarketers of "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating." (*See* Mem. in Supp. of Pls.' Opp'n to Defs.' Mot. Summ. J. on Counts I-V parts I.A. to B).

20. In 2002, the FTC provided further explanation of the rationale underlying the Advance Fee Provision. Specifically, the FTC explained that the Advance Fee Provision falls within "the purview of its traditional unfairness analysis" because, according to the FTC, "[a]n important characteristic common to credit repair services" scams prohibited by the TSR "is that in each case the offered service is fundamentally bogus." (Hudson Aff., Ex. D at 4,511 (67 Fed. Reg. 4,492).) Indeed, "the essence of these schemes" was "to take consumers' money for services that the seller has no intention of providing and in fact does not provide." (*Id.*) Accordingly, the

Advance Fee Provision was intended to prevent unfair conduct that the FTC viewed as "outright theft." (*Id.*)

**Plaintiffs' response:** Disputed. Defendants mischaracterize the FTC's rationale. The FTC's statements on the "Advance Fee Provision," or § 310.4(a)(2), during and after the TSR's promulgation, reflect its intention to impose a payment delay on all telemarketed credit-repair goods and services. Section 310.4(a)(2) is calibrated to protect consumers from paying for services that do not yield results. (60 Fed. Reg. 43,842, 43,854 (Aug. 23 1995) ("§ 310.4(a)(2) is directed [against] the deceptive marketing and sale of bogus credit repair services")). The FTC analyzed large volumes of consumer complaints; commentary from law enforcement agencies, public interest groups, and members of the credit reporting industry; its prior enforcement history; and the fact that the vast majority of consumers cannot be helped by credit repair services. (67 Fed. Reg. at 4511). It concluded that the credit-repair industry as a whole had caused substantial injury to consumers by offering services that were "fundamentally bogus" and failed to actually repair consumers' credit. (67 Fed. Reg. at 4511).

21. The FTC's recent guidance further explains the deceptive conduct targeted by the Advance Fee Provision: a wrongdoer may claim to provide credit repair services and will give the appearance of providing effective services by "flooding a credit bureau with letters disputing the accuracy of [legitimate] negative entries," which result in credit reporting agencies temporarily removing the negative entries pending an investigation. (FTC, *Complying with the Telemarketing Sales Rule*, attached as **Exhibit E** to Hudson Aff.)

**Plaintiffs' response:** Disputed in part. Defendants materially mischaracterize the FTC's guidance by suggesting that it narrows the scope of § 310.4(a)(2) to "wrongdoers" who "floo[d]

a credit bureau with letters." Without the full context of the guidance and the FTC's rationale, Defendants' quoted text is misleadingly narrow. For example, the guidance also states:

> **The TSR prohibits sellers and telemarketers from requesting or receiving payment for credit repair services before two events occur**: One, the time frame during which the seller has promised services will be provided must have expired. Sellers can represent the time frame for the delivery of the services either orally or in writing, including in the contract for the services. If there's a discrepancy between the various representations by the credit repair seller, the longest time frame represented determines when payment may be requested or received. Two, the seller must provide the consumer with evidence that the improvement promised in the consumer's credit record has been achieved. The evidence must be a consumer report from a consumer reporting agency, issued more than six months after the results were achieved. Nothing in the TSR affects the requirement in the Fair Credit Reporting Act (FCRA) that a consumer report may be obtained only for a specific permissible purpose.

And the guidance states, "Consumers do not need the services of a third party to correct an inaccurate or out-of-date credit report. No one can do anything to "repair" a bad credit report that is accurate and up to date." (Defs.' Ex. E (FTC, *Complying with the Telemarketing Sales Rule*)). Finally, the guidance Defendants' cite describes the Advance Fee Provision as "directed at the deceptive marketing and sale of bogus credit repair services;" and the FTC describes *any* credit repair services that do not satisfy the Advance Fee Provision as bogus and illusory. (*See, e.g.*, 67 Fed. Reg. 4492, 4504 n.106, 4511 (Jan. 30, 2002) ("illusory"); 74 Fed. Reg. 41,988, 42,006 (Aug. 19, 2009) (same); 67 Fed. Reg. 4492, 4511 (Jan. 30, 2002) ("outright theft"); 68 Fed. Reg. 4580, 4614 (Jan. 29, 2003) ("outright theft" and "fundamentally bogus"); 60 Fed. Reg. 43,842, 43,854 (Aug. 23, 1995) ("bogus"); 4 Fed. Reg. 41,988, 41,990 (Aug. 19, 2009) (same); 67 Fed. Reg. 4492, 4511 (Jan. 30, 2002) ("fundamentally bogus")). Plaintiffs do not dispute Defendants' statement to the extent it describes the strategy of "flooding a credit bureau with letters" and how this strategy and its effects are addressed by, among other things, the Advance-Fee Provision.

22. Faced with such challenges, CRAs sometimes cannot complete the investigations within the statutorily required 30-day period, so the negative tradelines are provisionally removed from a consumer's credit report. (*Id.*) The temporary removal of such negative tradelines gives the appearance that the consumer's credit record has improved. (*Id.*) The wrongdoer then takes the consumer's money and the negative/accurate tradelines are then returned to the consumer's credit report after the completed investigation confirms that no basis for removal exists. (*Id.*)

**Plaintiffs' response:** Disputed in part. The FTC guidance cited by Defendants does not contain any support for Defendants' the assertions, "Faced with such challenges, CRAs sometimes cannot complete the investigations within the statutorily required 30-day period and "[t]he wrongdoer then takes the consumer's money . . . .". Plaintiffs do not dispute, however, that the FTC guidance states: "Deceptive credit repair services may be able to cause negative credit information to disappear from a consumer's credit report temporarily by flooding a credit bureau with letters disputing the accuracy of the negative entries. But once the credit bureau verifies with creditors that the negative items are accurate, they will reappear on a consumer's credit report."

23. In commenting on the TSR's Advance Fee Provision, the U.S. Postal Service stated that it was necessary to distinguish "[s]o-called credit repair services" from "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer." (U.S. Postal Serv., Comment Letter on Proposed Telemarketing Sales Rule, attached as **Exhibit F** to Hudson Aff.) The "[s]o-called credit repair services" would typically only provide "written advice to customers on how to obtain copies of their credit reports" and encourage customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (*Id.*)

**Plaintiffs' response:** Disputed. Defendants materially mischaracterize the Postal Inspection Service's commentary by suggesting the commentary "distinguishes 'so-called credit repair services" from "actual services." The Postal Inspection Service's commentary describes *all* credit-repair services, noting: "So-called credit repair services are frequently misrepresented as actual services in which a company will interact with creditors and credit reporting services as an advocate for a consumer. In fact, these 'services' usually consist of written advice to customers on how to obtain copies of their credit reports." The Postal Inspection Service's commentary recognized that the Advance Fee Provision covers *all* credit-repair services and noted that by "requiring that actual results be accomplished before payment can be requested or received [the Advance Fee Provision] *will cause those who do not actually repair credit to cease operating (at least by telemarketing)*." (U.S. Postal Serv. Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 31, 1995), FTC File No. 411001, attached as **Exhibit F** to Hudson Aff.).

24. Only a few months after the FTC promulgated the TSR, Congress enacted the Credit Repair Organizations Act ("CROA"). 15 U.S.C. § 1679 *et seq*. As a Congressionally enacted statute, CROA exhaustively addresses the credit repair industry, and it was enacted *after* the FTC promulgated the TSR's Advance Fee Provision. *See* 15 U.S.C. § 1679 *et seq*.; *compare* 15 U.S.C. § 1679 (CROA effective September 30, 1996) *with* 60 Fed. Reg. 43,841 (promulgating 16 C.F.R. 310.4(a)(2) August 23, 1995).

**Plaintiffs' response:** Disputed. Defendants' statement that the CROA "exhaustively addresses the credit repair industry" is not correct. As the Court has ruled, the TSR is applicable to credit-repair goods and services that are sold through telemarketing and the TSR and CROA do not conflict. (Order Denying Mot. to Dismiss at 3–4, ECF 47).

25. Notably, CROA specifically addresses how credit repair companies may charge fees: "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). Accordingly, Congress determined that, once a service has been fully performed, credit repair organizations may properly collect fees for those completed services. (*See id*.)

**Plaintiffs' response:** Disputed. The second sentence is disputed to the extent it purports to state the full scope of the requirements for credit-repair companies' fee-charging practices. Companies that sell credit repair goods and services through telemarketing must comply with both CROA and the TSR. As recognized by this Court, the TSR and the CROA do not conflict, "[t]he TSR simply adds a precondition to requesting payment, namely that the organization provide proof that the services were rendered more than six months after performance." (Order Denying Mot. to Dismiss at 3–4, ECF 47).

26. In 2008, Key Credit began providing credit repair services to qualified customers from its office in Mattapan, MA. (Hudson Aff., Ex. C at 13:14-23 (Tsoukalis Dep.).) At relevant times, Key Credit' senior leadership consisted of Nikitas Tsoukalis (Founder and CEO), Jennifer Hadayia (Vice President of Customer Service), Melina Vallas (Head of Sales), Maria Steeves (Head of Operations), and Alejandra Martinez (Head of Quality Control). (Hudson Aff., Ex. C at 19:3-24, 22:17-23:9 (Tsoukalis Dep.); Deposition of N. Tsoukalis ("Tsoukalis Dep. II") at 27:4-10, attached as **Exhibit G** to Hudson Aff.; Deposition of Jennifer Hadayia ("Hadayia Dep.") at 13:1-8, attached as **Exhibit H** to Hudson Aff.)

**Plaintiffs' response:** Disputed in part. The meaning of "qualified customers" in the first sentence is vague and ambiguous, but Plaintiffs do not dispute the remainder of the sentence. The

meaning of "at relevant times" is vague and ambiguous, but Plaintiffs do not dispute the remainder of the sentence.

27. Key Credit is a licensed credit repair company in all states in which it operates. (Hudson Aff., Ex. C at 16:11-22 (Tsoukalis Dep.).)

**Plaintiffs' response:** Undisputed but immaterial. Whether Key Credit is a licensed credit repair company in all states in which it operates is immaterial to Defendants' liability for Counts I-V of the Amended Complaint.

28. Key Credit has long maintained an "A" rating with the Better Business Bureau. (Hudson Aff., Ex. C at 77:11-17 (Tsoukalis Dep.).)

**Plaintiffs' response:** Disputed but immaterial. Key Credit's current Better Business Bureau rating is an A-minus. (Ex. 2 at ¶ 12 (Schneider Decl., Aug 16, 2023.)). The phrase "long maintained" is a characterization that is vague and ambiguous. Further, Key Credit's Better Business Bureau rating is immaterial to Defendants' liability for Counts I-V of the Amended Complaint.

29. Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit including: learning each customer's specific concerns and goals; consulting with each consumer about inaccurate and challengeable items on their credit report; analyzing each customer's credit report; preparing and sending written disputes of inaccurate negative items on a customer's credit reports; following up with credit reporting agencies to ensure that inaccurate/questionable negative tradelines are removed from a customer's credit report; analyzing new credit reports to ensure that inaccurate/questionable negative items have been removed; creating a customized action plan to help improve the customer's credit score; and providing credit counseling and coaching to

customers so that they can make educated and informed decisions about their personal credit for themselves. (Hudson Aff., Ex. C at 33:2-16, 36:14-24 (Tsoukalis Dep.); Transcript of Investigational Hearing Testimony of Nikitas Tsoukalis, May 16, 2019 ("May 2019 Hearing Tr.") at 86:24-87:7, attached as **Exhibit I** to Hudson Aff.; Tsoukalis Decl. ¶¶ 7-9; Key Credit customer contracts, attached as **Exhibits J-L** to Hudson Aff.)

**Plaintiffs' response:** Disputed in part. The phrase "qualified customers" in the first sentence is vague and ambiguous. Plaintiffs do not dispute that Key Credit represents to consumers that it will perform the services listed in ¶ 29 if consumers enroll in its programs. Plaintiffs dispute, however, that Defendants provided the services listed in ¶ 29 in all cases after consumers have enrolled in its programs. Consumers have complained that that Key Credit did not provide the services it represented it would provide, and that in some instances Key Credit did not provide any services at all. For example, consumers have made the following complaints:

- "I have been very disappointed in the progress I have received from Key Credit Repair. They have made NO progress in anything on my credit file. . my credit status is the same as when I started doing business with them. My question is if they are professionals in credit repair why [wasn't] anything done to correct my credit? I feel as if this company is scamming people who are in dire need to repair their credit and doing nothing in return but take their money." (Ex. 1 at ¶ 15(a) (Schneider Decl.)).
- Another consumer said "Key Credit Repair took my money but gave ZERO results. I never received updated credit reports in the mail. Nothing changed on my credit report. My credit still remained the same. This company charged me for months

and promised they could repair my credit. Yet, all they did was take my money." (Ex. 1 at ¶ 15(b) (Schneider Decl.)).

- "We are coming up on the ninety day mark and I have received very little assistance from the two people assigned to my account. I send e-mails asking for updates on my account and do not receive responses for days and, other times, do not receive responses at all. . . Nothing has been done through KeyCreditRepair.com except for requesting my credit reports, which I could do by myself." (Ex. 1 at ¶ 14(c) (Schneider Decl.)).
- "I was furious that Key Credit wasn't helping me and that they hadn't improved my credit over the course of the nine months that I had been paying them. . . I asked Key Credit Repair for a full refund because they did not provide me with an improved credit score or remove negative items from my credit report, as they had promised." (*See also* Ex. 47 (Blunt Decl. with attachments)); and
- ". . .I called Key Credit Repair to question them about my credit report. The representative I spoke to told me that I have to give it more time. I told the representative that Key Credit Repair had promised me results in 90 days, but my score went down, causing more harm than good. . . . Around September 2021, I called Key Credit Repair to cancel my payments and told them to stop working on my behalf. I also asked for a refund of the three months' payments I had made since they had not fulfilled their promise to improve my credit score." (Ex. 50 (Vess Decl.)).

30. Key Credit has a proven track record in assisting its customers in disputing and removing inaccurate, negative items on their credit reports. (Tsoukalis Decl. ¶ 6.)

**Plaintiffs' response:** Disputed. Defendants provide no support for this statement other than ¶ 6 of Defendant Tsoukales's Affidavit submitted in support of Defendants' motion for summary judgment. The entirety of ¶ 6 is just the statement above, which is vague and conclusory and does not meet the requirements of Fed. R. Civ. P. 56 and should not be considered by the Court. (*See, e.g.*, *Posadas de Puerto Rico, Inc.* 856 F.2d at 401 ("Vague and conclusory statements in an affidavit do not meet the specificity requirement of Federal Rule 56.")). Moreover, Key Credit does not track or calculate either the (1) the average credit score changes of its customers or (2) its customers' credit score improvements in the first 90 days of services. (Pls.' Statement of Facts ¶ 60, ECF 117 (citing Ex. 4 at 174:22–178:23 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); Ex. 6 at 92:2–93:16 (Tsoukales IH))). And when asked to identify the basis for Key Credit's advertisements and representations to consumers about the efficacy of Key Credit's programs, Tsoukales, on behalf of Key Credit, testified that there was no "algorithm or spreadsheet," but rather, the support for such statements was in his mind. (Pls.' Statement of Facts ¶¶ 59–62, ECF 117). Given that Key Credit does not track the efficacy of its programs, it's unlikely Defendants could produce any evidence in support their claim that Key Credit has "a proven track record."

31. Key Credit's comprehensive, multi-faceted approach also includes counseling and educating its customers on how to build and maintain a healthy mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. (Tsoukalis Decl. ¶ 7.)

**Plaintiffs' response:** Disputed but immaterial. Defendants provide no support for this statement other than ¶ 7 of Defendant Tsoukales's Affidavit submitted in support of his motion for summary judgment. The entirety of ¶ 7 is just the statement above, which is vague and conclusory

and does not meet the requirements of Fed. R. Civ. P. 56 and should not be considered by the Court. (*See, e.g., Posadas de Puerto Rico, Inc.* 856 F.2d at 401 ("Vague and conclusory statements in an affidavit do not meet the specificity requirement of Federal Rule 56.")). Moreover, the statement is immaterial to Defendants' liability for Counts I-V of the Amended Complaint.

32. As a long-standing "A"-rated member of the Better Business Bureau, Key Credit enters into written contracts with all of its qualified customers. (Tsoukalis Decl. ¶ 10.)

**Plaintiffs' response:** Disputed in part but immaterial. Key Credit's Better Business Bureau rating is currently an A-minus. (Schneider Decl. ¶ 12, Aug 16, 2023). The phrase "long maintained" is a characterization that is vague and ambiguous. The meaning of the phrase "qualified customers" is vague and ambiguous. Moreover, Key Credit's Better Business Bureau rating is immaterial to Defendants' liability for Counts I-V of the Amended Complaint.

33. The contracts are short, written in plain language, and contain all disclosures required under CROA. (Tsoukalis Decl. ¶ 11; *see* Hudson Aff., Ex. J at KCR_0057364; Hudson Aff., Ex. K at KCR_0057369-73; Hudson Aff., Ex. L at KCR_0057341-45.)

**Plaintiffs' response:** Dispute. Defendants' characterization that the contracts are "short" and written in "plain language" is not a statement of fact. Plaintiffs cannot respond to Defendants' assertion that the contracts "contain all disclosures required under CROA" because Key Credit's compliance with CROA is not relevant to any party's claim or defense and thus is beyond the scope of Fed. R. Civ. P. 26(b), and therefore there has been no discovery related to this issue.

34. The written contracts also explicitly set forth the scope of the services it provides to its customers (Hudson Aff., Ex. C at 53:24-54:6 (Tsoukalis Dep.)), clearly stating that:

- Key Credit "agrees to evaluate the Client's current credit profile and will advise Client on the necessary steps to legally remove information that is not accurate, complete, or verifiable." (Hudson Aff., Ex. J at KCR_0057364; Hudson Aff., Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341.)

- Key Credit "will provide the following credit repair services . . . [s]uch services will include attempts to remove inaccurate, erroneous, and/or obsolete credit information reported by Equifax, Experian and TransUnion to the Client's Credit Report . . . . will continually analyze and review Client's status . . . will respond to, receive, and/or initiat[e] correspondence from Client. . . will assist Client in responding to, receiving, and/or initiating correspondence via email regarding Client's Credit Report(s) . . . will create letters and/or emails and/or faxes and/or electronic communications and/or other written communications for Client in an attempt to correct errors and other items appearing on the Client's credit reports which Client indicates are inaccurate, incomplete, outdated, or unverified as per the [FCRA]. This includes preparation and transmittal of written correspondence to credit bureaus to verify and/or dispute items appearing on the Client's credit report. [Key Credit] will review and analyze all correspondence received from credit bureaus, creditors, and others . . . will conduct follow up calls with Client to discuss Client's status and strategy . . . will review the Client's credit report updates to determine subsequent steps . . . will assist Client with credit questions." (Hudson Aff., Ex. K at KCR_0057370; Hudson Aff., Ex. L at KCR_0057342.)

- Key Credit "will prepare all necessary correspondence in dispute of all inaccurate and unverifiable information on Client's credit reports (Experian, Equifax, TransUnion) and will stamp and mail for client. . . will prepare and mail to each collection agency that can validate a debt a settlement offer. . . will agree to prepare and mail each collection agency a formal validation request to ensure Client is only paying off verifiable and accurate collections. . . [and] agrees to provide unlimited advice and credit coaching to Client." (Hudson Aff., Ex. J at KCR_0057364; Hudson Aff., Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341.)

**Plaintiffs' response:** Disputed in part. If ¶ 34 means that all Key Credit's contracts contain the cited language, Plaintiffs dispute this assertion since at least some Key Credit contracts do not contain this language (*See, e.g.*, Hudson Aff., Ex. J at KCR_0057364)). If the assertion that "written contracts also explicitly set forth the scope of the services it provides to its customers" means that Key Credit actually provided the described services to consumers, Plaintiffs dispute this as the contracts only show the offer of services and not the performance. The word "clearly" is a characterization and is vague and ambiguous.

35. Plaintiffs do not allege or claim that Key Credit's services described above were "bogus" or that Key Credit failed to perform its contracted-for services whatsoever. (Am. Compl., Dkt. 26.)

**Plaintiffs' response:** Disputed in part. The term "contracted-for services" is vague and ambiguous. Moreover, Plaintiffs allege that Key Credit made representations about its services that it did not actually provide in many instances. (Am. Compl. ⁋⁋ 33-40, ECF 26) (alleging, among other things, that Key Credit failed to deliver on its representations to consumers that it could "dramatically increase" consumers' credit scores and "clean up unlimited negative records" on behalf of consumers)). Plaintiffs do not dispute that they did not specifically allege Key Credit's services were "bogus."

36. In their contracts, Key Credit and its customers also agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (Hudson Aff., Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341; *see also* Hudson Aff., Ex. J at KCR_0057364 ("Accurately reported items on a credit report[] cannot be removed.").)

**Plaintiffs' response:** Disputed in part. Plaintiffs do not dispute that customers are required to sign contracts. But Plaintiffs dispute that customers knowingly "agree" to the quoted language above. Key Credit's enrollment process is structured such that consumers are unlikely to have read and understood Key Credit's contracts at the time of signing. First, Key Credit's website represents that customers do not sign contracts and agents tell customers in enrollment calls that there is "no contract." (Pls.' Statement of Facts ⁋ 48, ECF 117 (Key Credit tells consumers that it requires "NO CONTRACTS"); *see, e.g.*, Ex. 53 at KCR_0007912 (Revised Sales Script 7.18.19, KCR_0007911); Ex. 52 at KCR_0007771 (sales script, KCR_0007769); Ex. 39 at KCR_0028393 (website capture of landing page from May, 1 2017, KCR_0028390); Ex. 25 at KCR_0028733 (website capture of free consultation page from May 18, 2017, KCR_0028731); Ex. 26 at

KCR_0028757 (website capture of free consultation page from June 22, 2017, KCR_0028755); Ex. 29 at KCR_0029238 (website capture of free consultation page from Dec. 15, 2017, KCR_0029236); Ex. 54 at 5:11–13, 12:15–19 (Consumer Call Transcript, KCR_0001838); Ex. 56 at 31:4-5 (Consumer Call Transcript, KCR_0007782); Ex. 60 at 16:8–10 (Consumer Call Transcript, KCR_0014169); Ex. 68 at 20:7–8; 36:11 (Consumer Call Transcript, KCR_0019585); Ex. 69 at 6:13-14, 7:1–3, 8:6–12 (Consumer Call Transcript, KCR_0020918); Ex. 70 at 8:13–23 (Consumer Call Transcript, KCR_0020923); Ex. 79 at 5:17–19, 6:5 (Consumer Call Transcript, KCR_0020933); Ex. 80 at 7:5–22 (Consumer Call Transcript, KCR_0020938); *see also* Ex. 3 at 10 (April 2017 Business Plan, KCR_0025502)). Similarly, there is evidence that at least some Key Credit sales agents tell consumers that Key Credit does not require contracts and refer to Key Credit's written contracts as "DocuSign" during enrollment. (*See, e.g.*, Ex. 68 at 36:10–20 (Consumer Call Transcript KCR_0019585) ("Yep. So it's very simple. Um, as I said, we have no contracts or anything like that, so what I would send out to you is just a small agreement. I'm not sure if you've ever used DocuSign? ...So it would be just a small agreement that I will send out to you, and what we will do within that DocuSign is just set up the date that you choose and, of course, your -- all your information so we can go ahead and start off, uh, today working on your accounts.")). Second, call transcripts show that during the enrollment call, Key Credit's agents send customers an electronic copy of the contract and ask customers to sign the contract while on the phone. Key Credit's agents refer to the contract as a "DocuSign," as noted above, and do not make clear to customers that the "DocuSign" is a contract. (Pls.' Statement of Facts ¶¶ 51-52, ECF 117 (Consumers are asked to sign and return the agreement while still on the phone with Key Credit's sales agents); Ex. 59 (2017 SMS Keycredit Templates, KCR_0015828); Ex. 58 at KCR_0001779 (Full Sales Script); Ex. 68 at 36:10–42:25 (Consumer Call Transcript,

KCR_0019585); Ex. 56 at 38:25–39:5 (Consumer Call Transcript KCR_0007782) (Key Credit sales agent states: "I quickly need you to sign this docusign"); Ex. 69 at 26:16–28:24 (Consumer Call Transcript, KCR_0020918); Ex. 70 at 25:10–29:23 (Consumer Call Transcript, KCR_0020923)). Call recordings also show that Key Credit sales agents do not review the contract terms with customers before they sign. (Ex. 80 at 26:9–28:13 (Consumer Call Transcript, KCR_0020938) ("Everything looks good. Okay. So what you do is you sign that one spot. At the end of page, there is a yellow box with a red arrow that says, 'Sign here.'…So there should be a yellow tab in the corner that says 'finish' there. That's the last step there. Just click on the finish sir.")). Finally, according to many consumers, when they enrolled with Key Credit, the company did represent that its services would help remove derogatory information from, and improve, their credit scores. (*See, e.g.*, Pls.' Statement of Facts ⁋ 63, ECF 117; Ex. 1 ¶¶ 14–20 (Schneider Decl.); Ex. 47 (Blunt Decl. with attachments); Ex. 48 (Finney Decl. with attachments); Ex. 49 (Perrow Decl. with attachments); Ex. 50 (Vess Decl.)).

37. Finally, Key Credit's consumers explicitly acknowledge and agree that in their written contracts that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (Hudson Aff., Ex. J at KCR_0057364; Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341.)

**Plaintiffs' response:** Disputed. Plaintiffs do not dispute that customers are required to sign contracts. But Plaintiffs dispute that customers knowingly "agree" to the quoted language above. As detailed in Response 36, Key Credit's enrollment process is structured such that consumers are unlikely to have read and understood Key Credit's contracts at the time of signing.

38. Moreover, each customer expressly acknowledges that "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has

been promised to me that is not in this agreement." (Hudson Aff., Ex. J at KCR_0057365; Hudson Aff., Ex. K at KCR_0057371; Hudson Aff., Ex. L at KCR_0057342.)

**Plaintiffs' response:** Disputed. Plaintiffs do not dispute that customers are required to sign contracts. But Plaintiffs dispute that customers knowingly "agree" to the quoted language above. As detailed in Response 36, Key Credit's enrollment process is structured such that consumers are unlikely to have read and understood Key Credit's contracts at the time of signing.

39. Key Credit does not offer "bogus" services or schemes that "take consumers' money for services that the seller has no intention of providing and in fact does not provide," much less place any conditions on the receipt of fees for "promised results" that any fair and reasonable person could view as "outright theft." (Tsoukalis Decl. ¶ 14; Hudson Aff., Ex. D at 4,511 (67 Fed. Reg. 4,492).)

**Plaintiffs' response:** Disputed. Exhibit D, which is a page of the Federal Register, does not contain any information about Key Credit and thus does not support this assertion. The only other document cited in support of this assertion is ¶ 14 of Defendant Tsoukales's Affidavit, which Defendants submitted in support of their motion for summary judgment. The entirety of ¶ 14 is just the statement above, which is vague and conclusory and does not meet the requirements of Fed. R. Civ. P. 56 and should not be considered by the Court. (*See, e.g., Posadas de Puerto Rico, Inc.* 856 F.2d at 401 ("Vague and conclusory statements in an affidavit do not meet the specificity requirement of Federal Rule 56.")). Further, the terms "'bogus' services" and "schemes" are vague and ambiguous. The assertion that "Key Credit does not . . . place any conditions on the receipt of fees for "promised results" that any fair and reasonable person could view as 'outright theft'" is vague and ambiguous and does not appear to be a statement of fact. To the extent that ¶ 39 means that Key Credit has not made false and unsubstantiated representations to consumers that its

services would result in significantly improved credit scores in several months and the removal of unlimited negative items from their credit reports, Plaintiffs dispute this. Key Credit routinely represented that its services could improve a consumer's credit scores by 90 points in 90 days, or other similar amounts, (Pls.' Statement of Facts ¶¶ 19, 21, 22, ECF 117), despite not having a basis for this claim, (Pls.' Statement of Facts ¶¶ 57–60, ECF 117). Key Credit also routinely represented that its services could remove unlimited negative items from credit reports, (Pls.' Statement of Facts ¶¶ 20–22, ECF 117), even though such claim is not possible, (*see* Pls.' Mot. Summ. J. 17, ECF 116). Moreover, numerous consumers have filed complaints that Key Credit did not provide the services it represented it would provide, or that Key Credit provided no services at all, including complaints that after enrolling with Key Credit the consumer was "left broke with a worse score" and the consumers "have not seen any results whatsoever." (Pls.' Statement of Facts ⁋ 63, ECF 117; Ex. 1 at ¶¶ 14(a)-(b) (Schneider Decl.)).

40. Key Credit also does not and has never engaged in the practice of "flooding" CRAs with dispute letters, whether with the purpose of temporarily removing negative tradelines or otherwise. (Tsoukalis Decl. ¶ 15.)

**Plaintiffs' response:** Disputed but immaterial. Defendants provide no support for this statement other than ¶ 15 of Defendant Tsoukales's Affidavit submitted in support of his motion for summary judgment. The entirety of ¶ 15 is just the statement above, which is vague and conclusory and does not meet the requirements of Fed. R. Civ. P. 56 and should not be considered by the Court. (*See, e.g., Posadas de Puerto Rico, Inc.* 856 F.2d at 401 ("Vague and conclusory statements in an affidavit do not meet the specificity requirement of Federal Rule 56.")). Moreover, Key Credit persistently represents to consumers that it can improve their credit scores by removing negative items and that it will do so by challenging *all* negative items on a consumer's report again

and again. For example, on its website, Key Credit represents, "We will analyze the items not yet removed and generate new letters addressing them again. We will do this every 30-45 days until you are happy with the number of removals and/or the credit score increase you have as a result of cleaning up inaccuracies." (Ex. 2, Attachment B at 6, Attachment C. at 4, 11 (Schneider Decl.); *see also* Ex. 26 at KCR_0028759 (website capture of free consultation page from June 22, 2017, KCR_0028755); Ex. 25 at KCR_0028734 (website capture of free consultation page from May 18, 2017, KCR_0028731)). During calls with consumers, Key Credit agents have made similar representations. During one call, a sales agent said, "if they [the CRAs] do verify any of these negative marks the first month, of course, we don't give up. What we do is we challenge it again. We keep on challenging every month. So we make the procedure too expensive and too time-consuming for them." (Ex. 80 at 5:2–7 (Consumer Call Transcript, KCR_0020938)). Finally, whether Key Credit has engaged in the practice described above is immaterial to Defendants' liability for Counts I-V of the Amended Complaint.

41. Nor has Key Credit ever encouraged customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (Tsoukalis Decl. ¶ 16.)

**Plaintiffs' response:** Disputed but immaterial. Defendants provide no support for this statement other than ¶ 16 of Defendant Tsoukales' Affidavit submitted in support of his motion for summary judgment. The entirety of ¶ 16 is just the statement above, which is vague and conclusory and does not meet the requirements of Fed. R. Civ. P. 56 and should not be considered by the Court. (*See, e.g., Posadas de Puerto Rico, Inc.* 856 F.2d at 401 ("Vague and conclusory statements in an affidavit do not meet the specificity requirement of Federal Rule 56.")). Finally, whether Key Credit ever encouraged customers to "falsely document a good credit history by

leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else, is immaterial to Defendants' liability for Counts I–V of the Amended Complaint.

42. Further, Key Credit has never been found to have violated any provision of CROA, including CROA's prohibition against false or deceptive advertising or conduct. (Tsoukalis Decl. ¶ 17.)

**Plaintiffs' response:** Beyond Scope, disputed, and immaterial. Plaintiffs cannot respond to the accuracy of Defendants' assertion because the alleged statement of fact is not relevant to any party's claim or defense and thus is beyond the scope of Fed. R. Civ. P. 26(b). Accordingly, there has been no discovery of Key Credit's compliance under CROA. Plaintiffs also dispute the assertion because Defendants provide no support for this statement other than ¶ 17 of Defendant Tsoukales' Affidavit submitted in support of his motion for summary judgment. The entirety of ¶ 17 is just the statement above, which is vague and conclusory and does not meet the requirements of Fed. R. Civ. P. 56 and should not be considered by the Court. (*See, e.g., Posadas de Puerto Rico, Inc. v.* 856 F.2d at 401 ("Vague and conclusory statements in an affidavit do not meet the specificity requirement of Federal Rule 56.")). Finally, whether Key Credit has been found to have violated any provision of CROA is immaterial to Defendants' liability for Counts I–V of the Amended Complaint.

43. After a customer signs the written contract, Key Credit then waits a minimum of five business days before allowing a customer to make a payment. (Hudson Aff., Ex. G at 17:21-18:9 (Tsoukalis Dep. II); Hudson Aff., Ex. J at KCR_0057364 (contract states that customer's first payment will be "5 days after the signing of this contract (unless the client indicates a date greater than 5 days …)"); Hudson Aff., Ex. K at KCR_0057369-70 ("The Client will not be charged any

advance Monthly Service Fees for any Services, rather such fees will only be charged by [Key Credit] to the Client upon [Key Credit's] completing the Services on behalf of the Client which will not occur until a minimum of 5 days subsequent to the Client entering into this agreement with [Key Credit]."); Hudson Aff., Ex. L at KCR_0057341-42 (same).) Key Credit does so only after the "first work" is fully completed. (Hudson Aff., Ex. I at 114:21-115:22 (May 2019 Hearing Tr.).) "First work" consists of analyzing the customer's credit reports, completing all required data entry, creating all dispute letters, and auditing the credit records. (*Id.*) Subsequent fees are billed on a monthly basis in accordance with the written contracts for services that are fully performed before that fee is charged. (Hudson Aff., Ex. I at 121:8-15 (May 2019 Hearing Tr.); Tsoukalis Decl. ¶ 13.)

**Plaintiffs' response:** Disputed in part. The phrase "fully performed" is vague and ambiguous. Plaintiffs dispute that subsequent fees are billed on a monthly basis "for services that are fully performed before that fee is charged" because Defendants have not cited to evidence that substantiates this claim. Further, Key Credit's documents and other testimony contradict this assertion. (Pls.' Statement of Facts ¶¶ 44–45, 62, ECF 117 (Key Credit charges consumers monthly fees until the customer cancels; monthly fees are not related to the credit improvements achieved for customers; Key Credit does not track whether services result in the removal of negative credit report items)). In addition, Consumers have complained that that Key Credit billed them on a monthly basis but not provide the services it represented it would provide, and that in some instances Key Credit did not provide any services at all. (*See, e.g.* Ex. 1 ¶ 15(a) (Schneider Decl.) (consumer paid Key Credit $166 a month for over 3 months but "received NO credit repair); Ex. 1 ¶ 15(b) (Schneider Decl.) ("Key Credit Repair took my money but gave ZERO results.); Ex. 1 ¶ 14(c) (Schneider Decl.) (consumer paid Key Credit $139.95 for services but reported, "Nothing

has been done through KeyCreditRepair.com except for requesting my credit reports, which I could do by myself."); Ex. 47 (Blunt Decl. with attachments) (consumer paid Key Credit $94.97 per month for services that Key Credit represented would "help improve my credit score with the three credit reporting agencies and remove negative items from my report" but Key Credit "did not provide me with an improved credit score or remove negative items from my credit report, as they had promised.")). Plaintiffs do not dispute that Key Credit charges a first-work fee five days to two weeks after enrollment or on a specific date selected by the customer.

44. Key Credit's customers determine how long they choose to use Key Credit's services and always retain the right to cancel at any time without penalty. (Hudson Aff., Ex. C at 51:10-12, 57:21-58:2 (Tsoukalis Dep.) ("Clients are the boss. . . . that's why it is a cancel anytime policy. They can cancel for any reason at any time without any minimum time-frames they are with [Key Credit])"); Hudson Aff., Ex. H at 14:5-15:1 (Hadayia Dep.); Hudson Aff., Ex. J at KCR_0057365-67 (contract); Hudson Aff., Ex. K at KCR_0057369 (contract stating "You have a right to cancel your contract with any credit repair organization for any reason within 5 days from the date you signed it."); Hudson Aff., Ex. L at KCR_0057342 (contract).)

**Plaintiffs' response:** Disputed in part but immaterial. Although Key Credit's service agreements typically provide that a consumer has the right to cancel the agreement at any time, Plaintiffs dispute that "customers determine how long they choose to use Key Credit's service." Numerous consumer complaints allege that it is difficult for consumers to cancel their service agreements with Key Credit or that after they cancel, Key Credit continues charging their accounts. (*See, e.g.*, Ex. 1 at ¶¶ 14(b)-(c), 15(e), 16(b), & 17(a) (Schneider Decl.); Ex. 50 (Vess Decl.) (". . .I called Key Credit Repair to cancel my payments and told them to stop working on my behalf. .

. The Key Credit Repair representative told me that they would not cancel my payments or refund my payments. The representative told me that I was making a mistake and that I should give Key Credit Repair more time to help me improve my credit. I was furious that Key Credit Repair wouldn't cancel when I requested.")). Consumers have also complained that when they attempt to cancel, they are indefinitely placed on hold, are unable to reach anyone by phone or e-mail, and are never able to make contact with a Key Credit representative. (*See, e.g.*, Ex. 1 at ¶ 14(b)-(c) (Schneider Decl.)). Finally, whether customers can cancel their services with Key Credit is immaterial to Defendants' liability for Counts I–V of the Amended Complaint.

45. Key Credit provides various safeguards to ensure that its services are accurate and provide "complete clarity" to its customers. (Hudson Aff., Ex. C at 47:12-48:2 (Tsoukalis Dep.).)

**Plaintiffs' response:** Disputed in part. Plaintiffs dispute this assertion for the reasons stated in Responses 46, 47, and 48 which describe the "various safeguards" referenced in this paragraph.

46. First, Key Credit enters into written contracts that clearly and unambiguously set forth the specific services that Key Credit agrees to perform and what Key Credit does and does not promise. (Hudson Aff., Ex. C at 47:12-25, 53:15-21 (Tsoukalis Dep.); Hudson Aff., Ex. I at 87:20-25, 107:14-19 (May 2019 Hearing Tr.); Hudson Aff., Exs. J-L (contracts).)

**Plaintiffs' response:** Disputed in part. Plaintiffs dispute Defendants' characterization that Key Credit's contracts "clearly and ambiguously set for the specific services that Key Credit agrees to perform and what Key Credit does and does not promise." As detailed in Response 36, Key Credit's enrollment process is structured such that consumers are unlikely to have read and understood Key Credit's contracts at the time of signing. (*Supra* Response 36). Plaintiffs do not dispute that Key Credit enters written contracts with consumers.

47. In addition to listing the specific services that Key Credit agrees to perform, Key Credit and its customers agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (Hudson Aff., Ex. K at KCR_0057369; Hudson Aff., Ex. L at KCR_0057341; see also Hudson Aff., Ex. J at KCR_0057364 ("Accurately reported items on a credit report[] cannot be removed.").)

**Plaintiffs' response:** Disputed in part. Plaintiffs do not dispute that some of Key Credit's contracts contain the quoted language. But Plaintiffs dispute that customers knowingly "agree" to the quoted language. As described in Response 36, Key Credit's enrollment process is structured such that consumers are unlikely to have read and understood Key Credit's contracts at the time of signing.

48. Second, Key Credit provides its representatives with scripts and trains its sales representatives on understanding credit scores, understanding Key Credit's action plans, interacting with customers, and important regulatory information. (Hudson Aff., Ex. I at 59:8-60:5, 65:11-17, 100:17-101:4 (May 2019 Hearing Tr.).)

**Plaintiffs' response:** Undisputed.

49. In its scripts for sales consultants, Key Credit advises prospective customers that "if there is something they want to challenge [on their credit reports], we'll challenge it for them. We will do the leg work, we'll create and mail the letters for them . . . . We'll be their credit coach while they're with us . . . [and that] if they follow the action plan and if they really understand how their credit works that they can improve their credit score." (Hudson Aff., Ex. I at 54:25-55:14 (May 2019 Hearing Tr.).)

**Plaintiffs' response:** Undisputed.

50. Key Credit also trains its sales consultants that "We do not guarantee a specific score change" and "do not guarantee a specific deletion rate" to its customers. (Key Credit Consultant A to Z at KCR 0018438, attached as Exhibit M to Hudson Aff.)

**Plaintiffs' response:** Disputed in part. Plaintiffs do not dispute that Key Credit's training materials include the statements quoted above; however, based on sales agents' representations to customers and consumer complaints, Plaintiffs dispute that the training is effective and that Key Credit's sales agents follow such guidance. (Pls.' Statement of Facts ¶¶ 34-36, 63, ECF 117 (citing, *e.g.*, Ex. 62 (Tsoukales selling tips email KCR_0019812); Ex. 63 (Script and Negative Items email, KCR_0001777); Ex. 61 at 23:1–4 (Consumer Call Transcript, KCR_0001844)); Ex. 1 ¶¶ 14–20 (Schneider Decl.); Ex. 47 (Blunt Decl. with attachments); Ex. 48 (Finney Decl. with attachments); Ex. 49 (Perrow Decl. with attachments); Ex. 50 (Vess Decl.)).

51. Key Credit's Founder and CEO also informs sales representatives to:

- "Never promise a timeline
- Never promise we can delete something
- Never tell someone we will get all of the items removed
- Results always vary
- We are brutally honest and that is what's [sic] sets us apart
- Always
  - Let clients know only something that cannot be verified can be deleted
  - Let clients know that if something cannot be verified it cannot remain on credit
  - We increase the odds of removing more items than other companies because we work on all 3 [credit reporting] agencies at the same time and every negative record
  - Give examples of how something can be removed and explain our process.

- Please be careful not to overpromise. This is the only thing that can quickly end a career. The best salesman [sic] are brutally honest."

(KCR_0020907-08, attached as **Exhibit N** to Hudson Aff.)

**Plaintiffs' response:** Disputed in part but immaterial. Plaintiffs do not dispute that Tsoukales sent the email (Exhibit N) to his sales team on March 14, 2018. But to the extent Defendants' statement implies that the contents of this email were regularly communicated or widely distributed, Plaintiffs dispute that a single email is sufficient to establish that. Further, whether Tsoukales informed Key Credit's sales representatives about the statements quoted above is immaterial to Defendants' liability for Counts I–V of the Amended Complaint.

52. Key Credit also trains its customer service and sale representatives to "never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." (Hudson Aff., Ex. N at KCR_0020907.)

**Plaintiffs' response**: Disputed. Defendants dispute that a single email (Exhibit N) containing the language quoted above is sufficient to support the statement that "Key Credit also trains its customer service and sale representatives to 'never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." Indeed, several call transcripts show that a Key Credit sales agents made representations inconsistent with the assertions in ¶ 52. (*See, e.g.* Ex. 54 at 12:17–19 (Consumer Call Transcript, KCR_0001838) (sales agent promises a timeline, "If you don't see any results in the next 30 to 45 days, you can call us back, cancel at any time and get your money back, sir."); Ex. 56 at 27:22–25 (Consumer Call Transcript, KCR_ 0007782) (sales agent promises to delete negative items from consumer's credit report, "We're going to do a clean up for you, ma'am, where we're going to remove all negative items in order to increase your credit score.); Ex. 64 at 5:12–16, 8:18–21, (Consumer Call Transcript, KCR_0017956) (sales agent tells consumer ". . .we should be getting

you first to a 640, which is bankable, then 680, and graduation score is around 740 or above. So, we not only help you to remove things, but we also help you to build credit."; "during the process, it takes around 30 days to start seeing some results;" and "Okay, so, this is not a contract, at all. So, we usually forecast that in the first 30 days -- you'll start seeing the start of deletions, so we track your credit progress every 30 days."); Pls.' Statement of Facts ¶ 37, ECF 117 (attaching excerpt of call transcript in which agent states, "we're going to remove all negative items")).

53. The customer experience begins with phone calls between prospective customers that can consist of short calls (that may last for 30 seconds) or full consultations (that include reviewing a customer's credit report and going through the customer's goals and the enrollment process). (Hudson Aff., Ex. C at 156:16-157:15 (Tsoukalis Dep.); Tsoukalis Decl. ¶ 9.) A full consultation can last up to two hours. (Tsoukalis Decl. ¶ 9.)

**Plaintiffs' response:** Disputed in part. As phrased, Defendants' statement that "[t]he customer experience begins with phone calls between prospective customers…" would mean that customers speak to each other, which does not happen. (Pls.' Statement of Facts ⁋⁋ 25-26, ECF 117). Plaintiffs do not dispute that prospective customers contact Key Credit by phone and those conversations can consist of short calls or full consultations that can last up to two hours.

54. During a full consultation, Key Credit's sales representatives spend substantial time educating prospective customers "through and beyond [the] basics of just removing inaccuracies from their credit report," explaining "what makes up a credit report, how the FICO score algorithm works," and empowering prospective customers "on how they, themselves, without ever signing up or needing [Key Credit] to do anything for them could increase their credit scores by paying down debts, paying off balances, [and] using credit more intelligently." (Hudson Aff., Ex. G at 23:11-24:12 (Tsoukalis Dep. II).)

**Plaintiffs' response:** Disputed. The phrases "substantial time" and "empowering prospective customers" are vague and ambiguous. Call transcripts show that in many instances Key Credit's sales agents do not "educate" consumers in a "full consultation" (i.e. "spend substantial time educating prospective customers 'through and beyond [the] basics of just removing inaccuracies from their credit report,' explaining 'what makes up a credit report, how the FICO score algorithm works,' and empowering prospective customers)." (*See, e.g.* Ex. 55 at 2:11–14; 12:16–22; & 13:19–14:05) (Consumer Call Transcript, KCR_0007782) (sales agent does not "educate" the consumer in a full consultation but did make various promises of credit improvement, including: "What we basically do is to dispute and challenge negative items on your credit report to help you boost up your score. . .We're going to challenge everything that you have within [the CRAs], so if one of the – if one account is posted on TransUnion but it's not in Experian or Equifax, that's not a problem. We're going to fight for everything that's affecting all three credit bureaus;" "We're expecting to see the first and main improvement within the next 30 to 45 days after they get the letters, and then once you see you're back on track, you give us a call and cancel;" "Everything, yes, sir. Everything that affects and gives a negative impact on your credit, late payments, hard inquiries, collections, charge offs and bankruptcy, everything that's affecting your credit. We'll fight for everything, sir. Don't – don't worry."); Ex. 64 at 5:05–07, 11:14–12:03 (Consumer Call Transcript, KCR_0017956) (sales agent does not "educate" the consumer in a full consultation but did make various promises of credit improvement, including: "So, um, we work with the three credit bureaus, and we tackle unlimited items. So, basically, it doesn't matter how many negatives you have; we just work with everything;" "So, we usually forecast that in the first 30 days – you'll start seeing the start of deletions, so we track your credit progress every 30 days;" "[W]e should be expecting at least a 90 point in 90-day improvement, there. So, we can wait around

two months to see most things off your credit so that you can refinance yourself.") ; Ex. 79 at 4:18–5:12 (Consumer Call Transcript, KCR_0020933) (sales agent does not "educate" the consumer in a full consultation but did make various promises of credit improvement, including: ". . .if [CRAs] cannot respond back in 30 days for any reason at all, [they] are going to remove negative mark and debt from your credit report like it never existed;" "So we make the procedure too expensive and too time-consuming for them. So, as you can understand, sir, everything here will be done on a monthly basis. Challenge all negatives. If they respond back and verify, we challenge again. If they cannot, negative mark and debt will get removed.")).

55. Finally, Key Credit regularly monitors customer calls and grades (and sometimes fires) representatives who deviate from these policies. (*See* Hudson Aff., Ex. N at KCR_0020907; *see also* Hudson Aff., Ex. O.)

**Plaintiffs' response:** Disputed. Plaintiffs dispute that the two documents cited by Defendants support the assertion that "Key Credit regularly monitors customer calls and grades (and sometimes fires) representatives who deviate from these policies." Exhibit N is an email from Tsoukalis referencing a "1 strike rule" and stating, among other things, "[n]ever promise we can delete something; [n]ever tell someone we will get all of the items removed," but does not show that Key Credit regularly monitors customer calls and grades (and sometimes fires) representatives. And although Exhibit O includes compliance-monitoring emails and "Sales Grade Scorecards" for Key Credit's sales representatives, parts of it contradict Defendants' statement above. In one scorecard, for example, an agent is congratulated for a "great job" but also given feedback that the agent made misrepresentations to a customer: "when you speak about timeframes, just use 'on average' before giving out any time frame. You said 90 points in 90 days…. you said [the customer] would get results in 30 days." That agent scored 84.62% and was

not fired under the purported "1 strike rule" in Exhibit O for making purportedly prohibited representations to the customer. Moreover, other Key Credit documents show sales call emails and scorecards where a sales agent apparently deviated from Key Credit's policy and sales scripts by informing a consumer that he or she might get a 90-point increase in 30 days, but the "Sales Grade Scorecard" awards the sales agent with a high or perfect score. (*See, e.g.*, Ex. 110 at KCR_0008854 (email with sales agent scorecard showing 76% but noting that the agent told "a client he would be with us around 2-3 months. . . . Lately I've been noticing the call quality dropping. Last week we had 2 out of compliance calls.")).

56. The Quality Control process includes listening to phone calls between sales associates and prospective customers and utilizing a quality control checklist for each call to ensure that sales associates comply with sales and "compliance-based" training and to enforce that "things that are not allowed to be said and that are fireable offenses." (Hudson Aff., Ex. C at 154:18-156:1 (Tsoukalis Dep.).) Key Credit's Head of Quality Control listens to the calls to ensure quality control. (Hudson Aff., Ex. C at 23:5-9; 47:12-25 (Tsoukalis Dep.); Hudson Aff., Ex. I at 66:2-67:6 (May 2019 Hearing Tr.).)

**Plaintiffs' response:** Disputed. Plaintiffs dispute Defendants' assertion in ¶ 56 to the extent Defendants are claiming that they "ensure" and "enforce" compliance guidance and policies. As described in Response to 55, "Sales Grade Scorecards" show that Key Credit commends sales agents and provides high marks for performance even where the sales agents made statements that are against Key Credit's purported policies. (Ex. O (compliance-monitoring emails and "Sales Grade Scorecards" that show positive scores despite prohibited statements from sales agents to customers)). Plaintiffs do not dispute the description of the quality-control process generally.

**PLAINTIFFS' ADDITIONAL UNDISPUTED MATERIAL FACTS**

57. From June 1, 2020, to June 1, 2023, Key Credit's website displayed representations about Key Credit's credit-repair services, including:

- "FREE Credit Improvement Plan of Action" (Ex. 2 at ¶ 8(A) (Schneider Decl.));
- "Start correcting your credit report and start living the life you deserve!" (*id.* ¶ 8(B));
- "Our credit repair experts work on an Unlimited number of inaccurate items on your credit report with all 3 credit agencies and creditors, for one flat monthly fee with zero up-front or advanced fees" (*id.* ¶ 8(C));
- "We have no up-front costs, contracts or commitments" (*id.* ¶ 10(B));
- "A Simple Program To Correct Your Credit Scores" (*id.* ¶ 10(C));
- "Unlike other companies, we offer an Unlimited Service and a free credit counseling session up front. This means that we can work on Every Single Negative item at once with All 3 Credit Agencies (rather than just a set number of negative items per month). We do this so that you see results much faster than with other companies" (*id.* ¶ 10(D));
- "Clients can start seeing corrections in as little as 45 days" (*id.* ¶ 10(E)); and
- "Key Credit Repair removed all of my negative records and I have only been with them for 2 months . . . Before Key Credit Repair I couldn't get a credit card, now I can." (*id.* ¶ 10(F)).