**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General,<br>Plaintiffs,<br>v.<br>COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS<br>Defendants. | No. 20-cv-10991<br><br>Judge Rya W. Zobel<br><br>**REQUEST FOR ORAL ARGUMENT** |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT ON COUNTS I-V**

**Leave to File Granted on August 30, 2023**

Timothy A. Hudson, *pro hac vice*
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., Ste. 700
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlaw.com

-and-

David B. Mack (BBO No. 631108)
Stephanie R. Parker (BBO No. 687610)
O'Connor, Carnathan and Mack LLC
10 Burlington Mall Road, Ste. 301
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net
sparker@ocmlaw.net

Dated: September 1, 2023

# TABLE OF CONTENTS

**PAGES**

TABLE OF AUTHORITIES ........ iii

ARGUMENT ........ 1

I. Summary Judgment Should be Granted in Key Credit's Favor on Counts III, and IV Because the TSR's Advance Fee Provision Does Not Apply to Key Credit Based on the Undisputed Facts of this Case ........ 1

A. Plaintiffs' interpretation of the Provision is contrary to, and would be an unwarranted expansion of, its stated purpose ........ 1

B. Plaintiffs misinterpret the Provision in a manner that is contrary to its plain language and that would render terms meaningless ........ 3

C. The Advance Fee Provision does not require any "seller" – including Key Credit – to provide a time frame for the completion of its services ........ 7

D. Plaintiffs' interpretation of the Advance Fee Provision is unreasonable and would lead to absurd results ........ 8

E. The record establishes that Key Credit does not promise results to customers and does not represent a time frame by which all services will be provided ........ 10

F. Plaintiffs' proffered interpretation exceeds its scope of its statutory Authority ........ 12

II. Summary Judgment Should be Awarded to Key Credit on Counts I – V ........ 14

A. The TSR places Unconstitutional content-based restrictions on speech in violation of the First Amendment ........ 14

B. The TSR violates the Equal Protection Clause ........ 16

C. The funding employed by the Bureau to bring this action was not Constitutionally appropriated ........ 17

CONCLUSION ........ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barr v. American Association of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020) ....................15

*Bartok v. Hometown Am., LLC*,
No. 21-10790-LTS, 2023 WL 3773106 (Feb. 27, 2023) ....................8

*CFPB v. Morgan Drexen, Inc.*,
No. SACV 13-1267-JLS, 2014 WL 12581776 (C.D. Cal. Nov. 25, 2014) ....................11

*CFPB v. Progrexion Marketing, Inc.*,
No. 2:19-cv-00298-BSJ, 2023 WL 2548008 (D. Utah Mar. 10, 2023) ....................5, 6

*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ....................11

*FTC v. Fin. Freedom Processing, Inc.*,
538 Fed. Appx. 488 (5th Cir. 2013) ....................11

*FTC v. Gill*,
71 F. Supp. 2d 1030 (C.D. Cal. 1999) ....................11

*FTC v. Nudge, LLC*,
No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695 (D. Utah June 14, 2022) ....................11

*In re Hill*,
562 F.3d 29 (1st Cir. 2009) ....................7

*Jette v. United of Omaha Life Ins. Co.*,
18 F.4th 18 (1st Cir. 2021) ....................3, 5

*King v. Governor of the State of New Jersey*,
767 F.3d 216 (3d Cir. 2014) ....................15

*Mass. Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976) ....................17

*Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*,
524 F.3d 54 (1st Cir. 2008) ....................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................8, 13

*In re National Credit Management Group*,
21 F. Supp. 2d 424 (D.N.J. 1998) ....................15, 16

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) ....................17

*Removatron Int'l Corp. v. FTC*,
884 F.2d 1489 (1st Cir. 1989) ....................11

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
502 U.S. 105 (1991) ....................14, 15

*U.S. v. Lachman*,
387 F.3d 42 (1st Cir. 2004) ....................7

*In re Vistaprint Corp Mktg. & Sales Practices Litig.*,
MDL No. 4:08-md-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) ....................11

**Statutes**

31 U.S.C. § 1349 ....................18

31 U.S.C. § 1350 ....................18

**Other Authorities**

16 C.F.R. § 310.2 ....................5

16 C.F.R. § 310.3 ....................5

16 C.F.R. § 310.4 ....................4

60 Fed Reg. 43,842 ....................7, 13

65 Fed. Reg. 10,428 ....................2

67 Fed. Reg. 4,492 ....................1, 2, 12

Defendants Commonwealth Equity Group, LLC d/b/a Key Credit Repair and Nikitas Tsoukalis (together, "Key Credit") respectfully submit this reply in support of their motion for summary judgment on Counts I-V.

**RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS**

Key Credit respectfully refers the Court to its separately-filed Response to Plaintiffs' Statement of Additional Facts, which Key Credit incorporates by reference.

**ARGUMENT**

**I. Summary Judgement Should be Granted in Key Credit's Favor on Counts I, III, and IV Because the TSR's Advance Fee Provision Does Not Apply to Key Credit Based on the Undisputed Facts of this Case.**

As set forth in its opening brief, Key Credit's motion for summary judgment should be granted on Counts I, III, and IV because the plain language and purpose of the Telemarketing Sales Rule's ("TSR") Advance Fee Provision make clear that the Provision only applies when a "seller or telemarketer … promised results" and "represented a time frame" by which all services would be provided to customers. Here, Key Credit never promised results or represented any such specific time frame. In response, Plaintiffs attempt to re-write the TSR by ignoring clear language and inserting unfounded assumptions that would render terms of the Provision superfluous.

**A. Plaintiffs' interpretation of the Provision is contrary to, and would be an unwarranted expansion of, its stated purpose.**

Plaintiffs argue that the Provision's legislative history and purpose support their proposition that it applies broadly to "all telemarketed credit-repair goods and services." (Dkt. 122 at 7.) Plaintiffs are wrong.

The purpose of the Advance Fee Provision is to prohibit unfair scams where credit repair companies offer "fundamentally bogus" services that they have "no intention of providing and in fact do[] not provide." 67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002). According to the FTC, "the essence

of these schemes [is] to take consumers' money for services that the seller has no intention of providing and in fact does not provide" and the Provision was intended to prevent such unfair conduct that the FTC viewed as "outright theft." *Id.* Importantly, and as explained in a comment on the Advance Fee Provision, it is necessary to distinguish "[s]o-called credit repair services" from "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer." (*See* Dkt. 114-6 (U.S. Postal Serv., Comment Letter on Proposed Telemarketing Sales Rule).)

Although Plaintiffs rely on FTC notices in an effort to support their claim that the Provision is intended to apply broadly to any and all credit repair services (Dkt. 122 at 7), those notices actually contradict Plaintiffs' claim. In fact, those FTC notices underscore that the Advance Fee Provision's purpose is to prohibit unfair scams in which credit repair companies offer "bogus" services "that the seller has no intention of providing and in fact does not provide." For example, Plaintiffs cite to an FTC request for comment (Dkt. 122 at 7 n.20), but ignore the FTC's very next statement, which asks whether section 310.4(a)'s provisions "have been effective weapons in combating credit repair, advance fee loan, and recovery room ***scams***." 65 Fed. Reg. 10,428, 10,432 (Feb. 28, 2000) (emphasis added).

Plaintiffs' reliance on an FTC 2002 notice is similarly unhelpful to Plaintiffs. The first quoted language simply notes that the TSR focuses on "illusory services which the FTC intended to prohibit" (*i.e.*, bogus services that companies do not provide and never intend to provide). (Dkt. 122 at 7 n.21.) Plaintiffs also claim that the 2002 notice describes the Advance Fee Provision as restricting credit-repair services without mentioning guarantees or promises (*Id*. at 7 n.22), but the language quoted by Plaintiffs is not found anywhere in the final Rule. In the end, the FTC chose not to include language in the Advance Fee Provision making the Provision so broad that it would

prohibit "requesting or receiving payment for credit repair services prior to delivery and proof that such services have been rendered." (*Id.*)

Plaintiffs also rely on irrelevant materials that provide no support for their contention that the Advance Fee Provision broadly applies to "all telemarketed credit-repair goods and services" (Dkt. 122 at 7). First, Plaintiffs cite a comment by State Attorneys General who played no role in the promulgation of the TSR. Second, Plaintiffs cite to various complaints to support their contention that their interpretation of the Advance Fee Provision is consistent with the federal government's interpretation in past cases. (Dkt. 122 at 7-8, 8 n.23.) But Plaintiffs merely cite to *complaints* filed – *not actual court rulings* that adopt Plaintiffs' novel interpretation of the Advance Fee Provision or stating that Plaintiffs' proposed interpretation is correct. Government allegations in complaints filed in other cases and comments by State Attorneys General are simply irrelevant, and they cannot change the TSR's plain language or legislative intent.

Ultimately, Plaintiffs admit (as they must) that the TSR's Advance Fee Provision was intended to address "the problems that arise from the telemarking of [] illusory services." (Dkt. 122 at 7.) Yet, here, there is no dispute that Key Credit provides actual, concrete services for all of its customers – not "bogus" or "illusory" services that the Provision is intended to remedy.

### B. Plaintiffs misinterpret the Provision in a manner that is contrary to its plain language and that would render terms meaningless.

Courts should construe a regulation, such as the TSR, "in light of its chosen language, the specific context in which that language is used, and the broader context of the regulation as a whole." *Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 28 (1st Cir. 2021) (quotation omitted).

Under the Provision, it is an abusive telemarketing practice when a seller requests or receives payment "for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating" before the time in which the seller "represented

all of the goods or services will be provided to that person has expired" and the seller "provided the person with documentation … demonstrating that the ***promised results*** have been achieved." 16 C.F.R. §§ 310.4(a)(2)(i)-(ii).

Plaintiffs' incorrectly contend that sections 310.4(a)(2)(i) and (ii) are "preconditions for solicitation and receipt of payment." (Dkt. 122 at 4.) However, neither the TSR nor the Provision require that credit repair organizations must (i) set forth a time frame by which they represent that all services will be provided, or (ii) specify or otherwise promise any results to their customers. Yet, according to Plaintiffs' interpretation, a credit-repair organization cannot even solicit or offer to provide services to customers unless the organization promises results to customers. The Provision does not set forth requirements for all sellers "requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating." Instead, the Provision prohibits such sellers from engaging in certain, specific acts and practices *if* those sellers set forth a time frame by which they "represent that all services will be provided," and "promise results" to their customers.

As Plaintiffs admit, their interpretation of the Provision relies on the incorrect assumption that a seller *always* promises a result to its customers. (Dkt. 122 at 5 (stating that Plaintiffs "assume that a telemarketer or seller 'promises a result of some sort.'").) Plaintiffs invite this Court to graft such an assumption into the TSR and re-write the Provision in a manner that would render the terms "services" and "promised results" meaningless or, at a minimum, synonymous. The Court should reject Plaintiffs' ill-founded invitation to create assumptions and obligations that exist nowhere in the language of the TSR, the Advance Fee Provision, or its regulatory history.

Ignoring the Provision's plain language, Plaintiffs incorrectly argue that Key Credit "invented" the Advance Fee Provision's distinction between "services" and "promised results" (Dkt.

122 at 5). But the drafters of the TSR, not Key Credit, used the terms "services" and "promised results" separately and independently. Indeed, the TSR itself expressly recognizes the distinction between the terms "services" and "promised results."

The terms "services" and "results" are not interchangeable and are used throughout the TSR to refer to different things. *Compare* 16 C.F.R. § 310.2(n) ("Customer means any person who is or may be required to pay for goods or ***services*** offered through telemarketing") *and* § 310.2(dd) ("Seller means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or ***services*** to the customer in exchange for consideration") *and* § 310.3(a) (setting forth when deceptive telemarketing acts or practices occur before a customer agrees to pay for "***services*** offered"), *with* 16 C.F.R. §§ 310.3(a)(1)(viii), (x) (setting forth when a deceptive act or practice occurs "in the sale of any debt relief service" if a seller fails to disclose "the amount of time necessary to achieve the ***represented results***" or "the percentage or number of customers who attain the ***represented results***"). The Court should respect the TSR's choice of language and the distinction it recognizes between "services" and promised/represented "results." *See Jette*, 18 F.4th 18, (1st Cir. 2021) (construing regulation in light of its language and use of certain terms to refer to different things).

Not only is Plaintiffs' assumption that a seller always promises a result contrary to the TSR's plain language and purpose, but Plaintiffs' only support is a single, nonbinding case from a district court in Utah—*CFPB v. Progrexion Marketing, Inc.*, No. 2:19-cv-00298-BSJ, 2023 WL 2548008 (D. Utah Mar. 10, 2023). In *Progrexion Marketing*, the court gestures to the Advanced Fee Provision's requirement regarding "promised results" in a single, cursory paragraph, the entirety of which Plaintiffs quote in their response (Dkt. 122 at 5; *see also Progrexion Marketing*, 2023 WL 2548008 at *6.)

Like the arguments Plaintiffs advance here, the *Progrexion Marketing* court's meager analysis consists of little more than *ipse dixit* and has no basis in the TSR's text or legislative history. For example, the court explained that the TSR does not include an exception to the Advance Fee Provision for sellers who do not offer "promised results." *Progrexion Marketing*, 2023 WL 2548008 at *6. But there is no need for an exception for sellers who do not offer "promised results" when, on its face and in its legislative history, the Provision applies only to sellers who actually offer "promised results" in the context of offered "illusory services" that the seller does not and has no intention to provide. In the TSR, the FTC clearly chose to limit its draconian Advance Fee Provision only to those sellers who "promise results" and represent a time frame by which all of their services will be provided.

Plaintiffs' proffered interpretation would also render the "promised results" language in section 310.4(a)(2)(ii) superfluous. However, courts in the First Circuit should construe regulatory text so that *all* provisions are given effect and *no* part is rendered superfluous. *See Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 59 (1st Cir. 2008).

Finally, Plaintiffs incorrectly contend that Key Credit "equat[es] 'promised results' with a guarantee by referencing the definitions of 'promise' and 'result'" (Dkt. 122 at 4). Plaintiffs misapprehend Key Credit's argument because Key Credit does not equate "promised results" and "guarantee." Moreover, Plaintiffs cite no authority to support their attempt to ignore the relevance of dictionary definitions when interpreting a regulation. As the First Circuit has explained, dictionaries "are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations," and it is entirely proper to use the dictionary definitions of key terms when construing

the TSR. *U.S. v. Lachman*, 387 F.3d 42, 51 (1st Cir. 2004). Plaintiffs do not (and cannot) argue otherwise.[1]

**C. The Advance Fee Provision does not require any "seller" – including Key Credit – to provide a time frame for the completion of its services.**

Plaintiffs argue that Key Credit "suggests that the company doesn't represent to consumers that its services will be completed in any particular time frame," and, therefore, Plaintiffs argue that "it is impossible for Key Credit to comply" with the Provision. (Dkt. 122 at 5-6.) Plaintiffs' argument is incorrect.

As set forth above, nothing in the Provision or the TSR requires that Key Credit (or any "seller") provide consumers with a time frame by which all services will be provided. (*See supra* Section I.B.) Instead, and in keeping with the Provision's purpose to prohibit unfair scams where credit repair companies offer "fundamentally bogus" services they never intend to provide, the Provision prohibits sellers from engaging in specific acts if those sellers set forth a time frame by which they represent all services will be provided and promise results to customers. *See* 60 Fed Reg. 43,842, 43,854 (Aug. 23, 1995) (to be codified at 310 C.F.R. pt. 310) ("The abusive practice against which § 310.4(a)(2) is directed is the deceptive marketing and sale of bogus credit repair services. … [T]he Commission does not intend that this Section apply to legitimate credit monitoring services."). Like Plaintiffs' attempt to rewrite romanette (ii) of the Provision, the court should reject Plaintiffs' attempt to insert an assumed obligation that sellers must make a representation as to a time frame by which all services will be provided, which has no basis in the plain language or regulatory history of the Provision or the TSR. By its terms, the Provision restricts when a seller can receive

---

[1] In fact, Plaintiffs' response cites to caselaw that relies on dictionary definitions to interpret a statutory provision (Dkt. 122 at 12). *See In re Hill*, 562 F.3d 29, 33 & n.5 (1st Cir. 2009) (relying on dictionary definitions of statutory terms to interpret the provision's meaning).

payment for its services if the seller has, among other things, "represented" a time frame by when all of its services will be provided. Here, Key Credit's customers – not Key Credit – exclusively control how long they receive services. There is no genuine dispute of material fact that Key Credit makes no such representations, much less as part of any "scam" to offer "bogus" services that it does not and has no intention to provide. Accordingly, for this independent reason, summary judgment should be granted in favor of Key Credit.

### D. Plaintiffs' interpretation of the Advance Fee Provision is unreasonable and would lead to absurd results.

Plaintiffs' interpretation of the Provision to cover "all telemarketed credit-repair goods and services" is unreasonable, would lead to absurd results, and should be rejected. *See Bartok v. Hometown Am., LLC*, No. 21-10790-LTS, 2023 WL 3773106, at *5 n.4 (Feb. 27, 2023) (courts must avoid interpreting regulations in a manner that produces "'absurd' results when sensible construction is available"). Indeed, Plaintiffs' attempt to rewrite the Advance Fee Provision by inserting unfounded assumptions and obligations reveals the disconnect between Plaintiffs' interpretation of the Provision and its plain language and purpose, as well as its practical application. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (a "rational connection" must exist between a regulation's scope and the "relevant data").

Under Plaintiffs' interpretation (that all sellers should be assumed to have "represented a time frame" and "promised results" to their customers), customer conduct outside a seller's control could prevent the seller from showing its services improved a customer's credit score, even if the services are undisputedly performed. For example, a customer could work with Key Credit to identify inaccurate items on their credit report; Key Credit could dispute those inaccurate items, have them removed from the customer's credit report, and the customer's credit score could improve; but

then the customer engages in other activity (such as opening new credit cards or missing credit card payments) during the six-month waiting period that harms the customer's credit score.

Although Plaintiffs argue that Key Credit's example above somehow shift a burden or risk onto its customer (Dkt. 122 at 11), Plaintiffs fundamentally misapprehend Key Credit's argument and the actual, concrete services it provides. Further, Plaintiffs ignore the contracted-for services that Key Credit provides its customers in order to make another baseless assumption: that Key Credit works for its customers "without regard to why [a] customer's credit rating was unfavorable" or whether a customer could be helped by credit-repair services (Dkt. 122 at 12). Plaintiffs' supposition is wholly unfounded and contradicted by the undisputed factual record. Indeed, Plaintiffs admit that Key Credit representatives speak to all prospective customers, including during "full consultations that can last up to two hours," to assess whether the customers' unique situations would benefit from Key Credit's service and before any customer ever signs a contract with Key Credit. (Dkt. 123 ¶ 53.)

If the Provision applied to all "all telemarketed credit-repair goods and services" (which it does not), then through no fault of its own, Key Credit would not be able to charge for the valuable (and successful) services it provides if the Provision is interpreted to apply even where no promised results were made. Moreover, practically speaking, Plaintiffs' interpretation simply does not make sense. How can a seller know when it should provide documentation "demonstrating that the promised results have been achieved" if the seller never promised any results would be achieved? What document would show that "promised results" were achieved if nothing was promised to begin with?

For all of the above reasons and set forth in Key Credit's opening memorandum, Plaintiffs' interpretation of the Advance Fee Provision is contrary to its plain language, purpose, and the regulatory history of the Provision and the TSR.

**E. The record establishes that Key Credit does not promise results to customers and does not represent a time frame by which all services will be provided.**

In its memorandum, Key Credit established that the undisputed facts demonstrate that it promises only to perform specific services for its customers with no promise of any result or outcome, and that Key Credit did not represent to customers a time frame by which all services will be performed. In response, Plaintiffs provide no evidence to the contrary. In fact, Plaintiffs admit there is no genuine dispute that Key Credit does not represent a time frame by which it will provide all services to its customers (Dkt. 122 at 6).

Nonetheless, Plaintiffs attempt to manufacture "promised results" where none exist. Plaintiffs argue that Key Credit made "a variety of promises," including "general representations that its services ***could*** help consumers improve their credit." (Dkt. 122 at 8 (emphasis added).) However, a general advertising statement that services *could* help customers simply does not constitute a "promised result." As the undisputed record shows, the plain and unambiguous terms of its written contracts establish that Key Credit does not promise results to its customers. (*See, e.g.*, Dkt. 123 ¶¶ 34, 47.)

It is also undisputed that Key Credit's policies and training for its representatives prohibit making promises to prospective and actual customers. (*See id.* ¶¶ 48-50.) And, Key Credit's consumers explicitly acknowledge and agree in their written contracts that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (*Id.* ¶¶ 37, 47.) Each customer also expressly acknowledges that "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement." (*Id*. ¶ 38.) Key Credit and its customers also agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist

Client on improving Client's credit rating or record." (*Id*. ¶ 36.) On their face, Key Credit's customer contracts promise only that it will provide specified, contracted-for services (not results). (*Id.* ¶ 47.)

Finally, the caselaw Plaintiffs rely on is inapposite. Each of those cases involve whether deceptive misrepresentations were made to consumers, not whether sellers "promised results" under the TSR's Advance Fee Provision. *See Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) (whether deceptive misrepresentations about hair removal products were made); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631-32 (6th Cir. 2014) (analyzing whether representations were likely to mislead customers; defendants did not dispute they made the representations at issue); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1045-46 (C.D. Cal. 1999) (same); *FTC v. Fin. Freedom Processing, Inc.*, 538 Fed. Appx. 488, 489-90 (5th Cir. 2013) (affirming judgment in favor of defendants on deceptive misrepresentations claim).

Even assuming cases involving claims for deceptive misrepresentations were applicable to the issue of whether a seller "promised results" under the Provision, such cases support the fact that Key Credit never promised results to its customers. Considered in context, none of Key Credit's statements cited by Plaintiffs promised results. *See In re Vistaprint Corp Mktg. & Sales Practices Litig.*, MDL No. 4:08-md-1994, 2009 WL 2884727, at *11 (S.D. Tex. Aug. 31, 2009) (clear and easily understandable written disclosures available to consumers before finalizing their agreement were not, as a matter of law, unfair or deceptive); *FTC v. Nudge, LLC*, No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695, at *17 (D. Utah June 14, 2022) (disclaimers and disclosures such as "we do not guarantee your success" and "we make no earnings or return on investment claims or guarantees" could lead "a reasonable trier of fact to conclude that ordinary consumers were not likely to be misled with regard to their likely earnings"); *see also CFPB v. Morgan Drexen, Inc.*, No. SACV 13-1267-JLS (JEMx), 2014 WL 12581776, at *7 (C.D. Cal. Nov. 25, 2014) (advertising statements such as

"Be debt free," or that a customer could become debt free do not "necessarily suggest that someone 'will' become debt free or that any guarantees are being made").

Accordingly, there is no genuine dispute that Key Credit's customer contracts, training materials, and other safeguards establish that Key Credit does not promise results to its customers, but instead promises only to perform specific services without any promised result or outcome. (*See*, *e.g.*, Dkt. 123 ¶¶ 48-50.)

**F. Plaintiffs' proffered interpretation exceeds its scope of its statutory authority.**

As Key Credit explained in its opening brief, Plaintiffs' interpretation of the Advance Fee Provision exceed its administrative authority in two ways. First, the conduct that the Bureau seeks to regulate here is not the conduct proscribed by the Advance Fee Provision that was intended to prohibit unfair scams in which a credit repair company's "offered service is fundamentally bogus" and designed "to take consumers' money for services that the seller has no intention of providing and in fact does not provide," 67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002). Second, the TSR constitutes an unlawful agency action in excess of the FTC's statutory authority to promulgate rules under the Telemarketing Act.

Plaintiffs misconstrue, but do not dispute, Key Credit's argument. Indeed, Plaintiffs do not dispute that:

- widespread errors in credit reports hurt consumers;
- no agency or legislative body prohibits credit repair services entirely as being somehow inherently fraudulent, "bogus," or otherwise "illusory;"
- all of the issues and data cited by the FTC in promulgating the Advance Fee Provision concerned scammers who promised "illusory" and "bogus" services that amounted to "outright theft;"
- unlike an empty "promise" to remove accurate credit information, Key Credit's credit repair services are real, concrete and actually provided; and

- neither the Telemarketing Act nor the Provision permits the Bureau to simply enforce a fee rule requiring credit repair companies who offer their services over the phone to wait at least six months before they can be paid for legitimate credit repair services when there are no "promised results" based on "bogus" services.

As Key Credit explained, there is no rational basis in the FTC's rulemaking history to suggest that the regulation of legitimate credit repair companies like Key Credit who provide concrete services without offering "promised results" is what the FTC intended – or even had authority – to regulate. *See e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (a "rational connection" must exist between the scope of a regulation and the "relevant data"); 60 Fed Reg. 43,842, 43854 (Aug. 23, 1995) (to be codified at 310 C.F.R. pt. 310) ("The abusive practice against which [the Advance Fee Provision] is directed is the deceptive marketing and sale of bogus credit repair services. … [T]he Commission does not intend that this Section apply to legitimate credit monitoring services.").

Rather than respond to these points, Plaintiffs argue only that the FTC "was statutorily authorized to issue the TSR." (Dkt. 122 at 14.) But that misconstrues Key Credit's argument. Key Credit does not quarrel that the FTC lacked authority to *issue* the TSR. Rather, Key Credit asserts that the Bureau's broad *interpretation* of the Advance Fee Provision – which was intended to prohibit abusive conduct by companies who perpetuate "bogus" scams amounting to "outright theft" based on "illusory services" and "promised results" – exceeds the scope of the FTC's statutory authority in an effort to expand the Provision to prohibit the receipt of fees by Key Credit even though there is no dispute that Key Credit does not operate a "bogus" operation, does not offer "illusory services," and does not "promise results."

## II. Summary Judgment Should be Awarded to Key Credit on Counts I – V.

### A. The TSR places Unconstitutional content-based restrictions on speech in violation of the First Amendment.

In its Memorandum, Key Credit established that the TSR's selectively applied restriction on requesting and receiving compensation for services violates the First Amendment. (Dkt. 111 at 23-26.) Plaintiffs argue that this restriction cannot violate the First Amendment because it merely regulates "the timing of payment," not speech. (Dkt. 122 at 15.) Plaintiffs' assertion that the TSR's payment collection restriction is "a restriction on conduct . . . not on speech" misapprehends the law and Key Credit's position regarding the speech at issue here. Key Credit has no quarrel with the principle that a restriction on conduct is not rendered an unlawful restriction on speech merely because the conduct at issue – here, Key Credit's payment collection practice – is in part initiated, evidenced, or carried out by speech. But speech that initiates, evidences, or carries out Key Credit's payment collection practice – for example, invoices, contracts, and communications concerning payment collection – is, emphatically, not the speech at issue here.

The U.S. Supreme Court has made clear that a statute that imposes financial burdens on the expression of speech is itself a restriction on speech. *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). And a statute that imposes such a financial burden based on the content of the speech being expressed is a content-based restriction on speech and "presumptively inconsistent with the First Amendment." *Id.* Importantly, it is well-settled that a statute is presumptively unconstitutional when it imposes a financial burden in the form of a constraint on a speaker's ability to obtain compensation for his or her speech based on its content. *See id.* at 115-16.

Here, the TSR's Advance Fee Provision places a severe constraint on certain speakers' ability to be compensated for their speech, and it is therefore a restriction on speech for purposes

of the First Amendment. The applicability of Provision turns on the content of the speech – namely, whether the telemarketer's speech concerns credit repair as virtually all telemarketing speech *other* than credit repair telemarketing speech is exempt from the Provision's requirements and constraints. Accordingly, the Provision is a *content-based* restriction on speech. *See Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) ("a law is content-based if a regulation of speech on its face draws distinctions based on the message a speaker conveys," including regulations that "single out specific subject matter for differential treatment"); *Simon & Schuster*, 502 U.S. at 116. The fully protectible speech at issue is the counsel and guidance that Key Credit provides to its clients regarding best practices for obtaining and maintaining a good credit rating. *See King v. Governor of the State of New Jersey*, 767 F.3d 216, 225-26 (3d Cir. 2014) (citing *Humanitarian Law Project*, 561 U.S. at 27-28) ("*Humanitarian Law Project* makes clear that verbal or written communications, even those that function as vehicles for delivering professional services, are 'speech' for purposes of the First Amendment"). That speech is constrained, based on its content, by the TSR's restrictions on requesting and receiving compensation for engaging in that speech. Because this constraint, on its face, is not "necessary to serve a compelling state interest and narrowly drawn to achieve that end," it violates the First Amendment. *Simon & Schuster*, 502 U.S. at 118. Plaintiffs' argument to the contrary should be rejected.

Plaintiffs' reliance on *In re National Credit Management Group*, 21 F. Supp. 2d 424, 460 (D.N.J. 1998) is also misplaced. *National Credit* addressed CROA, not the TSR. More importantly, the *National Credit* court did not hold (as Plaintiffs appear to believe) that a statutory constraint placed on income derived from speech is not a restriction on speech. Indeed, such a holding could not be reconciled with *Simon & Schuster* and the other precedents. Nor did the *National Credit*

court dispute that, where such a restriction applies based on the content of the speech, it must be "necessary to serve a compelling state interest and narrowly drawn to achieve that end" if it is to survive First Amendment scrutiny.

The TSR's Advance Fee Provision precludes a credit repair service provider from even *requesting* payment for completed services until *six months after* the services have been performed. In support of its holding, the *National Credit* court expressly found that, under CROA, there was "no reason why a customer could not be charged each time the customer called up to order [services]." Here, the same conduct is expressly prohibited, as is charging a customer at any time up to six months following the completion of services. On its face, such a draconian restriction is neither necessary to serve a compelling state interest nor narrowly drawn to achieve that end, and Plaintiffs offer no argument to the contrary.

Finally, Key Credit also established that the TSR's content-based selective application of its restrictions violates both the First Amendment and the Equal Protection Clause. (Dkt. 111 at 23-27.) Plaintiffs do not respond to (much less dispute) this argument and makes no argument to the contrary.

**B. The TSR violates the Equal Protection Clause.**

In its Memorandum, Key Credit established that the TSR discriminates against telemarketing speech on the subject of improving one's credit rating, that only credit repair telemarketing speech is subject to the TSR's debilitating payment constraint, and, in the context of businesses that only receive (rather than initiate) sales calls, virtually all telemarketing speech *other* than credit repair telemarketing speech is exempt from the TSR's requirements and constraints. As a result, the TSR's content-based selective application of its restrictions is not necessary and "finely tailored" to serve violates the Equal Protection Clause. (Dkt. 111 at 27, citing *Carey v. Brown*, 447 U.S. 455, 461-62 (1980).)

In a failed effort to dispute this conclusion, Plaintiffs offer only the conclusory assertion that a "rational basis" exists for the FTC to have adopted the Advance Fee Provision. (Dkt. 122 at 16.) Setting aside that equal protection analysis requires strict scrutiny of a government regulation when the regulation interferes with the exercise of Key Credit's fundamental First Amendment rights, *see Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983), Plaintiffs misconstrue Key Credit's argument. Key Credit does not contend that the FTC's mere *adoption* of the TSR's Advance Fee Provision *per se* violates the Equal Protection Clause. Rather, Key Credit contends that the FTC's *application* of the Advance Fee Provision discriminates against telemarketing speech on the subject of credit repair while exempting virtually all telemarketing speech *other* than credit repair telemarketing speech from the TSR's requirements and constraints. On its face, this content-based discrimination is not necessary and "finely tailored" to serve the interest in protecting consumers from deceptive and other abusive telemarketing acts or practices. Accordingly, the TSR cannot survive strict scrutiny and violates the Equal Protection Clause.

### C. The funding employed by the Bureau to bring this action was not Constitutionally appropriated.

In its Memorandum, Key Credit established that recently developed case law has highlighted the unconstitutionality of the Bureau's unusual funding mechanism. (Dkt. 111 at 27-32, citing *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 644 (5th Cir. 2022) ("*CFSA*") (holding that "Congress's cession of its power of the purse to the Bureau violates the Appropriations Clause and the Constitution's underlying structural separation of powers.") In their response, Plaintiffs do not (and cannot) cite to any case law from the First Circuit or the District of Massachusetts that holds otherwise. Instead, Plaintiffs rehash the same arguments about the Bureau's funding that the Fifth Circuit already rejected.

In an acknowledgement that a violation of the Appropriations Clause would spell the end of the Bureau's claims against Key Credit, Plaintiffs argue that the "Appropriation Clause problem" would not necessarily foreclose the Commonwealth's ability to pursue those claims in this action. (Dkt. 122 at 18.) Be that as it may, Plaintiffs' speculation about what the Commonwealth may, or may not, choose to do is no basis to deny Key Credit's well-founded basis for dismissal of the Bureau's claims. Finally, Bureau's argument the proper remedy for the "Appropriation Clause problem" is not to "unwind" the Bureau's action is without merit. Although Plaintiffs gesture to 31 U.S.C. §§ 1349(a), 1350, they have no relevance or applicability here because they concern only the availability of "administrative discipline" against "officers or employees" of the government, not the Bureau's ability to prosecute this case through unconstitutional funding.

## CONCLUSION

For all of the foregoing reasons and those set forth in Key Credit's Memorandum in Support of its Motion for Summary Judgment on Counts I-V, Key Credit respectfully requests that the Court grant its motion for summary judgment in its entirety as to Counts I through V of the Amended Complaint.

Dated: September 1, 2023

Respectfully Submitted,

COMMONWEALTH EQUITY GROUP, LLC d/b/a KEY CREDIT REPAIR and NIKITAS TSOUKALIS

By: /s/ Timothy A. Hudson
One of Their Attorneys

By: /s/ Stephanie R. Parker
One of Their Attorneys

Timothy A. Hudson, *pro hac vice*
Tabet DiVito & Rothstein LLC
209 S. LaSalle St., Ste. 700
Chicago, IL 60604
Tel: (312) 762-9450
Fax: (312) 762-9451
thudson@tdrlaw.com

-and-

David B. Mack (BBO No. 631108)
Stephanie R. Parker (BBO No. 687610)
O'Connor, Carnathan and Mack LLC
10 Burlington Mall Road, Ste. 301
Burlington, MA 01803
Tel: (781) 359-9005
dmack@ocmlaw.net
sparker@ocmlaw.net

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 1, 2023.

/s/ Stephanie R. Parker
Stephanie R. Parker