UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Bureau of Consumer Financial Protection and the Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney General,

Plaintiffs,

v.

Commonwealth Equity Group, LLC (d/b/a Key Credit Repair) and Nikitas Tsoukales (a/k/a Nikitas Tsoukalis),

Defendants.

Case No. 1:20-cv-10991-RWZ

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**LEAVE TO FILE GRANTED ON AUGUST 30, 2023**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..................................................ii

ARGUMENT ..................................................1

I. The Court should grant summary judgment against Defendants on Counts I, III, and V in connection with their violation of the TSR's advance-fee provision. ..................................................1

II. The Court should grant summary judgment against Key Credit on Counts II, III, IV, V, VII, VII, and IX in connection with its deceptive representations about Key Credit's services..................................................4

A. There is no genuine dispute that Key Credit made misleading credit-score improvement misrepresentations. ..................................................4

B. Defendants have not raised a genuine dispute that Key Credit makes misleading misrepresentations by falsely implying that its services can remove unlimited negative items from consumers' credit reports..................................................8

C. Defendants cannot refute that Key Credit's misrepresentations are material..................10

III. The Court should grant summary judgment against Defendants on Count VI. ..................10

A. Defendants' Credit Service Agreement (CSA) Violates M.G.L. c. 93, § 68C and M.G.L. c. 93, § 68D(c). ..................................................10

B. Defendants Violated M.G.L. c. 93, § 68B(1) Because They Failed To Establish a Trust Account. ..................................................11

IV. The Court should grant summary judgment against Tsoukales in connection with Key Credit's violations of the TSR and CFPA. ..................................................13

V. Key Credit's affirmative defenses do not preclude summary judgment. ..................17

VI. Defendants repeat the same attacks on the TSR and the Bureau's funding that Plaintiffs have previously addressed and the Court has already rejected and do not preclude summary judgment against Defendants..................................................18

CONCLUSION ..................................................19

# TABLE OF AUTHORITIES

Page(s)

Cases

*Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*,
521 F. Supp. 3d 112 (D. Mass. 2021) ....................18
*Bank of New York Mellon v. Lezdey*,
2016 WL 5539759 (D. Mass. Aug. 25, 2016) ....................18
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................18
*CFPB v. Progrexion Mktg., Inc.* 2:19-CV-00298-BSJ,
2023 WL 2548008-5 (D. Utah Mar. 10, 2023) ....................3
*Fanning v. FTC*,
821 F.3d 164 (1st Cir. 2016) ....................5
*Fennell v. First Step Designs, Ltd.*,
83 F.3d 526 (1st Cir. 1996) ....................18
*FTC v. Affiliate Strategies, Inc.*,
849 F. Supp. 2d 1085 (D. Kan. 2011) ....................5
*FTC v. Am. Precious Metals, LLC*,
2012 WL 3683467 (S.D. Fla. Aug. 24, 2012) ....................15
*FTC v. Amy Travel Serv., Inc.*,
875 F.2d 564 (7th Cir. 1989) ....................15, 16
*FTC v. Cyberspace.Com, LLC*,
453 F.3d 1196 (9th Cir. 2006) ....................15, 16
*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ....................6, 9
*FTC v. Fin. Freedom Processing, Inc.*,
538 Fed. Appx. 488 (5th Cir. 2013) ....................6
*FTC v. Fleetcor Tech., Inc.*,
620 F. Supp. 3d 1268 ....................5
*FTC v. Gill*,
265 F. 3d 944 (9th Cir. 2001) ....................12
*FTC v. Gill*,
71 F. Supp. 2d 1030 (C.D. Cal. 1999) ....................6
*FTC v. Grant Connect, LLC*,
763 F.3d 1094 (9th Cir. 2014) ....................15, 16
*FTC v. Med. Billers Network, Inc.*,
543 F. Supp. 2d 283 (S.D.N.Y. 2008) ....................14
*FTC v. Neovi, Inc.*,
598 F. Supp. 2d 1104 (S.D. Cal. 2008) ....................15
*FTC v. Pantron I Corp.*,
33 F.3d 1088 (9th Cir. 1994) ....................5, 10
*FTC v. Partners in Health Care Ass'n, Inc.*,
189 F. Supp. 3d 1356 (S.D. Fla. 2016) ....................14

*FTC v. Patriot Alcohol Testers, Inc.*,
798 F. Supp. 851 (D. Mass. 1992) .......... 5, 10
*FTC v. Publ'g Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997) .......... 15
*FTC v. Pukke*,
53 F.4th 80 (4th Cir. 2022) .......... 14
*GE Cap. Healthcare Fin. Servs. V. Fall River Walk-In E*, Civ. A. 02-11789-RCL,
2004 WL 40522 (D. Mass. Jan. 7, 2004) .......... 18
*In re Cliffdale Assocs. Inc.*,
103 F.T.C. 110 (1984) .......... 10
*People v. Debt Resolve, Inc.*,
387 F. Supp. 3d 358 (S.D.N.Y. 2019) .......... 14
*Removatron Int'l Corp. v. FTC*,
884 F.2d 1489 (1st Cir.1989) .......... 5, 6
*Torres Vargas v. Santiago Cummings*,
149 F.3d 29 (1st Cir. 1998) .......... 18
*Zimmerman v. Cambridge Credit Counseling Corp.*,
529 F. Supp. 2d 254 (D. Mass. 2008)) .......... 12
*Zimmerman v. Puccio*,
613 F. 3d 60 (1st Cir. 2010)) .......... 12

Statutes

12 U.S.C. § 5536(a)(3) .......... 17
15 U.S.C. § 1679b(b) .......... 12, 13
M.G.L. c. 93, § 68B .......... 12, 13
M.G.L. c. 93, § 68B(1) .......... 11, 12, 13
M.G.L. c. 93, § 68C .......... 10
M.G.L. c. 93, § 68D(c) .......... 10, 11

Rules

Fed. R. Civ. P. 56 .......... 18

Regulations

16 C.F.R. § 310.3(b) .......... 18
16 C.F.R. § 310.4(a)(2) .......... 1, 2, 3, 4

Defendants' opposition fails to establish that there are any material facts in dispute that would preclude a summary judgment ruling in Plaintiffs' favor. Key Credit's defense to charging unlawful advance fees relies solely on a misreading of the TSR; the fact that Key Credit charged consumers prior to demonstrating durable results for consumers is undisputed. Similarly, Defendants' opposition refutes neither the fact that Key Credit promised consumers radical credit score improvements without any substantiation of that claim, nor the fact that Key Credit led consumers to believe that it could remove unlimited negative credit items when the company knew or should have known that accurate and timely credit information cannot be removed from a consumer's credit report. Defendants opposition also fails to refute that did Defendants did not make disclosures or obtain a surety bond as required under Massachusetts law. Finally, Defendants' assumption that Plaintiffs must show that Tsoukales was involved in the day-to-day operation of Key Credit in order to establish individual liability is a flatly incorrect statement of the law. Plaintiffs have established that Tsoukales had authority to control Key Credit and knew about its advance-fee practices and misrepresentations; he is therefore liable for both.

## ARGUMENT

### I. The Court should grant summary judgment against Defendants on Counts I, III, and V in connection with their violation of the TSR's advance-fee provision.

The dispute over whether Defendants have violated the TSR's advance-fee provision boils down to the question of whether *all* sellers of telemarketed credit-repair services are covered by 16 C.F.R. § 310.4(a)(2), or, as Defendants argue, the provision applies only to sellers of telemarketed credit-repair services who "promise results" and "'represent a time frame' by which 'all' of its services would be completed."[1] As detailed in both Plaintiffs' summary

[1] Defs.' Mem. of Law in Opp'n to Pls.' Mot. Summ. J. 1 (Defs.' Opp'n), ECF No. 119.

judgment motion[2] and opposition to Defendants' summary judgment motion,[3] the advance-fee provision's text, rule-making and regulatory history, and judicial interpretation show that § 310.4(a)(2) applies to *all* sellers of telemarketed credit-repair services, including Key Credit.

The advance-fee provision is neither long nor complicated. The first part of the provision, subsections (a) and (2), identify those covered by the provision.[4] The second part of the provision, romanettes (i) and (ii), specify two conditions that must be satisfied before a covered seller or telemarketer may request or receive payment.[5] The coverage clause is clear that the provision covers "any seller or telemarketer [that requests or receives] payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating."[6] And it is undisputed that Key Credit meets these conditions.[7]

Defendants, however, ask this Court to essentially read § 310.4(a)(2) in reverse. They argue that romanettes (i) and (ii)—which come at the end of the provision and are indented

---

[2] Mem. in Supp. of Pls.' Mot. Summ. J. (Pls.' Mem.), ECF No. 116.
[3] Mem. in Supp. of Pls.' Opp'n to Defs.' Mot. Summ. J. on Counts I-V (Pls.' Opp'n), ECF No. 122.
[4] 16 C.F.R. § 310.4(a)(2); *see also* Pls.' Mem. 8-10, ECF No. 116; Pls.' Opp'n 2-3, ECF No. 122.
[5] 16 C.F.R. § 310.4(a)(2)(i) ("The time frame in which the seller has represented all of the goods or services will be provided to that person has expired"); § 310.4(a)(2)(ii) ("The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved."); *see also* Pls.' Mem. 8, 10-12, ECF No. 116; Pls.' Opp'n 2-4, ECF No. 122.
[6] *See* 16 C.F.R. § 310.4(a)(2).
[7] *See, e.g.,* Mem. in Supp. of Defs.' Mot. Summ. J., (Defs.' Mem.), ECF No. 111 ("Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit."); Pls.' Mem. 9-10, ECF No. 116 (Key Credit uses telemarketing to sell its credit-repair services).

subparts to (a) and (2)—identify which sellers and telemarketers are covered by the provision as well as describe what requirements those sellers and telemarketers must satisfy before requesting or receiving payment.[8] Defendants provide no support for why the text of the advance-fee provision should interpreted contrary to how it was written.

In contrast, Plaintiffs' reading of § 310.4(a)(2) is supported by the TSR's rulemaking history, which shows that the drafters of the provision intended to prohibit all sellers and telemarketers of telemarketed credit-repair services from charging advance fees and did not intend to limit the prohibition to a subclass of sellers and telemarketers that choose to comply with romanettes (i) and (ii).[9] Unsurprisingly, in the TSR's 28-year history, the federal government uniformly has interpreted and applied § 310.4(a)(2) as Plaintiffs do here.[10]

Further, the one court that has considered whether § 310.4(a)(2) covers all sellers and telemarketers of credit-repair services has agreed with Plaintiffs' position and expressly rejected the arguments raised by Defendants here.[11]

Finally, Defendants' attempts to convince the Court that Key Credit does not promise results or provide a time frame by which all services will be provided[12] is a red herring that is irrelevant to whether the advance-fee provision covers all entities like Key Credit. And although Plaintiffs strongly disagree with Defendants' claims on these points, as described in their

---

[8] Defs.' Opp'n 5-8, ECF No. 119.
[9] Pls.' Opp'n 6-8, ECF No. 122.
[10] *Id*.
[11] *See CFPB v. Progrexion Mktg., Inc.*, 2:19-CV-00298-BSJ, 2023 WL 2548008, at *4-5 (D. Utah Mar. 10, 2023) (finding that § 310.4(a)(2) prohibits all sellers and telemarketers of telemarketed credit-repair services from "requesting or receiving payment until the prerequisites listed in romanettes (i) and (ii) are met").
[12] *See, e.g.,* Defs.' Opp'n 9-11, ECF No. 119.

opposition brief,[13] the Court need not resolve these questions to determine whether Defendants have violated § 310.4(a)(2). Here, it is undisputed that Key Credit telemarkets and sells credit-repair services,[14] and so must comply with § 310.4(a)(2)'s payment conditions before requesting or receiving fees. It is also undisputed that Key Credit charges customers initial and monthly service fees,[15] which means that Key Credit routinely charges fees without complying with § 310.4(a)(2)'s payment conditions and therefore has violated the advance-fee provision.

## II. The Court should grant summary judgment against Key Credit on Counts II, III, IV, V, VII, VII, and IX in connection with its deceptive representations about Key Credit's services.

The deception claims here are simple; Defendants hook consumers with repeated misrepresentations made on Key Credit's website and in telemarketing sales calls about the benefits of Key Credit's credit-repair services. Defendants' misrepresentations fall into two categories: (1) that Key Credit's services result in significantly improved credit scores in a few months and (2) that its services result in the removal of unlimited negative items from consumers credit reports. It is undisputed that Key Credit made the former representations without substantiation, and it is undisputed that Key Credit made the latter representations despite clearly knowing that accurate and timely negative items cannot be removed from consumers' credit reports.

### A. There is no genuine dispute that Key Credit made misleading credit-score improvement misrepresentations.

Defendants do not dispute that Key Credit's website includes statements such as, "90+

---

[13] Pls. Opp'n 5-6, 8-10, ECF No. 122.
[14] *See, e.g.,* Defs.' Mem. 9, ECF No. 111 ("Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit."); Pls.' Mem. 9-10, ECF No. 116 (Key Credit uses telemarketing to sell its credit-repair services).
[15] Pls.' Mem. 4-5, 10-12, ECF No. 116.

Point Average Credit Score Increase In The First 90 Days," and "Most of our customers see a 90-Point Increase in 90-Days," as well as testimonials like, "[w]ithin two weeks of speaking to you, my FICO score jumped 110 points."[16] Likewise, Defendants do not dispute that Key Credit's sales scripts and sales call transcripts include statements to consumers about improving "your" credit score and that the improvement will be substantial.[17] And, Defendants admit that Tsoukales instructed sales agents to tell consumers "[w]e drastically improve your credit scores … our clients see an average 90 point increase in the first 90 days."[18]

As to the misleading nature of these representations, the parties agree that courts must view a representation as a whole and look to the impression created by it to determine whether it is misleading.[19] As stated in Plaintiffs' opening brief, a misrepresentation—whether express or implied—is considered likely to mislead consumers if it is either false[20] ***or*** **is not substantiated by a reasonable basis**.[21] Defendants argue that Key Credit's representations about credit-score improvement cannot be misleading for three reasons—each reason fails.

---

[16] Defs.' Resp. to Pls.' Statement of Material Facts and Statement of Additional Undisputed Material Facts (Defs.' Resp. to Pls.' Statement of Material Facts), ECF No. 120 at ¶¶ 18, 19, 21, 22, 33, 34; see also ¶ 10.

[17] Defs.' Resp. to Pls.' Statement of Material Facts, ECF No. 120 at ¶¶ 29, 30, 32, 35, 36.

[18] Defs.' Resp. to Pls.' Statement of Material Facts, ECF No. 120 at ¶¶ 33, 34.

[19] See *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496-97 (1st Cir.1989); see also *FTC v. Patriot Alcohol Testers, Inc.*, 798 F. Supp. 851, 855 (D. Mass. 1992).

[20] Plaintiffs have not moved for summary judgment on the basis that Key Credit's representations about significant credit score improvements were false, but rather that they are unsubstantiated and Key Credit lacked a reasonable basis to make those representations.

[21] Pls.' Mem. 16, ECF No. 116 (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994) (explaining the falsity and reasonable basis theories for misleading representations); see also *Fanning v. FTC*, 821 F.3d 164, 170 (1st Cir. 2016) ("Claims can be either express or implied.") *FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1105 (D. Kan. 2011) (finding that claims about success rate were misleading because defendants did not track success); *FTC v. Fleetcor Tech., Inc.*, 620 F. Supp. 3d 1268, 1289 (explaining that whether a misrepresentation was likely to mislead can be shown by demonstrating "either that the express or implied message" conveyed is false).

First, Defendants argue Key Credit did not mislead consumers because it does not make "guarantees."[22] But a representation can be misleading without making a "guarantee," particularly where, as here, the representation is reinforced through multiple phrasings and in multiple interactions with consumers (e.g., on the website and in sales calls). Defendants' cite to contract language stating that Key Credit does not promise or guarantee the results or outcomes of its services, but it is axiomatic that Key Credit "cannot make considerable material misrepresentations to consumers and then bury corrections and disclaimers in subsequent communications," including in contracts.[23]

Second, Defendants complain that Plaintiffs offer no evidence of falsity or that the claims were misleading or that Key Credit lacked a reasonable basis for its representations.[24] But this simply isn't true. Plaintiffs' opening brief demonstrated that Key Credit did not substantiate the claims that its services lead to significant credit score improvements in short periods of time.[25] For example, Plaintiffs asked for the identification of all customers who gained at least a ninety-point credit-score increase in ninety days, and Defendants responded that "Key Credit lacks

---

[22] Defs.' Opp'n, ECF No. 119 at 18-20.
[23] *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631-33 (6th Cir. 2014) (citation omitted) (finding that Defendants provision of clearer descriptions of their services and disclaimers in written materials, including in contracts, did not negate representations made in earlier in phone calls); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (finding that credit-repair company's provision of clearer descriptions of their services and disclaimers in written materials and contracts did not cure representations made in earlier in phone calls and advertisements*); see also Removatron Int'l. Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir. 1989) ("Each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads. Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings."); *FTC v. Fin. Freedom Processing, Inc.*, 538 Fed. Appx. 488, 489-50 (5th Cir. 2013) (same).
[24] Defs.' Opp'n 20, ECF No. 119.
[25] Pls. Mem. 16, ECF No. 116.

knowledge or information sufficient to respond to this interrogatory."[26] Similarly, when Tsoukales testified under oath during the Bureau's investigational hearing, he stated that he did not know whether a ninety-point credit-score increase in the first ninety days was the actual average, he did not remember whether he had calculated the average, and he did not know whether anyone else at the company had calculated the average.[27] Although Defendants now claim that Key Credit "does track credit score changes and improvements in the first 90 days of service,"[28] Defendants have failed to present any credible evidence substantiating Key Credit's claims regarding average credit-score increases.

Finally, Defendants insist that Key Credit's claims of ninety-point average credit score increases in the first ninety days are supported by Tsoukales's personal experience. This argument strains credulity. It is implausible that Tsoukales could calculate an accurate average credit score increase based on the mere memory of purportedly reviewing thousands of credit reports and conducting 15,000 sales consultations.[29] Indeed, Tsoukales displayed no such savant-like memory while testifying on behalf of his company. And even if Tsoukales's personal experience was an adequate basis to substantiate Defendants' claims, he contends that it was limited to the company's first five to six years of operation, from about 2008 to 2013, yet the company continued to make the ninety-point claims through the end of 2018—long after the period during which his personal experience was applicable and during a time when the company was enrolling thousands of additional customers.[30]

---

[26] *See* Defs' Resp. to Pls' Statement of Material Facts ¶ 57, ECF No. 120.
[27] *Id.* at ¶ 60.
[28] *Id.*
[29] *Id.* at ¶¶ 58, 59.
[30] *Id.* at ¶¶ 58, 59, 63.

**B. Defendants have not raised a genuine dispute that Key Credit makes misleading misrepresentations by falsely implying that its services can remove unlimited negative items from consumers' credit reports.**

In asserting that Plaintiffs cannot establish that Key Credit represented that it could "remove all negative items," Defendants misunderstand that crux of Plaintiffs' deception claims. Plaintiffs' proffered evidence establishes that the net impression created by Key Credit's advertising, including representations made on its website and by telemarketing sales agents, is that its services would result in the removal of unlimited negative items, whether accurate or inaccurate, from consumers' credit reports.

Defendants do not dispute that the Key Credit's website included statements like "We Fix Unlimited Negative Items," and "Clean Up Unlimited Negative Records" as well as testimonials like "Key Credit Repair removed all of my negative records and I have only been with them for 2 months."[31] Defendants also do not dispute that Key Credit's website described the work it performs as "looking for negative items like collections, charge-offs, tax liens, judgments and late payments that may be hurting your score," disputing "all of the negative items on [consumers'] reports," and repeating the process for "items not yet removed" until the customer is "happy with the number of removals."[32] Likewise, Defendants do not dispute that Key Credit's sales scripts and sales call transcripts included statements to consumers like, "we're going to remove all negative items," "we work on improving your Credit Scores by reducing the number of negative records that are placed in your report," and "we dispute every single negative item placed on your report."[33] And, Defendants admit that Tsoukales instructed sales agents to tell consumers, "[w]e drastically improve your credit scores … by removing negative items from

---

[31] Defs' Resp. to Pls' Statement of Material Facts ¶¶ 20-22, ECF No. 120.
[32] *Id.* at ¶ 56.
[33] *Id.* at ¶¶ 29-31, 37.

your credit report."[34] The plain language of these representations falsely imply that Key Credit can remove unlimited negative items—accurate as well as inaccurate—from consumers' credit reports.

Again, Key Credit's contracts do not help Defendants' position. As they point out, at least some contracts state: "[a]ccurately reported items on a credit report cannot be removed" and "neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, negative information removed from your credit report before it is seven years old." As discussed above, Defendants' contracts cannot cure their prior deceptive misrepresentations.[35] If anything, these statements show that Defendants knew the difference between accurate and inaccurate negative items and understood the limitations of Key Credit's services with respect to accurate negative items. Yet Defendants chose to make representations that referred simply to "negative" items, which necessarily includes accurate as well as inaccurate items.

Defendants do not present any facts disputing that these misrepresentations are misleading. And Defendants would be hard pressed to find facts to dispute the misleading nature of these claims because they are false. Defendants cannot remove all or unlimited negative items from consumers' credit reports because accurate negative items cannot be removed for at least seven years.[36] False representations like those made by Defendants here are exactly the kinds of false claims that mislead consumers and violate deception law.[37]

---

[34] Defs' Resp. to Pls' Statement of Material Facts ¶¶ 33, 34, ECF No. 120.
[35] *See FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d at 631-33 (later provided written documents, including contracts, that more accurately characterize a defendants' services do not overcome the net impression of prior representations or create a genuine dispute of material fact regarding the net impression of representations to consumers).
[36] *See* Pls. Mem. 17, ECF No. 116.
[37] See *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994) (explaining the falsity theory for misleading representations). *Supra* n.23.

### C. Defendants cannot refute that Key Credit's misrepresentations are material.

Finally, Defendants' unsupported statements that materiality is not established is insufficient to defeat summary judgment. Defendants do not assert that these misrepresentations are immaterial or present any facts disputing materiality, nor can they. For a credit-repair company to claim that representations about improving credit scores and the inclusion of negative items on credit reports are immaterial is patently absurd. A "material representation is one that 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"[38] Here, Key Credit told consumers that its service would improve credit scores and credit reports, and that is exactly what consumers paid Defendants to do—repair their credit.

## III. The Court should grant summary judgment against Defendants on Count VI.

### A. Defendants' Credit Service Agreement (CSA) Violates M.G.L. c. 93, § 68C and M.G.L. c. 93, § 68D(c).

Section 68(C)(6) plainly states that "[b]efore the execution of a contract or other form of agreement between a buyer and a credit services organization or before the receipt by any such organization of money or other valuable consideration," a credit services organization (CSO) must provide to the buyer, in writing: "a statement asserting the buyer's right to proceed against the surety bond or trust account required under section sixty-eight B" and "the name and business address of any such surety company and of the depository of the trust account, together with the name of the trustee and the number of the account." This requirement is not predicated on the performance of any services. Defendants' CSA does not contain any such statements and

---

[38] *Patriot Alcohol Testers, Inc.*, 798 F. Supp. at 855 (quoting *Cliffdale Assocs. Inc.*, 103 F.T.C. 110, 165 (1984)); *see also FTC v. Pantron I* at 1095-96 ("Express product claims are presumed to be material").

this fact is not in dispute.[39] Indeed, Defendants effectively concede that they have not made any such disclosures because they incorrectly contend that such disclosure requirements do not apply.

Section 68(D)(c) requires that CSOs' contracts with the buyers include "the terms and conditions of payment, including the total of all payments to be made by the buyer." Defendants' "Unlimited"[40] plans allow Key Credit to charge a monthly fee indefinitely – even where Key Credit may not be providing any further credit repair services – stopping only when and if a client cancels in writing. Therefore, Defendants' CSA does not disclose (or even estimate) the "total of all payments to be made by the buyer" and therefore, violates M.G.L. c. 93, § 68D(c).

### B. Defendants Violated M.G.L. c. 93, § 68B(1) Because They Failed To Establish a Trust Account.

Under Section 68(B)(1), CSOs shall not "charge or receive any money or other valuable consideration prior to full, complete and satisfactory performance of the services the credit services organization has agreed to perform for the buyer, unless such organization has obtained a surety bond in an amount not less than ten thousand dollars issued by a surety company authorized to do business in the commonwealth and has established a trust account at a federally insured bank or savings and loan association located in the commonwealth."

As a threshold matter, Defendants concede that they have not established a trust account as required under Section 68(B)(1).[41] Defendants instead argue that they are not subject to

---

[39] *See* Pls.' Reply to Defs.' Resp. to Pls.' Statement of Material Facts ¶ 80.

[40] "I agree and authorize Key Credit Repair to charge/debit my Vias, MasterCard, American Express . . . $159 a month + $6.50 expedited billing processing fee and any applicable state tax each subsequent month for work performed within that month until client cancels the program." *See*, Pls.' Reply to Defs.' Resp. to Pls.' Statement of Material Facts ¶ 80.

[41] Defs.' Resp. to Pls.' Statement of Material Facts ¶ 78, ECF No. 120.

Section 68B(1) because they purportedly did not charge any advance fees "prior to full, complete and satisfactory performance of the services" that Defendants "agreed to perform."[42] In support of this argument, Defendants point to a provision in the CSA governing the "first work fee," which is a fee Defendants charge 5 or 7 days after the signing of the contract to conduct a preliminary review of a customer's financial documents and to discuss those documents with the customer.[43] But Section 68B(1) prohibits the CSO from charging the customer fees until the "full, complete and satisfactory performance of the services that the CSO agreed to perform are competed." Here, Defendants concede that they charge advance fees from customers in the form of a "first work fee" and a "monthly enrollment fee" before the full set of credit-repair services it agreed to provide are completed.[44]

Courts interpreting a nearly identical prohibition to M.G.L. c. 93, § 68B under the Credit Repair Organization Act ("CROA") have found that initial fees charged for preliminary screening services, just like the "first work fee" charged here, violated the prohibition because the fees were charged before fully performing all services.[45] For example, in *Zimmerman v. Cambridge Credit Counseling Corp.* ("CCCC"), CCCC, a CSO, would develop a "Debt Management Plan" ("DMP") for clients after gathering information about a customer's debts during an initial screening call.[46] CCCC would then charge a "design fee" for the development of the DMP. The Court held that CCCC violated 15 U.S.C. § 1679b(b) by charging up-front fees to customers before they had "*fully performed the promised services*," in the form of a "Design

[42] Defs.' Opp'n 30-31, ECF No. 119.
[43] Defs.' Opp'n 30-31, ECF No. 119 (citing a Key Credit service agreement, KCR_0057364 (see Defs.' Resp. to Pls.' Statement of Material Facts ¶42, ECF No. 120).
[44] *S*ee Defs' Resp. to Pls' Statement of Material Facts ¶¶ 42-44, ECF No. 120.
[45] *See* 15 U.S.C. § 1679b(b).
[46] 529 F. Supp. 2d 254, 279 (D. Mass. 2008), *aff'd sub nom. Zimmerman v. Puccio*, 613 F.3d 60 (1st Cir. 2010).

Fee" assessed upon enrollment in a DMP.[47] Similarly, in *FTC v. Gill*, the Court held that the CROA prohibits acceptance of any payment before *fully performing all services*.[48]

Lastly, Defendants argue that the trust account requirement applies only to CSOs that "actually handle their clients' money," which Key Credit allegedly does not do.[49] Defendants' argument is based on an erroneous reading of the law and is contradicted by the undisputed facts. A CSO is required to maintain a trust account if they "charge or receive money" and nothing under § 68B(1) limits the requirement of maintaining a trust account to CSOs who hold a client's money to perform debt management services, as Defendants argue here.[50] As demonstrated above, under the CSA, Key Credit "charges" its clients' "money" in the form of a "first work fee" and a "monthly enrollment fee."

## IV. The Court should grant summary judgment against Tsoukales in connection with Key Credit's violations of the TSR and CFPA.

Defendants contend that Plaintiffs are not entitled to summary judgment against Tsoukales for Key Credit's violations of the TSR and the CFPA because a "genuine issue of material fact exists as to whether [Tsoukales] handled day-to-day operations of Key Credit that could subject him to individua[l] liability."[51] But whether Tsoukales "handled day-day operations" is not a question that needs to be resolved to determine whether Tsoukales has violated the TSR and CFPA. As Plaintiffs illustrated in their opening brief, Tsoukales is individually liable for Key Credit's violations of the TSR and CFPA under theories of direct

[47] *Id.*
[48] 265 F.3d 944, 956 (9th Cir. 2001) (emphasis added and in the original).
[49] Defs.' Opp'n 30 n. 6, ECF No. 119.
[50] M.G.L. c. 93, § 68B.
[51] Defs.' Opp'n 29, ECF No. 119.

liability and substantial assistance.[52] An individual's involvement in day-to-day operations of an entity is not necessary to establishing liability under either theory.

Direct liability arises under the TSR and CFPA where an individual: "(1) participated in the [unlawful] acts or had authority to control the corporate defendant and (2) knew of or was recklessly indifferent to the [unlawful] acts or practices."[53] Here, there is no genuine dispute that Tsoukales had "authority to control the corporate defendant." Defendants concede that Tsoukales is the founder, chief executive officer, and sole shareholder of Key Credit.[54] Based on these facts alone, Plaintiffs have established "a presumption of ability to control,"[55] which Defendants do not dispute.[56] Defendants also concede that Tsoukales oversees the company, was responsible for setting up the company's bank accounts, and is a signatory on all the company's accounts,[57]

---

[52] Specifically, (1) Tsoukales's actions meet the standard for direct liability under the TSR in connection with Key Credit's charging of advance fees and engaging in deceptive acts and practices, Pls.' Mem. 12, 21, ECF No. 116; (2) Tsoukales's actions meet the standard for direct liability under the CFPA in connection with Key Credit's engaging in deceptive acts and practices, Pls.' Mem. 18; (3) Tsoukales's actions constitute substantial assistance under § 310.3(b) of the TSR in connection with Key Credit's violations of the TSR, Pls.' Mem. 13, 22, ECF No. 116; and (4) Tsoukales's actions constitute substantial assistance under § 1036(a)(3) of the CFPA in connection with Key Credit's deceptive acts and practices, Pls.' Mem. 22, ECF No. 116.

[53] Pls.' Mem. 12, 19, ECF No. 116 (citing *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 368 (S.D.N.Y. 2019) (quoting *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008)); *see also FTC v. Pukke*, 53 F.4th 80, 105 (4th Cir. 2022) ("Both the TSR and the FTC Act bear the same standards for individual liability.")).

[54] Defs' Resp. to Pls' Statement. of Material Facts ¶ 2, ECF No. 120.

[55] "[A]n individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." Pls. Mem. 13, ECF No. 116 (quoting *FTC v. Partners in Health Care Ass'n, Inc.*,189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016) (finding that an individual's status as "president and sole officer" who "controlled the day-to-day activities" of a company was "sufficient to establish the first element of individual liability" without more)).

[56] Defendants' opposition brief mentions at least four individuals and numerous third parties purportedly involved in some part of Key Credit's operations, but Defendants do not identify anyone other than Tsoukales who had the authority to control Key Credit. *See* Defs. Opp'n. 27-29, ECF No. 119.

[57] Defs' Resp. to Pls' Statement of Material Facts ¶¶ 64, 74, ECF No. 120.

evidencing "active involvement in business affairs and the making of corporate policy."[58] Accordingly, Plaintiffs have established that Tsoukales had the authority to control Key Credit under the first prong.[59]

Turning to the second prong, there is no genuine dispute that Tsoukales "had actual knowledge of the wrongful acts or practices" or at least "was recklessly indifferent to whether or not the corporate acts or practices were fraudulent."[60] With respect to Key Credit's charging of unlawful advance fees, Plaintiffs have shown that Tsoukales had both actual knowledge of Key Credit's billing practices and was recklessly indifferent to whether the practices were unlawful.[61] Defendants concede that Key Credit charges consumers a first-work fee five days to two weeks after enrollment and charges consumers monthly fees thereafter.[62] Although Defendants purport to dispute that Tsoukales had knowledge of Key Credit's fee structure they have failed to identify any evidence that genuinely disputes Plaintiffs' evidence.[63] Specifically, Defendants attempt to dispute Plaintiffs' evidence by citing to a portion of Tsoukales's deposition testimony that is irrelevant to his knowledge of Key Credit's billing practices.[64] Defendants also attempt to dispute Tsoukales's knowledge by asserting that Key Credit's attorneys created company

---

[58] Pls.' Mem. 13, ECF No. 116 (quoting and citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) (citations omitted), *overruled on other grounds by FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019); *FTC v. Am. Precious Metals, LLC*, No. 11-61072-CV, 2012 WL 3683467, at *2 (S.D. Fla. Aug. 24, 2012) (citations omitted).
[59] With respect to Key Credit's deceptive acts and practices, Plaintiffs have also satisfied the first element of individual liability by showing that Tsoukales participated in the unlawful acts. *See* Pls.' Mem. 18-19, 21-22, ECF No. 116.
[60] Pls.' Mem. 12, ECF No. 116 (quoting *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1117 (S.D. Cal. 2008) (citing *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (additional citations omitted) (setting forth knowledge standard under the FTC Act)).
[61] *See* Pls.' Mem. 13, ECF No. 116.
[62] *S*ee Defs' Resp. to Pls' Statement of Material Facts ¶¶ 42-44, ECF No. 120.
[63] *See* Pls.' Reply to Defs.' Resp. to Pls.' Statement of Material Facts ¶ 73.
[64] See id.

documents and advised the company about its fees.[65] Not only is this irrelevant to whether Tsoukales had knowledge of Key Credit's billing practices, to the extent Defendants are suggesting that this is a defense to Tsoukales's liability, they are wrong. "It is well established that 'reliance on advice of counsel [is] not a valid defense on the question of knowledge' required for individual liability."[66]

With respect to Key Credit's deceptive acts and practices, the undisputed facts show that Tsoukales had both actual knowledge of Key Credit's misrepresentations and was recklessly indifferent to the truth or falsity of the misrepresentations.[67] Defendants cannot credibly dispute Tsoukales's knowledge of Key Credit's misrepresentations or the falsity of those misrepresentations. Defendants attempt to distance Tsoukales from the acts of his company by disputing Plaintiffs' facts with assertions that the company has a management team that handles certain business activities. But Defendants concede that Tsoukales reviews Key Credit's sales scripts and sent emails to sales representatives with tips on how to sell Key Credit's services to prospective customers.[68] Defendants also attempt to dispute that Tsoukales drafted sales scripts and is responsible for the content of Key Credit's website, but they present no evidence to controvert these facts.[69] Defendants likewise dispute that Tsoukales reviews sales calls by citing his October 18, 2022 deposition testimony, while ignoring that he admitted listening to sales calls and reviewing sales grade summaries of calls in the last five years after he was confronted

---

[65] *See id.* ¶¶ 73-74.
[66] *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014) (citing *FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006) (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 575 (7th Cir. 1989)).
[67] *See* Pls.' Mem. 19, ECF No. 116.
[68] *See* Defs.' Resp. to Pls.' Statement of Material Facts ¶ 71, ECF No. 120.
[69] *See* Pls.' Reply to Defs.' Resp. to Pls.' Statement of Material Facts ¶¶ 67, 71.

with a document showing that he reviewed a sales call as recently as January 2022.[70] Accordingly, Plaintiffs have established that Tsoukales had knowledge under the second prong.

Second, Plaintiffs have shown that Tsoukales is also individually liable for providing substantial assistance to Key Credit in violation of § 1036(a)(3) of the CFPA and § 310.3(b) of the TSR.[71] Under the CFPA, it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person" engaging in unfair, deceptive, or abusive acts or practices,[72] and under the TSR a person may be liable for substantially assisting a seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates the TSR.[73] As with direct individual liability, substantial assistance does not require that an individual be involved in the day-to-day activities of an entity.[74] And the same facts described above showing Tsoukales's control and knowledge easily satisfy the standards for substantial assistance.

## V. Key Credit's affirmative defenses do not preclude summary judgment.

Defendants erroneously argue that the Court should deny summary judgment in favor of Plaintiffs because Plaintiffs did not address the six remaining affirmative defenses alleged by Defendants.[75] Defendants do not specifically address any of these affirmative defenses other than to list them, nor do Defendants provide any evidence in support of those defenses. Rather, Defendants seem to argue that Plaintiffs must preemptively refute every affirmative defense in

[70] *See* Pls.' Reply to Defs.' Resp. to Pls.' Statement of Material Facts ¶ 72.
[71] *See* Pls. Mem. 13, 22, ECF No. 120.
[72] *Id.* at. 22 (quoting 12 U.S.C. § 5536(a)(3)).
[73] *Id.* at 14 (discussing 16 C.F.R. § 310.3(b)).
[74] *See id.* at 13, 22.
[75] Defendants initially alleged 15 affirmative defenses but withdrew 2. *See* Am. Affirmative Defenses to Am. Compl., ECF No. 60. Plaintiffs then moved to strike 7 of the remaining 13 affirmative defenses, which this Court granted. *See* Order, June 1, 2022, ECF No. 69.

order to satisfy their burden under the summary judgment standard. This position is unsupported and contrary to well-established authority confirming that Defendants may not rest on their pleadings but must provide evidence showing there is a genuine issue of material fact to defeat a summary judgment motion.[76]

## VI. Defendants repeat the same attacks on the TSR and the Bureau's funding that Plaintiffs have previously addressed and the Court has already rejected, and which do not preclude summary judgment against Defendants.

Defendants' opposition reproduces nearly verbatim the same claim they have now made multiple times in this litigation, including in their motion for summary judgment, that the Federal Trade Commission exceeded its statutory authority when it issued the TSR.[77] In addition, Defendants' opposition "adopts and incorporates" Defendants' previously offered arguments that the TSR and the Bureau's funding are unconstitutional in various respects.[78]

---

[76] *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (explaining that Fed. R. Civ. P. 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'"); *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998) (explaining that the party asserting an affirmative defense "bears the burden of establishing its applicability); *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996) (quoting *Celotex*, 477 U.S. at 322) ("Fed. R. Civ. P. 56(c) 'mandates the entry of summary judgment, ... upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"); *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 521 F. Supp. 3d 112, 126 (D. Mass. 2021) ("In its opposition, DRG mentions only six of its 17 affirmative defenses, and as to those six, it makes no real effort to identify the specific evidence . . . th[at] purportedly establishes the elements of each defense. Consequently, DRG cannot avoid summary judgment on that basis."); *Bank of New York Mellon v. Lezdey*, Civil Action No. 13-11118-MLW, 2016 WL 5539759, at *10 (D. Mass. Aug. 25, 2016) (stating that "affirmative defenses do not preclude summary judgment in favor of plaintiff" where defendants did not "elaborate" on the defenses on summary judgment); *GE Cap. Healthcare Fin. Servs. v. Fall River Walk-In E*, No. Civ. A. 02-11789-RCL, 2004 WL 40522, at *3 (D. Mass. Jan. 7, 2004) ("Thus, the defendants cannot survive summary judgment based on the unsubstantiated and undeveloped affirmative defenses included in their answer.").

[77] *Compare* Defs.' Opp'n at 15-17, ECF No. 119, *with* Defs.' Mot. for Summ. J. 21-23, ECF No. 110.

[78] Defs.' Opp'n 26, ECF No. 119.

Plaintiffs have now refuted these claims multiple times over, including most recently in their summary judgment opposition.[79] The Court itself has repeatedly rejected Defendants' claims.[80] Rather than repeating the same arguments once again here, Plaintiffs respectfully refer the Court to the relevant portions of their summary judgment opposition as well as to the Court's sound prior adjudication of these issues, which Defendants continue to simply ignore.[81]

**CONCLUSION**

Based on the evidentiary record and governing law the Court should grant summary judgment in Plaintiffs' favor on Counts I-IX.

Dated: September 1, 2023

Respectfully submitted,

Eric Halperin
*Enforcement Director*
Alusheyi J. Wheeler
*Deputy Enforcement Director*
Jade Burns
*Assistant Litigation Deputy*

/s/ Nelle Rohlich
Nelle Rohlich (WI Bar No. 1047522)
(202) 435-7280
Nelle.rohlich@cfpb.gov
Carmen Christopher
Carmen.christopher@cfpb.gov
Patricia Hensler
Patricia.hensler@cfpb.gov
Benjamin Konop
Benjamin.konop@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW

[79] *See* Pls.' Opp'n 12-18, ECF No. 122.
[80] *See id.* at 13-14.
[81] *See, e.g.*, Order Denying Mot. to Dismiss, ECF No. 4.

Washington, DC 20552
*Attorneys for Plaintiff Consumer Financial Protection Bureau*

/s/ Lilia V. DuBois
Commonwealth of Massachusetts
Maura Healey, Attorney General
Lilia V. DuBois (MA Bar No. 688848)
(617) 963-2239
Lilia.DuBois@state.ma.us
Assistant Attorney General
Insurance & Financial Services Division
One Ashburton Place, 18th Floor
Boston, MA 02108

*Attorneys for Plaintiffs*