UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Bureau of Consumer Financial Protection and the Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney General,

Plaintiffs,

v.

Commonwealth Equity Group, LLC (d/b/a Key Credit Repair) and Nikitas Tsoukales (a/k/a Nikitas Tsoukalis),

Defendants.

Case No. 1:20-cv-10991-RWZ

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Plaintiffs Bureau of Consumer Financial Protection (Bureau) and the Commonwealth of Massachusetts *ex rel.* Maura Healey, Attorney General, submit this Reply to Defendants' Response to Plaintiffs' Statement of Material Facts and Statement of Additional Undisputed Material Facts. (ECF No. 120).

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

Defendants do not dispute the following paragraphs in Plaintiffs' Statement of Material Facts, ECF No. 117: 1, 6–7, 9, 12–15, 17–18, 21, 25–26, 33–35, 39, 42–44, 46, 49–51, 58, 75-76, and 78.

Defendants dispute, in whole or in part, the following paragraphs in Plaintiffs' Statement of Material Facts, ECF No. 117, but Defendants' disputes are either (1) irrelevant or (2) do not

controvert or refute the facts set forth in paragraphs: 3–5, 10, 11, 16, 19, 20, 22–24, 27–32, 36–38, 40, 47, 48, 52, 53, 55–56, 64, 77 and 79.

Defendants dispute the following paragraphs in Plaintiffs' Statement of Material Facts, ECF No. 117, and Plaintiffs reply to those disputes below: 2, 8, 41, 45, 54, 57, 59, 60–63, 65–74, and 80.

**Plaintiffs' Replies**

2. Defendant Tsoukales founded Key Credit and is Key Credit's Chief Executive Officer, President, "VP of Sales and Marketing" and sole shareholder. (Ex. 1 at ¶ 5-8 (Schneider Decl.); Ex. 2 (Massachusetts Secretary of State Incorporation Documents); ECF 56 at ¶ 8 (Defs.' Answer to Am. Compl.); Ex. 3 at 30 (April 2017 Business Plan, KCR_0025502); Ex. 4 at 11:24-12:2, 20:2-10 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)); Ex. 5 at 7:18-9:9 (Dep. of Tsoukales, Oct. 18, 2022); Ex. 6 at 20:22-21:9 (Investigational Hearing (IH) of Tsoukales, May 16, 2019)).

DEFENDANTS' RESPONSE: Undisputed that Mr. Tsoukalis is the founder of Key Credit and is Key Credit's Chief Executive Officer and sole shareholder. Key Credit disputes that Mr. Tsoukalis is Key Credit's "VP of Sales and Marketing." (See Pl. Ex. 5 at 16:4-9, 27:6-15, 27:20-22; Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II); Tsoukalis Aff. (Dkt. 113) ¶ 3.)

PLAINTIFFS' REPLY: Key Credit disputes that Tsoukales is Key Credit's "VP of Sales and Marketing," but this dispute is not supported by the evidence cited.

8. Key Credit's target demographic for its services are consumers with credit scores below 650 and household incomes of less than $30,000. (Ex. 3 at 17-18 (April 2017 Business Plan, KCR_0025502)).

DEFENDANTS' RESPONSE: Disputed. The document cited in Paragraph 8 does not support the proposition for which it is cited.

PLAINTIFFS' REPLY: Defendants' dispute is not supported by the evidence cited.

41. Sales agents request payment information and arrange the first payment during the initial sales pitch. (Ex. 54 at 5:17-19, 17:4-8 (Consumer Call Transcript, KCR_0001838); Ex. 61 at 22:11-23:22 (Consumer Call Transcript, KCR_0001844); Ex. 56 at 39:1-40:3 (Consumer Call Transcript, KCR_0007782); Ex. 60 at 30:6-24 (Consumer Call Transcript, KCR_0014169); Ex. 68 at 42:5-19 (Consumer Call Transcript, KCR_0019585); Ex. 69 at 27:1-28:25 (Consumer Call Transcript, KCR_0020918); Ex. 70 at 28:2-30:1(Consumer Call Transcript, KCR_0020923)).

DEFENDANTS' RESPONSE: Undisputed that Key Credits sales representatives request payment information and arrange for receipt of the First Work Fee after the prospective customer has agreed to engage Key Credit to provide its services and pursuant to the written customer agreements. Key Credit disputes Paragraph 41 to the extent it implies that customers are charged before entering into the written customer agreement and disputes to the characterization on the basis that the characterization is not supported by the documents cited in Paragraph 41. Key Credit does not process a payment during any initial sales calls and Plaintiffs cite no evidence to the contrary because none exists. (See Hudson Aff. (Dkt. 114), Exs. J-L.)

PLAINTIFFS' REPLY: Key Credit's dispute is irrelevant because ¶ 41 does not state or imply that customers are charged before entering into the written customer agreement. The sales call transcripts cited show that Key Credit arranges the first payment during the initial sales call—it obtains payment information from customers and sets the first payment date.

45. Key Credit's monthly charge is typically a static fee—it does not change and it is not related to the credit improvements achieved for customers. (Ex. 73 at KCR_0057365 (2016 Service Agreement, KCR_0057364); Ex. 74 at 3 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023270 (2019 Service Agreement, KCR_0023268); Ex. 72 at KCR_0057371 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057343 (2021 Service Agreement, KCR_0057340); see also Ex. 53 at KCR_0007912-13 (Revised Sales Script 7.18.19); Ex. 52 at KCR_0007771 (sale script); Ex. 119 at KCR_0015852 (scripts 12.27.18 new programs, KCR_0015852); Ex. 71 at KCR_0000335 (Sales Bible 6.20.18, KCR_0000320)).

DEFENDANTS' RESPONSE: Undisputed that Key Credit's monthly charge is typically a static fee that is agreed upon in writing, is not based on achieving improvements to a customer's credit; otherwise disputed as to the characterization which is not supported by the documents cited in Paragraph 45. Answering further, Key Credit charges in arrears for services it has provided. (See Exhibits cited in Paragraph 45 above.)

PLAINTIFFS' REPLY: Defendants' statement, "disputed as to the characterization which is not supported by the documents cited" is vague and conclusory—it does not provide sufficient information to enable Plaintiffs to meaningfully reply. Defendants further answer is vague as to the "services" to which it refers and is immaterial to Plaintiffs' claims.

54. The service agreements disavow Key Credit's prior representations by stating that it will not "assist Client on improving Client's credit rating or record" and it "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report)" because "[a]ccurately reported items on a credit reports (sic) cannot be removed." Ex. 74 at 1 (2018 Service Agreement, IH Ex 8); Ex. 75 at KCR_0023268 (2019 Service

Agreement, KCR_0023268); Ex. 72 at KCR_0057369 (2019 Service Agreement, KCR_0057368); Ex. 76 at KCR_0057341 (2021 Service Agreement, KCR_0057340); see also Ex. 73 at KCR_0057364 (2016 Service Agreement, KCR_0057364)).

DEFENDANTS' RESPONSE: Undisputed that Key Credit's customers are informed and expressly agree and acknowledge that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." Key Credit disputes that the written contracts disavow prior representations. (See, e.g., Exhibits cited in paragraph 54 above including customers' express acknowledge and agreement that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement" and "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement."; see also Hudson Aff., Exs. J-L.)

PLAINTIFFS' REPLY: While Key Credit "disputes that the written contracts disavow prior representations" it does not dispute that these statements contradict the company's advertising representations about improving consumers' credit scores and removing negative items from consumers' credit reports. (*See* Mem. in Supp. of Pls' Mot. for Summ. J., ECF No. 116; Pls.' Statement of the Material Facts, ECF. No. 117; and Pls.' Reply filed contemporaneously with this document).

57. Key Credit could not identify a customer who gained at least a ninety-point increase in their credit scores within ninety days. (Ex. 40 at No. 7 (Def. Key Credit's Answer to Pls.' Interrogs.)).

DEFENDANTS' RESPONSE: Disputed, as the document cited in Paragraph 57 does not support the statement for which it is cited and because Key Credit's basis for its "90 point average credit score increase in the first 90 days" statement is based on Mr. Tsoukalis' personally "review[ing] thousands of credit reports" during the first "five to six years" of the company when he personally provided credit repair services to Key Credit's customers. (See Pl. Ex. 4 at 35:9-17; 175:20-177:21 (Key Credit 30(b)(6) Dep., Tsoukalis testimony).)

PLAINTIFFS' REPLY: Defendants' dispute is not supported by the evidence cited. The fact that the basis for Key Credit's claims is Tsoukales's personal observations has no bearing on the fact that Key Credit could not identify a customer who gained at least a ninety-point credit-score increase in ninety days. Rather, Key Credit answered that it "lacks knowledge or

information sufficient to respond" to Plaintiffs' interrogatory asking Defendants to identify representative customers. (Pls.' Ex. 40 cited in ¶ 57).

59. On behalf of Key Credit, Tsoukales testified that the 90-point representation came from "data" not based on "an algorithm or a spreadsheet," but in his mind from when he "was working with people closely. . . when [the] company was smaller." (Ex. 4 at 177:2-6. (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

DEFENDANTS' RESPONSE: Disputed. Key Credit's basis for its "90 point average credit score increase in the first 90 days" statement is based on Mr. Tsoukalis' personally "review[ing] thousands of credit reports" during the first "five to six years" of the company when he personally provided credit repair services to Key Credit's customers. (See Pl. Ex. 4 at 35:9-17, 175:20-177:21 (Key Credit 30(b)(6) Dep., Tsoukalis testimony).)

PLAINTIFFS' REPLY: Defendants' dispute does not controvert the stated fact.

60. Key Credit does not track or calculate either the (1) the average credit score changes of its customers or (2) its customers' credit score improvements in the first 90 days of services. (Ex. 4 at 174:22-178:23 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)). Ex. 6 at 92:2-93:16 (Tsoukales IH)).

DEFENDANTS' RESPONSE: Disputed, as the documents cited do not support the statement in Paragraph 60. If customers provide Key Credit with access to their credit reports then Key Credit can and does track credit score changes and improvements in the first 90 days of service. (Pl. Ex. 4 at 174:22-175:19, 176:12-177:6.)

PLAINTIFFS' REPLY: Defendants' dispute is not supported by the evidence cited. Specifically, Defendants cite Tsoukales's testimony in response to the question of when Key Credit tracks consumers' credit scores: "[i]f a client has a credit report that tracks a credit score, then yes." This does not controvert the statement that Key Credit does not track the average of, or improvements to, its customers' credit scores, which is supported by the evidence cited by Plaintiffs. Moreover, Defendants purported contrary evidence only suggests the possibility that the customer might be tracking her credit score and uploading information into Key Credit's system (client's portal) that would make it possible for Key Credit to track credit-score changes, but this does not show that Defendants do any such tracking. And Defendants have not produced any evidence showing that Key Credit, in fact, tracks consumers' credit-score changes.

61. Tsoukales testified that Key Credit cannot remove negative items that are accurate and within the limitations period. (Ex. 4 at 178:24-179:16 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

DEFENDANTS' RESPONSE: Disputed. Mr. Tsoukalis was asked whether it is possible to "remove something" if the record is accurate and he testified (correctly) that "If something has passed the statute of limitations, it could have happened and it was accurate at that time but it is now obsolete. So that is an example of something that was accurate at one point but not accurate today. Many of the credit reports have examples of items like that. If the record is verified and confirmed and documented, then it cannot be removed." (Pl. Ex. 4 at 179:3-16.) Answering further, Key Credit advises every customer, in writing, that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report) ….." (See KCR SUF, ¶ 36.)

PLAINTIFFS' REPLY: Defendants' dispute does not controvert the stated fact. Defendants' response admits Plaintiffs asked Tsoukales, "And is it possible to remove a negative record that is accurate?" and Tsoukales responded, "If the record is verified and confirmed and documented, then it cannot be removed. You cannot remove anything from a credit report." (Pls.' Ex. 4 cited in ¶ 61).

62. Key Credit does not track whether its services result in the removal of, or permanent removal of, negative items from customers' credit reports. (Ex. 4 at 78:12-20. (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

DEFENDANTS' RESPONSE: Disputed. (See Pl. Ex. 4 at 174:22-175:19, 176:12-177:6, 178:8-20.)

PLAINTIFFS' REPLY: Defendants do not identify any specific dispute and cite to testimony that does not controvert Plaintiffs' stated fact. Specifically, testimony that Tsoukales's personal, undocumented observations are the only evidence to support changes to credit score and credit-report improvements does not refute the statement that Key Credit does not track the efficacy of its services. Rather, this supports the notion that the company does not track credit score and credit report changes systematically, and any purported tracking is either done by customers or anecdotally by Tsoukales.

63. Customers complain that Key Credit's services did not result in an increase to their credit scores or in the removal of negative items on their credit reports and consumers have reported being distressed and vulnerable when they sought assistance from Key Credit. (Ex. 1 at ¶ 14-20 (Schneider Decl.); Ex. 47 (Blunt Decl. with attachs.); Ex. 48 (Finney Decl. with attachs.); Ex. 49 (Perrow Decl. with attachs.); Ex. 50 (Vess Decl.)).

DEFENDANTS' RESPONSE: Key Credit does not dispute that Plaintiffs purport to have identified 106 complaints from more than 40,000 consumers who worked with Key Credit from 2016 through 2019 alone, reflecting purported complaints from approximately 0.002% of Key Credit's customers during that 4-year period. Key Credit disputes Paragraph 63 on the grounds that the microscopically small number of complaints to which it refers is inadmissible under the Federal Rules of Evidence, including the Hearsay Rule.

PLAINTIFFS' REPLY: Key Credit does not dispute the veracity of the cited consumer declarations. Defendants provide no evidentiary support for the statements made in this response. Defendants' statements do not dispute or refute the facts that form the basis of Plaintiffs' legal claims. Defendants also object on what appears to be "hearsay" grounds. But the four consumer declarations (Pls.' Exs. 47–50 cited in ¶ 63) contain the personal knowledge of consumer witnesses. The declaration of Bureau investigator Dani Schneider (Pls.' Ex. 1 cited in ¶ 63) provides a summary of consumer complaints regarding conduct by Defendants that Plaintiffs obtained from the Federal Trade Commission's Consumer Sentinel complaint database. Courts regularly admit consumer complaints like these under the "residual" hearsay exception because they are supported by sufficient guarantees of trustworthiness and are the most probative evidence Plaintiffs can obtain through reasonable efforts. *See* Fed. R. Evid. 807.

65. Tsoukales is responsible for Key Credit's marketing. (Ex. 4 at 108:14-109:12 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 5 at 15:25-16:9 (Tsoukales Dep.); Ex. 6 at 80:13-82:3 (Tsoukales IH); Ex. 21 (email from Tsoukales to lead generator about new telemarketing campaign to generate clients, KCR_0020652); Ex. 81 (email from Tsoukales to Key Credit staff about new marketing initiatives, KCR_0008230); Ex. 82 (email from Key Credit representative to Tsoukales with summaries of Key Credit sales agents' performances, KCR_0001812).

DEFENDANTS' RESPONSE: Disputed, as the documents cited in Paragraph 65 do not support the proposition for which they are cited. As of October 18, 2022, Mr. Tsoukalis "only recently" began managing Google Ad campaigns in which "quite a few people" provided input –

including third-parties, marketing agencies and freelancers – that are not run by the company. (Pl. Ex. 4 at 108:14-109:17.) Mr. Tsoukalis has "ma[de] suggestions" and Key Credit's management team "collectively decides" on Key Credit's marketing. (Pl. Ex. 5 at 16:4-9.) Mr. Tsoukalis relies on "a management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II).) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I don't, mostly." (Pl. Ex. 5 at 25:1-6.)

PLAINTIFFS' REPLY: Defendants' dispute is not supported by the evidence cited; rather, Defendants' response only addresses one marketing effort—Google Ad campaigns—in which Tsoukales, at least recently, *has been* involved. Defendants set forth evidence that people other than Tsoukales have "provided input," but this does not controvert the fact that Tsoukales has been responsible for the company's marketing.

66. Tsoukales leads Key Credit's relationships with its marketing partners, including lead generators and search engines, such as Google. (Ex. 4 at 108:14-109:12 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 81 at KCR_0008230 (email from Tsoukales to Key Credit staff about new marketing initiatives); Ex. 121 at KCR_0008793 (email from Tsoukales launching new outbound telemarketing campaign).

DEFENDANTS' RESPONSE: Disputed, as the documents cited in Paragraph 66 do not support the proposition for which they are cited. As of October 18, 2022, Mr. Tsoukalis "only recently" began managing Google Ad campaigns in which "quite a few people" provided input – including third-parties, marketing agencies and freelancers – that are not run by the company. (Pl. Ex. 4 at 108:14-109:17.) Mr. Tsoukalis has "ma[de] suggestions" on marketing to Key Credit's "management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. S at 16:4-9, 20:25-21:8 (Tsoukalis Dep. II).)

PLAINTIFFS' REPLY: Defendants' dispute does not controvert the stated fact. Defendants cite nearly identical testimony as Plaintiffs (Pls.' Ex. 4 cited in ¶ 66 and Defs.' Resp. thereto), which supports the fact, and cite to additional evidence that is irrelevant to whether "Tsoukales leads Key Credit's relationships with its marketing partners, including lead generators and search engines, such as Google."

67. Tsoukales is responsible for the content of Key Credit's website. (Ex. 4 at 86:24-87:25, 94:14-96:22 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 83 at KCR_0019586) (email exchange with Tsoukales directing changes to Key Credit website); Ex. 84 at KCR_0021134 (email exchange with Tsoukales directing changes to Key Credit website).

DEFENDANTS' RESPONSE: Disputed. Key Credit's website and its content were provided by a third-party company known as Conversion Hut which has responsibility for the website and its contents. (Pl. Ex. 4 at 86:15-87:13, 94:14-95:4.) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I don't, mostly." (Pl. Ex. 5 at 25:1-6.)

PLAINTIFFS' REPLY: Defendants' dispute does not controvert the stated fact. Defendants provide no evidence to controvert Plaintiffs' evidence showing Tsoukales is responsible for the content of Key Credit's website. (Pls.' Exs. 4, 83-84 cited in ¶ 67). The information cited by Defendants is irrelevant to Tsoukales' role and control over Key Credit's website. (Pls.' Exs. 4-5 cited in Defs.' Resp. to ¶ 67).

68. Tsoukales conducts marketing on behalf of Key Credit including creating and appearing in videos and sharing personal testimonials about Key Credit's credit-repair services. (Ex. 85 at KCR_0027341 (Tsoukales video on Key Credit's website); Ex. 86 at KCR_0027346 (Tsoukales "insider credit tips" on Key Credit's website; Ex. 87 at KCR_0039534 (Tsoukales testimonial on Key Credit's website telling consumers "[f]eel free to contact me").

DEFENDANTS' RESPONSE: Undisputed that Mr. Tsoukalis has created and appeared in videos and shared personal testimonials about Key Credit's credit-repair services. Otherwise disputed because Mr. Tsoukalis has "ma[de] suggestions" on marketing to Key Credit's "management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. S at 16:4-9, 20:25-21:8 (Tsoukalis Dep. II).) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I don't, mostly." (Pl. Ex. 5 at 25:1-6.)

PLAINTIFFS' REPLY: Defendants' dispute does not controvert the stated fact because the existence of a management team or staff that work for the company does not refute the fact that Tsoukales conducts or has conducted marketing on behalf of Key Credit.

69. Tsoukales has directly engaged with consumers in the marketing and sale of Key Credit's credit-repair services and states that he has conducted more than 15,000 sales consultations himself. (Ex. 4 at 49:13-18, 55:9-56:8 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Ex. 5at 7:18-9:9 at (Tsoukales Dep.); Ex. 89 at KCR_14170 (email exchange telling a consumer that Tsoukales will handle the consumer's Key Credit consultation because "our owner handles the majority of the consultations to ensure that you get the best service levels possible").

DEFENDANTS' RESPONSE: Disputed that Mr. Tsoukalis has always and directly

engaged with consumers in the marketing and sale of Key Credit services. Undisputed that approximately 15 years ago when he started Key Credit and had no other employees, Mr. Tsoukalis engaged directly with consumers in the sale of Key Credit's services and conducted more than 15,000 sales consultations himself. At that time, "like many small businesses, [Mr. Tsoukalis] did everything from speaking to clients and washing the windows and literally cleaning the office and the ordering supplies and even cleaning bathrooms, typical of many small businesses. (Pl. Ex. 5 at 8:2-9.) However, over time as the business grew, Key Credit created "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't, mostly." (Pl. Ex. 5 at 25:1-6.) And Mr. Tsoukalis stopped taking the customer service and sales calls himself. (Pl. Ex. 4 at 13:4-10; Pl. Ex. 5 at 8:1-9.)

PLAINTIFFS' REPLY: Defendants' dispute mischaracterizes Plaintiffs' stated fact. Specifically, Defendants dispute that Tsoukales "has *always* and directly engaged with consumers," but do not dispute Plaintiffs' fact that Tsoukales "has directly engaged with consumers."

70. Tsoukales receives and reviews consumer complaints, responds to Better Business Bureau (BBB) complaints, and guides staff on how to respond to other consumer complaints. (Ex. 5 at 24:13-25 (Tsoukales Dep.); Ex. 90 at KCR_0002497) (2017 consumer complaint sent to Tsoukales) Ex. 91 at KCR_0006728 (2019 consumer complaint sent to Tsoukales); Ex. 92 at KCR_0007379 (2020 consumer complaint sent to Tsoukales; Ex. 93 at KCR_0019375 (2016 consumer complaint sent to Tsoukales); Ex. 94 at KCR_0021114 (2019 consumer compliant sent to Tsoukales; (Ex. 1 at ¶ 14-20 (Schneider Decl.)).

DEFENDANTS' RESPONSE: Disputed. Customer complaints are handled by Key Credit's customer support team, headed by Jennifer Hadayia, who are "more experienced than [Mr. Tsoukalis] in client support issues, to address the issue appropriated. (Pl. Ex. 5 at 24:13-25.) Consumers reach out to Mr. Tsoukalis with complaints "very, very rarely . . . [Key Credit] ha[s] an entire team of managers and team leaders and staff that handles the day to day. I don't, mostly." (Pl. Ex. 5 at 25:1-6.) Mr. Tsoukalis does not "field those responses [to complaints]. Those responses are dealt with by [Key Credit's] client support team, Jennifer Hadayia." (Pl. Ex. 5 at 26:23-27:5.) Mr. Tsoukalis would be involved only if a complaint was provided to the "customer support team and someone from the team shared that with me and possibly asked me for guidance., in which case I would give it or ask the head of our client support team . . . to address the issue appropriately." (Pl. Ex. 5 at 24:17-25)

PLAINTIFFS' REPLY: Defendants clarify that Tsoukales "rarely" handles complaints, but do not controvert the fact that Tsoukales has received and reviewed consumer complaints, has responded to BBB complaints, and has guided staff on how to respond to consumer complaints, even if such tasks have been more recently delegated, in part, to others. Therefore,

there is no genuine dispute here.

71. Tsoukales drafts and reviews Key Credit's sales scripts, including scripts used by third-party lead generators, and gives tips to sales agents on how to sell Key Credit's services. (Ex. 5 at 16:14-22 (Tsoukales Dep.); Ex. 6 at 52:5-10 (Tsoukales IH); Ex. 95(Tsoukales email to sales agents regarding Key Credit's and scripts, KCR_0000577); Ex. 96 (email with Tsoukales' new sales script for affiliates, KCR_0001785); Ex. 97 at (email instructing sales agents to "follow the exact script [Tsoukales] sent yesterday when dealing with affiliates," KCR_0015241); Ex. 10 (Key Credit "click to dial" program "this is the single best tool to kill outbound calls LIKE A BOSS," at KCR_0016006); Ex. 22 (email from Tsoukales instructing sales team to use new script for affiliate sales calls, KCR_0020373); Ex. 15 (email exchange between Tsoukales and lead generator launching new telemarketing campaign with Tsoukales' telemarketing script, KCR_0021218 ); Ex. 18 (email about new Key Credit telemarketing campaign "[Tsoukales] wants you to follow the script he sent out yesterday," KCR_0008647); Ex. 102 (email from Tsoukales to Key Credit client relations employee with sales script: "This is the money pitch. I've done [over] 15k of these myself. It's excellent." KCR_0019016); Ex. 103 (Tsoukales selling tips email, KCR_0019812).

DEFENDANTS' RESPONSE: Undisputed that Mr. Tsoukalis reviews Key Credit's sales scripts, including scripts used by third-party lead generators, and sent the emails cited in Paragraph 71 above to sales representatives with tips on how to sell Key Credit's services to prospective customers. Otherwise disputed. Mr. Tsoukalis does not draft sales scripts, which is instead handled by "a management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. P at 41:14-23, 44:6-19, 47:3-20 (Tsoukalis Dep.); Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II).) Melina Vallas is Key Credit's "head of sales" and she, not Mr. Tsoukalis, and "runs" the sale department. (Pl. Ex. 5 at 27:6-15, 27:20-22.) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't, mostly." (Pl. Ex. 5 at 25:1-6.) Issues and practices regarding Key Credit sales representatives are "formulated collectively" by Key Credit's "head of sales, client support, sales team leaders, support team leaders, operations, managers, and team leaders." (Pl. Ex. 5 at 17:10-17.) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't, mostly." (Pl. Ex. 5 at 25:1-6.) Key Credit has "a management team in charge of many of the day-to-day tacks of the company." (Suppl. Hudson Aff., Ex. S at 21:4-8 (Tsoukalis Dep. II).)

PLAINTIFFS' REPLY: Defendants' dispute is not supported by the evidence cited. For example, Defendants dispute that Tsoukales drafts sales scripts, but cite testimony that does not controvert this fact—in Defendants' cited testimony, Tsoukales tacitly admits that he drafts scripts stating, "I would like to believe that *the scripts that I created* are the most correct and accurate scripts for our team." (Defs.' Ex. P cited in Defs.' Resp. to ¶ 71) (emphasis added)). Defendants also rely on testimony about two instances where Tsoukales denies that he drafted

scripts, (Defs.' Ex. P cited in Defs.' Resp. to ¶ 71), but that in no way means that Tsoukales did or does not draft scripts particularly considering that in 2019, one year before this case was filed, Tsoukales testified before the Bureau that he created the script for answering phones and that no one else drafted scripts. (Pls.' Ex. 6 cited in ¶ 71) ("I create how someone should answer the phone. I've created the script. Q. Has anybody else drafted scripts; A. No."). Defendants likewise cite Tsoukales's testimony that "I haven't been the scriptwriter as of recent," (Defs.' Ex. S cited in Defs.' Resp. to ¶ 71), but, again, that does not show that he did not draft scripts at other times and does not controvert Plaintiffs' evidence showing that he drafted Key Credit scripts as recently as January 2022, (Pls.' Exs. 22, 99 cited in ¶ 71). The remaining evidence cited by Defendants is irrelevant to whether Tsoukales drafts scripts.

72. Tsoukales monitors Defendants' inbound and outbound call volume, participates in the hiring and training of Defendants' sales agents and customer representatives, reviews sale agents' calls, and monitors and guides their work, compensation, bonuses, and commissions. (Ex. 5 at 16:18-17:3, 19:21-20:17, 29:3-5 (Tsoukales Dep.); Ex. 104 (email from Tsoukales with Key Credit's daily telemarketing sales report, KCR_0009024) Ex. 105 (Tsoukales training videos and recordings "how. . . to do the perfect consultation," KCR_0000539); Ex. __ (Tsoukales email to sales team with Tsoukales' "sales bible". . ."save it. read it, ask me questions. . . become a ninja," KCR_0000592); Ex. 107 (email exchange with Tsoukales launching a search for 10 new sales agents "to hit our goal," KCR_0011778); Ex. 108 (email exchange from Tsoukales "I was listening to [sales agents'] calls today and they didn't sound like 100's to me. Please check today's calls in call rail. They sound like kaka," KCR_0001757); Ex. 109 (email exchange with Tsoukales reviewing Key Credit Repair's sales agents' calls, KCR_0001814); Ex. 110 (email to Tsoukales regarding sales agents' performance, KCR_0008854 ); Ex. 99 (email from Tsoukales about sales agent's resignation, KCR_0010606); Ex. 14 (Tsoukales email to sales team handling new leads from affiliate telemarketing campaign "[these] leads. . . need to get screened VERY FAST so we're not wasting our time and money," KCR_0020375); Ex. 112 (Tsoukales email to Key Credit Repair sales agents about commission structure, KCR_0002291); Ex. 113 (Tsoukales email exchange about sales agents' bonuses, KCR_0003084); Ex. 114 (Tsoukales email about payroll, KCR_0009911); Ex. 115 (Tsoukales email about payroll and bonuses, KCR_0010041); Ex. 116 (Tsoukales email about team leader bonuses, KCR_0010314).

DEFENDANTS' RESPONSE: Undisputed that Mr. Tsoukalis has received reports on Key Credit's call volume; otherwise disputed. Mr. Tsoukalis does not review sales calls made by Key Credit's sales representatives. (Pl. Ex. 5 at 19:17-20.) Melina Vallas is Key Credit's "head of sales" and she, not Mr. Tsoukalis, "is in charge of making decisions about to who to hire and

terminate" and "runs" the sale department. (Pl. Ex. 5 at 27:6-15, 27:20-22.) Other issues and practices regarding Key Credit sales representatives are "formulated collectively" by Key Credit's "head of sales, client support, sales team leaders, support team leaders, operations, managers, and team leaders." (Pl. Ex. 5 at 17:10-17.) Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't, mostly." (Pl. Ex. 5 at 25:1-6.) Key Credit has "a management team in charge of many of the day-to-day tacks of the company." (Suppl. Hudson Aff., Ex. S at 21:4-8 (Tsoukalis Dep. II).)

PLAINTIFFS' REPLY: Defendants' dispute is not supported by the evidence cited. Specifically, Defendants dispute that Tsoukales "reviews sales call[s] made by Key Credit's sales representatives," but the evidence Defendants cite does not support this contention. Defendants cite one page of Tsoukales' testimony from October 18, 2022, where Tsoukales answers "presently I do not" when asked "do you review sales calls? (Pls.' Ex. 5 cited in Defs.' Resp. to ¶ 72), but Defendants fail to cite Tsoukales' testimony immediately following that statement, where, after being confronted with an email, he admits he *had* listened to sales calls as recently as January 2022, (Pls.' Ex. 5 cited in ¶ 72 and Defs.' Resp. thereto) (emphasis added). Specifically, Tsoukales admitted, "I have listened to calls in the last five years," when shown a January 2022 email (Pls.' Ex. 108 cited in ¶ 72), from Tsoukales to Alejandra Martinez saying, "Ale I was listening to calls today and they didn't sound like 100's to me. Please check today's calls in call rail. They sound like kaka."

73. Tsoukales plays a role in determining the fees charged to consumers and authored the company's service agreements, which set out the company's fee structure. (Ex. 4 at 17:21-24, compare to 27:6-15 (Tsoukales Dep.); Ex. 5 at 51:18-52:17 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

DEFENDANTS' RESPONSE: Key Credit does not dispute that Key Credit's service agreements were created by Key Credit's regulatory lawyers at the law firm of Greenspoon Marder, who also advised Key Credit on the fees charged to its customers; otherwise disputed. (Pl. Ex. 4 at 52:16-21; Pl. Ex. 5 at 18:1-13.)

PLAINTIFFS' REPLY: Defendants' dispute is not supported by the evidence cited. Specifically, Defendants cite to a portion of Tsoukales's deposition testimony that is irrelevant to

whether "Tsoukales plays a role in determining the fees charged to consumers and authored the company's service agreements, which set out the company's fee structure." Defendants also attempt to dispute Tsoukales's role by asserting that Key Credit's attorneys created the company's service agreements and advised the company about its fees. But this statement does not refute that Tsoukales plays a role in determining fees or has authored service agreements, particularly considering that (1) Tsoukales admits that he has "a role in determining the amount of fees Key Credit will charge its clients," (Pls.' Ex. 4 cited in ¶ 73) and (2) when asked whether he had drafted a 2019 service agreement, Tsoukales testified, "I believe so" and "I believe this was drafted *in conjunction with* our regulatory law firm….," (Pls.' Ex. 5 cited in ¶ 73) (emphasis added)).

74. Tsoukales was responsible for setting up Key Credit's bank accounts, is a signatory on all the accounts, has a role in determining the fees charged to consumers, and bases his income on the profits of the company. (Ex. 5 at 10:20-11:13; 12:4-10 (Tsoukales Dep.)).

DEFENDANTS' RESPONSE: Key Credit disputes that Mr. Tsoukalis "has a role in determining the fees charged to consumers", as the document cited in Paragraph 74 does not support that statement, and to the extent that Key Credit's service agreements were created by Key Credit's regulatory lawyers at the law firm of Greenspoon Marder, who also advised Key Credit on the fees charged to its customers. (Pl. Ex. 4 at 52:16-21; Pl. Ex. 5 at 18:1-13.) Otherwise undisputed.

PLAINTIFFS' REPLY: Defendants' dispute is not supported by the evidence cited. Specifically, Defendants assert that Key Credit's attorneys created the company's service agreements and advised the company about its fees, but does not dispute that "Tsoukales was responsible for setting up Key Credit's bank accounts, is a signatory on all the accounts, … and bases his income on the profits of the company" and it does not refute that he "has a role in determining the fees charged to consumers."

80. Defendants' service agreements do not disclose (a) a complete and detailed description of the services to be performed by the company and the total cost to the buyer for such services or (b) the terms and conditions of payment, including the total of all payments to

be made by the buyer. (See Ex. 73 (2016 Service Agreement, KCR_0057364); Ex. 74 (2018 Service Agreement, IH Ex 8); Ex. 75 (2019 Service Agreement, KCR_0023268); Ex. 72 (2019 Service Agreement, KCR_0057368); Ex. 76 (2021 Service Agreement, KCR_0057340); Ex. 4 at 67:7-76:7 (Key Credit 30(b)(6) Dep. (Tsoukales testimony)).

DEFENDANTS' RESPONSE: Disputed. (See Exhibits cited in paragraph 80 above; Hudson Aff. (Dkt. 114), Exs. J-L.)

PLAINTIFFS' REPLY: Defendants' dispute is vague—it does not provide sufficient information to enable Plaintiffs to meaningfully reply and cites only to the exhibits used by Plaintiffs to support this stated fact. Defendants dispute is not supported by the evidence. (*See* Pls.' Ex. 74 cited in ¶80 and Defs.' Resp. thereto. "I agree and authorize Key Credit Repair to charge/debit my Vias, MasterCard, American Express . . . $159 a month + $6.50 expedited billing processing fee and any applicable state tax each subsequent month for work performed within that month until client cancels the program." *See, e.g.*, Defs.' Ex. K cited in Defs.' Resp to ¶ 80.)

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

Below Plaintiffs respond to each of Defendants' additional undisputed facts. Because paragraphs 1–16 and 18–24 are repetitive of Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on Counts I-V (ECF No. 112), Plaintiffs incorporate by reference their responses thereto (Pls.' Resp. to Defs.' Statement of Facts, ECF No. 123) as set forth below.

1. Credit reports habitually contain erroneous information that harms consumers. (KCR SUF, ¶ 10.[1]) The Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau (the "Bureau") accept consumer complaints related to CRAs. (Id. ¶ 11.) Both agencies have reported an increase in complaints related to CRAs in recent years. (Id.) The FTC tracks these complaints and has found that credit reporting complaints have been among the top consumer complaints since 1997, accounting for approximately 20% of all complaints received. (Id.)

[1] References to "KCR SUF" are to Defendants' Statement of Undisputed Material Facts filed in Support of Their Motion for Summary Judgment on Counts I-V of the Amended Complaint. (ECF No. 112.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶ 10, ECF No. 123.

2. In 2020, the FTC received over 246,000 credit reporting complaints. (KCR SUF, ¶ 12.) The most common issues reported by consumers included incorrect information on credit reports, difficulty obtaining credit reports, difficulty disputing errors, and unauthorized inquiries. (*Id.*) Compared to other complaint categories, complaints related to CRAs consistently rank among the top categories received by both agencies. (*Id.*) For example, a PERC research report analyzed a sample of 200 credit reports from each of the three major CRAs - Equifax, Experian, and TransUnion - and found that a significant number of credit reports contained errors. (*Id.* ¶ 13.) Specifically, 26% of the credit reports contained at least one "material error" which is defined as an error that could negatively impact a consumer's creditworthiness or ability to obtain credit. (*Id.*)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 12-13, ECF No. 123.

3. To protect consumers from these errors, Congress enacted the Fair Credit Reporting Act ("FCRA") nearly 40 years ago. (*Id.* ¶ 14.) One of FCRA's key provisions requires credit bureaus to conduct a reasonable investigation when a consumer disputes an item in their credit report. (*Id.*)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 12-13, ECF No. 123.

4. Credit repair services are "not a one size fits all" approach because "[e]very credit report, financial situation, and human being has different goals with different timelines" for each customer's specific goals. (KCR SUF, ¶ 16.) Credit repair companies – like Key Credit – provide a wide range of credit repair services to help consumers enforce their legal rights to ensure that items on their credit reports are fair, accurate and substantiated. (*Id.* ¶ 15.) Among other things, these services address the problems recognized by the FTC and the Bureau; namely, that there are errors and inaccuracies in a consumer's credit report that should be corrected and that harm the consumer's credit worthiness. (*Id.*) Some credit repair companies – like Key Credit – also provide credit counseling and coaching to customers. (*Id.*)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 15-16, ECF No. 123.

5. The FTC promulgated the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310, to carry out the Telemarketing and Consumer Fraud and Abuse Prevention Act's ("Telemarketing Act") direction to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1).

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶ 17, ECF No. 123.

6. Relevant here, one of the TSR's restrictions includes a prohibition on asking for, or receiving, payment for credit repair services that "promised results." Specifically, the TSR's Advance Fee Provision states, in pertinent part:

> (a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> > (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
> >
> > > (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; ***and***
> > >
> > > (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that ***the promised results*** have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2)(i)-(ii), emphasis added.

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶ 18, ECF No. 123.

7. The requirement to show that "promised results" had still been achieved six months later was the result of a specific type of fraudulent scheme perpetrated by "fundamentally bogus" entities holding themselves out as credit repair companies. (KCR SUF, ¶ 19.) In 2002, the FTC provided further explanation of the rationale underlying the Advance Fee Provision. (*Id.* ¶ 20.) Specifically, the FTC explained that the Advance Fee Provision falls within "the purview of its traditional unfairness analysis" because, according to the FTC, "[a]n important characteristic common to credit repair services" scams prohibited by the TSR "is that in each case the offered service is fundamentally bogus." (*Id.*) Indeed, "the essence of these schemes" was "to take consumers' money for services that the seller has no intention of providing and in fact does not provide." (*Id.*) Accordingly, the Advance Fee Provision was intended to prevent unfair conduct that the FTC viewed as "outright theft." (*Id.*)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 19-20, ECF No. 123.

8. The FTC's recent guidance further explains the deceptive conduct targeted by the Advance Fee Provision: a wrongdoer may claim to provide credit repair services and will give the appearance of providing effective services by "flooding a credit bureau with letters disputing the

accuracy of [legitimate] negative entries," which result in credit reporting agencies temporarily removing the negative entries pending an investigation. (KCR SUF, ¶ 21.) Faced with such challenges, CRAs sometimes cannot complete the investigations within the statutorily required 30-day period, so the negative tradelines are provisionally removed from a consumer's credit report. (*Id.* ¶ 22) The temporary removal of such negative tradelines gives the appearance that the consumer's credit record has improved. (*Id.*) The wrongdoer then takes the consumer's money and the negative/accurate tradelines are returned to the consumer's credit report after the completed investigation confirms that no basis for removal exists. (*Id.*)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 21-22, ECF No. 123.

9. In commenting on the TSR's Advance Fee Provision, the U.S. Postal Service stated that it was necessary to distinguish "[s]o-called credit repair services" from "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer." (KCR SUF, ¶ 23.) The "[s]o-called credit repair services" would typically only provide "written advice to customers on how to obtain copies of their credit reports" and encourage customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (*Id.*)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶ 23, ECF No. 123.

10. In 2008, Key Credit began providing credit repair services to qualified customers from its office in Mattapan, Massachusetts. (KCR SUF, ¶ 26.) At relevant times, Key Credit' senior leadership consisted of Nikitas Tsoukalis (Founder and CEO), Jennifer Hadayia (Vice President of Customer Service), Melina Vallas (Head of Sales), Maria Steeves (Head of Operations), and Alejandra Martinez (Head of Quality Control). (*Id.*)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶ 26, ECF No. 123.

11. Key Credit is a licensed credit repair company in all states in which it operates. (*Id.* ¶ 27.) Key Credit has long maintained an "A" rating with the Better Business Bureau. (*Id.* ¶ 28.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 27-28, ECF No. 123.

12. Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit including: learning each customer's specific concerns and goals; consulting with each consumer about inaccurate and challengeable items on their credit report; analyzing each customer's credit report; preparing and sending written disputes of inaccurate negative items on a customer's credit reports; following up with credit reporting agencies to ensure that inaccurate/questionable negative tradelines are removed from a customer's credit report; analyzing new credit reports to ensure that

inaccurate/questionable negative items have been removed; creating a customized action plan to help improve the customer's credit score; and providing credit counseling and coaching to customers so that they can make educated and informed decisions about their personal credit for themselves. (*Id.* ¶ 29.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶ 29, ECF No. 123.

13. Key Credit has a proven track record in assisting its customers in disputing and removing inaccurate, negative items on their credit reports. (*Id.* ¶ 30.) Key Credit's comprehensive, multi-faceted approach also includes counseling and educating its customers on how to build and maintain a healthy mix of credit, how to negotiate accurate debts down to an amount that can be more easily paid off, and how to prioritize accurate, negative items for payment and resolution. (*Id.* ¶ 31.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 30-31, ECF No.

123.

14. As a long-standing "A"-rated member of the Better Business Bureau, Key Credit enters into written contracts with all of its qualified customers. (*Id.* ¶ 32.) The contracts are short, written in plain language, and contain all disclosures required under CROA. (*Id.* ¶ 33.) Customers only sign the agreements "[w]hen they are ready to engage with [Key Credit] but before they become a client." (Pl. Ex. 4 at 53:15-21.) The written contracts also explicitly set forth the scope of the services it provides to its customers, clearly stating that:

- Key Credit "agrees to evaluate the Client's current credit profile and will advise Client on the necessary steps to legally remove information that is not accurate, complete, or verifiable."
- Key Credit "will provide the following credit repair services . . . [s]uch services will include attempts to remove inaccurate, erroneous, and/or obsolete credit information reported by Equifax, Experian and TransUnion to the Client's Credit Report . . . . will continually analyze and review Client's status . . . will respond to, receive, and/or initiat[e] correspondence from Client. . . will assist Client in responding to, receiving, and/or initiating correspondence via email regarding Client's Credit Report(s) . . . will create letters and/or emails and/or faxes and/or electronic communications and/or other written communications for Client in an attempt to correct errors and other items appearing on the Client's credit reports which Client indicates are inaccurate, incomplete, outdated, or unverified as per the [FCRA]. This includes preparation and transmittal of written correspondence to credit bureaus to verify and/or dispute items appearing on the Client's credit report. [Key Credit] will review and analyze all correspondence received from credit bureaus, creditors, and others . . . will conduct follow up calls with Client to discuss Client's status and strategy . . . will review the Client's credit report updates to determine subsequent steps . . . will assist Client with credit questions."
- Key Credit "will prepare all necessary correspondence in dispute of all inaccurate and unverifiable information on Client's credit reports (Experian, Equifax, TransUnion) and will stamp and mail for client. . . will prepare and mail to each

> collection agency that can validate a debt a settlement offer. . . will agree to prepare and mail each collection agency a formal validation request to ensure Client is only paying off verifiable and accurate collections. . . [and] agrees to provide unlimited advice and credit coaching to Client."

(KCR SUF, ¶ 34.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 32-34, ECF No. 123.

15. Plaintiffs do not allege or claim that Key Credit's services described above were "bogus" or that it failed to perform its contracted-for services whatsoever. (*Id.* ¶ 35.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶ 35, ECF No. 123.

16. In their contracts, Key Credit and its customers also agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (*Id.* ¶ 36.) Finally, Key Credit's consumers explicitly acknowledge and agree in their written contracts that Key Credit "makes no other express or implied promises or guarantees as to the result or outcome of its services except as outlined in this agreement." (*Id.* ¶ 37.) Each customer also expressly acknowledges that "I have read this Service Agreement and Contract and fully understand and agree to its terms and conditions. Nothing has been promised to me that is not in this agreement." (*Id.* ¶ 38.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 36-38, ECF No. 123.

17. If customers provide Key Credit with access to their credit reports, then Key Credit can and does track credit score changes and improvements in the first 90 days of service. (Pl. Ex. 4 at 174:22-175:19; 176:12-177:6.)

**Plaintiffs' Response:** Disputed. The evidence cited does not establish that Key Credit "can and does track credit score changes and improvements in the first 90 days of service." The testimony cited says Key Credit may track scores in "certain cases." Key Credit cites no other evidence to show that it routinely tracks or calculates either (1) the average credit score changes of its customers or (2) its customers' credit score improvements in the first 90 days of services. And Key Credit does not track whether its services result in the removal of, or permanent

removal of, negative items from customers' credit reports. *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 60, 62, ECF No. 123.

18. Key Credit does not offer "bogus" services or schemes that "take consumers' money for services that the seller has no intention of providing and in fact does not provide," much less place any conditions on the receipt of fees for "promised results" that any fair and reasonable person could view as "outright theft." (KCR SUF, ¶ 39.) Key Credit also does not and has never engaged in the practice of "flooding" CRAs with dispute letters, whether with the purpose of temporarily removing negative tradelines or otherwise. (*Id.* ¶ 40.) Nor has Key Credit ever encouraged customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with borrowed funds)," but do nothing else. (*Id.* ¶ 41.) Further, Key Credit has never been found to have violated any provision of CROA, including CROA's prohibition against false or deceptive advertising or conduct. (*Id.* ¶ 42.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 39-42, ECF No. 123.

19. After a customer signs the written contract, Key Credit waits a minimum of five business days before allowing a customer to make a payment. (KCR SUF, ¶ 43.) Key Credit does so only after the "first work" is fully completed. (*Id.*) "First work" consists of analyzing the customer's credit reports, completing all required data entry, creating all dispute letters, and auditing the credit records. (*Id.*) Subsequent fees are billed on a monthly basis in accordance with the written contracts for services that are fully performed before that fee is charged. (*Id.*) Key Credit's customers determine how long they choose to use Key Credit's services and always retain the right to cancel at any time without penalty. (*Id.* ¶ 44.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 43-44, ECF No. 123.

20. Key Credit provides various safeguards to ensure that its services are accurate and provide "complete clarity" to its customers. (KCR SUF, ¶ 45.) First, Key Credit enters into written contracts that clearly and unambiguously set forth the specific services that Key Credit agrees to provide and what Key Credit does (and does not) promise. (*Id.* ¶ 46.) In addition to listing its specific services, Key Credit and its customers agree that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." (*Id.* ¶ 47.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 45-47, ECF No. 123.

21. Second, Key Credit provides its representatives with scripts and trains its sales representatives on understanding credit scores, understanding Key Credit's action plans,

interacting with customers, and important regulatory information. (*Id.* ¶ 48.) Sales representatives do not follow scripts verbatim and instead use them for general guidance. (Pl. Ex. 4 at 43:7-19.) In its scripts for sales consultants, Key Credit advises prospective customers that "if there is something they want to challenge [on their credit reports], we'll challenge it for them. We will do the leg work, we'll create and mail the letters for them . . . . We'll be their credit coach while they're with us . . . [and that] if they follow the action plan and if they really understand how their credit works that they can improve their credit score." (KCR SUF, ¶ 49.) Key Credit also trains its sales consultants that "We do not guarantee a specific score change" and "do not guarantee a specific deletion rate" to its customers. (*Id.* ¶ 50.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 48-50, ECF No.

123.

22. Key Credit also informs sales representatives to:

- "Never promise a timeline
- Never promise we can delete something
- Never tell someone we will get all of the items removed
- Results always vary
- We are brutally honest and that is what's [sic] sets us apart
- Always
  - Let clients know only something that cannot be verified can be deleted
  - Let clients know that if something cannot be verified it cannot remain on credit
  - We increase the odds of removing more items than other companies because we work on all 3 [credit reporting] agencies at the same time and every negative record
  - Give examples of how something can be removed and explain our process.
- Please be careful not to overpromise. This is the only thing that can quickly end a career. The best salesman [sic] are brutally honest."

(*Id.* ¶ 51.) Key Credit also trains its customer service and sale representatives to "never promise a timeline; never promise we can delete something; never tell someone we will get all of the items removed; results always vary." (*Id.* ¶ 52.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 51-52, ECF No.

123.

23. The customer experience begins with phone calls between prospective customers that can consist of short calls (that may last for 30 seconds) or full consultations (that include reviewing a customer's credit report and going through the customer's goals and the enrollment process). (*Id.* ¶ 53.) A full consultation can last up to two hours. (*Id.*) During a full consultation, Key Credit's sales representatives spend substantial time educating prospective customers "through and beyond [the] basics of just removing inaccuracies from their credit report,"

explaining "what makes up a credit report, how the FICO score algorithm works," and empowering prospective customers "on how they, themselves, without ever signing up or needing [Key Credit] to do anything for them could increase their credit scores by paying down debts, paying off balances, [and] using credit more intelligently." (*Id.* ¶ 54.)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 53-54, ECF No. 123.

24. Finally, Key Credit regularly monitors customer calls and grades (and sometimes fires) representatives who deviate from these policies. (KCR SUF, ¶ 55.) The Quality Control process includes listening to phone calls between sales associates and prospective customers and utilizing a quality control checklist for each call to ensure that sales associates comply with sales and "compliance-based" training and to enforce that "things that are not allowed to be said and that are fireable offenses." (*Id.* ¶ 56.) Key Credit's Head of Quality Control also listen to these calls to ensure quality control. (*Id.*)

**Plaintiffs' Response:** *See* Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 55-56, ECF No. 123.

25. Approximately 15 years ago when he started Key Credit and had no other employees, Mr. Tsoukalis engaged directly with consumers in the sale of Key Credit's services and conducted more than 15,000 sales consultations himself. At that time, "like many small businesses, [Mr. Tsoukalis] did everything from speaking to clients and washing the windows and literally cleaning the office and the ordering supplies and even cleaning bathrooms, typical of many small businesses. (Pl. Ex. 5 at 8:2-9; see also Pl. Ex. 4 at 176:24-177:4.)

**Plaintiffs' Response**: Undisputed.

26. During the company's early years, Mr. Tsoukalis' personally "review[ed] thousands of credit reports" and personally provided credit repair services to Key Credit's customers. (*See* Pl. Ex. 4 at 35:9-17, 175:20-177:21.)

**Plaintiffs' Response:** Undisputed.

27. Over time as the business grew, Key Credit created "a management team in charge of many of the day-to-day tasks of the company." (Pl. Ex. 5 at 20:25-21:8, 25:1-6; Suppl. Hudson Aff., Ex. P at 88:1-18, 90:6-12 (Tsoukalis Dep.) (as Key Credit was "growing, while I would love to have my hands in everything, there are a lot of moving parts and so much of the work is being delegated"); Pl. Ex. 5 at 13:8-11.)

**Plaintiffs' Response:** Undisputed that Tsoukales formed a management team, but this fact is immaterial to Tsoukales's individual liability.

28. Key Credit has "an entire team of managers and team leaders and staff that handles the day to day. I [Mr. Tsoukalis] don't . . . ." (Pl. Ex. 5 at 25:1-6; *see also* Suppl. Hudson Aff., Ex. P at 44:13-19 (Tsoukalis Dep.).) Along with Mr. Tsoukalis, Key Credit's senior leadership consisted of Jennifer Hadayia (Vice President of Customer Service), Melina Vallas (Head of Sales), Maria Steeves (Head of Operations), and Alejandra Martinez (Head of Quality Control). (KCR SUF, ¶ 26; *see also* Pl. Ex. 5 at 16:4-9, 27:6-15, 27:20-22; Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II).)

**Plaintiffs' Response**: Disputed to the extent Tsoukales's testimony is mischaracterized by removing the word "mostly," which clarifies the statement and changes its meaning. Specifically, Tsoukales answered a question about whether consumers contact him directly with complaints by testifying that there is "an entire team of managers… that handle the day to day. I don't, mostly." Tsoukales does not testify that he *does not* handle any "day to day" activities. Plaintiffs do not dispute the second sentence, which is immaterial.

29. For the past ten years, Ms. Hadayia, as the Vice President of Customer Service, has been responsible for the daily management of staff and customer relations, including interviewing new customer service support members; training new staff members; managing customer complaints; and handling cancelled customer files. (Hudson Aff. (Dkt. 114), Ex. H at 13:17-25, 15:6-17 (Hadayia Dep.) ("[I]n the end I am the one that actually cancels a file out."); Pl. Ex. 5 at 26:23-27:5.) As part of the management team, Ms. Hadayia was regarded as the most qualified team member than Mr. Tsoukalis to handle client support issues. (Pl. Ex. 5 at 24:13-25.)

**Plaintiffs' Response:** Undisputed but immaterial.

30. Mr. Tsoukalis long ago stopped taking the customer service and sales calls himself. (Pl. Ex. 4 at 13:4-10; Pl. Ex. 5 at 8:1-9.) Mr. Tsoukalis does not "field those responses [to complaints]. Those responses are dealt with by [Key Credit's] client support team, Jennifer Hadayia." (Pl. Ex. 5 at 26:23-27:5.) Mr. Tsoukalis would be involved only if a complaint was provided to the "customer support team and someone from the team shared that with me and possibly asked me for guidance., in which case I would give it or ask the head of our client support team . . . to address the issue appropriately." (Pl. Ex. 5 at 24:17-25.) As such, customer complaints are directed to team leaders and members of management who handle Key Credit's day-to-day tasks, rather than Mr. Tsoukalis. (Pl. Ex. 5 at 25:1-6.)

**Plaintiffs' Response:** Disputed. The first sentence is vague because the term "long ago" is not defined. The second sentence is contradicted by the third sentence: first stating that complaint responses are "dealt with" by Ms. Hadayia; but then admitting that Tsoukales does

still get involved with complaints. Likewise, the fourth sentence states that complaints are directed to team leaders and management, but again, the prior sentence admits that Tsoukales does still get involved with complaints. And Defendants' statements in this paragraph do not refute the fact that Tsoukales has handled consumer complaints as established by his own testimony and evidence of complaints received and reviewed by Tsoukales. (*See* Pls.' Statement of Facts ⁋ 70, ECF No.117 (Tsoukales receives and reviews consumer complaints, responds to Better Business Bureau (BBB) complaints, and guides staff on how to respond to other consumer complaints); Pls.' Ex. 5 at 24:13-25 (Tsoukales Dep.); Pls.' Ex. 90 at KCR_0002497 (2017 consumer complaint sent to Tsoukales); Pls.' Ex. 90 at KCR_0002497 (2017 consumer complaint sent to Tsoukales); Pls.' Ex. 91 at KCR_0006728 (2019 consumer complaint sent to Tsoukales; Pls.' Ex. 92 at KCR_0007379 (2020 consumer complaint sent to Tsoukales); Pls.' Ex. 93 at KCR_0019375 (2016 consumer complaint sent to Tsoukales); Pls.' Ex. 94 at KCR_0021114 (2019 consumer compliant sent to Tsoukales); Pls.' Ex. 1 at ¶ 14-20 (Schneider Decl.)).

31. Melina Vallas, Key Credit's Head of Sales for the past ten years, has supervised the sales department and its operations, including the hiring, firing, and daily management of approximately 20 sales agents. (Suppl. Hudson Aff., Ex. P at 32:7-10 (Tsoukalis Dep.); Pl. Ex. 5 at 27:6-22.) In her role, Ms. Vallas is responsible for revising Key Credit's customer agreements, which detailed customer billing and payment authorization, and drafting and revising call scripts. (Suppl. Hudson Aff., Ex. P at 136:6-13 (Tsoukalis Dep.); Pl. Ex. 4 at 72:2-13.)

**Plaintiffs' Response:** Undisputed but immaterial.

32. Ms. Vallas is Key Credit's "head of sales" and she, not Mr. Tsoukalis, and "runs" the sale department and "is in charge of making decisions about to who to hire and terminate." (Pl. Ex. 5 at 27:6-15, 27:20-22.) Issues and practices regarding Key Credit sales representatives are "formulated collectively" by Key Credit's "head of sales, client support, sales team leaders, support team leaders, operations, managers, and team leaders." (Pl. Ex. 5 at 17:10-17.)

**Plaintiffs' Response:** Disputed. Tsoukales testified that he has handled "everything" at the company, including oversight of the sales department and decisions about hiring and firing.

(Pls.' Ex. 4 at 56:2-8 56:11-62:14 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Pls.' Ex. 6 at 27:7-28:1 (Tsoukales IH)). Plaintiffs do not dispute that Ms. Vallas has a role or also participates in such activities to some extent.

33. Mr. Tsoukalis does not draft sales scripts, which is instead handled by "a management team in charge of many of the day-to-day tasks of the company." (Suppl. Hudson Aff., Ex. P at 41:14-23, 44:6-19, 47:3-20 (Tsoukalis Dep.); Suppl. Hudson Aff., Ex. S at 20:25-21:8 (Tsoukalis Dep. II).)

**Plaintiffs' Response:** Disputed. Tsoukales testified under oath that he has drafted sales scripts. (Suppl. Hudson Aff., Ex. P at 44:6-11 ("if someone has created a script outside of a script that I have created, that's very possible. But I would like to believe that the scripts that I created are the most correct and accurate scripts for our team."); Pls.' Ex. 6 at 52:5-10 (Investigational Hearing (IH) of Tsoukales, May 16, 2019) ("I create how someone should answer the phone. I've created the script "Q. Has anybody else drafted scripts; A. No.")).

34. Alejandra Martinez, Head of Quality Control, is responsible for listening to sales agents' phone calls; ensuring quality customer service and sales agent performance; compiling sale agents' call scores and safeguarding sales agent compliance. (Suppl. Hudson Aff., Ex. P at 154:14-155:5, 155:17-156:1 (Tsoukalis Dep.).) Mr. Tsoukalis does not review sales calls made by Key Credit's sales representatives. (Pl. Ex. 5 at 19:17-20.)

**Plaintiffs' Response:** Disputed. Tsoukales reviewed sales calls as recently as January 2022. (*See* Pls.' Ex. 5 20:08-17 ("Q: So I was asking if you listened to calls. Do you engage in listening to calls today or, I mean, in general? A: Right now, October of 2022, in this period, no; in the past, of course. Q. Okay. So this is from January of 2022. So in the last five years, were you listening to calls? A. Yes, I have listened to calls in the last five years. Q: Okay. And do you review sales grade summaries of calls? A: Yes.")). Plaintiffs do not dispute the first sentence in ¶ 34.

35. In addition to Key Credit's management team, many other important tasks are the responsibility of various third-parties, marketing agencies and freelancers that are not run by the company. (Pl. Ex. 4 at 108:14-109:17; Pl. Ex. 5 at 19:10-16.) For example, Key Credit's service

agreements are created by Key Credit's regulatory lawyers at the law firm of Greenspoon Marder, who also advise Key Credit on the fees charged to its customers. (Pl. Ex. 4 at 52:16-21; Pl. Ex. 5 at 17:25-18:1-13.)

**Plaintiffs' Response:** Undisputed but immaterial.

36. Key Credit's website and its content were provided by a third-party company known as Conversion Hut which has responsibility for the website and its contents. (Pl. Ex. 4 at 86:15-87:13, 94:14-95:4.)

**Plaintiffs' Response:** Disputed. Tsoukales testified under oath that he is responsible for the content of Key Credit's website and documents produced by Defendants corroborates his testimony. (*See* Pls.' Statement of Facts ⁋ 67; Pls.' Ex. 4 at 86:24-87:25, 94:14-96:22 (Key Credit 30(b)(6) Dep. (Tsoukales testimony); Pls.' Ex. 83 at KCR_0019586 (email exchange with Tsoukales directing changes to Key Credit website); Pls.' Ex. 84 at KCR_0021134 (email exchange with Tsoukales directing changes to Key Credit website)).

37. Castellum Pro, a third-party contracting company, provided over 55 independent contractors who performed work on behalf of Key Credit as team leads and sales agents. (Suppl. Hudson Aff., Ex. P at 20:11-21:1; 23:12-23 (Tsoukalis Dep.).) Castellum Pro also helped recruit sales agents and handle administrative functions, such as billing and payroll for Castellum Pro contractors. (Suppl. Hudson Aff., Ex. P at 26:13-27:6 (Tsoukalis Dep.).)

**Plaintiffs' Response:** Undisputed but immaterial.