UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION and the COMMONWEALTH OF MASSACHUSETTS *ex rel*. ANDREA CAMPBELL,[1] ATTORNEY GENERAL,<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH EQUITY GROUP, LLC (d/b/a KEY CREDIT REPAIR) and NIKITAS TSOUKALES (a/k/a NIKITAS TSOUKALIS),<br><br>Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * Civil Action No. 1:20-cv-10991-IT <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

MEMORANDUM & ORDER
September 30, 2024

TALWANI, D.J.

Plaintiffs Bureau of Consumer Financial Protection (the "Bureau") and the

Commonwealth of Massachusetts *ex rel.* Andrea Campbell, Attorney General (the

"Commonwealth") bring this action against Defendants Commonwealth Equity Group, LLC

(d/b/a Key Credit Repair) ("Key Credit") and Nikitas Tsoukales. Plaintiffs allege that Defendants

made false representations that Key Credit's actions would remove all negative items from

consumers' credit reports and substantially improve their credit scores, and requested payment in

---

[1] On January 18, 2023, Andrea Campbell assumed the office of Attorney General for the
Commonwealth of Massachusetts. Per Federal Rule of Civil Procedure 25(d), the court
substitutes Attorney General Campbell's name for former Attorney General Maura Healey. Fed.
R. Civ. P. 25(d).

advance of full performance, in violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R.

§ 310, *et seq.*; the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536; the

Massachusetts Consumer Protection Law, M.G.L. c. 93A, § 2 ("Chapter 93A"); and the

Massachusetts Credit Services Organization Law ("MA-CSO"), M.G.L. c. 93, §§ 68A–68E.

Now pending before the court are the parties' <u>Motions for Summary Judgment</u> [Doc.

Nos. 110, 115]. Defendants move for summary judgment on the counts of Plaintiffs' <u>Amended</u>

<u>Complaint</u> [Doc. No. 26] that are based upon, or derive from, violations of the TSR (counts I–V).

Defs.' Mot. for [Partial] SJ [Doc. No. 110]. Plaintiffs move for summary judgment on all nine

counts. Pls.' Mot. for SJ [Doc. No. 115]. For the reasons that follow, Defendants' <u>Motion for</u>

<u>[Partial] Summary Judgment</u> [Doc. No. 110] is DENIED and Plaintiffs' <u>Motion for Summary</u>

<u>Judgment</u> [Doc. No. 115] is GRANTED.

## I.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

when "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under

the governing substantive law, it could affect the outcome of the case. <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Baker v. St. Paul Travelers Ins.</u>, 670 F.3d 119, 125 (1st

Cir. 2012). A dispute is genuine if a reasonable fact-finder could return a verdict for the non-

moving party. <u>Anderson</u>, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). This burden can be satisfied

in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-

moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing on] mere allegation[s] or denials of [the] pleading[s]." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences" are not the functions of a judge when ruling on a motion for summary judgment. Anderson, 477 U.S. at 255. However, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

The filing of cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each party, the appropriate ruling. See Wightman v.

3

Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

## II.  Statutory Background

### A.  The Telemarketing Sales Rule ("TSR")

The TSR is the implementing regulation of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–6108. At Congress's direction, and following notice and comment, the Federal Trade Commission ("FTC") promulgated the TSR. See id. § 6102(b). As discussed further below, the TSR includes a provision limiting sellers and telemarketers from charging an advanced fee (the "advance-fee provision").

The TSR also prohibits sellers and telemarketers from making deceptive representations. Under the TSR, it is illegal for a telemarketer or seller to "[m]isrepresent[], directly or by implication, . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristic of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii).

The Bureau is charged with enforcing "Federal consumer financial laws," and has independent litigating authority. 12 U.S.C. §§ 5563, 5564. The attorney general of any state is also authorized to initiate and enforce civil actions in federal district court to enforce provisions of the TSR. See 15 U.S.C. § 6103(a).

### B.  The Consumer Financial Protection Act ("CFPA")

The ambit of the CFPA includes "covered persons" who "engage[] in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). Among other things,

consumer financial products or services include (1) "financial advisory services," such as "credit counseling," and (2) "collecting, analyzing, maintaining, or providing consumer report information or other account information." 12 U.S.C. § 5481(15)(A)(viii)–(ix). The statute's definition of "covered persons" also includes "related person[s]," who include "any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of . . . such covered person" and (2) "any shareholder . . . who materially participates in the conduct of the affairs of such covered person." 12 U.S.C. § 5481(25)(C)(i), (ii). Such a "related person" is deemed a "covered person for all purposes of any provision of Federal consumer financial law[.]" 12 U.S.C. § 5481(25).

The CFPA prohibits "covered persons" from engaging in deceptive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). A violation of the TSR by a person subject to the CFPA is "treated as a violation of a rule under section 1031 of [the CFPA, 12 U.S.C. § 5531] regarding unfair, deceptive, or abusive acts or practices." 15 U.S.C. § 6102(c)(2). Under the CFPA, it is also unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person" engaging in unfair, deceptive, or abusive acts or practices." 12 U.S.C. § 5536(a)(3).

The Bureau has the authority to enforce the TSR with respect to the offering or provision of a consumer-financial product or service under the CFPA. 15 U.S.C. § 6105(d). The attorney general of any state is also authorized to initiate and enforce civil actions in federal district court to enforce provisions of the CFPA. See 12 U.S.C. § 5552(a)(1).

### C.  Chapter 93A

Chapter 93A of the Massachusetts General Laws prohibits credit services organizations from making or using any "untrue or misleading representations in the offer or sale of [credit

services] or from engag[ing], directly or indirectly, in any act, practice or course of business intended to defraud or deceive a buyer in connection with the offer or sale of such services." M.G.L. c. 93, § 68B(4). A "credit services organization" ("CSO") is a person or entity that "sells, provides, performs, or who represents to sell, provide or perform for the payment of money or other valuable consideration" one or more of three types of services, which include "improving a buyer's credit record, history or rating" and "providing advice or assistance" in support thereof. M.G.L. c. 93, § 68A.

Violations of federal consumer protection laws such as the TSR and CFPA constitute violations of § 2 of Chapter 93A. 940 CMR 3.16; M.G.L. c. 93A, § 2.

Chapter 93A created a statutory mandate for the Attorney General of the Commonwealth to investigate and prosecute any entity or person who "is using or is about to use any method, act, or practice declared by section two to be unlawful." M.G.L. c. 93A, §§ 4, 6.

### D.  Massachusetts Credit Services Organization Law ("MA-CSO")

In Massachusetts, in order to charge any advance fees, a CSO is required to both maintain a $10,000 surety bond written by a company authorized to do business in Massachusetts and establish and maintain a trust account with a Massachusetts bank or savings and loan institution. M.G.L. c. 93, § 68B(1).

In addition, before execution of a contract with, and before the receipt of money or valuable consideration from, a consumer, a CSO must disclose in writing "a complete and detailed description of the services to be performed by the [CSO] and the total cost to the buyer for such services." M.G.L. c. 93, § 68C(5). And every CSO service agreement or contract must set forth "the terms and conditions of payment, including the total of all payments to be made by the buyer, whether to the [CSO] or to some other person." M.G.L. c. 93, § 68D(c) (emphasis

added). A CSO is also required to provide consumers with a written statement "asserting the buyer's right to proceed against the surety bond or trust account required under [§ 68B of the MA-CSO]" along with the name and business address of any such surety company and trust-account depository, together with the name of the trustee and the account number. M.G.L. c. 93, § 68C(6)–(7).

Violations of §§ 68B to 68E of the MA-CSO automatically constitute violations of Chapter 93A.

### III. Defendants' Legal Challenges to the TSR

Defendants move for partial summary judgment on the five counts in the Amended Complaint [Doc. No. 26] that are based upon, or derive from, TSR violations.[2] Four of their arguments are broad challenges to the TSR: (1) implementation of the TSR exceeded the FTC's statutory authority; (2) the TSR violates the First Amendment by placing unconstitutional content-based restrictions on speech; (3) the TSR violates the Equal Protection Clause; and (4) the Bureau's funding is unconstitutional.[3]

Defendants previously raised the four broad challenges to the TSR in their motion to dismiss and these arguments are again rejected. First, the FTC was statutorily authorized to issue

---

[2] Count I alleges a violation of the TSR's advance fee provision; Count II alleges violations of the TSR based on allegedly deceptive representations; Count III alleges a violation of the CFPA based on a violation of the TSR's advance fee provision; Count IV alleges violations of the CFPA based on allegedly deceptive representations; and Count V alleges violations of Chapter 93A based on the Count I and Count III TSR and CFPA violations.

[3] Defendants' final argument (as to counts I, III, and V) that Defendants are not covered by the TSR's advance-fee provision because they do not "promise results" is discussed in the following section.

the TSR because Congress directed the FTC to issue rules "prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 60 15 U.S.C. § 6102(a)(1). The statute "does not require an individual to make unsolicited calls in order to engage in telemarketing [as Defendants argue], but only requires the use of a telephone—which can both make and receive calls." Mem. & Order 7; see also 15 U.S.C. § 6106(4) (defining "telemarketing" by reference to the "use of one or more telephones").

Second, the TSR does not violate the First Amendment. As the court has previously explained, the advance-fee provision is a "restriction . . . on conduct—the timing of payment— not on speech." Mem. & Order 6. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." United States v. Hansen, 143 S. Ct. 1932, 1947 (2023) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)); see also Sorrell v. IMS Health Inc., 564 U.S. 552, 567 (2011) ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.").

Third, the TSR does not violate the Equal Protection Clause. As this court has previously stated, "the legislature must be allowed to 'devise specific rules for businesses in different fields, . . . a reflection of the time-honored tenet that, within wide limits, courts must defer to [ ] legislative classifications construed to further legitimate economic objectives.'" Mem. & Order 6 (quoting Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 7 (1st Cir. 2007)). Here, there was plainly a "rational basis" for the FTC to adopt the advance-fee ban for telemarketed credit-repair services and such a ban furthered the legislature's economic objectives of protecting consumers from paying fees in advance of—and without having seen—any results.

8

Fourth, the Bureau's funding is not unconstitutional. As the Supreme Court concluded while Defendants' motion was pending here, "[t]he Bureau's funding statute contains the requisite features of a congressional appropriation" and "fits comfortably with the First Congress' appropriations practice." CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd., 601 U.S. 416, 435 (2024). The Supreme Court thus affirmed "that the requirements of the Appropriations Clause are satisfied" by the Bureau's statute. Id.

Therefore, Plaintiffs' Motion for [Partial] Summary Judgment [Doc. No. 110] is DENIED as to these challenges to the TSR.

## IV. Cross Motions for Summary Judgment Based on the Factual Record

Plaintiffs move for summary judgment on all nine counts of the Amended Complaint [Doc. No. 26]. Pls.' Mot. for SJ [Doc. No. 115]. These counts can be divided into three groups: (1) claims based on, and derivative of, Defendants' alleged violation of the TSR's advance-fee provision—namely, Count I, which alleges a violation of the TSR's advance-fee provision; Count III, which alleges a violation of the CFPA based on that violation of the TSR's advance-fee provision; and Count V, which alleges violations of Chapter 93A based on those TSR and CFPA violations; (2) claims based on Defendants' alleged violation of the MA-CSO disclosure and trust account requirements—namely, Count VI, which alleges violations of the MA-CSO's disclosure and trust account requirements and Count VIII, which alleges a violation of Chapter 93A based on those MA-CSO violations; and (3) claims based on Defendants' allegedly deceptive representations, namely Counts II, IV, VII, and IX, which allege violations of the TSR, CFPA, MA-CSO, and Chapter 93A respectively based on allegedly deceptive representations.

Defendants' motion, to the extent not addressed above, is limited to the first group of claims. Defendants contend that they are not sellers and telemarketers subject to the advance-fee provision in the TSR.

### A. Factual Background

Key Credit is a limited liability company that was incorporated in Massachusetts in 2007. Defs.' Resp. to Pls.' SUMF ¶ 1 [Doc. No. 120].[4] Tsoukales is Key Credit's founder, CEO, and sole owner. Id. ¶ 2.

Key Credit provides credit-repair or credit-improvement services to consumers. Id. ¶ 3. As part of these services, Key Credit provides counseling to customers who want to challenge questionable tradelines on their credit reports and improve their credit and assists them with the process. Id. ¶ 29. Since 2008, it has been offering credit-repair services nationwide and since 2010 it has been making these offers over interstate telephone calls. Defs.' SUMF ¶ 26 [Doc. No. 112]; Defs.' Resp. to Pls.' SUMF ¶ 6 [Doc. No. 120].

Consumers must speak to one of the company's sales agents to enroll in Key Credit's services. Defs.' Resp. to Pls.' SUMF ¶ 25–26 [Doc. No. 120]. Key Credit's website instructs consumers to call a toll-free number for a "free consultation" or to fill out a "free consultation" form on the website with information that enables the company's sales agents to call consumers.

---

[4] The parties incorporate statements of fact and responses they filed regarding the other side's motion for summary judgment. This court therefore looks at filings for both motions, keeping in mind that on Plaintiffs' motion for summary judgment, inferences are to be drawn in Defendants' favor. Unless otherwise noted, the facts stated above are undisputed.

Tsoukales Dep. 146:20–147:2, Ex. 4 to Pls.' Mot. for SJ [Doc. No. 117-1]; see also Ex. 31 [Doc. No. 117-4] (website screenshot of free consultation page from October 18, 2018).

Since 2008, Key Credit has enrolled thousands of consumers from across the country in its credit-repair services. Id. ¶ 9. Key Credit generally charges $99.95 and $289.95 as a "First-Work Fee" five days to two weeks after enrollment or on a specific date selected by the customer. Id. ¶¶ 15, 42. Key Credit also charges consumers monthly service fees of between $99.95 and $189.95—depending on the program consumers select—until the customer cancels or, in some instances, after a given number of payments are made. Id. ¶¶ 15, 44. Key Credit's monthly charge is typically a static fee; it does not change and it is not related to the credit improvements achieved for customers. Id. ¶ 45.

Key Credit does not set a timeframe for providing all of its credit-repair services to a customer. Id. ¶ 46. Consumers are required to authorize Key Credit to automatically charge or debit both the first-work fees and the monthly fees. Id. ¶ 43. Sales agents request payment information and schedule the first payment during the initial call with consumers. Id. ¶ 41. Defendants charge consumers before providing a consumer report demonstrating that any results have been achieved. Id. ¶ 47. Consumers can cancel their program at any time without penalty. Id. ¶¶ 16–17.

Key Credit uses third-party lead generators, search engine optimization, and paid advertisements such as Google Ads to market its services and generate inbound telephone sales.

Id. ¶¶ 13–16.[5] Since around 2015, Key Credit has also contracted with Castellum Pro Services, a company located in Central America, to conduct a majority of its telephone sales calls with U.S. consumers. Id. ¶ 27.

Tsoukales has personally created thousands of documents related to Key Credit's business activities and generally oversees the company. Id. ¶ 13.[6] When he first started the company and had no other employees, Tsoukales engaged directly with consumers in the sale of Key Credit's services and personally conducted over 15,000 sales, but as the business grew, Key Credit created a team of managers to handle the day to day operations. Id. ¶ 69. Tsoukales continues to work together with the management team to handle Key Credit's marketing. Pls.' Reply to Defs.' Resp. to Pls.' SUMF ¶ 65–68 [Doc. No. 129].[7] Additionally, Tsoukales continues to review Key Credit's sales scripts, including scripts used by third-party lead generators, and has sent emails to sales representatives with tips on how to sell Key Credit's services to prospective customers. Defs.' Resp. to Pls.' SUMF ¶ 71 [Doc. No. 120].

---

[5] Key Credit disputes that it currently pays third-party lead generators to conduct digital marketing campaigns but admits that it has used them during its fifteen years of operation. Defs.' Resp. to Pls.' SUMF ¶ 16 [Doc. No. 120].

[6] Key Credit seeks to "otherwise dispute" this fact and states that "Key Credit has 'an entire team of managers and team leaders and staff that handles the day to day.'" Defs.' Resp. to Pls.' SUMF ¶ 64 [Doc. No. 120]. The court finds that this fact, accepted as true for the purposes of summary judgment, does not detract from Tsoukales overseeing the company—a fact Key Credit does not dispute.

[7] The parties dispute the extent of Tsoukales's involvement with Key Credit's marketing. See Defs.' Resp. to Pls.' SUMF ¶ 65–68 [Doc. No. 120]; Pls.' Reply to Defs. Resp. ¶ 65–68 [Doc. No. 129].

Between March 26, 2016, and December 8, 2018, the following quotations appeared on Key Credit's website pages:

a. "90+ Point Average Credit Score Increase In The First 90 Days";
b. "Average 90 Point Increase In 90 Day"; and
c. "Most of our customers see a 90-Point Increase in 90-Days."

Id. ¶ 19. Key Credit has not identified any customers who gained a ninety-point increase in their credit scores within ninety days but asserts that its "90 point average credit score increase in the first 90 days" statement is based on Tsoukales "review[ing] thousands of credit reports" during the first "five to six years" of the company when he personally provided credit repair services to customers. Pls.' Reply to Defs.' Resp. to Pls.' SUMF ¶ 57, 59 [Doc. No. 129] (citing, e.g., Tsoukales Dep. 35:9–17, 175:20–177:21, Ex. 4 to Pls.' SUMF [Doc. No. 117-1]). Between April 28, 2017, and March 9, 2019, the following quotations also appeared on Key Credit's website pages:

a. "We can also fix Unlimited Items in your credit file";
b. "Clean Up Unlimited Negative Records"; and
c. "We Fix Unlimited Negative Items."

Defs.' Resp. to Pls.' SUMF ¶¶ 20–21 [Doc. No. 120]. Key Credit's agents use sales scripts for general guidance on calls with consumers, which include statements such as "we dispute every single negative item placed on your report . . . ." and "[o]n average when a client comes to us, they are normally around the 350's – 400's and they stay with us for about 6-9 months. On average they graduate our program with a 740 or above." Id. ¶¶ 31–32. In a 2017 email, Tsoukales provided "selling tips" to agents, instructing them to "sell the benefits" of Key Credit's services by telling consumers:

We drastically improve your credit scores so you can start getting approved for things like home loans, car loans and credit cards again. We do this by removing

13

negative items from your credit report. It's a fantastic process and our clients see an average 90 point increase in the first 90 days.

Id. ¶ 34. Key Credit's sales agents have also made statements such as "we . . . challenge every single negative item you have on your credit report," and "we're going to remove all negative items." Id. ¶ 37. The years in which Key Credit featured the above quotations across iterations of its web pages correspond with the years in which Key Credit earned its highest revenue. Defs.' SUMF ¶ 9 [Doc. No. 112].

Key Credit states on its website that it requires "NO CONTRACTS" and "[does not] push consumers into any contracts at all." See Exs. 25, 26, 29, 39 to Pls.' SUMF [Doc. Nos. 117-3, 117-4] (website screenshots from different dates in 2017). On the phone, Key Credit's sales agents require consumers to sign a service agreement in order to enroll in its services. Defs.' SUMF ¶¶ 18, 37 [Doc. No. 112]. The sales agents send the service agreement to consumers while on the phone with them, and ask them to sign and return the agreement during the phone call. See, e.g., Ex. 58 [Doc. No. 117-6] (full sales script); Ex. 68, 46:10–42:25 [Doc. No. 133-19] (transcript of consumer call), Ex. 56, 39:1–40:7 [Doc. No. 133-11] (transcript of consumer call). During calls, at least some Key Credit sales agents refer to the contract as a "DocuSign" and tell consumers that the company does not require contracts. See, e.g., Ex. 68, 36:10–20 [Doc. No. 133-19] ("So it's very simple. Um, as I said, we have no contracts or anything like that, so what I would send out to you is just a small agreement. I'm not sure if you've ever used DocuSign?"). Key Credit's contracts with consumers state that Key Credit "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report), nor will [Key Credit] assist Client on improving Client's credit rating or record." Defs.' SUMF ¶ 36 [Doc. No. 112]. If customers provide Key Credit with access to their credit reports, then

14

Key Credit is able to track their credit score changes over time, including within the first ninety days of service. Id. ¶ 22.

Finally, Defendants do not maintain a trust account. Id. ¶ 30. Nor do Defendants' service agreements with consumers disclose (a) a statement asserting the buyer's right to proceed against the surety bond or trust account, and (b) the name and business address of any such surety company and trust-account depository, together with the name of the trustee and the account number. Id.

### B. Discussion

1. Counts Based Upon, or Deriving From, the TSR's Advance-Fee Provision (Counts I, III and V)

The advance-fee provision of the TSR states:

(a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

. . .

(2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:

(i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

(ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2).

a. Key Credit is subject to the TSR's advance-fee provision

Defendants contend in their Motion for [Partial] Summary Judgment [Doc. No. 110] that they are not subject to the TSR's advance-fee provision. Plaintiffs contend (and must show, for purposes of their Motion for Summary Judgment) that Defendants are subject to those

15

provisions. The court finds that there is no material fact in dispute and that Key Credit is Defendants are subject to the TSR's advance-fee provision.

For purposes of the advance-fee provision, a seller includes any person that "provides . . . goods or services to the customer in exchange for consideration" in connection with a telemarketing transaction. 16 C.F.R. § 310.2(dd). A telemarketer includes any person that "initiates or receives telephone calls to or from a customer" in connection with a telemarketing transaction. 16 C.F.R. § 310.2(ff). Telemarketing is defined as "a plan, program, or campaign which is conducted to induce the purchase of goods or services[,] by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

Key Credit is a seller that provides services to customers and a telemarketer because it uses interstate telephone calls to do so. Since 2010, Key Credit has used interstate telephone calls to market and sell its services to consumers located in almost every state. Defs.' Resp. to Pls.' SUMF 24–25 [Doc. No. 120]. The only way that consumers can enroll in Key Credit's services is through a telephone-based sales agent. Id. ¶ 26. Therefore, it is covered by subsection (a).

Subsection (2) indicates that the provision applies to payment for "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating." Defendants concede in their motion that Key Credit's services are designed to help consumers improve their credit: "Key Credit provides services and counseling to qualified customers who want to challenge questionable tradelines on their credit reports and improve their credit." Defs.' Mem. ISO Mot. for [Partial] SJ 9 [Doc. No. 111]. Hence, Key Credit is covered by subsection (2).

Because Key Credit meets the coverage requirements of § 310.4(a)(2), it is subject to romanettes (i) and (ii), which set specific requirements for a company to solicit and receive

payment for telemarketed credit-repair services. Romanettes (i) and (ii) provide that before they may accept any payment, telemarketers must first allow the time frame in which they indicated their services would be complete to expire and then provide consumers with qualified documentation to demonstrate that they achieved the promised results at least six months after the fact. Importantly, given that the regulation contains an "**and**" between romanettes (i) and (ii), the requirements are conjunctive: Key Credit must satisfy both provisions before it can request or receive payment.

Defendants argue that the "[a]dvance [f]ee [p]rovision explicitly restricts a credit repair company from requesting or receiving payment for its services if, and only if" romanettes (i) or (ii) are triggered." Defs.' Mem. ISO Mot. for [Partial] SJ 15–16 [Doc. No. 111]. But this argument presupposes that romanettes (i) and (ii) limit the coverage provisions of § 310.4(a)(2). However, these are sub-subsections that merely set out preconditions for solicitation and receipt of payments, not <u>who</u> may solicit or receive payment (which is defined by subsection (a)(2)).

Defendants construe the provision to apply only to telemarketers who "promise[] results" and thus to exclude companies who merely provide "services" to consumers. Defs.' Mem. ISO Mot. for SJ 16 [Doc. No. 111]. Thus, Defendants argue, they are exempt from the application of the advance-fee provision, because "Key Credit promise[s] only to perform specified *services* for its customers with no promise or guarantee of any *result* or outcome." <u>Id.</u> at 17 (italics added). Further, they assert that the conduct the Bureau seeks to regulate in this case is different from that proscribed by the advance-fee provision. Defs.' Opp. to Pls.' Mot. for SJ 14 [Doc. No. 119].

Contrary to Defendants' reading of the provision, the rule's text affords no differential treatment to telemarketers who do not promise results to consumers. The plain language of the rule indicates that it applies to telemarketers who "request[] or receiv[e] payment . . . for . . .

services represented to remove derogatory information, or improve, a person's credit history."
(Emphasis added). Thus, the rule does not exempt no-guarantee telemarketers, but rather,
dictates that telemarketers who represent to a consumer that they will remove derogatory
information may not charge that consumer any fees before providing measurable and qualified
results in return.

Nor does the rule exempt telemarketers who fail to provide consumers with any specific
time frame. As provided by the express language in subsection (a)(2) of the TSR, where a
consumer has been billed for a telemarketer's goods or services before the represented time
frame for completion has elapsed, or before the telemarketer has first observed the six-month
waiting period and then provided the consumer with a credit report required by the advance-fee
provision, the telemarketer has violated the TSR. That Key Credit and Tsoukales do not offer
consumers any timeline as to when the contracted-to services would be completed thus serves
only as evidence that they made no effort or attempt to conform with the express requirements of
the advance-fee provision.

The court agrees with the reasoning in CFPB v. Progrexion Marketing, Inc., 2023 WL
2548008 (D. Utah Mar. 10, 2023). The defendants in Progrexion provided services purporting to
help consumers remove derogatory information from their credit reports and thereby improve
their credit scores. Id. at *8. There, defendants were found to have violated the advance-fee
provision of the TSR by charging clients fees on a monthly basis without meeting the
requirements in romanettes (i) and (ii) of subsection (a)(2) the TSR. Id. at *14. Though the
defendants in Progrexion, not unlike those here, creatively argued that they were exempt from
application of the TSR given that they offered no "result whatsoever" to their customers, the
court was unpersuaded by this argument. Id. at *15. The court in Progrexion instead found that

18

the rule's text "does not offer any exception to the six-month waiting period for telemarketers who do not offer 'promised results' . . . [r]ather, romanette (ii) . . . *assumes* that a telemarketer promises a result of some sort[,]" and that this assumption seemed "reasonable". Id. at *16 (italics added).

Because this court concludes that Key Credit is subject to the TSR's advance-fee provision, including romanettes (i) and (ii), Defendants' Motion for [Partial] Summary Judgment on counts I, III, and IV is DENIED as to Key Credit.

>   b.   Tsoukales is subject to the TSR's advance-fee provision

First, Tsoukales, like Key Credit, is also a seller under the TSR because he arranged for others (i.e., Key Credit) to provide credit-repair services in exchange for payment of fees, and this was done through interstate telephone calls. 16 C.F.R. § 310.2(dd).

Individual liability arises under the TSR for an entity's abusive telemarketing acts or practices where an individual: "(1) participated in the acts or had authority to control the corporate defendant and (2) knew of the acts or practices." People v. Debt Resolve, Inc., 387 F. Supp. 3d 358, 368 (S.D.N.Y. 2019) (quoting FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008)); see also FTC v. Pukke, 53 F.4th 80, 105 (4th Cir. 2022) ("Both the TSR and the FTC Act bear the same standards for individual liability."). The second prong is met by showing that an individual "had actual knowledge of the wrongful acts or practices; [] was recklessly indifferent to whether or not the corporate acts or practices were fraudulent; or [] had an awareness of a high probability that the corporation was engaged in fraudulent practices along with an intentional avoidance of the truth." FTC v. Neovi, Inc., 598 F. Supp. 2d 1104, 1117 (S.D. Cal. 2008) (citing FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) (additional citations omitted) (setting forth knowledge standard under the FTC Act).

As to the first prong, "[a]n individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." <u>FTC v. Partners In Health Care Ass'n, Inc.</u>, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016) (citation omitted) (finding that an individual's status as "president and sole officer" was "sufficient to establish the first element of individual liability" without more). Here, Tsoukales is the CEO and sole shareholder of Key Credit, giving rise to the presumption that he can control Key Credit.

The second prong is also easily met here. Tsoukales had actual knowledge of Key Credit's billing practices or was at least recklessly indifferent to whether the practices were unlawful. He testified about Key Credit's fee structure and he authored the company's service agreements, which detail and establish payment authorization for the monthly fees as well as the first-work fee and the timing of payments. Pls.' SUMF ¶¶ 39, 40, 73 [Doc. No. 117].

Tsoukales is also subject to the TSR on the independent basis that he substantially assisted Key Credit in, and was aware of, its alleged violations of the TSR. Under 16 C.F.R. § 310.3(b), it is a violation of the Telemarketing Sales Rule "for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule." The "'threshold for what constitutes substantial assistance is low' . . . and requires showing only more than 'mere causal or incidental' assistance to the telemarketer." <u>CFPB v. Daniel A. Rosen, Inc.</u>, 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) (quoting <u>FTC v. Lake</u>, 181 F. Supp. 3d 692, 700-01 (C.D. Cal. 2016) and the TSR, 60 Fed. Reg. 43842, 43852 (Aug. 23, 1995); <u>see also</u> <u>F.T.C. v. Chapman</u>, 714 F.3d 1211, 1216 (10th Cir. 2013).

Based on the undisputed record, Tsoukales provided substantially more than "mere causal

or incidental" assistance to Key Credit's operations. Chapman, 714 F.3d at 1216–17. The record reflects that Tsoukales has personally overseen the company's operations since the company began offering credit repair services in 2008 and that he continues to be involved in its marketing and customer support efforts. Defendants admit that when Tsoukales started Key Credit, it had no other employees, and thus he "did everything[,]" at the company. Defs.' Resp. to Pls.' Mot. for SJ 25 [Doc. No. 120]. This included engaging one-on-one with consumers in the sale of credit repair services and conducting more than "15,000 sales consultations himself[.]" Id. at 40. Defendants contend, however, that as the business grew, Tsoukales has come to rely on a team of managers and staff to handle most of the day-to-day operations at Key Credit. Id. Further, Defendants claim that Tsoukales rarely deals with consumer complaints at this point and though he receives some reports about the company's call volume, he does not generally review sales calls made by the company's representatives. Id. at 28.

Tsoukales does not need to be involved in most of the day-to-day operations at Key Credit to meet the low threshold showing of substantial assistance under the TSR. Tsoukales is not only responsible for overseeing the company writ large, but the undisputed record indicates that he is an ongoing and active participant in the company's marketing activities. Defendants themselves admit that Tsoukales is personally involved in the company's present-day marketing efforts—including recently managing Key Credit's Google Ad campaigns, making suggestions to its management team, personally creating and appearing in videos for marketing purposes, and sharing personal testimonials about Key Credit's services. Id. at 24–25.

Moreover, it is clear from the record that Tsoukales knew or should have known that Key Credit was engaging in these practices because he was and continues to be closely involved with the company. See Defs.' Resp. to Pls.' SUMF ¶¶ 64–74 (Defendants concede that Tsoukales

"created thousands of documents and oversees the company[]"; reviews sales scripts; sends specific instructions and sales tips to employees; and is a signatory on company accounts).

Viewing these facts in the light most favorable to Defendants, Tsoukales substantially assists Key Credit in its operations and knew or should have known of its conduct. His role in founding and exclusively running the company in its early years alongside his active and ongoing support to its management and marketing teams demonstrate that Tsoukales continues to play an integral role in promoting the services that Key Credit markets to consumers. Tsoukales' involvement suffices to meet the low threshold showing of substantial assistance to a telemarketer under both the TSR and Defendants have failed to raise any genuine issues of fact regarding the same.

Therefore, Defendants' <u>Motion for [Partial] Summary Judgment</u> [Doc. No. 110] as to counts I, III, and V is DENIED as to Tsoukales.

    c.   Count I: Defendants have violated the TSR's advance-fee provision

Key Credit's billing structure violates the TSR's advance-fee provision in two ways. First, Key Credit offers some credit-repair services without a specified end date for its performance. Without offering a definitive time frame for these services, it is impossible for Key Credit to comply with the express requirement of romanette (i) of the advance-fee provision that prohibits credit-repair service sellers from billing consumers until the expiration of a set time frame. The requirement ensures that sellers cannot string along consumers indefinitely—all the while charging them—without providing the requisite services.

Second, Key Credit charges consumers before delivering promised results. Key Credit generally charges consumers between $99.95 to $289.95 for credit-repair services shortly after a consumer enrolls with Key Credit and on a monthly basis thereafter. <u>See</u> Defs.' Resp. to Pls.'

SUMF ¶¶ 40–44 [Doc. No. 120]. However, under romanette ii of the advance-fee provision, in order for Key Credit to collect any fees from consumers, it must wait for six months after the time frame for delivery of its services has elapsed and it has demonstrated credit improvement or any other result to consumer—such a result being in the form of a credit report. See Progrexion Mktg., 2023 WL 2548008, at *5 (finding that a credit-repair company violated the TSR's advance-fee provision by charging monthly fees "without waiting six months and without providing a consumer report at the six-month mark showing results have been achieved"). Therefore, even in instances where Key Credit sets a definitive time-frame for its services, its method of charging fees beginning within five business days of enrollment violates the TSR's advance-fee provision.

Accordingly, Plaintiffs are entitled to summary judgment on Count I of their Amended Complaint for both Defendants' violations of the TSR's advance-fee provision.

### d.  Count III: Defendants' violations of the TSR's advance-fee provision are also violations of the CFPA

#### i.  Key Credit is subject to the CFPA and liable to Plaintiffs

Key Credit is a "covered person" under the CFPA because it offers a consumer financial product or service such as "credit counseling." 12 U.S.C. § 5481(6); 12 U.S.C. § 5481(15)(A)(viii). Under the CFPA, it is unlawful for covered persons to commit any act or omission that violates a "[f]ederal consumer financial law." 12 U.S.C. § 5536(a)(1)(A). As indicated above, the TSR was promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention Act, which provides, in relevant part, that a violation of the TSR committed by covered persons "shall be treated as a violation of a rule under § 1031 of [the CFPA] regarding unfair, deceptive, or abusive acts or practices." 12 U.S.C. § 5531; 15 U.S.C. § 6102(c)(2). The

TSR is a federal consumer financial law. See 12 U.S.C. § 5481(14). Thus, a violation of the TSR's advance-fee provision by a covered person, as demonstrated above, is also a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

> ii.   Tsoukales is individually liable for Key Credit's CFPA violations

Tsoukales is also individually subject to the CFPA due to his close ties with Key Credit. Specifically, Tsoukales is a "related person" under the CFPA. Related persons include (1) "any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of . . . such covered person" and (2) "any shareholder . . . who materially participates in the conduct of the affairs of such covered person." 12 U.S.C. § 5481(25)(C)(i), (ii). As CEO and sole shareholder of Key Credit, Tsoukales is a controlling shareholder of a covered person. He also materially participates in its affairs: he oversees "everything" at the company, he established and is a signatory on its bank accounts, and he directed the company's marketing. Therefore, he is a "related person" under the CFPA and is thus individually covered by that statute. Pls.' SUMF ¶¶ 64–74 [Doc. No. 117].

Tsoukales is also subject to the CFPA because he substantially assisted Key Credit in, and was aware of, its allegedly abusive practices. It is a violation of the CFPA for "any person to knowingly or recklessly provide substantial assistance to a covered person" engaging in unfair, deceptive, or abusive acts or practices. 12 U.S.C. § 5536(a)(3); see also CFPB v. D & D Mktg., 2016 WL 8849698, at *11 (C.D. Cal. Nov. 17, 2016) (same); CFPB v. Nesheiwat, 2022 WL 17958636, at *2 (9th Cir. Dec. 27, 2022) (explaining that the analysis regarding liability for substantial assistance under the CFPA is similar to the analysis under the TSR). For the reasons described supra IV.B.1.b, Tsoukales substantially assisted Key Credit in its acts or practices allegedly violating the CFPA.

24

Accordingly, Plaintiffs are also entitled to summary judgment on Count III of their Amended Complaint for Defendants' violations of the CFPA.

> e. Count V: Defendants' violations of the TSR's advance-fee provision are also violations of Chapter 93A

Both Key Credit and Tsoukales are subject to Chapter 93A. First, each is a credit services organization ("CSO") defined under the Massachusetts Credit Services Organization Act ("MA-CSO") as any person or entity that "sells, provides, performs, or who represents to sell, provide or perform for the payment of money or other valuable consideration any of the following services: (i) improving a buyer's credit record, history or rating." M.G.L. c. 93, § 68A. Because Tsoukales and Key Credit are each a person or entity representing to sell services including improving a buyer's credit record, both Defendants are considered CSOs and are thus covered by the MA-CSO and Chapter 93A.

Under Chapter 93A, violations of federal consumer protection laws such as the TSR and CFPA also constitute violations of Section Two of Chapter 93A, which prohibits unfair or deceptive acts or practices in the conduct of business in Massachusetts. See 940 CMR 3.16(4); M.G.L. c. 93A, § 2. Defendants here violated the TSR's advance-fee provision and the CFPA, as explained supra IV.B.1.c–d. Moreover, both the TSR and CFPA are federal consumer protection laws within the purview of M.G.L. c. 93A § 2. Thus, Defendants' violations of TSR's advance-fee provision and consequent CFPA violation also necessarily violate Chapter 93A. Accordingly, Plaintiffs are entitled to summary judgment on Count V of their Amended Complaint for Defendants' violations of Chapter 93A.

2.   Counts Based Upon, or Deriving From, the Defendants' Violations of the MA-CSO Disclosure and Trust Account Requirements

   a.   Count VI: Defendants' violations of the MA-CSO disclosure and trust account requirements

      i.   Defendants' failure to provide the disclosures required by M.G.L. c. 93, § 68C(5) and M.G.L. c. 93, § 68D(c)

The MA-CSO requires CSOs, like Key Credit and Tsoukales, to provide consumers with certain disclosures prior to entering a contract for services. M.G.L. c. 93, §§ 68C, 68D; see supra IV.B.1.e. (explaining that both Defendants are CSOs subject to the MA-CSO). Before the execution of a contract, CSOs are required to make available to the consumer in writing: (a) a statement asserting the buyer's right to proceed against the surety bond or trust account required § 68B of the MA-CSO and (b) the name and business address of any such surety company and trust-account depository, together with the name of the trustee and the account number. M.G.L. c. 93, § 68C. Also, before execution of a contract and before the receipt of fees from a consumer, CSOs must disclose in writing "a complete and detailed description of the services to be performed by the [CSO] and the total cost to the buyer for such services." M.G.L. c. 93, § 68C(5).

Defendants do not dispute that they did not make the requisite pre-contract disclosures to consumers under the MA-CSO. Defs.' Resp. to Pls.' SUMF ¶ 30 [Doc. No. 120]. Moreover, Defendants' service agreements fail to disclose the "total cost to the buyer" or the "total of all payments to be made by the buyer." Instead, Defendants' agreements note that "the client understands that they are paying on a month-to-month basis," and disclose only (i) the first-work fee, to be paid within five days of execution, and (ii) the monthly service fee plus "expedited billing processing fee," to be charged "each subsequent month" after the first-work fee. See Pls.'

SUMF ¶ 50 (citing examples of Defendants' services agreements). Defendants' service agreements thus provide that consumers are to be charged monthly fees for an indefinite amount of time, and such fees will stop only when and if a client cancels in writing. As such, Defendants' service agreements are unable to disclose the "total cost" to Key Credit's consumers and fails to comply with the requirements of the MA-CSO accordingly.

        ii.    Defendants' failure to maintain a trust account in violation of the MA-CSO

The MA-CSO also requires credit services organizations to establish "a trust account at a federally insured bank or savings and loan association" in Massachusetts. M.G.L. c. 93, § 68B. While Defendants do maintain a surety bond required under MA-CSO, they admit that they have not established the required trust account. Defs.' Resp. to Pls.' SUMF ¶ 78 [Doc. No. 120].

Defendants contend, however, that they have not violated Section 68B because they do not charge advance fees to consumers. Defs.' Opp. to Pls.' Mot. SJ 30–31 [Doc. No. 119]. However, as previously discussed, Defendants do charge fees to consumers—both "first work" fees and monthly fees—and these fees are charged "prior to full, complete and satisfactory performance" of services. See supra IV.B.1.c; M.G.L. c. 93, § 68B. Because Defendants have charged advance fees to consumers without having established the required trust account, they are in violation of the express requirements of the MA-CSO. M.G.L. c. 93 § 68B(1). Defendants' failure to maintain the requisite trust account serves further to indicate that Defendants neglected to provide the required disclosures under the MA-CSO, and Defendants do not dispute as much. Defs.' Resp. to Pls.' SUMF ¶ 79 [Doc. No. 120]; see also M.G.L. c. 93, § 68C(6)–(7).

Accordingly, Defendants have failed to raise any genuine issues of material fact regarding these claims. Plaintiffs are entitled to summary judgment on Count VI of their

Amended Complaint for Defendants' failures to comply with the express requirements of the MA-CSO.

>       b.   Count VIII: Defendants' violations of the MA-CSO's trust account and
>            disclosure requirements also constitute violations of Chapter 93A

Furthermore, Defendants' violations of Sections 68B and 68C(6)–(7) of the MA-CSO, as explained supra IV.B.2.a, also necessarily constitute violations of Chapter 93A. M.G.L. c. 93, § 68. Section 68 dictates that a violation of any section of the MA-CSO relating to the conduct of CSOs in Massachusetts (i.e., §§ 68B to 68D of M.G.L. c. 93) "shall [also] constitute a violation of" Chapter 93A. M.G.L. c. 93, § 68. Given that Defendants are CSOs under the definitions provided by both the MA-CSO and Chapter 93A, see supra IV.B.1.e, and Defendants' violations of the MA-CSO are directly related to their credit repair services, Defendants' violations of the MA-CSO are also violations of Chapter 93A. Plaintiffs are thus entitled to summary judgment for Count VIII due to Defendants' violations of the MA-CSO and Chapter 93A.

>   3.   Counts Based Upon Defendants' Allegedly Deceptive Representations
>        (Counts II, IV, VII, IX)

The remaining claims are based on Defendants' allegedly deceptive representations about their services, which Plaintiffs argue violate the TSR, CFPA, MA-CSO, and Chapter 93A. Plaintiffs claim Defendants made certain statements amounting to two types of deceptive representations about Key Credit's services: (1) consumers would see substantial increases to credit scores; and (2) all negative items would be removed from credit reports. Defendants contend that their statements meant that consumers could have *eligible* negative items removed from their credit reports and could *potentially* see improvements in their credit scores and that Plaintiffs have not proven that Defendants' statements are likely to mislead consumers.

28

a.  Count IV: Defendants' violations of the CFPA for deceptive
     representations

An act or practice is deceptive under the CFPA when there is (1) a representation,
omission, or practice (2) that is likely to mislead consumers acting reasonably under the
circumstances, and (3) that is material. FTC v. Patriot Alcohol Testers, Inc., 798 F. Supp. 851,
855 (D. Mass. 1992) (citing In re Cliffdale Assocs., Inc., 103 F.T.C. 110, 165 (1984)).

Defendants do not dispute the first element: that the alleged representations were made.
See Defs.' Opp. to Pls.' Mot. for SJ 18 (challenging Plaintiffs' showing only as to the second and
third requirements for deceptive representations) [Doc. No. 119]. More specifically, Defendants
do not dispute that statements such as "Average 90 Point Increase In 90 Days[,]" were displayed
across their website, and statements such as  "the majority of our clients . . .get 90 points in 90
days as an average," were made in calls with consumers. Defs.' Resp. to Pls.' SUMF ¶¶ 5, 12
[Doc. No. 120]. Defendants also do not dispute that statements such as "We can also fix
Unlimited Items in your credit file"; "Clean Up Unlimited Negative Records"; and "We Fix
Unlimited Negative Items" appeared in iterations of Key Credit's web pages between 2017 and
2019. Defs.' Resp. to Pls.' SUMF ¶¶ 6-7 [Doc. No. 120]. Defendants concede that these
statements appeared across Key Credit's website, in sales scripts and call transcripts, and that
Tsoukales instructed sales agents to make similar representations to consumers. See Defs' Resp.
to Pls.' SUMF ¶¶ 18, 19, 21, 22, 29, 30, 32–36 [Doc. No. 120],

As to the third element, a "material representation is one that 'involves information that is
important to consumers and, hence, likely to affect their choice of, or conduct regarding, a
product.'" Patriot Alcohol Testers, Inc., 798 F. Supp. at 855 (quoting In re Cliffdale Assocs.,
Inc., 103 F.T.C. at 165). Materiality is presumed with express claims, intended implied claims,

and claims pertaining to the central characteristic of the product. See Fanning v. FTC, 821 F.3d 164, 172–73 (1st Cir. 2016); see also FTC v. Pantron I Corp., 33 F.3d 1088, 1095–96 (9th Cir. 1994) ("Express product claims are presumed to be material"). Here, Key Credit expressly made both representations at issue on its website and during phone calls with customers. The claims in the statements—that Key Credit's services have significantly improved a vast majority of customer's credit scores and that they remove unlimited negative items from credit reports—are core to credit-repair services and are the reason consumers pay for such services. Cf. 60 Fed. Reg. 43,842, 43,853 (Aug. 23, 1995) (explaining that credit-repair services include promises to improve a consumer's credit record by removing negative information). Therefore, both representations at issue are material, and Defendant has failed to demonstrate otherwise.

That leaves in dispute only the second element: whether the representations were likely to mislead. A representation is likely to mislead a consumer if it is false or if it is not supported by a reasonable basis. Pantron I Corp., 33 F.3d at 1096 (9th Cir. 1994). Courts evaluate "each representation as a whole[,] . . . in context rather than in isolation. FTC v. Patriot Alcohol Testers, Inc., 798 F. Supp. 851, 857 (D. Mass. 1992). Defendants allege that their statements were taken out of context, are incomplete, or do have a reasonable basis. See Defs.' Opp. to Pls.' Mot. for SJ [Doc. No. 119]; Defs.' SUMF ¶¶ 36, 52 [Doc. No. 112].

    i.  Representation I: Plaintiffs' purported success in obtaining substantial
        increases in clients' credit scores

Plaintiffs contend that the statements concerning an average 90 point increase in 90 days are not substantiated by a reasonable basis. They point to the inability of Defendants to identify a single customer who gained at least a ninety-point increase in their credit scores within ninety days.

The court agrees with Plaintiffs. Defendants make three arguments for why this representation could not mislead a reasonable consumer, but each argument fails. First, Defendants argue that statements surrounding consumers' *average* credit score improvement cannot mislead consumers because they are not "guarantees." See Defs.' Opp. to Pls.' Mot .for SJ 18–20 [Doc. No. 119]. But a representation need not be a guarantee to be subjected to the requirement of a reasonable basis. Any "affirmative information about a product's attributes, performance or efficacy . . . require[s] some level of substantiation in support." In re Removatron Int'l Corp., 111 F.T.C. 206, 1988 WL 1025512, at *8 (F.T.C. Nov. 4, 1988). The average credit score improvement obtained—and the short window to achieve it—is "affirmative information" about a credit-repair service's efficacy for the same reasons that make such a representation material, as described above. Moreover, the representation here was explicitly reinforced for consumers in multiple phrasings and over multiple interactions (e.g., on the website and over phone calls). "Consumers have no obligation to doubt the veracity of express claims, and . . . unsubstantiated claims are inherently likely to mislead." FTC v. Direct Mktg. Concepts, Inc., 2004 U.S. Dist. LEXIS 11628, at *13 (D. Mass. June 23, 2004) (internal citation and quotations omitted) ("Direct Mktg. Concepts D. Mass.").

Defendants' reliance upon language in Key Credit's contracts with customers to walk back any promise of outcomes does not protect them. This is because Key Credit "cannot make considerable material misrepresentations to consumers and then bury corrections and disclaimers in subsequent communications." See FTC v. E.M.A. Nationwide, Inc., 767 F.3d 611, 631–33 (6th Cir. 2014) (citation omitted) (finding that Defendants' provision of clearer descriptions of their services and disclaimers in written materials, including in contracts, did not negate representations made earlier in phone calls).

31

Defendants' second argument is that Plaintiffs offered no evidence that Key Credit lacked a reasonable basis for its representations. See Defs.' Opp. to Pls.' Mot .for SJ 20 [Doc. No. 119]. But this is belied by the record. Plaintiffs sought during discovery the identification of all customers who gained at least a ninety point credit-score increase in ninety days, and Defendants responded that "Key Credit lacks knowledge or information sufficient to respond to this interrogatory." See Defs. Ans. to Pls.' First Set of Interrogatories, Interrogatory 7 [Doc. No. 117-4].

Defendants' final argument is that Key Credit's statements surrounding consumers' average credit score improvement were based on Tsoukales's personal review of credit reports. Defs.' Opp. to Pls.' Mot. for SJ  20–21 [Doc. No. 119]. Tsoukales testified during his deposition that "the 90-point representation came from 'data' not based on 'an algorithm or spreadsheet,' but in his mind from when he 'was working with people closely . . ." and "personally 'review[ing] thousands of credit reports' during the first 'five to six years' of the company." Tsoukales Dep., 35:9–17; 175:20–177:21, Ex. 4 to Pls.' Mot. for SJ [Doc. No. 117-1].

However, information "in his mind" does not support the specific, quantitative representation of average credit-score improvement at issue here. Defendants' argument hinges upon Tsoukales being able to calculate an accurate average credit score increase based on sheer memory of purportedly reviewing thousands of credit reports and conducting 15,000 sales consultations. Even if this were possible, Tsoukales testified during his deposition and under oath at the Bureau's investigational hearing that he did not know whether a ninety-point credit-score increase in the first ninety days was the actual average, he did not remember whether he had calculated the average, and he did not know whether anyone else at the company had calculated the average. Id. ¶ 60 (citing Tsoukales Dep. 174:22–178:23, Ex. 4 to Pls.' SUMF

[Doc. No. 117-1], Tsoukales Inv. Hrng. Testimony, 92:2–93:16, Ex. 6 to Pls.' SUMF [Doc. No. 117-1]). Moreover, even if Tsoukales's recollection of events from the first five to six years of the company were accurate, the information is stale. Defendants admit that as the business grew, Tsoukales stopped taking any sales calls himself. Defs.' Resp. to Pls.' SUMF ¶ 69 [Doc. No. 120]. Thus, taking Tsoukales' testimony as true, any information about what business outcomes may have in fact looked like in the first five to six years of the company has no meaningful bearing on Key Credit's statements of an average 90 point improvement in 90 days nearly a decade later.

Defendants have not pointed to any hard data from the roughly fifteen years that Key Credit has been in business to substantiate its claims of an average increase of ninety points in ninety days. Nor have they offered records of a single consumer from those fifteen years of doing business who achieved such an increase in the represented time frame. "Neither wishful thinking . . . nor conclusory responses unsupported by evidence will serve to defeat a properly focused Rule 56 motion." Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 15 (1st Cir. 2007).

In sum, Defendants' statements regarding achieving substantial increases in consumers' credit scores are unsubstantiated and as express claims, are considered inherently likely to mislead consumers.

ii.    Representation II: Removing "Unlimited" Negative Items

Plaintiffs' second group of claims about misleading representations concerns statements such as "We Fix Unlimited Negative Items" posted on various iterations of Key Credit's web pages between 2017 and 2019. Defs.' Resp. to Pls.' SUMF ¶¶ 6–7 [Doc. No. 120]. Plaintiffs argue that "Key Credit's representations give the false impression that it can resolve all negative

items, even those that are accurate and timely." Pls.' Mem. ISO Mot. for SJ 17 [Doc. No. 116].

The court agrees. The impression conveyed by the use of the verb "fix" in statements such as "We Fix Unlimited Negative Items."—as opposed to "dispute," "challenge," or "fight," just to name some potential alternatives—is that the negative items on a credit report are within Key Credit's power to fix, <u>even if</u> they are accurately reported and verified by the credit bureaus and timely. Defendants also admit that Tsoukales instructed sales agents to tell consumers "[w]e drastically improve your credit scores . . . by removing negative items from your credit report." [8]

Defendants argue in response that Key Credit's statements about fixing or cleaning up items on credit reports are not intended to mislead consumers about its success in challenging negative items, but instead to serve as a competitive differentiator on the number of items Credit Key will dispute—compared to other credit repair companies that may only dispute a few negative items at a time. <u>See</u> Defs.' Opp. to Pls.' Mot. for SJ 23–24 [Doc. No. 119]. Defendants allege that when viewed in the context of their representations as a whole, the statements indicate only that Key Credit could dispute an unlimited (rather than a limited) number of negative items on consumers' credit reports. Defendants point to statements on Key Credit's website explaining, for example, that it does not charge consumers for each inaccurate item removed from a credit report or "limit the number of inaccurate items worked on." Defs.' Opp. to Pls.' Mot. for SJ 23 [Doc. No. 119]; <u>see also</u> Supp. Aff. of Timothy A. Hudson, Ex. Q [Doc. No. 121]. ("[Key

---

[8] Plaintiffs also point to transcripts of calls to customers where Key Credit's sales agents have made statements such as "we're going to remove all negative items," but Key Credit disputes that this language was used in calls other than the specific calls cited. Defs. Resp. to Pls.' SUMF ¶ 37 [Doc. No. 120]. For purposes of summary judgment, the court has not relied on these individual statements in assessing whether the web page and scripted statements are misleading.

Credit] offer[s] an unlimited service . . . rather than just a set number of negative items per month").

But while Defendants may well have been seeking to differentiate themselves from their competitors based on the number of challenges they would file, the website speaks of "fixing" items, not merely challenging them. And the truth or falsity of an alleged misrepresentation is determined at the time it was made and intended to be relied upon. See Cummings v. HPG Int'l, Inc., 244 F.3d 16, 23 (1st Cir. 2001).

Defendants also point to the written contract Key Credit enters into with each client. Defs.' SUMF ¶ 46 [Doc. No. 112]. Key Credit's contracts state, for example, that "[a]ccurately reported items on a credit report cannot be removed," and "neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, negative information removed from your credit report before it is seven years old." Defs.' Opp. to Pls.' Mot. for SJ 24 [Doc. No. 119]. Defendants argue that Key Credit's contracts further advise every customer that it "cannot and will not remove any derogatory information (defined as accurate information appearing on a Client's credit report) . . . ." Id. at ¶ 47; see also Aff. of Timothy A. Hudson, Ex. J [Doc. No. 114-10]. ("Accurately reported items on a credit report[] cannot be removed.") [Doc. No. 112].

However, Key Credit's contracts cannot "cure" potential deception from a prior representation. "Each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads." Removatron Int'l. Corp. v. FTC, 884 F.2d 1489, 1496– 97 (1st Cir. 1989). Courts around the country have held that written documents—such as contracts—that are provided later to consumers and more accurately characterize a defendant's services do not necessarily overcome

the net impression of prior representations made in advertisements and over phone calls to those consumers. See E.M.A. Nationwide, 767 F.3d at 631–33; FTC v. Gill, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), aff'd, 265 F.3d 944 (9th Cir. 2001); Removatron Int'l, 884 F.2d at 1496–97 ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

Here, the statements on the website included no limiting language or even an asterisk to suggest that there were some limitations. The contracts were shared with consumers over the course of a phone call; on several occasions, sales agents did not refer to them as a contract but as a DocuSign. Consumers were asked to sign the contract while on the phone with Key Credit's sales agents, and nothing in the record suggests that the sales agents reviewed the terms of the contract with prospective consumers or explained that the contracts contradicted or limited the representations on the website. When the disclaimers are viewed in this context, their potential to "cure" the express representations Key Credit made on its website is further diminished.

In sum, Defendants have failed to raise any genuine issues of fact regarding the inherently misleading nature of these representations as well. Plaintiffs are thus entitled to summary judgment on Count IV for violations of the CFPA for deception.

        b.   Count II: Defendants' violations of the CFPA for deceptive representations also constitute violations of the TSR

Under the TSR it is illegal for a telemarketer to "[m]isrepresent[], directly or by implication, . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristic of goods or services that are the subject of a sales offer. 16 C.F.R.

§ 310.3(a)(2)(iii). The "principles of deception" underlying the TSR are identical to those underlying § 5 of the FTC Act. <u>See</u>, <u>e.g.</u>, <u>FTC v. E.M.A. Nationwide, Inc.</u>, 767 F.3d 611, 633 (6th Cir. 2014). Thus, for the reasons outlined <u>supra</u> IV.B.3.a, Defendants' deceptive representations regarding substantial increases in consumers' credit scores also violate the TSR. Accordingly, Plaintiffs are entitled to summary judgment on Count II of their Amended Complaint.

### c. Count VII: Defendants' violations of the CFPA and TSR for its deceptive representations also constitute violations of the MA-CSO

The MA-CSO also prohibits credit services organizations from making any "misleading representations in the offer or sale of [credit services] . . . ." M.G.L. c. 93, § 68B(4). For the same reasons Defendants violated the CFPA's and the TSR's prohibitions on deceptive acts and practices—as explained above—Defendants also violated the MA-CSO. <u>See</u> M.G.L. c. 93, § 68B(4). Accordingly, Plaintiffs are also entitled to summary judgment on Count VII.

### d. Count IX: Defendants' violations of the CFPA, TSR, and MA-CSO for deceptive representations also constitute violations of Chapter 93A

As explained above, Defendants' representations that consumers could achieve an average of ninety point increases on their credit scores within ninety days of using Key Credit's services were inherently misleading towards consumers given that Defendants could not meaningfully substantiate those claims. Given that those statements consisted of "untrue or misleading representations" relating to Defendants' offer and sale of credit services, they have also violated § 68B(4) of the MA-CSO, M.G.L. c. 93. And violations of § 68B automatically constitute violations of Chapter 93A. Plaintiffs are thus entitled to summary judgment on Count IX.

## V.  Relief

Plaintiffs ask the court to enter judgment on all counts in their favor and have submitted a proposed order detailing consumer redress, injunctive relief, and civil penalties. Defendants opposed Plaintiffs' Motion for Summary Judgment [Doc. No. 115] but made no arguments beyond those discussed above opposing the nature and scope of relief the Plaintiffs sought. See generally Defs.' Opp. to Pls.' Mot. for SJ [Doc. No. 119].

The court describes in the sections below the relief awarded and will enter an order separately from this memorandum.

### A.  Consumer Redress

The CFPA authorizes this Court to "grant any appropriate legal or equitable relief" for Defendants' violations of the TSR and the CFPA. 12 U.S.C. § 5565(a)(1). The Bureau seeks consumer redress in the form of legal restitution or the refund of moneys for Defendants' violations of the TSR and CFPA.[9] The Commonwealth also seeks consumer redress in the form of legal restitution under Chapter 93A for Defendants' violations of the TSR, CFPA, and Chapter 93A. See M.G.L. ch. 93A, § 4.

---

[9] Restitution is legal in nature where it "impos[es] a merely personal liability upon the defendant to pay a sum of money," but equitable in nature where the plaintiff seeks money or property that can "clearly be traced to particular funds or property in the defendant's possession," typically "in the form of a constructive trust or an equitable lien." Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213–14 (2002) (citations omitted). Here, the Bureau seeks legal restitution because it does not seek particular funds or property in Defendants' possession, but rather a judgment imposing personal liability on them to pay a sum of money.

1.  Defendants' violation of the TSR's advance-fee provision warrants legal restitution to consumers.

In calculating consumer redress, Plaintiffs bear the initial burden to reasonably approximate the baseline amount that is necessary to compensate injured consumers. FTC v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 15 (1st Cir. 2010). This initial approximation may be based on Defendants' gross receipts from consumers. Cf. id. at 14 (affirming the use of gross receipts to determine damages for violations of the FTC Act). Once Plaintiffs have established their reasonable approximation, the burden shifts to Defendants "to put forth evidence showing that certain amounts should offset the [award] assessed against them;" the risk of any uncertainty in the calculation falls on them. FTC v. Kuykendall, 371 F.3d 745, 765–66 (10th Cir. 2004) (en banc).

Here, credit repair is Key Credit's only product or service and Key Credit's credit-repair-services revenue consists solely of the two types of illegal fees at issue: the First-Work Fee and the recurring monthly fee. Defs.' Resp. to Pls.' SUMF ¶¶ 39–40, 75 [Doc. No. 120]. Plaintiffs calculate Key Credit's gross revenue attributable to telemarketing from January 1, 2011 (the first full year during which Key Credit engaged in telemarketing) through March 22, 2022 (the last month for which Defendants provided gross revenue figures) as $31,723,003. Pls.' SUMF ¶¶ 76–77 [Doc. No. 117]. Defendants do not dispute the gross revenue amounts, objecting only to the characterization that Defendants engaged in telemarketing. Defs.' Resp. to Pls.' SUMF ¶¶ 76–77 [Doc. No. 120]. As discussed above, see supra Part IV.B.1.a, the court has concluded that Defendants engaged in telemarketing. Accordingly, the court finds that Plaintiffs have established $31,723,003 as the initial baseline amount necessary to compensate injured consumers.

Defendants have offered no evidence to show that certain amounts should offset the award assessed against them. Accordingly, the court adopts this baseline amount to be appropriate as legal restitution.

The court further orders Key Credit to produce to Plaintiffs, within twenty-one days of the date of this order, Key Credit's revenue data from March 23, 2022, to the earlier of the date Defendants ceased collecting advance fees or the date of this order. The court anticipates using this amount in calculating the initial baseline amount necessary to compensate consumers injured during that period.

> 2.   Defendants' deceptive practices in violation of the CFPA, TSR, and Chapter 93A would have separately warranted legal restitution, but that relief is duplicative here.

To establish the right to and scope of consumer relief for deceptive acts and practices, Plaintiffs must prove that Defendants "made material misrepresentations which were of the type that a reasonable and prudent person would rely upon, that the misrepresentations were widely disseminated," and that consumers purchased the defendants' services. United States v. Bldg. Inspector of Am., Inc., 894 F. Supp. 507, 522 (D. Mass. 1995) (citing FTC v. Figgie Int'l, Inc., 994 F.2d 595, 605–06 (9th Cir.1993)).

Here, for the reasons stated supra Part IV.B.2.a., Plaintiffs have proved that Defendants made material representations that a reasonable and a prudent person would rely upon. These representations were widely disseminated; they were featured prominently on Key Credit's website and repeated by its sales agents on telephone calls with consumers over years. Accord FTC v. Mort. Relief Advocs. LLC, 2015 WL 11257575, at *9 (C.D. Cal. July 1, 2015) ("Defendants have also demonstrated that the misrepresentations were widely disseminated

through websites and telemarketing calls."). And undisputed facts in the record demonstrate that consumers purchased Key Credit's services. Pls.' SUMF ¶¶ 76–77 [Doc. No. 117].

Plaintiffs therefore are entitled to an order of legal restitution of all fees collected from consumers who purchased Key Credit's services from the period when these statements were indisputably made: March 26, 2016, to March 9, 2019. However, consumers entitled to redress for Defendants' deception-related violations are a subset of the consumers entitled to redress for Defendants' advance-fee violations. Consequently, the court does not separately award redress relief on the basis of Defendants' deception-related violations.

        3.   Defendants are jointly and severally liable for legal restitution.

Where individual liability is established, an individual may be held jointly and severally liable for the full amount of harm caused by a corporation. See CFPB v. Gordon, 819 F.3d 1179, 1196 (9th Cir. 2016) (affirming decision to hold individual and company jointly and severally liable for the full amount of redress in part because the individual participated in the violating practices or had authority to control them). As described supra Part IV.B.1.b, Part IV.B.1.d.ii, Part IV.B.1.e, Tsoukales is individually liable for Defendants' violations of the TSR, CFPA, and Chapter 93A. Therefore, Key Credit and Tsoukales are jointly and severally liable for legal restitution.

### B.  Injunctive Relief

Under the CFPA, the Bureau may seek "a permanent or temporary injunction as permitted by law," and the Court may order "any appropriate legal or equitable relief," including "limits on the activities or functions" of those that violate the law. 12 U.S.C. §§ 5564(a)–5565(a)(1), (2)(G). Under Chapter 93A, the Attorney General may seek a court order of

injunctive relief to enjoin the use of any method, act, or practice declared by Section 2 to be unlawful. M.G.L. c. 93A, § 4.

For the court to grant injunctive relief, Plaintiffs are required to show that the violations are ongoing or that there is a "reasonable likelihood of future violations of the statutory provisions." Cf. SEC v. John Adams Tr. Corp., 697 F. Supp. 573, 577 (D. Mass. 1988) (citations omitted) (statutory securities laws). "Mere cessation of the unlawful conduct, even if accompanied by expressed intent to refrain from future unlawful conduct, will not defeat an injunction if 'there exists some cognizable danger of recurrent violation.'" Cf. SEC v. J & B Indus., Inc., 388 F. Supp. 1082, 1084 (D. Mass. 1974) (quoting United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953)) (statutory securities laws).

Here, the court finds that Plaintiffs have met their burden to obtain injunctive relief. Key Credit's violations of the TSR's advance-fee provision lasted more than a decade at least. The record also demonstrates—and Key Credit has failed to create a genuine dispute as to this fact— that Key Credit's sales agents continued making representations of the kind found deceptive in supra Part IV.B.2.a, after this litigation had commenced and well into discovery. See Pls.' SUMF ¶ 35 [Doc. No. 117]. Even if Key Credit removes some representations from its website, the courts finds that there is "cognizable danger" that Key Credit could continue making similar representations to consumers directly, given that its sign-up model required consumers to enroll in its services by partaking in a phone call with a sales agent.

The court also finds that the provisions of injunctive relief are appropriate to bring Defendants into compliance with the CFPA, TSR, and Chapter 93A; they are not overbroad and would not impose unnecessary burdens on Defendants. The injunctive relief sought requires Defendants to comply with the TSR, specify in their written contracts with consumers the

services they will provide including the timeframe and the conditions for payment, refrain from deceptive marketing and deceptive sales pitches, comply with § 68B of the MA-CSO, establish a trust account at a federally insured bank or savings and loan association within Massachusetts, and identify all consumers affected by their violations and the amounts paid by those consumers less refunds to effectuate legal restitution. The injunctive relief sought is within the counts that the court has already found in favor of Plaintiffs, see supra Part IV.B.

### C. Civil Penalties under the CFPA

The CFPA mandates the imposition of a civil money penalty against any person who violates federal consumer financial law. 12 U.S.C. § 5565(c)(1) ("Any person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty . . . .") (emphasis added). The CFPA provides for three statutory penalty tiers, escalating based on the degree of scienter behind the conduct: (1) Tier 1 penalties require no showing of scienter; (2) Tier 2 penalties are for reckless violations; and (3) Tier 3 penalties are for knowing violations. Id. § 5565(c)(2). For violations that occurred before November 2, 2015, civil penalty amounts are $5,000 for Tier 1, $25,000 for Tier 2, and $1,000,000 for Tier 3 violations. Id. § 5564(a), 5565(a) & (c). For violations that occurred on or after November 2, 2015, the civil penalty amounts are adjusted for inflation each year and are currently $6,813 for Tier 1, $34,065 for Tier 2, and $1,362,567 for Tier 3 violations. See C.F.R. § 1083.1.

Once the penalty tier is determined, the maximum penalty permitted may be calculated by assessing the number of violations and, for any given violation, the number of days the

violation continued. The Bureau seeks civil money penalties against each Defendant beginning
July 21, 2011.[10]

     1.   Defendants' violation of the advance-fee provision warrants civil penalties.

     The court agrees with the Bureau's request of first-tier penalties against each Defendant
for their violations of the TSR's advance-fee provision but reserves judgment on the period for
which these penalties are sought. Plaintiffs seek penalties from July 21, 2011, to the date of this
order. See Prop. Order ¶ 35 [Doc. No. 116-1]. For now, the court orders penalties from July 21,
2011, to July 28, 2023—the date the parties' summary judgment motions were filed, and at
which point Plaintiffs stated that Defendants' violations of the TSR's advance-fee provision were
ongoing. If the Bureau seeks imposition of civil penalties on Defendants for additional dates, it
must file a motion stating those additional dates, supported by evidence that the Defendants'
violations continued throughout that period.

     For the purposes of this relief, the Bureau does not treat each instance of the Defendants
charging fees to consumers (and receiving such fees) in violation of the TSR's requirements as a
separate violation—but treats the Defendants' practice as one continuing violation. This
approach is more conservative than that approved in other disputes. See, e.g., Bureau of
Consumer Fin. Prot. v. Consumer Advoc. Ctr. Inc., 2023 WL 5162392 (C.D. Cal. July 7, 2023)
(approving an order of civil penalties that treated the defendants' billing practices as two
different violations of the TSR's advance-fee provision). The CFPA does not require a showing

---

[10] This is the date the Bureau assumed its full range of authorities under the CFPA, including the
authority to enforce federal consumer financial laws. See 12 U.S.C. §§ 5581, 5582; 75 Fed. Reg.
57252 (Sept. 20, 2010)

that a violation occurred every day, instead providing for a penalty to be charged "for each day during which such violation continues." 12 U.S.C. § 5565(c)(2)(B) (emphasis added).

Because the court has found that Defendants' conduct violates the TSR's advance-fee provision, and this conduct continued to at least July 28, 2023, the court agrees that first-tier civil penalties against Defendant from July 21, 2011, to July 28, 2023 at the rate of $5,000 per day until November 1, 2015, and $6,813 per day from November 2, 2015, is an appropriate maximum amount.

2.    Defendants' deceptive representations warrant civil penalties.

The Bureau seeks second-tier penalties against both Defendants for their deceptive representations that violate the TSR and CFPA for each day between March 26, 2016, and March 9, 2019.  Second-tier penalties require a scienter showing of recklessness, which the court finds was met here. Tsoukales knew or recklessly ignored that Key Credit was routinely making misrepresentations about the efficacy of its services on its website and in sales calls. Tsoukales knew that Key Credit did not track its consumers' credit scores, that it could not identify one concrete customer who had seen a 90-point credit score in 90-day window, and that it could not "fix" all negative items from a credit report (as evidenced by the disclaimers in Key Credit's contracts). Given Tsoukales's role and authority at Key Credit, Key Credit's acts were also reckless. Moreover, the Bureau takes the conservative approach of treating the Defendants' practice of making such representations as one violation that continued throughout the aforementioned period, rather than suggesting that each representation be counted separately and the civil penalties multiplied accordingly. Therefore, the court agrees that a second-tier penalty against each Defendant at the rate of $34,065 for each day of the aforementioned window is an appropriate maximum.

45

    3.   The statutory mitigating factors favor reducing the civil penalties against each Defendant

In determining the penalty amount to impose, the court must consider the statutory factors: (1) "the size of financial resources and good faith" of a defendant; (2) "the gravity of the violation or failure to pay"; (3) "the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided"; (4) "the history of previous violations"; and (5) "such other matters as justice may require." 12 U.S.C. § 5565(c)(3).

Here, Plaintiffs ask the court to impose the maximum amount of penalties against each Defendant. Defendants have raised no argument that the statutory factors warrant a reduction in the amount of civil penalties against them.[11]

As to the first factor, the CFPA does not define the term "financial resources," see id., but when ordering civil penalties under other statutory schemes, courts have considered both the current and future financial condition of a defendant. See EC v. Fowler, 6 F.4th 255, 266 (2d Cir. 2021); SEC v. Interinvest Corp., Inc., 2016 WL 8711689, at *1 (D. Mass. 2016). Courts have also taken into account the amount of money gained from unlawful conduct for a defendant who claims current poverty. SEC v. Aletheia Rsch. & Mgmt. Inc., 2015 WL 13404306, at *5 (C.D. Cal. May 11, 2015), aff'd, 689 F. App'x 512 (9th Cir. 2017).

Key Credit collected fees of at least $31,723,003 from January 1, 2011, to March 22, 2022. Pls.' SUMF ¶¶ 75–77 [Doc. No. 117]. Tsoukales, as the sole shareholder of Key Credit, was the ultimate beneficiary of Key Credit's significant gross revenues, and he has authority to

---

[11] Except to argue that Tsoukales is not liable at all, Defendants have not objected to the imposition of separate penalties as to each Defendant.

determine his income from the profits of the company. The Bureau points to Key Credit's continued operations, Tsoukales's continued leadership role, and their potential for future earnings. Additionally, the record does not demonstrate that Key Credit or Tsoukales were acting in good faith but instead shows their recklessness (thus the second-tier civil penalties against them for deceptive representations).

However, the Bureau asks the court to impose penalties of $63,800,608 against each Defendant.[12] This amount is more than _twice_ Key Credit's gross revenues for more than a decade—which it will already have returned as part of the legal restitution that this court has approved (along with any other revenues it has earned since). And Tsoukales is jointly and severally liable for that restitution. Plaintiffs have not demonstrated that Tsoukales individually has the financial resources to pay this additional penalty at its maximum amount. Therefore, the court finds that the first factor favors mitigating the civil penalties.

As to the second and third factors, Key Credit's violations were significant and the harm caused to consumers severe. Key Credit's payment structure did not even attempt to comply with the TSR's requirements; in fact, its recurring monthly fees were structured such that its services were _incapable_ of conforming to the TSR's requirements of credit-repair telemarketers. Key Credit's deceptive representations were material, in that they went to the core of why a consumer would pay money for credit-repair services.

---

[12] This amount is the sum of each Defendant's first-tier civil monetary penalty for their violation of 16 C.F.R. § 310.4(a)(2) from July 21, 2011, to July 28, 2023, and a second-tier civil monetary penalty for their violations of 12 U.S.C. §§ 5531, 5536 and 16 C.F.R. § 310.3(a)(2)(iii) from March 26, 2016, to March 9, 2019—all calculated at the maximum amount.

The severity of the risks to or losses of the consumer "may take into account the number of products or services sold or provided." 12 U.S.C. § 5565(c)(3(C). Key Credit engaged in advance-fee violations for over a decade, reeling in tens of thousands of consumers and earning more than $30 million in fees. Consumers reported being distressed and vulnerable when they sought assistance from Key Credit, only to lose money for no results. Pls.' SUMF ¶ 63 [Doc. No. 117]. Therefore, the second and third factors warrant maintaining the civil penalties.

The fourth factor favors mitigation of the civil penalties because there are no known state or federal enforcement actions against either Defendant. Finally, as to the fifth factor, the court is not aware of any other considerations that justice may require it to consider.

In conclusion, the court finds that the first and fourth factor warrant mitigating a maximum award of civil penalties. Cf. Consumer Advoc. Ctr. Inc., 2023 WL 5162392, at *11–12 (finding that the second, third, and fourth factors warranted against mitigating civil penalties). The court imposes civil penalties against each Defendant at $9,570,091, for a total of $19,140,182. This civil penalty is fifteen percent of the maximum penalty amount of $63,800,608 sought against each Defendant, and the total penalty amount is still more than half of Key Credit's gross revenues until March 2022. The court finds that civil penalties against each Defendant at this amount will serve to deter them as well as others, while also heeding the statutory mitigating factors.

**VI. Conclusion**

For the foregoing reasons, Defendants' <u>Motion for Partial Summary Judgment</u> [Doc. No. 110] is DENIED, and Plaintiffs' <u>Motion for Summary Judgment</u> [Doc. No. 115] is GRANTED as to all counts. An order detailing the relief afforded to Plaintiffs will follow.

IT IS SO ORDERED.

September 30, 2024                    <u>/s/ Indira Talwani          </u>
                                                  United States District Judge